# Exhibit B

Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

DORA SOLARES, an individual,

        Plaintiff,

        v.

RALPH DIAZ, in his individual capacity,
KENNETH CLARK, in his individual
capacity, JOSEPH BURNS, in his
individual, and DOES 1 TO 15, in their
individual capacities

        Defendants.

Case No. 1:20-cv-00323-LHR-BAM

**FOURTH AMENDED
COMPLAINT FOR DAMAGES FOR
VIOLATIONS OF CIVIL RIGHTS
UNDER 18 U.S.C. § 1983**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      On or about March 7, 2019, CDCR inmate Luis Romero was transferred from Mule Creek State Prison to California State Prison, Corcoran. Corcoran prison officials chose to bypass the standardized administrative committee process that is required before compelling one inmate to share the cell of another, and rushed to assign Mr. Romero to the same cell as convicted murderer, inmate Jaime Osuna. Mr. Osuna had not had a cellmate at Corcoran prior to this assignment. Corcoran officials had already been put on notice that Mr. Osuna was uniquely unfit to be housed with a

1

cellmate, as he had engaged in multiple acts of violence against fellow inmates, had been charged with attempted murder as a result of one such incident, had exhibited violence towards prison staff, and had been recommended for placement in a psychiatric ward rather than a prison. On March 8, 2019, despite having received these warnings about Mr. Osuna, and despite taking the unusual step of expediting Mr. Romero's placement, Corcoran prison officials chose to bypass the standardized process and then failed to conduct regularly scheduled nightly safety checks of Mr. Romero's new cell. Even after a bedsheet was visibly draped along the bars inside this cell, preventing anyone outside from peering in, no Corcoran prison official bothered to conduct a routine safety check during the evening of March 8, 2019. In the early morning hours of March 9, 2019, Corcoran officials finally looked on the other side of the bedsheet. At that point, Mr. Romero was found decapitated, and Mr. Osuna was found wearing a necklace made of Mr. Romero's body parts.

## JURISDICTION AND VENUE

2.      This case arises under 42 U.S.C. § 1983, the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and various state-law governmental tort statutes. Jurisdiction in this Honorable Court by 28 U.S.C. §§ 1331 and 1343. Plaintiff's state-law claims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in Eastern District of California pursuant to 28 U.S.C. § 1391, as the underlying acts, omissions, injuries and related facts occurred in Kings County, California. This is an action for damages and such other and further relief as may be consistent with law pursuant to 42 U.S.C. § 1983, to redress violations of the decedent's rights protected by the United States Constitution, by persons acting under color of law. This is also a survivor's action and one for wrongful death brought pursuant to the Constitution, statutes and/or common law of the State of California.

## PARTIES

2

4.     Plaintiff Dora Solares (hereinafter, also referred to as "Plaintiff") is the mother of Luis Romero, deceased ("the decedent"). The decedent was never married, never had any domestic partner, nor children. Ms. Solares has standing to bring a cause of action for wrongful death and a section 1983 survivor action.

5.     When Luis Romero was three years old, and still living in Guatemala, Dora Solares divorced Luis Romero's father. Since that time, Dora Solares (and Luis Romero) have had no contact with the father. Furthermore, Dora Solares and Luis Romero emigrated to the United States shortly thereafter, and Luis Romero's father remained in Guatemala, and to Plaintiff's knowledge the father never moved to the United States and has never entered the United States. For these reasons it is not feasible to join him. Luis Romero's father never filed a timely tort claim form (Cal. Gov't. Code § 910). Furthermore, in the almost-two-years since this action has been filed Luis Romero's father has made no effort to be a part of this lawsuit, has made no effort to contact Ms. Solares or her counsel, and has made no effort to have any contact with the United States as a forum. Indeed, Ms. Solares has had no contact with Luis Romero's father since 1977 and she is not aware of anyone who knows his whereabouts. Moreover, Ms. Solares does not know the exact birthday of Luis Romero's father, and he left shortly after Luis Romero was born and never saw the family again. Luis Romero's father is not subject to process as his location within Guatemala is unknown, his birthday is unknown, and any family relations are unknown. With that said, the Court has ordered that Mr. Romero's father, Victor Manuel Romero, be joined as a party for purposes of the wrongful death claim. *See* Dkt. No. 56, fn. 3. As a result, Victor Manuel Romero Gonzalez is added as the second plaintiff in this case, and has standing to bring a wrongful death claim. "Plaintiffs" refers to both Victor Manuel Romero Gonzalez and Dora Solares.

6.     Dora Solares is a plaintiff in both her individual capacity and as a successor-in-interest, entitled to seek relief as a result of the unlawful and wrongful death of Luis Romero. Victor Manuel Romero Gonzalez is a plaintiff in his capacity as

a successor-in-interest. This action is filed pursuant to CCP §§ 337.60, 377.30, et al and a declaration has been filed under CCP 377.32. Decedent has no other remaining family members or heirs who have standing to bring a cause of action for wrongful death other than Plaintiffs.

7.     Defendant Joseph Burnes ("Burnes")[1] is a CDCR Sergeant who was working at the California State Prison, Corcoran at the time of the incident. He is sued in his individual capacity. Defendant licensed social worker K. Kyle ("Kyle") is a licensed social worker working at the California State Prison, Corcoran at the time of the incident, and in January 2019, when the decision to allow Osuna to share a cell was made. Defendant K. Kyle is sued in the individual capacity. Defendant M. Gamboa ("Gamboa") is a CDCR Lieutenant working at the California State Prison, Corcoran at the time of the incident, and in January 2019, when the decision to allow Osuna to share a cell was made. Defendant M. Gamboa is sued in the individual capacity. Defendant Leonel Pena ("Pena") is a Correctional Officer who was working at the California State Prison, Corcoran, at the time of the incident. He is sued in his individual capacity. Defendant Luis Silva ("Silva") is a Correctional Officer who was working at the California State Prison, Corcoran, at the time of the incident. He is sued in his individual capacity. Defendant Bryan Gallemore ("Gallemore") is a Correctional Officer who was working at the California State Prison, Corcoran, at the time of the incident. He is sued in his individual capacity. Defendant Jesse Garcia ("Garcia") is a Correctional Officer who was working at the California State Prison, Corcoran, at the time of the incident. He is sued in his individual capacity. Defendant A. Loza ("Loza") is a Correctional Officer who was working at the California State Prison, Corcoran, at the time of the incident. He is sued in his individual capacity. Defendant F. Muñoz ("Muñoz") is a CDCR Lieutenant working at the California State Prison, Corcoran at

---

[1] Plaintiff's counsel conducted investigation to obtain additional facts, and in that process, the spelling of defendant Burnes was confirmed to not have an "e." Plaintiff accordingly corrects the spelling.

4

the time of the incident. Defendant M. Gamboa is sued in the individual capacity. These named individuals (Burnes, Kyle, Gamoba, Pena, Silva, Gallemore, Garcia, Loza and Muñoz) are referred to collectively as "All Defendants" or simply "Defendants."

8. At all relevant times, Defendant Burnes, Kyle, Gamboa, Pena, Silva, Gallemore, Garcia, Loza, Muñoz and Does 11-15 each of them, possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual employees of the CDCR, including those individuals charged with protecting the health and safety of inmates at the California State Prison, Corcoran, including decedent Luis Romero, and to assure that said actions, policies, rules, regulations, customs, practices and procedures of the CDCR and its employees and agents complied with the laws and constitutions of the United States and the State of California.

9. Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein Defendants Burnes, Kyle, Gamboa, Pena, Silva, Gallemore, Garcia, Loza, Muñoz and Does 1 through 15, inclusive, worked in Kings County, State of California. Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein Defendants Burnes and Does 1 through 15, inclusive, were employees, agents and/or servants of the CDCR, employed at the California State Prison, Corcoran, and acted within the course and scope of said employment, agency and/or service, and acted under color of state law.

10. Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 15, inclusive, and therefore sues these defendants by such fictitious names, in their individual capacities. Plaintiff is informed, believes and alleges that each of the fictitiously named defendants is legally responsible, intentionally, negligently, or in some other actionable manner, for the events and happenings hereinafter referred to and described, and thereby illegally caused the injuries, damages, and violations and/or deprivations of rights hereinafter alleged. Plaintiff will seek leave

of Court to amend this Complaint and state the true names and/or capacities of said fictitiously named defendants when the same have been ascertained.

11.     The reason why Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does, inclusive, is that same have been unascertainable as of the date of filing of this complaint, as many of these Does may be CDCR officers, sergeants, lieutenants, captains, associate wardens, chief deputy wardens and/or civilian employee agents, policy makers and representatives of the CDCR, or employees, agents and representatives of the CDCR, and as such many of their records are protected by state statute and can only reasonably be ascertained through the discovery process.

12.     The individual defendants were at all times mentioned herein duly appointed, qualified and acting officers of the CDCR, acting within the course and scope of such employment with the CDCR, and acted under color of the statutes, ordinances, regulations, policies, customs and usages of the State of California.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.     Pursuant to Government Code § 910, Plaintiff  Dora Solares presented a timely appropriate claim for damages and a $25 check for the required tort claim fee, on or around September 3, 2019, less than six months after the incident. On September 12, 2019, the State of California cashed the $25 check, representing the government tort claim fee. This action is timely. Plaintiff Victor Manuel Romero Gonzalez did not present a government tort claim but has been ordered to be joined as a party. *See* Dkt. No. 56.

## FACTS

### A.     The Decision to Place Luis Romero in Jaime Osuna's Cell

14.     On or about March 7, 2019, CDCR inmate Luis Romero (Inmate # H56733) was transferred from Mule Creek State Prison to California State Prison, Corcoran (hereinafter, "Corcoran"). Corcoran prison officials, including defendant CDCR Sergeant Joseph Burnes, and Does, were required to go through a standardized administrative committee process of matching two inmates in one cell, a process that is

6

described in Paragraph 15. Defendant Burnes and Does chose to not follow this standardized administrative committee process, and rushed to place Mr. Romero with convicted murderer and single-celled inmate Jaime Osuna, despite knowing that Osuna was a danger to anyone around him, as described in Paragraphs 16 and 17.

15. Normally, a committee of prison administrators must determine whether an inmate is fit to have a cellmate. After making this determination, the committee must find another inmate, and deem that inmate an appropriate fit as a cellmate. At that point, the committee ensures the two inmates are introduced to each other, and each inmate must then sign forms acknowledging and agreeing to be celled with one another. Based on information and belief, CDCR never followed the standardized administrative committee process with regards to housing Romero and Osuna together.

16. Defendants, including Burnes, Kyle, Gamboa, Loza and Muñoz and Does, were on notice that Jaime Osuna posed a threat to other inmates and should not share a cell with anyone. Jail and prison reports from Osuna's years behind bars document his violent misconduct and establish that he was always single-celled. It is believed that since his CDCR commitment in 2012, Osuna has never had a cellmate. Plaintiff is also informed that CDCR was in possession of documents from Jaime Osuna's own lawyers and medical team, warning CDCR of Osuna's propensity for extreme violence, insatiable desire to kill, and need to be held in a psychiatric ward, not in a prison with other inmates. Furthermore, defendants were on notice of Osuna's violent behavior while incarcerated at the Kern County Jail awaiting trial in his original murder case, including one incident that resulted in Osuna being charged with attempted murder. Defendants were on notice that Osuna was serving a no-parole sentence for torture killing of a Bakersfield woman in 2011. Defendants knew that Osuna posed a danger to anyone he shared a cell, which is why he had never had a cell-mate at Corcoran before.

17. According to CDCR records, in 2012, a guard caught Jaime Osuna with a five-inch metal shank. That same report describes Osuna has a high-risk inmate to be

housed in a secured single cell with no inmate contact. Shortly after the 2012 incident, another guard found Jaime Osuna with a hatchet like weapon in his single cell and a few months after that, despite being single celled, Jamie Osuna found his way into another inmate's cell where Osuna stabbed and slashed the face of the inmate, resulting in 67 stitches. When prison officials requested to photograph the inmate's injuries, he declined, noting that he didn't want to risk Osuna getting copies of the photos and adding them to his collection of "trophies." Prison reports from 2016 also list Osuna as high-risk staff assaultive, had engaged in an in-cell assault, and was an administrative segregated inmate. In 2017, Osuna was found to have engaged in multiple instances of battery on a peace officer, and that year was placed in the Administrative Segregation Unit for battery on an inmate with a weapon. In 2019, Osuna ripped into pieces his state-issued bed sheets, blankets and mattress. To licensed clinical social worker K. Kyle, Osuna had expressed his frequent homicidal ideation and Kyle knew that Osuna was a homicidal sociopath who should not be housed with anyone since Osuna himself had expressed to Kyle his desire to kill again in the future. Thus, Osuna posed an objectively homicidal risk to anyone around him, including anyone with whom he shared a cell, and Defendants, including Burnes, Kyle, Gamboaand Does constituted the committee assigned with reviewing the single-cell review process and were on notice of the ongoing threat posed by Osuan but still approved Osuna to go from being single-celled to being permitted to share a cell ("double-cell") in January 2019. As a result, Osuna went from being strictly single-celled to being permitted to share a cell

if so assigned.18.    Defendants were on notice that Jaime Osuna had mental health issues and was prone to violence:



19.    Despite being put on notice that Osuna would kill again if placed in close proximity to another inmate, and despite glaring evidence that Osuna was an inmate who should not be housed with any other inmate, Defendant Burnes not only took part in the January 2019 decision to permit Osuna to share a cell, but then assigned Romero to share a cell with Osuna in March 2019. As the sergeant in the administrative segregated unit Osuna was assigned, Defendant Burnes was responsible for supervising the unit and assigning newly arriving inmates to share cells. On or around March 7, 2019, when Romero arrived at Corcoran, Defendant Burnes had available options for housing Romero other than assigning him to share a cell with Osuna: there were literally other empty cells in the same unit, and other inmates who were permitted to share a cell but were currently single-celled. Despite these other housing options on October 7, 20219, Defendant Burnes and Does chose to ignore the known risk of Osuna and took the highly unusual decision to assign Luis Romero to share a cell with

Jaime Osuna within 48 hoursof Romero arriving at Corcoran jail. Defendants Loza and Muñoz also knew the threat posed by Osuna to others yet took part in the administrative process of double-celling Romero with Osuna, not telling Romero about the threat posed by Osuna, and bypassing obvious alternatives to house Romero in empty cells in the same unit rather than with Osuna. At this time around March 7, 2019, Romero did not have the information that Burnes and other defendants did about the threat posed by Osuna, and as an inmate did not have the luxury of choosing his cellmate. The risk that Osuna posed to others was known to Burnes since he knew of Osuna's violent history, as CDCR records made this clear and Burnes had been put on notice that Osuna posed a threat to other inmates with whom he came in contact since Corcoran officials had established for years that Osuna not be celled with any other inmate. Plaintiff alleges, based upon information and belief, that Luis Romero had filed personnel complaints against Burnes and other Corcoran guards, including Does, and Burnes' and Does' decision to not follow the administrative committee process was animated in part to retaliate against Mr. Romero. Defendant Burnes could not have acted alone, as the decision to bypass the normal committee process could not have been made by one person alone, and defendant Does, along with Burnes, chose to ignore the known risk posed by Osuna and chose to not follow the administrative committee process. Burnes was on notice of the particular violent nature of Jaime Osuna but took no steps to ensure that Osuna remained single-celled. Defendant Burnes made the decision to assign Romero to Osuna's cell and then failed to properly supervise Doe defendants to ensure that the standardized administrative committee process was followed in this instance, and instead approved and allowed the out-of-protocol decision to go forward. Defendant Burnes took part in and thus permitted Does to not follow the proper administrative procedure for placing one inmate in the cell of another inmate, despite being put on notice of the threat that Osuna posed to anyone with whom he shared a cell.

**B.    The Failure to Conduct Safety Checks**

20.     After placing Luis Romero in harm's way by forcing him to share a cell with Osuna, defendants Burnes, Silva, Gallemore, Pena, Garcia, and Does then failed to conduct routine safety check-ups, routine counting of inmates that require a visual inspection of inmates in each cell, and routine visual and auditory monitoring of the cell, even when a bedsheet was impermissibly draped inside the cell. Normally, a corrections officer is supposed to conduct nightly safety checks of each cell at least every hour. And normally, inmates are prohibited from obstructing the view into their cell, and the draping of bedsheets or other materials in such a manner is not permitted.

21.     On the evening of March 8, 2019, however, defendants Burnes, Silva, Gallemore, Pena, Garcia, and Does did not enforce the normal rules, despite being put on notice of the danger Osuna posed to other inmates in general, and despite being aware of the fact that Osuna had not been permitted to share a cell with anyone before. Doe defendants, correctional officers at Corcoran assigned to the cellblock that Romero and Osuna were housed on the evening of March 8, 2019, did not conduct any night-time safety checks. Defendants Silva, Gallemore, Pena, Garcia and Does did not order Osuna (or Romero) to take the bedsheets down at any point in the night. Defendants Silva, Gallemore, Pena, Garcia and Does  failure to conduct required safety-checks and required count measures and required audio/visual monitoring was so prolonged and pronounced that they heard no sounds that would indicate a violent attack was being committed and that they should in intervene. The delay of nighttime safety checks was so severe that Osuna had time to decapitate Romero, make a necklace of Romero's body parts, and cover the cell in blood, all with a small razor. The prosecutor assigned to Mr. Romero's murder calls it "probably the most unusual and gruesome case that I've had in my career."[2] Defendants Burnes and Does 11-15 also failed to supervise Defendants Silva, Gallemore, Pena, Garcia and Does responsible for conducting routine night-time safety checks and counts, and thus Defendants Silva, Gallemore, Pena, Garcia and Does failed to actually conduct routine

---

[2] *Available at* https://abc30.com/5271416/

night-time safety checks and safety measures on tnight of March 8-March 9, 2019, that

Romero was in a cell with Osuna, even though they knew Osuan had not been celled

with another inmate while in administrative segregation unit and who they knew posed

a threat to other inmates. Defendants Burnes and Does 11-15failed to establish a

system that would ensure crucial nighttime safety checks were actually conducted.

Defendants Burnes and Does 11-15 also failed to train on these above-issues, and were

aware of the deficiencies in the training of the correctional officers tasked with

enforcing night-time safety checks and the rule against permitting inmates to hang

sheets in their cells to obstruct viewing into such cells. As a result, hours passed

without any CDCR official conducting any routine safety check, and in this vacuum,

Mr. Romero was brutally murdered.

22.    Defendants Burnes, Kyle, Gamboa, Silva, Loza, Muñoz, Gallemore, Pena,

Garcia and Does were deliberately indifferent to a substantial risk of serious harm to

which Luis Romero was exposed. Such indifference to which they were subjectively

aware includes: choosing to ignore the proper administrative procedure for placing one

inmate with another, despite having been put on notice that Jaime Osuna was a violent

psychopath; affirmatively placing Mr. Romero in a cell with Jaime Osuna, even though

Mr. Osuna had not shared a cell with anyone before at Corcoran because he had been

identified as a violent psychopath who posed a danger to fellow inmates; failing to

ensure regular, night-time security checks of the cell that housed Mr. Romero and Mr.

Osuna, despite Mr. Osuna having been identified as a violent killer who posed a danger

to fellow inmates; and for Burnes and the Doe defendants who were the correctional

officers on shift over the night, failing to make regular checks despite a bedsheet

draped inside Romero and Osuna's cell that evening, which visibly prevented proper

monitoring and would have required the inmates to take it down, under Corcoran's

own rules, and failing to monitor the cell holding Osuna and Romero

23.    A March 13, 2019 the autopsy cited a litany of injuries, which Luis

Romero suffered even before his death. According to the medical examiner, Luis

Romero's spine was severed in the area of its first two segments. The cut-line was irregular and the surrounding skin showed scattered abrasions, scratches, and clusters of superficial stab wounds averaging a quarter inch in length. Romero's right ear was removed by Jamie Osuna. Romero's eyes were forcibly detached by Osuna, and Romero's left eye had been stabbed. Superficial scratches were seen on the right side of Romero's face. Prominent lacerations extended laterally from Romero's right and left side of his mouth approximately two and a half inches. A square-shaped incision was made to Romero's left upper chest cavity measuring four inches by three inches. The underlying rib segment was removed and Romero's left lung was removed in two parts. Crime scene photos taken prior to Romero being removed from the cell showed Romero's body had been posed in a way that if possible, made the full decapitation even more shocking. Jamie Osuna had made a necklace for himself using Romero's body parts and organs. Osuna was found with the murder weapon believed to have been manufactured from a razor with a string around it.

## DAMAGES

24.     As a direct and proximate result of aforesaid acts and omissions, and the customs, practices, policies and decisions of the defendants alleged in this complaint, Plaintiff suffered and will continue to suffer great emotional, mental and physical pain and injuries, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused and will continue to cause, Plaintiff to sustain general damages in a sum to be determined at trial. Luis Romero suffered greatly before his eventual death at the hands of Osuna, and his estate is entitled to damages stemming from pre-death pain and suffering.

25.     As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned Defendants, Plaintiff suffered the denial of her fundamental constitutional rights guaranteed by the Fourteenth Amendments of the United States Constitution, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

26.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned Defendants, Plaintiff incurred and/or will continue to incur medical expenses, including psychological treatment.

27.     As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the aforementioned Defendants, Plaintiff suffered past and future losses of income that have caused her to sustain economic damages in a sum to be determined at trial.

28.     Defendant Burnes and individual Doe defendants acted in a manner that was willful, wanton, malicious and oppressive, with reckless disregard of or in deliberate indifference to and with the intent to deprive the decedent of his constitutional rights, and did in fact violate the aforementioned rights, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial in this matter. Plaintiff also seeks attorneys' fees.

## FIRST CLAIM FOR RELIEF
### Violation of Civil Rights – 42 U.S.C. § 1983
### Conditions of Confinement – 8th Amendment
### (Against All Defendants and Does 1 through 15)

29.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if re-alleged herein.

30.     Luis Romero faced substantial risk of serious harm when he was forced by All Defendants defendants to share a cell overnight with the no longer single-celled Osuna, and when they failed to ensure that routine cell-checks were conducted, and failed to enforce rules against bedsheets in the cells to prevent visibility from the outside.

31.     All Defendantsand Doe defendants were deliberately indifferent to a substantial risk of serious harm to which Luis Romero was exposed while in the same

14

cell as Osuna, in that they knew of it and disregarded it by failing to take reasonable measures to address it.

31.    As a direct and proximate result of All Defendants' conduct, in acting to put Romero in the same cell as Osuna and failing to act to protect him once in that cell, Defendants  and Doe defendants caused harm to Romero and plaintiff was damaged as alleged herein above.

32.    The aforementioned misconduct of the named defendants was of such an egregious nature that it entitles the plaintiffs to an award of exemplary and punitive damages according to proof and as permitted by law.

### SECOND CLAIM FOR RELIEF

### Violation of Civil Rights – 42 U.S.C. § 1983

### Failure to Protect Inmate – Eighth Amendment

### (Against All Defendants and Does 1 through 15)

33.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if re-alleged herein.

34.    Defendants and Doe defendants, while acting under color of law, deprived Luis Romero, Plaintiff's son, of his civil rights under the Eighth Amendments to the United States Constitution.

35.    Defendants and Doe defendants, while acting under color of law, deprived Luis Romero, Plaintiff's son, of his civil rights under the Eight Amendment to the United States Constitution when they made intentional decisions with respect to the conditions under which Romero was confined, as described above. These decisions put Romero in substantial risk of suffering serious harm.

36.    At all times relevant here, Defendants and Doe defendants did not take reasonable available measures to abate the substantial risk of harm to Romero. These defendants knew of the high degree of risk that Romero faced while in the same cell as Osuna, and disregarded it. Indeed, Burnes and Doe defendants were aware of the risk that Osuna posed to any other inmate in close proximity to him, and chose to ignore

15

standard administrative procedure in placing Romero in a cell with him, and that very first evening, failed to ensure that routine cell-checks were conducted, and failed to enforce rules against bedsheets in the cells to prevent visibility from the outside. The consequences of each of these decisions was obvious and constituted deliberate indifference Romero's serious safety needs.

37.    As a proximate result of the conduct of Defendants and Doe defendants 1 through 15, in particular, by not taking such measures as described above, Plaintiff suffered injuries and damages set forth herein, including great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity.

38.    The conduct of Defendants and Doe defendants 1 through 15 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of decedent and therefore warrants the imposition of exemplary and punitive damages as to Defendants.

39.    Defendants and Doe defendants 1 through 15 are liable to Plaintiff for the decedent's injuries and death, either because they were integral participants in the wrongful actions that led to Luis Romero being placed alone in a cell, unsupervised, with a violent psychopath.

40.    Plaintiff brings this claim both individually and as a successor-in-interest to decedent. Plaintiff seeks survival damages, including for the nature and extent of decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as wrongful death damages under this claim. Plaintiff also seeks attorney's fees.

### THIRD CLAIM FOR RELIEF

**Supervisory Liability**

**(42 U.S.C. § 1983; 8th and 14th Amendments)**

**(Against Defendants Burnes and Does 11-15)**

41.    Plaintiff incorporates by reference each and every allegation contained in

the foregoing paragraphs as if re-alleged herein.

42. Defendants Burnes and Does 11-15 acted in a supervisory capacity under color of law and was the supervisor for the administrative segregated unit to which Osuna was assigned from January 2019 through March 9, 2019, and where Romero was assigned from March 7, 2019, through March 9, 2019.

43. The acts and failures of Burnes and Does 11-15 were a cause of the murder of Luis Romero, which deprived Luis Romero of his rights under the Eighth Amendment, as alleged above.

44. Defendants Burnes and Does 11-15 knew of the decision to place Romero in Osuna's cell and approved it, thereby knowingly refusing to terminate acts of subordinates (Does 1-10) that he knew or reasonably should have known would cause the subordinates to deprive Romero of his Eighth amendment rights, and furthermore, Defendant Burnes knew that his subordinates (Does) were engaging in these acts to place Romero in Osuna's cell, and also Defendant Burnes knew that his subordinates (Does) were engaging in acts to place Romero in Osuna's cell and knew or reasonably should have known that the subordinate' conduct would deprive Romero of these rights.

45. Defendants Burnes and Does 11-15, as supervisors for other Does, the correctional officers on shift the night that Romero was murdered, knew that his subordinates did not follow protocol and knew that they did not conduct regular, scheduled safety checks of the inmates' cells during the night, and did not enforce the rules against sheets being hung up inside cells to obstruct viewing into said cells, and therefore Burnes knew or reasonably should have known that the subordinates' conduct would deprive Romero of his Eighth Amendment rights.

46. Defendants Burnes and Does 11-15, as supervisors, disregarded the known or obvious consequences that deficiencies in training correctional officers to conduct regularly scheduled night-time cell checks and enforcing the rule against sheets hung up inside a cell to obstruct views into it, and these deficiencies in night-time safety

17

checks would cause their subordinates to violate the Romero's constitutional rights.

47.     The conduct of Defendants Burnes and Does 11-15, as described above, were so closely related to the deprivation of Romero's constitutional rights as to be the moving force behind permitting Romero to be placed in a cell with Osuna overnight, and for Romero to be left unsupervised and unprotected for the entire night, which culminated in Romero's murder.

48.     Defendants Burnes and Does 11-15 engaged in conduct that showed a reckless or callous indifference to the deprivation by their subordinates of the rights of others.

## FOURTH CLAIM FOR RELIEF
### Loss of Familial Relations
### (42 U.S.C. § 1983; 14th Amendment)
### (Against All Defendants)

49.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if re-alleged herein.

50.     The individual defendants (Burnes and Does 1 through 15) each violated Plaintiff's constitutional rights by committing the misconduct set forth hereinabove in Claims for Relief One through Three. The defendants' above-alleged misconduct constituted deliberate indifference of Luis Romero's serious safety needs.

51.     As a direct and proximate result of the aforementioned actions and omissions, Plaintiff was deprived of her son and suffered the injuries and damages as alleged herein above. The liberty interests Plaintiff as a mother is well-recognized as Fourteenth Amendment substantive due process rights.

52.     The conduct of the individual defendant Burnes and Doe defendants 1 through 15 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of decedent and therefore warrants the imposition of exemplary and punitive damages as to Defendants.

## FIFTH CLAIM FOR RELIEF

**Wrongful Death**

**(California Code of Civil Procedure 377.60 et seq.)**

**(Against All Defendants and Does 1-15)**

62.     Plaintiffs Dora Solares and Victor Manuel Romero Gonzalez incorporate by reference each and every allegation contained in the foregoing paragraphs as if re-alleged herein.

63.     The named defendants have committed intentional or negligent misconduct that caused the untimely and wrongful death of decedent Luis Romero and deprived Plaintiffs of their son.

64.     As a direct and proximate result of this misconduct, Plaintiffs suffered the injuries and damages as alleged hereinabove

65.     These injuries and damages are compensable under California law.

**SIXTH CLAIM FOR RELIEF**

**Failure to Summon Medical Care**

**Cal. Gov't. Code § 845.6**

**(Against Defendants Silva, Pena, Gallemore, Garcia and Does 1-15)**

66.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if re-alleged herein.

67.     While in the cell he was forced to share with Jaime Osuna, Luis Romero was violently attacked. Defendants Silva, Pena, Gallemore, Garcia and Does failed to conduct timely safety checks, failed to order the draped bedsheets obstructing any view into the cell to come down, and failed to be within earshot or eyeshot of Romero and Osuna's cell. In the moments that Mr. Romero was attacked by Osuna, but before Mr. Romero died, Defendant Does failed to provide necessary medical care that would have prevented Mr. Romero's death.

68.     Defendants Silva, Pena, Gallemore, Garcia and Doe defendants, herein agents, servants, and employees of the CDCR, and within the course and scope of that agency, service, and/or employment, and under color of authority, failed to take

19

reasonable action to summons medical care for Mr. Romero, despite having reason to know that he was in need of immediate medical care, in violation of Cal. Gov't Code § 845.6.

69. As a result, plaintiff's injuries worsened, and without timely medical treatment, he died.

70. As a result, Mr. Romero sustained the injuries and damages alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows against defendants:

1. General and Special damages, including both survival and wrongful death damages, in an amount according to proof;

2. Exemplary and punitive damages against each individual and Doe defendant, in amounts according to proof;

4. Cost of suit, including attorneys' fees, under 42 U.S.C. § 1988; and

5. Such other relief as may be warranted or as is just and proper.

**LAW OFFICES OF JUSTIN STERLING**

DATED: June 14, 2024

By: ___/s/ Justin Sterling___
      Justin Sterling
      Attorney for Plaintiffs,
      DORA SOLARES

**LAW OFFICES OF ERIN DARLING**

DATED: June 14, 2024

By: ___/s/ Erin Darling___
      Erin Darling
      Attorney for Plaintiff,
      DORA SOLARES

//

## JURY DEMAND

Plaintiff Dora Solares hereby demands trial by jury on all issues so triable.

**LAW OFFICES OF JUSTIN STERLING**

DATED: June 14, 2024

By: ___/s/ Justin Sterling___

Justin Sterling
Attorney for Plaintiff,
DORA SOLARES

**LAW OFFICES OF ERIN DARLING**

DATED: June 14, 2024

By: _/s/ Erin Darling_

Erin Darling
Attorney for Plaintiff,
DORA SOLARES