1        IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3    _____
                                      )
4    DORA SOLARES, ET AL.,            )
                Plaintiffs,           )
5                                     ) CIVIL ACTION NO.
     VS.                              ) 1:20-323-LHR
6                                     )
     RALPH DIAZ, ET AL.,             )
7                Defendants.          )11:38 A.M.
     _____)

8

9                 PRE-MOTION CONFERENCE
          BEFORE THE HONORABLE LEE H. ROSENTHAL
10            UNITED STATES DISTRICT JUDGE
                   DECEMBER 10, 2024
11
     APPEARANCES:
12
     **FOR PLAINTIFFS:**
13   MR. ERIN R. DARLING
     Law Offices of Erin Darling
14   3435 Wilshire Boulevard, Suite 2910
     Los Angeles, California 90010
15   (323)736-2230

16   **FOR DEFENDANTS:**
     MR. JEREMY DUGGAN
17   MR. DAVID KUCHINSKY
     California Office of the Attorney General
18   300 South Spring Street, Suite 1702
     Los Angeles, California  90013
19   (213)269-6442

20   **FOR DEFENDANT SILVA:**
     MS. LYNNE G. STOCKER
21   Andrada & Associates
     1939 Harrison Street, Suite 612
22   Oakland, California  94612
     (510)287-4160

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

APPEARANCES CONTINUED:

**COURT REPORTER:**
Heather Alcaraz, CSR, FCRR, RMR
Official Court Reporter
515 Rusk, Suite 8004
Houston, Texas  77002
(713)250-5584

PROCEEDINGS

_____

*(The following hearing was held via video conference.)*

\* \* \*

11:38:57  **THE COURT:**  All right.  I think we're ready in the Solares case.

11:39:08  **MR. DUGGAN:**  Good morning, Your Honor.  Jeremy Duggan for Defendant Burnes.

11:39:14  **MS. STOCKER:**  Morning, Your Honor.  Lynne Stocker for Defendant Silva.

11:39:24  **MR. KUCHINSKY:**  And good morning, Your Honor.  I'm David Kuchinsky.  I'm cocounsel with Mr. Duggan for Defendant Burnes.

11:39:28  **THE COURT:**  All right.  Who are we missing, if anyone?

11:39:31  **MS. STOCKER:**  Plaintiff's counsel.

11:39:32  **THE COURT:**  That's what I thought.  All right.  We'll give them a few minutes.  I think we are a little bit early, not much.  I'm going to put you on mute and stop video until everyone's joined.

11:39:52  *(Pause in proceedings.)*

11:43:23  **MR. DUGGAN:**  Good morning, Mr. Darling.  Is Mr. Sterling joining us also today?

11:43:27  **MR. DARLING:**  No, just me.

11:43:29  **THE COURT:**  Do we now have everyone we need?

11:43:31  **MR. DARLING:**  Yes.

11:43:32  1          **THE COURT:**  All right.  I think -- everyone except

2  Mr. Darling, I think, has stated their appearance.

11:43:39  3          Mr. Darling?

11:43:40  4          **MR. DARLING:**  My apologies.  Yes, Erin Darling on

5  behalf of plaintiff.

11:43:44  6          **THE COURT:**  All right.  So we have a lot of discovery

7  issues.  I propose we just work through them.  I think a lot of

8  them are going to be pretty easy to resolve, and it may be that

9  we get to a point where you see a common theme in my approach

10  that will give you a -- enough guidance on some of the other

11  areas.

11:44:04 12          But unless anyone can suggest a better way, I'd like

13  to work through the discovery issues and save for another day

14  argument on the motions to dismiss and the motion to remand, all

15  right?  So the first issue in discovery that I see is a request

16  for production No. 14 -- give you a minute to get to the same

17  place I am.

11:44:35 18          **MR. DARLING:**  Okay.

11:44:36 19          **THE COURT:**  -- which seeks documents regarding

20  allegations of the use of force against Burnes for the

21  five years up to the date of the accident and then up until the

22  present -- or prior to the date of the incident up to the

23  present.  Frankly, this seems overbroad to the point of being

24  irrelevant.

11:45:00 25          This is -- the allegations against Mr. Burnes in this

1    case are that he bypassed the standardized required

2    administrative committee process that should have been

3    undertaken before celling two inmates in the same space, and

4    that wasn't done in this case.  The allegation is that even

5    though Mr. Osuna was known to be dangerous, the procedures were

6    still not followed.

11:45:30 7        Dif- -- very different allegations involving a

8    different type of excessive force seem to be irrelevant to this

9    case, so I think this request to compel should be denied.

11:45:51 10        Any questions about that one?

11:45:56 11        **MR. DARLING:**  Maybe -- I may want to go back to it,

12    but nothing at this point, Your Honor.

11:46:01 13        **THE COURT:**  Okay.  Let's go through them.  You may

14    find that some of what you need is going to be picked up in some

15    of the other requests.

11:46:10 16        **MR. DARLING:**  Okay.

11:46:11 17        **THE COURT:**  Fifteen asks for documents regarding

18    allegations of dishonesty against Burnes.  Same five years

19    before the date of the incident up till the present are sought.

20    This is, again, pretty broad.  Allegations by whom?  By inmates?

21    By supervisors?  Public?  It's unclear.

11:46:39 22        I think if you narrow the scope, however, there

23    certainly is a relevance to the present allegations since one of

24    the allegations is that Mr. Burnes covered up the fact that he

25    did not go through the proper administrative procedures before

1    assigning Mr. Osuna and Mr. Solares [sic] to the same cell, and

2    then that he dishonestly covered that up.

11:47:11    3         I think there is some relevance, but I think it has to

4    be narrowed to seek requests for -- to request documents showing

5    dishonesty in the course of his duties.

11:47:29    6         MR. DARLING:  Your Honor, on -- on the issue of

7    dishonesty, yes, it would be CDCR documents.  So it would be,

8    you know, allegations by inmates or allegations by CDCR against

9    Burnes himself.  It's not like, you know, anything out in -- in

10    his personal, you know, life or anything like that --

11:47:48    11         THE COURT:  Well, what I don't see as relevant are

12    allegations that he took something from the commissary --

11:47:58    13         MR. DARLING:  Understood.

11:47:58    14         THE COURT:  -- or took too many meals from the

15    cafeteria, something like that.

11:48:08    16         MR. DARLING:  Sure.

11:48:09    17         THE COURT:  But it's lying about alleged deficiencies

18    in the way he conducted his job.

11:48:12    19         MR. DARLING:  Right.  Yeah.

11:48:13    20         THE COURT:  Mr. Duggan, you look like you want to say

21    something.

11:48:16    22         MR. DUGGAN:  Yes, Your Honor.  Are we talking about

23    sustained allegations or even unsustained allegations from

24    inmates?

11:48:29    25         THE COURT:  I suppose -- I imagine you are seeking --

11:48:34  1          **MR. DUGGAN:**  We would oppose production of

2   unsubstantiated allegations from -- from inmates of dishonesty,

3   yes.

11:48:41  4          **THE COURT:**  All right.  Let's start with sustained

5   allegations, and if we see a need to go beyond that, we can

6   revisit it.

11:48:56  7              Okay.  Sixteen, allegation --

11:48:58  8          **MR. DARLING:**  Sorry.

11:48:59  9          **THE COURT:**  Yes.

11:49:00  10          **MR. DARLING:**  Because then there's the question -- so,

11   Mr. Duggan, because I don't know what you -- what was put under

12   the protective order.  Is -- is the -- is the defendants'

13   position that there are sustained allegations that are not being

14   produced -- that have not been produced?

11:49:18  15          **MR. DUGGAN:**  No.

11:49:21  16          **MR. DARLING:**  But -- so --

11:49:23  17          **THE COURT:**  So you've already got them?  Is that

18   right, Mr. Duggan?  It's already been produced?

11:49:29  19          **MR. DARLING:**  No.

11:49:29  20          **MR. DUGGAN:**  Well, yeah, no, we haven't produced any

21   sustained allegations of dishonesty because there aren't any.

11:49:35  22          **THE COURT:**  Well, that makes this a nullity, then.

23   Are there any unsustained allegations, yes or no?

11:49:42  24          **MR. DUGGAN:**  Yes.  From inmates, yes.

11:49:43  25          **THE COURT:**  Are there allegations of -- are there

1    allegations as -- that Mr. Burnes lied to cover up

2    inmate-on-inmate harm from inmates who shared a cell or were in

3    close quarters?

11:50:07    4         MR. DUGGAN:  There's 60 documents or so listed in our

5    privileged log.  So I would -- I would want to double-check, but

6    I don't remember one like that, yeah.

11:50:15    7         THE COURT:  All right.  If there is anything that is

8    a -- even an unsustained allegation of a failure to observe --

9    of Mr. Burnes attempting to cover up failures to observe

10   procedures required in managing inmate access to other inmates,

11   that is, putting them in the same cell, putting them in the same

12   rec areas at the same time, things like that -- even if they're

13   unsustained.

11:51:04  14         All right?

11:51:05  15         MR. DARLING:  Your Honor, if I could -- if I may,

16   the -- it's -- the other issue, in an allegation against Burnes,

17   is that the dishonesty was in just doing paperwork.  It --

18   especially as it related to not just assigning Romero, but in

19   reclassifying Osuna.  So I would ask that the dishonesty not

20   just be about inmates accessing inmates, but just dishonesty in

21   terms of filling out, you know, forms or going through

22   procedures as it relates to classification generally.

11:51:42  23         THE COURT:  All right.  I think that's reasonable.

11:51:47  24         MR. DARLING:  Thank you, Your Honor.

11:51:50  25         THE COURT:  Are we ready to move to 16?

11:51:53 1    **MR. DARLING:**  Plaintiff is.

11:51:54 2     **THE COURT:**  This -- allegations of bias, racial,

3 gender, sexual orientation against Burnes, again for the same

4 five years before, up to the present time period, I don't

5 understand how this has any bearing.

11:52:16 6     **MR. DARLING:**  Your Honor, so --

11:52:17 7     **THE COURT:**  It's too broad.  If you can narrow it so

8 that it's relevant, I'd reconsider, but as is it's too broad to

9 be relevant.

11:52:25 10    **MR. DARLING:**  So, first, Your Honor, under California

11 law, *Pitchess* allows for -- a *Pitchess* motion allows for

12 personnel complaints or allegations of bias that include racial,

13 gender, sexual orientation, and I think here where -- where, you

14 know, there's -- not only is the decedent Latino, but that

15 there's -- essentially, there's weird regional gang stuff within

16 the prison system.  And so if there's bias in favor of, say, one

17 prison gang over another or -- because the prison gangs are

18 racial.  It -- that is relevant because it's -- it's connected

19 to who gets housed together.

11:53:16 20    So if there's some bias that he has against,

21 essentially, Southern Hispanics, that's an issue.

11:53:24 22     **THE COURT:**  If you narrow it to any allegations of

23 bias impacting decisions as to classification, that's fine.

11:53:41 24     **MR. DARLING:**  Okay.  What about just racial bias

25 against Latino inmates?

11:53:46  1          **THE COURT:**  Again, I think that's too broad.  If there

2    -- if it is a bias against Latino inmates that affected

3    classification decisions, fine.

11:54:02  4          **MR. DARLING:**  Okay.  The issue, Your Honor, is that

5    Burnes is the -- is the person who's in charge of this entire

6    SHU area --

11:54:12  7          **THE COURT:**  Uh-huh.

11:54:13  8          **MR. DARLING:**  -- and so, you know, his -- his -- not

9    just his leadership, but his ability to assign and to look the

10   other way and to urge, you know, his subordinates on, to me

11   opens the door to just his general bias that he might have

12   that -- that not -- might not just be a sustained allegation as

13   to classification, but, you know, his bias against, you know,

14   Southern Hispanic inmates -- because it would affect not just

15   his own actions, but his subordinates.

11:54:43 16          **THE COURT:**  Mr. Duggan?

11:54:44 17          **MR. DUGGAN:**  I honestly didn't really follow that

18   argument, but it -- you know, I would object to the

19   characterization of Burnes as the leader.  He's a sergeant.

20   There's a lieutenant above him.  And as to some -- general bias

21   against Southern Hispanic inmates, I agree with the Court, that

22   I don't see the relevance of that.

11:55:09 23          **MR. DARLING:**  If I could -- I mean, I just want to

24   respond to two things.  First, that Mr. Duggan is saying he

25   doesn't understand the leadership issue.  There -- we have --

1    we've deposed many people.  Multiple witnesses have said that --

2    that Burnes is the supervisor of the SHU area.  So he certainly

3    supervises the line officers, point number one.

11:55:33  4         Point number two is the -- the -- the race and prison

5    gang identification of inmates is very important to the

6    classification process itself.  So we have -- we've heard

7    testimony that a factor in deciding which inmates go with the

8    other --

11:55:50  9         **THE COURT:**  Sure.  Gang affiliation.

11:55:54 10         **MR. DARLING:**  Exactly.  And so that's why -- because

11   this person has control over this area, that -- and -- and that

12   someone's race and alleged prison gang connection affects it, I

13   think his bias can infect lots of things.

11:56:08 14         **THE COURT:**  All right.  So if you narrow this to

15   allegations of racial bias against Southern -- I don't know the

16   best way for you that you want to characterize it.

11:56:23 17         **MR. DARLING:**  Hispanics.

11:56:24 18         **THE COURT:**  Hispanics would be great -- inmates.

11:56:28 19         **MR. DARLING:**  Yeah.  Yes.

11:56:31 20         **THE COURT:**  I'll allow that.

11:56:32 21         **MR. DARLING:**  Thank you, Your Honor.

11:56:39 22         **THE COURT:**  Seventeen, too broad.  All inmate

23   complaints against -- against you [sic] from five years before,

24   up to the present.  As I understand it, in order to be

25   discoverable, inmate complaints must be similar in nature to the

1    complaint or incident at issue.  So the inmate complaints would

2    have to be, I think, inappropriately classifying or housing

3    inmates together without following the procedures required.

11:57:17 4          MR. DARLING:  I would say it's not just -- it is

5    classification, Your Honor, but the other is acts of retaliation

6    against inmates for complaints -- for, basically, any complaint

7    made against --

11:57:31 8          THE COURT:  Who was being retaliated here, Osuna?

11:57:34 9          MR. DARLING:  The allegation is that Romero had made

10   complaints against Burnes and that as a form of retaliation --

11:57:41 11         THE COURT:  He put him in the cell.

11:57:43 12         MR. DARLING:  Exactly.

11:57:44 13         THE COURT:  All right.

11:57:44 14         MR. DARLING:  So I --

11:57:45 15         THE COURT:  Well, that would make it similar enough.

11:57:48 16         MR. DARLING:  Certainly.  So that's why it's

17   classification but, two, retaliation.

11:57:52 18         THE COURT:  All right.

11:57:54 19         MR. DUGGAN:  So that's --

11:57:56 20         THE COURT:  But --

11:57:56 21         MR. DUGGAN:  Is it -- yeah.

11:57:58 22         THE COURT:  Retaliation -- go ahead.  I'm sorry,

23   Mr. Duggan.

11:58:01 24         MR. DUGGAN:  Yeah.  I just want to clarify here.  Are

25   we talking about classification that -- that is retaliation by

1　classifying?  Is that what --

11:58:13 2　　　　　　**THE COURT:**  Yes.

11:58:14 3　　　　　　**MR. DUGGAN:**  Okay.  So it's retaliation by

4　classifying -- allegations of the -- that "Burnes retaliated

5　against me by classifying me or by housing me in a certain way."

11:58:23 6　　　　　　**THE COURT:**  Otherwise, we're going to get too far

7　afield.  We're going to get denial of commissary for a day as --

8　complaints of that nature that might be considered retaliatory.

9　Again, these have to be similar to the incident of complaint at

10　issue.

11:58:39 11　　　　　　Same approach will apply to 18, personnel complaints.

12　I don't know what a personnel complaint is, other than I assume

13　you mean a complaint made by other members of the staff.

11:58:54 14　　　　　　**MR. DARLING:**  Or -- or his supervisors.  So --

11:58:58 15　　　　　　**THE COURT:**  Right.

11:58:58 16　　　　　　**MR. DARLING:**  -- non-inmates.  CDCR --

11:59:00 17　　　　　　**THE COURT:**  So it would be the personal complaints

18　about racism against Hispanic inmates, complaints about

19　retaliatory -- retaliation as a factor in classification, and

20　complaints about failure to follow required procedures in

21　classifying and housing inmates.

11:59:29 22　　　　　　All right?

11:59:41 23　　　　　　Drugs provided to Mr. Osuna.  Defendants have already

24　agreed to produce the medication records.  Doesn't that resolve

25　the dispute?

11:59:51  1         **MR. DARLING:**  Well, Your Honor, I think the issue is

2  that there's the pending order regarding Osuna's mental health

3  records that hasn't been ruled on, and I -- it's my

4  understanding that defendants' position is that some of the

5  records include information about his mental health, and so that

6  they have not been produced in their entirety because some --

12:00:13  7         **THE COURT:**  I understand that, too, but I also

8  understood that they had separately produced the medication

9  administration records.

12:00:22 10         **MR. DARLING:**  I --

12:00:22 11         **THE COURT:**  Did those records also exclude medications

12  dealing with mental health treatment?

12:00:28 13         **MR. DARLING:**  It's my understanding that they've

14  produced some, but not all of his medication records because the

15  documents are commingled.

12:00:36 16         **THE COURT:**  All right.

12:00:37 17         **MR. DARLING:**  And -- but I also have -- do not recall

18  seeing what Osuna was taking in March of 2019.

12:00:47 19         **THE COURT:**  Mr. Duggan?

12:00:49 20         **MR. DUGGAN:**  Yeah.  So let me -- let me clarify.  This

21  is one that plaintiffs' counsel brought up during -- recently

22  during Thanksgiving week, and we took a look at it again and

23  said, "Yeah, okay.  We can produce that."  So we haven't

24  produced it yet, but what's going to be produced is the

25  medication records.

12:01:07  1          So the -- we're taking the position that the

       2    medication records are not the mental health records that are

       3    protected by *Jaffee*.

12:01:15  4          **THE COURT:**  So the mental health -- the medications

       5    will be produced?

12:01:19  6          **MR. DUGGAN:**  Yeah.

12:01:19  7          **THE COURT:**  Even if they are mental health

       8    medications?

12:01:22  9          **MR. DUGGAN:**  Yes.

12:01:22 10          **THE COURT:**  Okay.

12:01:24 11          **MR. DARLING:**  And that includes March of 2019?

12:01:27 12          **MR. DUGGAN:**  Yes.

12:01:28 13          **THE COURT:**  Good.

12:01:30 14          Okay.  That takes us to the C-file.  What's going on

      15    with the C-file?

12:01:35 16          **MR. DARLING:**  So the C-file is not a unified document.

      17    It's basically, you know, a series of documents that relate to

      18    an inmate.

12:01:42 19          **THE COURT:**  Right.

12:01:42 20          **MR. DARLING:**  And they, of course, have produced lots

      21    of documents, but they haven't produced everything, and -- and

      22    these are kind of connected to -- to some other requests, it

      23    turns out, but certainly there's not the mental health records,

      24    and I don't think there's complete records about the

      25    classification decisions of Osuna because he had been

1  single-celled on multiple occasions.

2        So that he had gone through a process of being

3  determined to either be single-celled or remain single-celled --

4  they call it an ICC chrono.  And so all of those documents

5  because a committee, in classifying an inmate, will rely on a

6  bunch of documents, including his mental health records and

7  statements.

8        And so it's either not been produced or defendants'

9  position is that they don't know what -- all the documents that

10 the ICC committee's relied on, and -- and it's, like, wait a

11 second, you -- we -- you need to track that down.

12       THE COURT:  What are the limitations on having these

13 documents -- financial health documents produced?

14       MR. DARLING:  It's my understanding that their

15 position is that they're waiting on the Court's order as to the

16 mental health records.

17       THE COURT:  Well, at this point I usually turn to

18 counsel and say, "What's wrong with a good old-fashioned

19 confidentiality order?"

20       MR. DARLING:  And we have that, by the way.

21       THE COURT:  Right.

22       MR. DUGGAN:  Yeah.

23       THE COURT:  So seems to me to -- getting these

24 documents and the information they contain is pretty important.

25       MR. DUGGAN:  Yeah.  It's -- it -- the mental health

1    records, in particular communications with a mental health

2    provider, are absolutely privileged under the *Jaffee* case.  And

3    we have to assert that privilege as Osuna's mental health

4    provider, and so that's -- and so that's been our position.

12:03:43  5    Privilege hasn't been waived so far as we know, and so

6    that's why we've not produced mental health records related to

7    Osuna.

12:03:53  8    **THE COURT:**  But I -- if I make the finding that the

9    need to obtain the evidence contained in those records outweighs

10   the privacy interest of third parties, which includes Mr. Osuna

11   and his victims and relatives -- if I make that finding, is that

12   sufficient to overcome the privilege?

12:04:16  13   **MR. DARLING:**  Yes.

12:04:17  14   **MR. DUGGAN:**  That is not -- not my understanding.  My

15   understanding is it's an absolute privilege under *Jaffee*.

12:04:24  16   **MR. DARLING:**  I would point out, Your Honor, this is

17   very convenient for defendants.  And this has been briefed, but

18   I think the reason why they're so adamant about this purported

19   absolute privilege is because we have statements from Osuna

20   himself stating, "I told them I wanted to kill again," and the

21   person he told was the social worker who was part of the

22   classification committee.

12:04:49  23   **THE COURT:**  All right.  And is there any other source

24   in which the same information could be obtained or contained?

25   Is this the only type of document that's going to have this

1  information?

12:05:10  2          MR. DUGGAN:  Well, I mean, yeah, if it's -- if what

3  they're looking for is communication between Osuna and his

4  mental health professional, then, I mean, that's only going to

5  be in his mental health records.

12:05:22  6          MR. DARLING:  Well, there's -- a few things,

7  Your Honor.  I think they're taking an expansive definition of

8  mental health records because there are other records where it

9  relates to conversations with CDCR staff about his state of

10  mind, his desire to kill, that then, I think, is being read as

11  mental health records, number one.

12:05:43  12          But, number two, as it relates to -- because it is

13  related to the classification process and notice, as the Court

14  said, in this balancing test, you know, it should -- it

15  should -- the interest, obviously, weighs in disclosure,

16  especially given the protective order.

12:06:00  17          THE COURT:  And we're clear that the parts of the

18  C-file that have been or are going to be produced do not contain

19  the information that we're arguing about now; is that accurate?

12:06:18  20          MR. DUGGAN:  That's -- I'm not sure what you mean by

21  the information we're arguing about now.

12:06:24  22          THE COURT:  The -- to take Mr. Darling's position at

23  face value, Mr. Osuna's statements to mental health treaters or

24  others that he wanted to kill somebody and was ready to act

25  promptly given the opportunity.

12:06:43  1          MR. DUGGAN:  Yeah.  I haven't -- yeah.  I have not

2    seen that in his C-file, no.

12:06:46  3          THE COURT:  All right.  All right.  Well, it seems to

4    me that the balance in this case, given the importance of the

5    information in terms of understanding the information that was

6    available at the time the classification decisions were made,

7    that those interests would outweigh the privacy interests of the

8    third parties, particularly given the protective order that we

9    have in this place and given the absence of the information in

10   the part of the C-file that has not been produced, the absence

11   of that information anywhere else -- the inability to get it

12   anywhere else.  So I think we should -- I will compel the

13   production of the entire C-file.

12:07:42 14          If you believe that there are any additional

15   confidentiality protections that need to be added to that,

16   whether it's attorney's eyes only or something of that nature, I

17   welcome you to consider that.

12:07:57 18          MR. DUGGAN:  Yeah.  I mean, there's -- there's

19   additional -- there were additional -- there's other documents

20   that we didn't produce in the C-file; for example, names and

21   addresses of Osuna's victims, names and addresses of --

12:08:12 22          THE COURT:  I don't think we need those.

12:08:14 23          MR. DUGGAN:  Okay.  -- names and addresses of Osuna's

24   family --

12:08:18 25          THE COURT:  I don't think we need those.  I think the

1   key here is what he told other people at the prison.

12:08:24 2      **MR. DUGGAN:** And then --

12:08:26 3      **THE COURT:** And about his intent to --

12:08:27 4      **MR. DUGGAN:** And then --

12:08:28 5      **THE COURT:** -- commit violence.

12:08:30 6      **MR. DUGGAN:** And then documents from after --

12:08:34 7      **THE COURT:** I don't think we need those.

12:08:36 8      **MR. DUGGAN:** Yeah. -- documents from after

9   March 2019. Okay.

12:08:40 10      **THE COURT:** Fingerprint documents, you tell me if

11   that's important. It's the mental health records and the

12   documents from -- and the medical records that are the important

13   parts before the March 2019 incident.

12:08:59 14      **MR. DARLING:** The one thing I would add, Your Honor,

15   is after the incident, to the extent that he made statements

16   about --

12:09:06 17      **THE COURT:** About the incident.

12:09:06 18      **MR. DARLING:** -- the incident, I would --

12:09:08 19      **THE COURT:** That's fine.

12:09:13 20      Okay.

12:09:13 21      **MR. DARLING:** But, yeah, in terms of the -- the

22   defendant has redacted other stuff. So I think, in terms of

23   redacting victims' names, numbers --

12:09:20 24      **THE COURT:** That's fine.

12:09:21 25      **MR. DARLING:** Yeah, of course.

12:09:22  1          **THE COURT:**  I agree.

12:09:23  2          Okay.  I think that takes us to 48, all documents that

3  pertain to any act of violence by Mr. Osuna since 2011.

12:09:40  4          **MR. DARLING:**  So the -- the defendants have produced,

5  actually, quite a number of -- of prior acts of violence by

6  Osuna, usually in the form of what's called an RVR, or rule

7  violation report, but in the act of meeting and conferring,

8  it -- it became -- it seemed to me that there are other

9  incidents that have not been produced, especially descriptions

10  that are not in an RVR.

12:10:11 11          **THE COURT:**  Response?

12:10:13 12          **MR. DUGGAN:**  Yeah.  We've produced the RVRs from

13  before March 2019, and some -- some of the ones after March 2019

14  have not been produced as part of the C-file because, as we

15  mentioned before, those -- those are relevant.

12:10:30 16          **MR. DARLING:**  But the issue, Mr. Duggan, is any issues

17  of violence that are outside of the RVRs.  I don't think those

18  have been produced.

12:10:40 19          **MR. DUGGAN:**  I don't -- we're not withholding anything

20  on that.

12:10:43 21          **THE COURT:**  Are there any -- are there any documents

22  that aren't called RVRs that would contain --

12:10:49 23          **MR. DUGGAN:**  Oh, no.

12:10:49 24          **THE COURT:**  -- information about prior violence?

12:10:52 25          **MR. DUGGAN:**  Okay.  Yeah, there may -- yeah.  There

1    may be that in his mental health records if he's talking -- if

2    he's talking to his mental health provider about prior acts of

3    violence.

12:11:05  4         THE COURT:  And are we now going to get those because

5    of the ruling on RFP 43?

12:11:12  6         MR. DUGGAN:  No.  The -- there is a separate group of

7    mental health records that are not part of the C-file.  So --

12:11:19  8         THE COURT:  All right.

12:11:19  9         MR. DUGGAN:  -- yeah.

12:11:19 10         THE COURT:  To the extent that separate group of

11    mental health records that is not part of the C-file contains

12    information relating to prior acts of violence by Mr. Osuna

13    since 2011 up until March 19th of 2019, produce them.

12:11:40 14         MR. DUGGAN:  Understood.

12:11:41 15         THE COURT:  Okay.

12:11:47 16         MR. DARLING:  Thank you, Your Honor.

12:11:49 17         THE COURT:  Number 50, IST training provided on

18    March 10, 2019.  Defendant says it's already produced training

19    documents but not a specific training document on the date in

20    question.  Are -- have there been any updates?  Have you found

21    anything more?

12:12:14 22         MR. DUGGAN:  No updates yet.  We are still looking,

23    Your Honor.

12:12:17 24         THE COURT:  All right.

12:12:17 25         MR. DARLING:  This isn't -- an issue, Your Honor, that

1    came up in the meet-and-confer process is a lot -- sometimes the

2    responses will say, like, "We'll produce.  It's ongoing," and

3    yet, like, here we are, and nothing has been produced.  And so I

4    think the issue isn't the decision to withhold, but the decision

5    to go out and find it and then produce it and -- because it --

6    it seems like this -- obviously, it's an ongoing duty, but if it

7    hasn't been produced and, you know, we're scheduling

8    depositions, I think it's time that, you know, that they produce

9    shortly.

12:12:48 10          **THE COURT:**  Mr. Duggan, what is the status -- what

11    have you done to search, and what are you intending to continue

12    to do?

12:12:56 13          **MR. DUGGAN:**  Well, I mean, without revealing

14    attorney-client communications, you know, we looked in the -- in

15    the usual places, and now we're going to look in an additional

16    place that I know is happening now.  So --

12:13:10 17          **THE COURT:**  All right.  Will you be in a position to

18    make a report to Mr. Darling by Friday as to the status of the

19    additional search?

12:13:19 20          **MR. DUGGAN:**  Friday may be too soon, but I will -- I

21    can endeavor to do that.

12:13:24 22          **THE COURT:**  All right.  If not Friday, Monday.

12:13:27 23          **MR. DUGGAN:**  Thank you.

12:13:29 24          **MR. DARLING:**  Thank you, Your Honor.

12:13:30 25          **THE COURT:**  All right.  Next is documents that the ICC

1    reviewed or relied on in the classification decision, and the

2    response is they would have reviewed the C-file, and the only

3    other thing that they would have reviewed would be the mental

4    health records that have been withheld from the other C-file

5    documents.  Are those records now going to be produced?

12:14:03  6        MR. DUGGAN:  Yes.

12:14:04  7        THE COURT:  Then that should take care of that.

12:14:06  8        MR. DARLING:  Are there any -- I guess my -- the other

9    issue, though, Your Honor, is that if there's any other

10   non-mental health, non-C-file records, what else has been

11   produced.  And it's my understanding that it's not just a claim

12   of privilege, but also that defendants' position is that, "Well,

13   we don't know what they looked at."  And it's, like, wait a

14   second.  You've got to go out and find to make sure that you

15   know what they looked at.

12:14:31 16        MR. DUGGAN:  I think that this is something that

17   should be address- -- addressed --

12:14:36 18        THE COURT:  That's a deposition question, and if,

19   based on the deposition testimony, they say, "Well, we also

20   looked at X," well, you're going to get X.  And if it wasn't

21   previously produced, you may get a chance to ask some additional

22   deposition questions based on X --

12:14:53 23        MR. DARLING:  Okay.

12:14:53 24        THE COURT:  -- but I agree.

12:15:00 25        It looks like the defendants have made a reasonable

1  response to their understanding of what is ordinarily reviewed,

2  and to the extent these individuals have -- who did the review

3  have additional information, you can find that out at their

4  deposition.

12:15:19  5          MR. DARLING:  Okay.  But -- but -- as -- what I

6  understand the Court's position on 58:  Based on the prior

7  issues with the other RFPs, that they will produce mental health

8  records that were reviewed in the ICC process?

12:15:34  9          THE COURT:  Yes, sir.

12:15:35  10          MR. DUGGAN:  Well, we -- as I say, we don't know which

11  ones were -- were reviewed, but we'll -- we'll produce --

12:15:42  12          THE COURT:  But those are going to be produced

13  anyway --

12:15:44  14          MR. DUGGAN:  Yes.

12:15:45  15          THE COURT:  -- because -- in response to a separate

16  request.

12:15:48  17          MR. DUGGAN:  Yes.

12:15:48  18          THE COURT:  Okay.  All right.  Document- -- I'm on 62,

19  documents that include or reference statements by Mr. Osuna that

20  reflect a desire to commit violence.  Isn't -- aren't those

21  going to be picked up by the other documents that we've ruled

22  will be provided?

12:16:13  23          MR. DUGGAN:  Yes.

12:16:15  24          THE COURT:  Okay.

12:16:17  25          MR. DUGGAN:  I think so, yeah.

12:16:18  1        **MR. DARLING:**  I mean, I guess I don't know what I

2    don't know, Your Honor.  If there's any other place where

3    there's -- a desire to commit violence is being stated because

4    that could be made in a non-mental health record, of course.

12:16:30  5        **THE COURT:**  I agree, but you're looking at his C-file.

6    You're going to get the mental health records.  So I think --

7    and then you're going to get deposition testimony that may

8    provide non-document responses.

12:16:47  9        **MR. DARLING:**  Well, here's an issue, Your Honor, is

10    that the defendants have produced a audio interview of

11    Mr. Osuna, and she talks about how he's been stating his desire

12    to kill, but I don't know if it's considered a C-file or mental

13    health record as to the investigation into the killing of

14    Romero, because he might have made other statements in -- in --

15    related to that investigation.  So that might be a separate

16    bundle, and then that, I think, has been invoked as, like, oh,

17    there's an ongoing prosecution.

12:17:19 18        But it's, like, yeah, but if it's an admission by

19    Osuna in the context of this investigation, I would think --

12:17:25 20        **THE COURT:**  Was Mr. Osuna interviewed and that

21    interview recorded as part of the investigation?

12:17:31 22        **MR. DARLING:**  And -- there is an interview with Osuna

23    that has been produced, but I don't know if there has been

24    subsequent interviews of him.

12:17:40 25        **THE COURT:**  Have you asked Mr. Duggan that?

1         **MR. DARLING:**  Yeah.  Well, I mean, that's what this

2  request contemplates, the desire to commit violence.

3         **THE COURT:**  Okay.  But the specific question:  Was

4  there a additional interview of Mr. Duggan [sic] that was

5  recorded either before or after the May incident?

6         **MR. DUGGAN:**  So, yeah, we've -- there's two

7  interviews, and we've produced both.

8         **THE COURT:**  Okay.

9         **MR. DUGGAN:**  Yeah.

10         **THE COURT:**  No other interviews?

11         **MR. DUGGAN:**  No.

12         **THE COURT:**  Okay.  That takes us to 74, which asks

13  about the decision to single-cell Mr. Osuna and clarifying that

14  the decision that you're asking about is the one that changed an

15  earlier decision allowing him to be double-celled and converting

16  him to single cell only.

17         **MR. DARLING:**  Yes.

18         **THE COURT:**  And the defendant says that it doesn't

19  know of any other documents beyond the ones it's already

20  produced.  So this sounds like one that you need to follow up in

21  the deposition and come back if it appears to be that there are

22  other sources of documents with this information.

23         **MR. DARLING:**  Okay.  Fair enough.  Thank you,

24  Your Honor.

25         **THE COURT:**  All right.  The documents the Corcoran

1    prison ICC reviewed in January of '17 -- 2019, I'm sorry, and

2    the cell status review, looks like the same sort of analysis.

12:19:29  3         Has this been -- previously been produced, Mr. Duggan?

12:19:35  4         **MR. DUGGAN:**  It's -- it's the same analysis as -- as

5    previous ones.  So, yeah, they'll -- some of the mental health

6    records that we've talked about will be produced in response --

12:19:44  7         **THE COURT:**  All right.

12:19:45  8         **MR. DUGGAN:**  -- in response to this one, yep.

12:19:48  9         **THE COURT:**  So the -- well, can you at least provide a

10   list of the documents the ICC would have reviewed in the cell

11   status review of January 2019?

12:19:59  12        **MR. DARLING:**  Thank you, Your Honor.  That -- no, I

13   just want to flag this.  This is all -- exactly.  That

14   articulation is what I've been seeking and has not been

15   produced, and that's -- the evasiveness is why we're here.

12:20:10  16        **THE COURT:**  Okay.

12:20:11  17        **MR. DUGGAN:**  That's -- it's not evasive.  We don't

18   know exactly which documents they --

12:20:15  19        **THE COURT:**  Can you tell us the ones you do know?

12:20:19  20        **MR. DUGGAN:**  If -- I mean, again, I agree with the

21   Court's previous statement that that seems like a deposition

22   question.

12:20:25  23        **THE COURT:**  Well, except here's where it's a little

24   bit different:  We're talking about a routine review.  There --

25   in every prison that I'm aware of, these kinds of reviews are

1    subject to a kind of a protocol.  Here's the steps you go

2    through; here's the stuff you look at.  If you can provide a

3    list of the documents that at least in the ordinary course would

4    be reviewed in a cell-status review, then with that to start

5    with, Mr. Darling is equipped to ask deposition questions about

6    whether other types of documents were also reviewed.

12:21:13  7         **MR. DUGGAN:**  I mean, I think that, you know, we have

8    already done that.  You've got -- you're looking at the --

9    you're looking at the C-file, and you're looking at -- if you

10   have a mental health professional present, then you're looking

11   at mental health records.

12:21:26 12         **MR. DARLING:**  But apart from the mental health issues,

13   which -- which the Court has addressed, there -- there's still

14   an issue where potentially there's a third bundle of documents

15   that we don't know, and it seems like defendant can inquire as

16   to whether other, you know, non-mental health, non-C-file

17   documents were reviewed and provide those.

12:21:47 18         **THE COURT:**  But it's really two questions here as I

19   read RFP No. 84 and 85 together.  Is there a folder labeled

20   "Cell Status Review, January 2019, Osuna," something like that?

12:22:11 21         **MR. DUGGAN:**  That -- that is a subset, and that would

22   be like a subset of his C-file.  No.

12:22:16 23         **THE COURT:**  All right.  So it's in the C-file?

12:22:19 24         **MR. DUGGAN:**  Yes.

12:22:19 25         **THE COURT:**  Any --

`12:22:20` 1          **MR. DUGGAN:**  And looking at it -- they'd be looking at

2     it on a computer.

`12:22:24` 3          **THE COURT:**  Any cell status review is going to be in

4     the C-file?

`12:22:29` 5          **MR. DUGGAN:**  The cell status review document itself,

6     yes.

`12:22:33` 7          **THE COURT:**  All right.

`12:22:34` 8          **MR. DARLING:**  But the documents --

`12:22:35` 9          **THE COURT:**  What about the other documents looked at

10     in conducting the cell status review?

`12:22:41` 11          **MR. DUGGAN:**  Those are in the C-file, but it's not all

12     of the C-file.

`12:22:45` 13          **THE COURT:**  I'm sorry.  It's --

`12:22:47` 14          **MR. DUGGAN:**  It's -- you know, you would be -- the

15     person conducting the cell status review would look at documents

16     that are -- some of the documents that are in the C-file.

`12:22:55` 17          **THE COURT:**  Would they ordinarily look at other kinds

18     of documents?

`12:23:00` 19          **MR. DUGGAN:**  If there's a mental health professional,

20     the mental health professional might -- would also look at the

21     mental health records.

`12:23:08` 22          **THE COURT:**  So the answers here are the C-file and the

23     mental health records?

`12:23:14` 24          **MR. DUGGAN:**  Yes.

`12:23:15` 25          **THE COURT:**  That's what they would have looked at?

12:23:17 1          **MR. DUGGAN:**  Yes.

12:23:18 2          **THE COURT:**  And have you provided the documents that

3 they looked at in January of 2019?

12:23:24 4          **MR. DUGGAN:**  Apart from what we've already talked

5 about that have been withheld previously, then yes.

12:23:29 6          **THE COURT:**  All right.  And after this hearing, what

7 will still be withheld?

12:23:40 8          **MR. DUGGAN:**  I don't think there's going to be

9 anything that going to be withheld after this --

12:23:42 10          **THE COURT:**  That's the point.

12:23:43 11          **MR. DUGGAN:**  Okay.

12:23:43 12          **THE COURT:**  So when you make the production that the

13 rulings of the hearing will lead to, then you'll have --

14 Mr. Darling should have everything that the ICC reviewed or

15 produced in its cell status review.

12:24:04 16          **MR. DUGGAN:**  Yeah.

12:24:05 17          **THE COURT:**  Is that right?

12:24:05 18          **MR. DUGGAN:**  Yes.  What I'm understanding, yeah.

12:24:06 19          **THE COURT:**  Okay.  I think that deals with all the

20 discovery issues that you brought to my attention.

12:24:21 21          **MR. DARLING:**  Thank you, Your Honor.  Just one -- just

22 anticipating an issue is that -- because, to me, the Court's

23 position is clear, but if the -- we just don't want defendant to

24 say, "Oh, the request for the order -- the standalone request

25 for order re mental health hasn't been ruled on, so we can't do

1    it since we're waiting on an order."  So I want just either

2    clarifi- -- clarification from Mr. Duggan that he's not going to

3    do that or if the Court can issue that separate order --

12:24:48  4         THE COURT:  Why don't you confer, draft me an order

5    that you can agree on at least as to form, and get it to me.

12:24:56  6         MR. DARLING:  Okay.  Well, on that issue, Your Honor,

7    we did submit -- I did submit an order.  That was at docket 94.

8    And then the parties had briefings, and so we can -- I don't

9    know if the Court wants --

12:25:09  10        THE COURT:  I think I've given you enough guidance

11   since then.

12:25:11  12        MR. DARLING:  Thank you.  Okay.  Okay.  I'll follow up

13   and do that.

12:25:14  14        THE COURT:  All right.

12:25:14  15        MR. DARLING:  Okay.  Thank you, Your Honor.

12:25:15  16        THE COURT:  Okay.  Couple of other things that we

17   might be able to deal with now.  There's a motion for -- by the

18   plaintiff for leave to file an amended complaint adding a new

19   defendant.  As I understand it, the late discovery responses are

20   the reasons for the late amendment.

12:25:39  21        The plaintiff initially agreed to extend the deadline

22   for the discovery responses to late in August.  The discovery

23   wasn't produced until three weeks afterwards, around

24   September 11, and when the defendant confirmed that the

25   plaintiff had agreed to extend the defendants' discovery

1    deadline, the defendant promised to stipulate to an extension of

2    time to amend pleadings, if that becomes necessary, and now,

3    apparently, the defendant is opposing the extension of time

4    perhaps on the ground that it's not necessary.

12:26:20  5    **MR. DUGGAN:**  The -- yeah.  We're not opposing a motion

6    for extension of time, Your Honor, and I -- I -- when we wrote

7    the opposition to the amendment, I had forgotten about that --

8    that agreement.  But, you know, we do oppose the amendment

9    itself because we believe that the allegations against the new

10    defendant, Mr. Beam, are not -- is not the same case or

11    controversy as what's been asserted against Mr. Burnes.

12:26:50 12    **THE COURT:**  Mr. Darling, did you want to respond?

12:26:52 13    **MR. DARLING:**  Please, yes.  I'm glad they've conceded

14    the first point, but as to not related, it is exactly related.

15    The -- the lawsuit -- the second lawsuit, filed in 2021, is

16    about CDCR employees sharing the photo.  Obviously, it's not

17    just one defendant.  That's why we have Does.

12:27:09 18    And so --

12:27:09 19    **THE COURT:**  Right.

12:27:10 20    **MR. DARLING:**  -- we learned about a second guy who --

21    who, in a CDCR investigation, was found to have e-mailed,

22    multiple instances, people at then -- effectively, at least

23    23 people saw these photos, and so it's this viral effect.  And

24    so this is -- this is the lawsuit.  The lawsuit is CDCR

25    employees sharing crime scene -- grisly crime scene photos of

1   Romero.  This is -- this is the lawsuit.

12:27:36  2          **THE COURT:**  All right.

12:27:37  3          **MR. DUGGAN:**  And in the -- in the original complaint,

4   it was only Corcoran employees, not CDCR employees.  So they're

5   expanding it to other prisons with this amendment.

12:27:46  6          **THE COURT:**  They're expanding the receipt in -- and

7   further distribution in other prisons of what originated in

8   Corcoran, correct?

12:27:57  9          **MR. DUGGAN:**  Well, yes.

12:27:58 10          **THE COURT:**  All right.  I really -- I think it would

11  be more complicated than clarifying to require a new lawsuit to

12  assert the complaints against Beam.  The amended complaint makes

13  minimal changes to the facts that underlie the claims that are

14  at the heart of this case, and they've always included sharing

15  photos, which is what Mr. Beam is alleged to have done.  And the

16  discovery of Beam's identity and potential liability came from

17  the documents that the defendants disclosed during the discovery

18  process.

12:28:37 19          I don't see any evidence of bad faith or undue delay

20  or dilatoriness, and I don't see unfair prejudice in allowing

21  it.  So I am going to grant the -- the motion to amend.  I do

22  want the defendant to -- unopposed motion to file a surreply,

23  I'm granting that, and I want that filed because it clarifies

24  that Mr. Beam is not going to be represented by the same counsel

25  as the existing panel.

`12:29:12` 1          **MR. DUGGAN:**  Thank you, Your Honor.  And just on --

2     still on that case, the -- the close of discovery is currently,

3     under this scheduling order, December 13th in that case.  I

4     imagine that will have to be moved now that we're adding a

5     party.

`12:29:30` 6          **THE COURT:**  About 60 days.

`12:29:32` 7          **MR. DARLING:**  Your Honor, could we ask for 90?

`12:29:35` 8          **THE COURT:**  That's fine.

`12:29:35` 9          **MR. DARLING:**  Because -- because -- and, actually, the

10    other issue is if, in fact, Mr. Duggan's office is not going to

11    be representing him, then there might be delays on that.

12    Just -- just so you know, I -- I subpoenaed Beam for a

13    deposition, and there's briefing on that, and we could basically

14    set that aside, if he's going to be separately --

`12:30:01` 15         **MR. DUGGAN:**  Represented.

`12:30:02` 16         **MR. DARLING:**  -- represented, and then -- and file an

17    answer.

`12:30:05` 18         But, one, if he -- if he himself files a motion to

19    dismiss, that will delay things, or, two, if there's just delay

20    in -- in me talking to counsel.  So just thinking this through,

21    you know, I -- I need to have time -- at least 30 days to -- to

22    propound documents on Beam, and then time to depose him.  So --

`12:30:26` 23         **THE COURT:**  So why don't you and Mr. Duggan confer

24    with others and draft and send me a, hopefully, agreed proposed

25    amended scheduling order that will allow for all of this work to

1   occur.

12:30:41  2        **MR. DARLING:**  Thank you, Your Honor.

12:30:43  3        **THE COURT:**  And if you could do that by Monday of next

4   week, we'll get it done promptly.

12:30:48  5        **MR. DARLING:**  Thank you, Your Honor.

12:30:50  6        **THE COURT:**  All right.  Anything else on the schedule

7   for today?

12:31:03  8        **MR. DARLING:**  So there was a -- yes.  One issue is --

9   so plaintiff served subpoenas on Beam, but also a 30(b)(6)

10   witness for the second case.  And so I guess, if it's -- if Beam

11   has a new counsel, but the 30(b)(6) is represented by

12   Mr. Duggan's office, then would that issue of the -- a

13   subpoena -- because it's -- it seems kind of -- we'll be --

14   basically have -- we're going -- we're going to have some

15   briefing in the Central District, because I'm in the Central

16   District.  So Mr. Duggan filed the motion to quash in the

17   Central District, but then it might move back to the Eastern

18   District to you.

12:31:56  19        So I'm just, for housekeeping purposes -- because we

20   have this pending 30(b)(6) deposition that -- quite frankly, I

21   don't even think we should have a motion to quash here because

22   this should be regularly scheduled.  I just -- I'm just -- I

23   kind of lost in terms of how to -- how to clean this up.

12:32:18  24        **THE COURT:**  What are you asking me to do?

12:32:22  25        **MR. DARLING:**  I guess -- I'm just -- I guess I'm

1    flagging it, but then --

12:32:26    2        **THE COURT:**  Okay.

12:32:26    3        **MR. DARLING:**  -- if, after the briefing in the Central

4    District, in the event that the Central District moves it over

5    to the Eastern District just to resolve it quickly --

12:32:35    6        **THE COURT:**  Where is the subpoena going to be

7    enforced?

12:32:39    8        **MR. DARLING:**  Well, see, because it is -- a Zoom

9    remote appearance is fine.  It could be enforced in the Eastern

10   District.  It doesn't --

12:32:47   11        **THE COURT:**  All right.

12:32:48   12        **MR. DARLING:**  People do not have to come to my office,

13   which is why I -- it was going to -- it was my -- that it should

14   be in the Eastern District.

12:32:53   15        **THE COURT:**  Then, as I understand the rules, the court

16   where the subpoena is going to be enforced should be the one to

17   resolve issues regarding its enforcement.

12:33:03   18        **MR. DARLING:**  That's my position, too, and that's why

19   --

12:33:06   20        **MR. DUGGAN:**  Our view was it was -- because the

21   address on the subpoena was in the Central District, then

22   that's -- that's the court that should hear the motion to quash.

12:33:16   23        **MR. DARLING:**  And that, Your Honor, just seems silly.

24   It's a remote Zoom deposition.  Of course my address is on there

25   because I'm the attorney doing it, but it should stay in front

1   of --

12:33:26  2          **THE COURT:**  To the extent we are interpreting the

3   phrase where the subpoena will be enforced or where the

4   subpoena -- what the subpoena requires will be performed, I

5   think that should govern.

12:33:37  6          **MR. DARLING:**  Right.  So that's the Eastern District.

12:33:40  7          **THE COURT:**  Exactly.

12:33:41  8          **MR. DARLING:**  Yeah.  Okay.  So -- so with that,

9   Mr. Duggan, would you disagree about just refiling this motion

10  to quash in the Eastern District and saving us the time of --

11  of --

12:33:52  12       *(Multiple speakers.)*

12:33:57  13         **MR. DUGGAN:**  Yeah.  I mean, I'll have to -- I don't

14  remember it saying in the subpoena that it was going to be by

15  Zoom, and so that's why I did file a motion to quash in the --

16  in the Central District.  So I would have to look back at that.

17  I mean, I think if you want to do a 30(b)(6) deposition, it

18  sounds like our -- you know, Beam is -- the issues are --

19  surrounding Beam are going to be in the case.

12:34:20  20         I think you should -- we should maybe just, you

21  know -- you can do that through us.  We do represent CDCR.  So

22  maybe, rather than doing the subpoena, we just discuss it

23  between me and Mr. Darling.

12:34:35  24         **THE COURT:**  I think that sounds terrific.

12:34:37  25         **MR. DARLING:**  Okay.  And if any issues, we'll go back

1  to Your Honor, but, hopefully, we just -- regularly scheduled

2  motion -- I mean, regularly scheduled deposition.

12:34:46  3      THE COURT:  I have -- I'm sure that I may have asked

4  this question before.  This is one of the grimmest and goriest

5  cases I suspect any of us has encountered.  It will not be an

6  easy case to try, at least not easy for the jury that will have

7  to decide it, and there seem to me to be all sorts of reasons

8  that every party to this case should want to consider settlement

9  as a resolution rather than a full-blown trial.

12:35:35  10      If we have to try it, that's fine with me, but I don't

11  want to miss an opportunity, if one arises, to pursue a mediated

12  resolution.

12:35:49  13      MR. DARLING:  Sure.

12:35:51  14      THE COURT:  Are we at that point?  Do you have enough

15  information now to make a presentation to a mediator, if that's

16  what is appropriate, or some kind of analysis what might be

17  appropriate as a way to resolve the case?  You tell me.

12:36:12  18      MR. DARLING:  Your Honor, I think we can walk and chew

19  gum.  So I think discovery can proceed and the parties can

20  schedule a mediation.  And I will say that the parties agree

21  that the mediation should contemplate both cases.  So looking

22  at --

12:36:25  23      THE COURT:  I agree.

12:36:25  24      MR. DARLING:  -- a universal settlement.

12:36:27  25      I think we have -- I mean, this is so grisly that

1   there's kind of like a threshold number that they don't agree

2   to, and so I think we might already start off at just being, you

3   know, too wide a distance.  And in my experience, CDCR is so

4   used to dealing with pro se plaintiffs that the pain -- the

5   actual settlements are so wildly lower.  And so, to be frank, I

6   think that they might need a verdict against them to reset their

7   expectations that --

12:36:58  8        THE COURT:  On the other hand, to quote something that

9   I just heard a few minutes ago, I suspect CDCR can walk and chew

10  gum at the same time, as well, and is fully aware of the

11  exposure that a case like this might create.

12:37:15  12        MR. DARLING:  Right.  So, Your Honor --

12:37:17  13        THE COURT:  But who knows?  Who knows what a jury

14  might do?

12:37:20  15        MR. DARLING:  Of course.  So the -- so the defendants

16  have agreed to a mediation for a panel mediator.  In reading the

17  tea leaves, they haven't been really open to a private one,

18  which is usually -- to me conveys a seriousness of settling, but

19  we have got the ball rolling.  We've reached out to the panel

20  mediator, and we've talked about continuing, because the

21  deadline was actually -- is this week.  So we're going to

22  continue the time -- the deadline maybe to 60 days, and then,

23  hopefully, we can -- we can mediate this in January or February.

12:37:55  24        THE COURT:  I hate to see the magic window of the

25  holiday season, which is great for mediations, close.

`12:38:02` 1          **MR. DARLING:**  I would love -- I'm happy to mediate

2    this next week, but I don't think -- I don't know --

`12:38:08` 3          **THE COURT:**  Is that realistic, Ms. Stocker,

4    Mr. Duggan, Mr. --

`12:38:13` 5          **MS. STOCKER:**  I haven't heard back from the panel

6    mediator.

`12:38:17` 7          **THE COURT:**  So tell me about this panel mediator.  We

8    don't -- we may use the same system but call it a different

9    name.

`12:38:25` 10          **MS. STOCKER:**  It's the --

`12:38:26` 11          **THE COURT:**  A court adjunct?

`12:38:30` 12          **MS. STOCKER:**  The court has a list of potential

13    mediators.  They sent out the list.  We chose one --

`12:38:36` 14          **THE COURT:**  Okay.

`12:38:36` 15          **MS. STOCKER:**  -- and we're waiting to hear back from

16    him.

`12:38:40` 17          **THE COURT:**  Are you restricted to the list of panel

18    mediators?

`12:38:47` 19          **MR. DARLING:**  For free mediation, yes.  For -- so

20    private mediation, we could choose whoever, but I -- this is

21    where I'm saying in -- I interpreted defendants' wariness to do

22    private mediation as not being serious about settlement, but I'm

23    happy to also do private mediation.

`12:39:04` 24          **MR. DUGGAN:**  And we -- you know, I did agree to do a

25    private mediation split 50/50.  So I'm not -- so --

12:39:14  1            THE COURT:  Why don't you do that?  Instead of waiting

2       around for somebody who's obviously not prioritizing this, I

3       should say, why don't you set up an early private mediation?

4       Can you agree on a private mediator?

12:39:31  5            MR. DARLING:  I -- that has also been an issue,

6       Your Honor.

12:39:34  7            THE COURT:  I'll pick.  You give me three, I'll pick

8       one.  You give me six, I'll pick one.  I can -- you let me pick,

9       and I'll pick one.

12:39:45 10            MR. DARLING:  Sure.  Okay.  Would the Court -- would

11      it seem too time intensive if we try panel and then go to

12      private, or do you think, just for purposes of time, just opt

13      into the private?

12:40:01 14            THE COURT:  I think it's going to be harder to do a

15      successful mediator -- mediation after an unsuccessful one.

12:40:09 16            MR. DARLING:  Hmm.

12:40:11 17            THE COURT:  Although people do it all the time.

12:40:16 18            MR. DARLING:  Okay.

12:40:17 19            MR. DUGGAN:  I mean, yeah, it sounds to me like you --

20      Erin, you feel like the process would go better with a private

21      mediator.  So we can discuss amongst ourselves, but maybe we

22      should be considering that option.

12:40:28 23            THE COURT:  Sooner rather than later.

12:40:32 24            MR. DARLING:  Yeah.  Absolutely.  We want -- if

25      anything -- yes.  The -- in -- there was a contemplated

1    stipulation to extend the time for the panel mediator, and I

2    e-mailed today saying 60 days, not 90 days, because I don't want

3    to extend it out too long.  So --

12:40:50  4            **THE COURT:**  Good.  I agree with that.  Okay.  Let me

5    know where we are on that.

12:40:55  6            **MR. DARLING:**  Okay.

12:40:56  7            **THE COURT:**  Ms. Stocker, you look like you wanted to

8    say something.

12:40:59  9            **MS. STOCKER:**  No.  Thank you, Your Honor.

12:41:01  10            **THE COURT:**  All right.  So I will --

12:41:02  11            **MR. DARLING:**  Your Honor, as it relates to

12    Ms. Stocker -- sorry to interrupt -- the -- her client, Silva,

13    there's still, obviously, no ruling on that, but I would just

14    request a ruling on that so we could then depose Silva.

12:41:17  15            **THE COURT:**  All right.  I will try to get that to you

16    promptly.

12:41:24  17            **MR. DARLING:**  Thank you so much.

12:41:25  18            **THE COURT:**  Thank you very much.  And you're going to

19    get me the orders and the amended scheduling order that we

20    talked about.

12:41:30  21            **MR. DARLING:**  Exactly.  Yeah.

12:41:32  22            And thank you so much.  I know this is very unwieldy.

23    So I just thank -- thank the Court for its attention.

12:41:38  24            **THE COURT:**  I don't know, you made Texas procedures

25    look simple.  I'm grateful.  Thank you very much.  Have a good

1    holiday.

12:41:47  2         **MS. STOCKER:**  Thank you, Your Honor.  You, too.

12:41:48  3         **MR. DARLING:**  Bye.

12:41:49  4         **THE COURT:**  Thank you.  You're all excused.

12:41:50  5         **MR. DUGGAN:**  Thank you, Your Honor.  Happy Holidays.

12:41:51  6       *(Proceedings concluded at 12:41 p.m.)*

7                              -o0o-

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above matter to the best

10   of my ability and skill, and that any indiscernible designations

11   are because of audio interference that precluded me from

12   understanding the words spoken.

13

14   Date:  December 18, 2024

15                        */s/ Heather Alcaraz*
                         Signature of Court Reporter
16

17

18

19

20

21

22

23

24

25