```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF CALIFORNIA
                      FRESNO DIVISION

*************************************************************
DORA SOLARES,

            Plaintiff,


VS.                        Case No. 1:20-CV-0323



RALPH DIAZ, ET AL.,

            Defendants.
*************************************************************

      TRANSCRIPT OF PRE-MOTION CONFERENCE VIA ZOOM
     HEARD BEFORE THE HONORABLE LEE H. ROSENTHAL
            UNITED STATES DISTRICT JUDGE


                   FEBRUARY 4, 2025


APPEARANCES:

FOR THE PLAINTIFF:          Erin R. Darling
                            Law Offices of Erin Darling
                            3435 Wilshire Blvd.
                            Suite 2910
                            Los Angeles, CA 90010



FOR THE DEFENDANTS:         Jeremy Duggan
                            Office of the Attorney General
                            1300 I Street
                            Suite 125
                            Sacramento, CA 95814



FOR LUIS SILVA:             Lynne G. Stocker
                            Andrada & Associates
                            1939 Harrison Street
                            Suite 612
                            Oakland, CA 94612
```

Official Court Reporter:    Nichelle N. Drake, RMR, CRR
                            515 Rusk Street
                            Suite 8004
                            Houston, Texas 77002


    Proceedings recorded by mechanical stenography,
transcript produced via computer.

1              **P R O C E E D I N G S**

2                  (Call to order of the court.)

3          THE COURT:  Good afternoon.  Do we have everybody

4      we need?

5          MR. DARLING:  I believe.

6          THE COURT:  All right.  Go ahead and state your

7      appearances, please.

8          MR. DARLING:  Good afternoon, Your Honor, Erin

9      Darling on behalf of Plaintiff.

10         MR. DUGGAN:  Good afternoon, Your Honor, Jeremy

11     Duggan on behalf of Defendant Burnes as well as Defendant

12     Pena, Ioza, Munoz, Gamboa, Gallemore, and Garcia.

13         MR. KUCHINSKY:  And good afternoon, Your Honor,

14     David Kuchinsky.  I am second counsel to Mr. Duggan

15     representing all the same defendants that he represents.

16         THE COURT:  All right.  Thank you.

17         MS. STOCKER:  Good afternoon, Lynn Stocker

18     appearing for Defendant Silva.

19         THE COURT:  All right.  Every time I look at this

20     case, my first instinct and my first question is:  Why

21     hasn't this case settled?  Are you really going to tie

22     this case to a jury, or is it going to be tried before

23     Horror Films International?

24         MR. DARLING:  I mean, I just will say, Your Honor,

25     we have scheduled a private mediation.  I know Plaintiff

1    is taking it seriously.

2         Earlier we anticipated a panel mediator, but

3    responding to the Court's prodding, I think we're paying

4    for a private mediation because we take it seriously.

5         My own guess, though, to put a little more contour

6    to it, is that we know from Jamie Osuna's statements

7    himself that he had a desire to kill and told CDRC

8    officials about his ongoing desire to kill and Defendants

9    really don't want to produce those records of his desire

10   to kill and that may affect the valuation.  And that's

11   why we're here today because they really want to not

12   produce those records because that might affect the

13   valuation because I think liability is clear.

14        THE COURT:  All right.  Well, then let's get to

15   the issues that you think are going to be so important in

16   terms of the evidence.

17        All right.  Go ahead, please.

18        MR. DARLING:  Yeah.  So the Court ruled on a

19   number of RFPs.  The defendant has not fully complied, so

20   I just thank the Court for having this hearing, to make

21   sure it doesn't slip through the cracks.

22        My own thought here is, we can go through these

23   one by one.  Some of these have nothing to do with mental

24   health records.  They're just outstanding issues, but

25   many of them do overlap with the mental health order.

1    And so I'm hoping we can first go through the RFPs and

2    then second address the pending mental health order.

3         And then last, just to note, that certain

4    defendants have filed motions to dismiss and that hasn't

5    been ruled on.  And so then because of that, they haven't

6    appeared and that's also kind of affecting the timing of

7    depositions.

8         THE COURT:  Remind me.  Are all of those motions

9    to dismiss now ripe for decision?

10         MR. DARLING:  Yes, Your Honor.

11         MS. STOCKER:  Yes, Your Honor.

12         MR. DARLING:  And it's Docket Nos. 100, 105, and

13    107.

14         THE COURT:  Thank you.

15         MR. DARLING:  Thank you.

16         So Mr. Duggan and I conferred on January 30th, so

17    this is pretty recent regarding No. 15, which is

18    allegations of dishonesty.

19         THE COURT:  I'm there.

20         MR. DARLING:  So in December, the Court ruled on

21    this issue.  Mr. Duggan says, you know, there were a

22    bunch of 602s in the privilege log, but there's only one

23    that was responsive to the narrowing request.  But then

24    -- since then, additional 602s, that bring us up to the

25    present, they haven't been received.

1          So the first point, Your Honor, is Plaintiff still

2     doesn't have them.  We are in early February.  This last

3     hearing was in December, so this two-month delay is

4     prejudice to Plaintiff.  We need these materials.  And so

5     there are the 602s that haven't been produced, that they

6     say they haven't been produced and they have not, and

7     this is even the narrowed scope.  This is -- to be clear,

8     not all complaints, but it's allegations of dishonesty in

9     terms of filling out forms and procedures, and even if

10    they're unsubstantiated, so that is 15.

11         And then related is 16, which is complaints, and

12    this was narrowed and that was narrowed to bias against

13    southern Hispanics, and then there was dishonesty filling

14    out forms and the classification.  And on that,

15    Mr. Duggan informed me that there were no classification

16    complaints in the privilege log, but he's now bringing

17    them up to the present.  So he's expecting more documents

18    soon.  So we don't know because he still doesn't have

19    them.  But I would point out there's cover-ups and, so I

20    think we have a dispute because is it cover-ups or just

21    cover-ups related to classification.  And I'm saying to

22    him, if it's cover-ups, it goes to dishonesty.  So it's

23    not just a mere cover-up about a classification, but

24    cover-ups -- if you're covering up, you're covering up

25    and that should be at issue --

1          THE COURT:  Well, if I could interject there,

2     covering up to say, for example, you overstayed on a

3     lunch period, does not seem to me to be something that is

4     necessarily included in this production.  It has to be

5     something that is directly related to the performance of

6     the essential functions of the job of the correctional

7     officer.

8          MR. DARLING:  Okay.

9          THE COURT:  That does not include things like

10    tardiness, insubordination, unless it affects the job or

11    overstaying lunch.

12         MR. DARLING:  I understand.  And I would -- yes,

13    if Mr. Duggan can be pointed to cover-ups related to

14    essential functions of the job, the plaintiff would

15    welcome that.  I just think it's cutting it too thin to

16    say it's just cover ups related to filling out forms.

17         THE COURT:  Well, essential portions of the job

18    would include forms that related to classification

19    decisions, for example, and that's probably the easiest

20    example.

21         MR. DARLING:  Sure.  I think there are other

22    job-related functions, especially as a supervisor, that

23    it goes to Sergeant Burnes' power to cover up and the

24    cover-up is itself at issue in this case.

25         THE COURT:  Right.

1          MR. DARLING:  Yeah.

2          THE COURT:  But that's going to the cart.  Let's

3     stay with the horse first.

4          MR. DARLING:  Okay.  So if -- go ahead.  I'm

5     sorry, Your Honor.  Please.

6          THE COURT:  All right.  So 15.  Where are we?

7     Have we fully covered its current status and anything

8     else that you need to do?

9          MR. DARLING:  I would like the Court to put some

10    timing on this because it's been two months and we still

11    don't have it.  And he said next week and I still don't

12    have anything.

13         MR. DUGGAN:  Your Honor, I would like to be heard.

14         THE COURT:  Of course.

15         MR. DUGGAN:  Just on the -- I think that in our

16    meet and confer last week it was apparent that the

17    parties have some small disagreements about what was

18    ordered in the -- at the previous hearing --

19         THE COURT:  You have a transcript, right?

20         MR. DUGGAN:  Yeah.  And so we were reviewing

21    the transcript -- we -- we reviewed the transcript

22    together and still, you know, a little bit of

23    disagreement over what was meant exactly.  And so

24    that's -- that's part of it.  And then, yeah.

25         THE COURT:  So how does that affect your

1    compliance with No. 50?

2         MR. DUGGAN:  So to argue it was cover-ups that are

3    limited to managing inmate access to other inmates and

4    classification or housing inmates that -- dishonesty

5    related to those -- to those matters is what was ordered.

6         THE COURT:  I would add -- I would add to that

7    perhaps dishonesty in reporting responses to inmate

8    distress.  I think that's very much an issue in the case,

9    and whether this was actually perceived inmate distress

10   or distress that it took deliberate indifference not to

11   see.  I think you understand where I'm going.  But that

12   should be part of it.

13        MR. DUGGAN:  Okay.  Well, I mean, with that

14   change, I will have to go back and look at that -- look

15   at them all again and look at the new ones we're getting

16   in.

17        THE COURT:  Hopefully that won't be too long.

18        16.

19        MR. DARLING:  Your Honor, sorry.  As it relates to

20   inmate distress, I think I interpret that -- surely in a

21   broader way than Mr. Duggan will, inmate distress is not

22   about, hey, I didn't get my lunch today or late to work,

23   but as it relates to inmate sense of safety and so -- and

24   to the extent that Sergeant Burnes is a supervisor and

25   people are -- there's allegations that in his position as

1    a supervisor, you know, the way that an inmate feels

2    safe, it doesn't have to be something like I, inmate,

3    feel -- I am in distress --

4         THE COURT:  No, no, no, no, no.  Look.  Look at

5    the allegations in this case.  We have a sheet covering

6    visual access.  We have a guy that is known to be a

7    violent offender housed with a new inmate.  There isn't

8    any, as I recall the pleadings and I could be wrong --

9    there isn't detailed information, correct me if I'm

10   wrong, about officers hearing horrible noises from behind

11   that white sheet that night, hearing the victim scream or

12   anything like that.  Correct me if I'm wrong.  But the

13   issue here is, I think, whether the mere presence of this

14   very violent guy celled with a new cell mate when he's

15   used to not having any cell mate at all, followed by a

16   long period of inattention from the prison officers and a

17   lack of taking any step to remove or do anything about

18   the white sheet that was hung to obstruct vision --

19        MR. DARLING:  So that's why, Your Honor, I think

20   why -- because Burnes was the supervisor at the time, but

21   he wasn't onsite over the night, but he was the guy

22   responsible for this unit.  And so that's why, as it

23   relates to inmate distress on prior occasions, you know,

24   I think that's why it is so crucial, including exactly

25   not just, hey, I'm physically threatened right now, but

1    even something like prior covering of sheets that the

2    correctional officers can't do proper safety checks.  So

3    I just want to emphasize that, you know, that is not just

4    defined so narrowly, that is convenient to the

5    defendants.

6            THE COURT:  Go ahead.

7            MR. DARLING:  Point two, Your Honor, is that the

8    defendants are maintaining that there is no -- they did

9    not hear anything, but I think there may be evidence that

10   there were others.

11           THE COURT:  Yeah, I'm operating on the pleadings

12   as they stand.

13           All right.  So is 15 now put to bed?

14           MR. DARLING:  Can we -- is there a date by which

15   they have to produce?  Because I'm just worried about

16   another two-month delay.

17           THE COURT:  How about a one-month delay?

18           MR. DARLING:  Produce by February 4th?  I mean,

19   excuse me, March 4th?

20           THE COURT:  March 4th, please.

21           Mr. Duggan, does that give you enough time?

22           MR. DUGGAN:  It should to, yes, bring things up to

23   the present.

24           But I do want to go back to the definition because

25   we had -- of what's being produced under the -- under the

 1  adjusted ruling, what I have written down is reported --

 2  dishonesty related to reporting responses to inmate

 3  distress.  Is that what we're -- as understood based on

 4  the discussion of the last few minutes?

 5        MR. DARLING:  I also heard allegations of

 6  dishonesty related to complaints.  And so it's not just

 7  distress, but complaints about Sergeant Burnes' lack of

 8  honesty in doing these job functions.

 9        THE COURT:  So we got two points:  What did they

10  do in response to signs of distress?  Whatever they were.

11  We don't have details about them.  All we know is the

12  white sheet and the celling of two who probably shouldn't

13  have been celled together.

14        The second question -- and it's separate, I

15  think -- is what the officers did once they realized what

16  had happened behind that curtain.  And there the question

17  of the cover-up comes in.  I don't know if the cover-up

18  issue would extend to the reasons for the double-celling

19  or the reasons for, as is alleged, failing to go through

20  the entire analysis of determining that it was safe to

21  cell these two people together.

22        MR. DARLING:  Plaintiffs' allegations, Your Honor,

23  are that the cover-up is related to the double-celling,

24  and because the double-celling itself was retaliatory to

25  the decedent's prior complaints against Sergeant Burnes

1  himself, because he had filed a complaint against Burnes

2  before --

3      THE COURT:  All right.  So that's going to cover

4  the inmate complaints referred to in 16, right?

5      MR. DARLING:  Off the top of my head.  I don't

6  know if -- if the decedent's complaints were five years

7  but, yes, yes, it is about inmate complaints.

8      THE COURT:  So are we clear about what we're

9  looking for in 15 and 16?

10      MR. DARLING:  Mr. Duggan, I believe that's

11  questions for you.

12      MR. DUGGAN:  Honestly, it is still a little bit

13  murky to me, Your Honor.

14      THE COURT:  Then why don't you repeat to me what

15  you think is called for in 15 and 16.

16      MR. DUGGAN:  In addition to what's -- what was

17  discussed in the last -- the last time, December 10,

18  2024, allegations of dishonesty or cover-ups or

19  retaliation relating to reporting, responses to inmate

20  distress, I think that's all, but --

21      THE COURT:  And the classification.

22      MR. DUGGAN:  And the classification, which I felt

23  was covered in the December hearing, but, yes, and

24  classifications okay.

25      THE COURT:  Okay.  Can we go to 18?

1          MR. DARLING:  Your Honor, just on 16, there was an

2     issue.  The complaints about allegations of bias last

3     time we were -- at the December hearing were allegations

4     of racial bias and it was narrowed to bias against other

5     Hispanics.  Mr. Duggan says there's no complaints against

6     southern Hispanics, but there are allegations of racial

7     bias against Sergeant Burnes.  So it is my position that

8     his racial bias, especially under California state law,

9     pitches dishonesty and racial bias is discoverable and so

10    this should be turned over.

11         THE COURT:  I'm a little confused.  And perhaps

12    that I just have not understood what you have recounted,

13    but were there allegations of racial bias against this

14    officer, specifically targeted against southern

15    Hispanics?

16         MR. DARLING:  It's my understanding -- that is an

17    allegation.  It is my understanding that there are --

18    that Mr. Duggan's position is that there are not

19    allegations of racial bias against southern Hispanics,

20    but there are allegations of racial bias against black

21    inmates.  And so -- so there is an allegation of racial

22    bias.  And so Mr. Duggan is cutting it finally to say it

23    doesn't apply.  And I'm saying wait a second, this is an

24    allegation of racial bias.  I'm entitled to it.

25         MR. DUGGAN:  That was the definition that was

1   decided in the last hearing and it was Mr. Darling's

2   suggestion, that it be limited to bias against southern

3   Hispanics because that's what -- that's what would relate

4   to this case.

5           THE COURT:  I agree.  I agree.  I don't think we

6   need to broaden it, Mr. Darling.

7           MR. DARLING:  Okay.

8           THE COURT:  All right.  Are we ready for 18?

9           MR. DARLING:  Yes, Your Honor.  The point here is

10  the retaliation.  So retaliation, is it retaliation about

11  just classification versus retaliation?  There is a

12  document at issue that there is retaliation for filing a

13  602 complaint.  And I think Mr. Duggan can state his

14  position, but he's saying that it's too narrow and it

15  wouldn't contemplate producing a document about

16  essentially retaliation for filing a 602.

17          MR. DUGGAN:  So at the previous hearing, this was

18  discussed and limited to retaliation by classification or

19  by housing an inmate in a certain way.  So in other

20  words, Burnes retaliated against me by housing me here or

21  housing me -- or placing me with a certain inmate.  And

22  so that's what was -- that's what the ruling was at the

23  previous hearing.

24          I now understand that we're going to expand it.

25  We've just -- the retaliation portion, as we just

1    discussed, with regard to No. 15.  And so I think that's

2    the ruling.  I'll go back and look for any retaliation on

3    that basis.

4        MR. DARLING:  But, Your Honor, to be frank, I do

5    not think this is a new thing at issue.  In the prior

6    hearing, there was retaliation and problems with

7    classification, but it wasn't the retaliation strictly

8    confined to retaliation by wrongly classifying.  It's

9    retaliation is retaliation.

10        THE COURT:  I'm not sure I understood the

11    difference between retaliation in the form of wrongful

12    classification or vengeful classification and retaliation

13    is retaliation.  We're dealing with a particular form of

14    retaliation here.  It is the retaliation of the housing

15    assignment that is alleged.  So why don't we limit it to

16    what's alleged.

17        MR. DARLING:  Well, Your Honor, because I think

18    there's so many ways that someone like a sergeant

19    responsible for a unit can retaliate -- and so that

20    retaliation against other -- that other complaints, other

21    personal complaints against Sergeant Burnes as it related

22    to acts of retaliation, I don't think they should be

23    refined to just how he retaliated in reclassifying.  It

24    can be retaliating from physical violence to harassment

25    to not moving a sheet in a cell and so I -- it seems to

1    me that based on the Court's ruling for 15, it's that the

2    retaliation, of course, can be in the classification

3    process, but it can be manifesting in some other ways

4    that we don't know about.

5        MR. DUGGAN:  I think we discussed it on 15 and,

6    you know, retaliation, it is expanded, so it is

7    retaliation in terms of reporting responses to -- to

8    inmate -- to inmate distress and classification.  I think

9    that's --

10        THE COURT:  I think those are the two things that

11    are at issue here, retaliation in terms of more onerous

12    work assignments.  Moving someone from the bottom bunk to

13    the top bunk.  That would get us into too many rabbit

14    holes that aren't relevant to the case.  So let's keep it

15    to the two forms of retaliation that are at issue in the

16    case.

17        MR. DARLING:  But something -- that example, I

18    think, is limited, Your Honor, because -- like, a work

19    assignment, for instance, can be a form of distress,

20    right, if an inmate is assigned to some onerous

21    assignment, that is itself a form of distress.  And so

22    I --

23        THE COURT:  What's the evidence that it happened

24    here, with either Osuna or Romero?

25        MR. DARLING:  Well, here, it's the classification,

1    but certainly it's also the distress related to not

2    covering up or not enforcing the law about covering up --

3    the coverings.

4         THE COURT:  Right, we talked about that.

5         MR. DARLING:  Not doing the safety checks.  And

6    so, you know, there's distress, but there can be prior

7    complaints, personal complaints, against Sergeant Burnes

8    that aren't just exactly the scenario.  It can be

9    Sergeant Burnes, you know, retaliating by assigning an

10   inmate to a more onerous work assignment or, you know, a

11   bunk if they have back issues.  There's -- again, there's

12   ways they can exert power that qualify as harassment that

13   I think are squarely within what's requested for 18.

14        THE COURT:  But if we limit 18 to retaliation in

15   classification decisions and in -- it's really the key

16   personnel complaints against you from the five years

17   before this incident of using retaliation in making

18   classification decisions.  That is tailored to what we're

19   talking about.

20        MR. DARLING:  There's also inmate distress, and so

21   it seems that inmate distress, which is what clearly --

22   what --

23        THE COURT:  If you want to ask -- if you want to

24   ask another question, all personnel complaints against

25   you from five years prior to the date of the incident for

1  retaliatory failures to respond to acute calls for

2  urgently needed inmate distress or protection, I think

3  those are the two things we're getting at.

4        MR. DARLING:  Understood.  We'll do both.

5        THE COURT:  All right.

6        MR. DARLING:  Thank you, Your Honor.

7        THE COURT:  That takes us to 31.

8        MR. DARLING:  Yes.

9        THE COURT:  The drugs that Mr. Osuna got.

10        MR. DARLING:  Right.

11        THE COURT:  I assume it's a long list.

12        MR. DARLING:  And so last we spoke, Mr. Duggan

13  said he got the wrong dates and that we will be producing

14  it when we get it, and he says hopefully in two weeks.  I

15  just don't want that to be a hope, given the delay.  So

16  if the Court, I guess, can put that same, you know,

17  March 4th --

18        THE COURT:  That's fine.

19        Okay.  The C-file for Mr. Osuna, any issues on

20  that?

21        MR. DARLING:  So there are -- there's the mental

22  health records and also the non-mental health records.

23        THE COURT:  So here's my question:  On the mental

24  health records, did the correctional officers who would

25  have been on duty the night of the incident, did they

1    have access to the mental health records?

2          MR. DUGGAN:  So that's -- the parts that were in

3    Osuna's C-file, yes.  The mental health services delivery

4    system records, no.

5          THE COURT:  So produce the part that was available

6    to the correctional officers who were on duty that night.

7          MR. DARLING:  Thank you.

8          MR. DUGGAN:  Those records are absolutely

9    privileged in our view.

10          THE COURT:  That's fine.  I will draft or someone

11    will draft for me an order compelling the production for

12    attorneys' eyes only in this case.

13          MR. DARLING:  And if the court -- I would really

14    appreciate if the Court does that because there's been

15    such delay.  I mean --

16          THE COURT:  Draft me an order.  Draft me a

17    proposed order and run it by Mr. Duggan.

18          MR. DARLING:  We did that in December, Your Honor,

19    and they objected and here we are two months later.  And

20    so they -- we're still fighting over it and Mr. Duggan's

21    last proposal is for more briefing on this issue.

22          THE COURT:  No, we're not going to have more --

23          MR. DARLING:  It's getting laughable, Your Honor.

24          THE COURT:  No more briefing.

25          So, Mr. Duggan, what is the issue if I order

1  subject to attorneys' eyes only under strict

2  confidentiality to be used only in this case, the

3  psychiatric documents in the C-file that were available

4  to the officers on duty that night?

5      MR. DUGGAN:  The issue is all the mental health

6  records are protected -- absolutely protected from

7  compelled disclosure under the *Jaffee* case.  So because

8  -- because Mr. Osuna hasn't waived that privilege, it's

9  the psychotherapist-patient privilege, common law

10  privilege created by the Supreme Court in the *Jaffee* case

11  --

12      THE COURT:  Does Mr. Osuna have the mental

13  capacity to waive?

14      MR. DARLING:  Your Honor, I would just like to

15  flap (sic) my arms right here and say that he is

16  misstating the law, that there's a Ninth Circuit case

17  called *Romo* that we briefed, that says it is not an

18  absolute privilege.  So I think this is a misstatement of

19  the law.  And *Romo* actually defines the contours where,

20  in fact, it could either be waived or it does not apply.

21  And so I think the Court is well within its power to --

22  to order this and it is absolutely not an absolute

23  privilege.

24      THE COURT:  All right.  So I apologize if I'm

25  retreading ground that we tread some months ago.  It's

1  been some months.  But I would propose Mr. Darling draft

2  me a stout order that is lauded with citations to the

3  authorities that you say authorize this limited release

4  under terms of confidentiality and restriction to

5  attorneys' eyes only.  Lard it up.

6          MR. DARLING:  Okay.

7          THE COURT:  And then make sure that Mr. Duggan has

8  a chance to see it.

9          MR. DARLING:  Okay.  I will do that.

10         MR. DUGGAN:  And, Your Honor, just to the question

11 of -- because you asked whether Mr. Osuna has the

12 capacity to waive or not waive.  We asked -- Mr. Osuna

13 has a -- has an attorney in the criminal matter, which is

14 still pending, and he -- so we asked Mr. Osuna's attorney

15 whether he would waive and Mr. Osuna's attorney said no.

16         MR. DARLING:  But here's the point on that:

17 Within the criminal context, Your Honor, CDCR has waived.

18 CDCR -- and I've briefed this.

19         CDCR turned over Osuna's mental health records in

20 the criminal case because Osuna's mental health was at

21 issue in that case, and now here CDCR's position is they

22 can't turn it over.  And so it's just so inconsistent.

23         THE COURT:  So I have a question.  I don't know if

24 you do this in California, but in Texas, I routinely get

25 requests to waive privileges or protections that were

1  imposed in one context in a different context.  For

2  example grand jury proceedings, moving on what was in the

3  grand jury proceedings.  Here, we move from criminal to

4  civil, different context.  I don't understand why there

5  would not be an ability to argue and present an order

6  that would say, because this is a different context,

7  because this is a -- because the records would be used in

8  this fashion and subject to these protections, we can

9  overcome what Mr. Duggan has described as a presumption.

10  So we say more than a presumption to begin production for

11  this purpose.

12       MR. DARLING:  I can include that in the order I

13  submit, Your Honor.

14       MR. DUGGAN:  Your Honor, I really think that would

15  include more briefing to make -- to make that decision

16  that this is a -- that this --

17       THE COURT:  Can I ask you a question, Mr. Duggan?

18       MR. DUGGAN:  Yes.

19       THE COURT:  Is there any other way to get the

20  information?

21       MR. DUGGAN:  Is -- the information that's --

22  that's absolutely privileged.  It's as the Supreme Court

23  said, this decision in *Jaffee* may result in probative

24  evidence not being available for these cases because it's

25  an absolute -- an absolute psychotherapy patient

1    privilege.  So for another way for Plaintiffs to get the

2    information, my suggestion would be they send a subpoena

3    to CDCR because -- and that -- and with that include a

4    waiver from -- from Mr. Osuna and that's how you can get

5    the --

6          THE COURT:  So if he doesn't waive?

7          MR. DARLING:  Right.

8          MR. DUGGAN:  Then it's not available under this

9    principle.

10          MR. DARLING:  This misstates the law, Your Honor.

11   *Romo* says -- a Ninth Circuit held that a defendant, for

12   instance, a confession to a prison counselor is not

13   protected, so if there is a desire to kill or discussion

14   about violence, the confession is not even protected.  So

15   this is an overstatement of the law.

16          THE COURT:  So to the extent we have those kinds

17   of statements, what else do we need?

18          MR. DARLING:  That's my point.

19          MR. DUGGAN:  Your Honor --

20          THE COURT:  Have you produced those kinds of

21   statements?

22          MR. DARLING:  No, he has not.

23          THE COURT:  Produce the statements.  Let's look at

24   the statements under the case law and you can produce

25   them again attorneys' eyes only and confidential, and if

1    after producing the statements, if we need to continue to

2    argue over whether that's a sufficient basis to require

3    the remaining records to be produced, we can have that

4    discussion at that point.

5              MR. DARLING:  Thank you, Your Honor.

6              The other contour --

7              THE COURT:  Hang on.  Hold on.  Mr. Duggan had

8    something to say.

9              MR. DARLING:  Sorry.

10             MR. DUGGAN:  There isn't even a request that --

11   that -- on this that would encompass those statements,

12   and to the extent that those -- that that -- so -- so

13   Sergeant Burnes would object to producing it on that

14   basis.  And then the -- you know, to the extent we're

15   covering now the non-C-file mental health records, the

16   mental health services delivery system records, those are

17   again absolutely privileged and they're not in Sergeant

18   Burnes' possession, custody, or control.  He has no

19   access to those.

20             THE COURT:  Who has them?

21             MR. DUGGAN:  CDCR.

22             THE COURT:  So why don't you take a deposition of

23   CDCR?

24             MR. DARLING:  Your Honor, here's the other issue

25   though:  Because the Court mentioned earlier this is

1    about officers who were on duty that day --

2          THE COURT:  Right.

3          MR. DARLING:  -- but there is a second issue, is

4    we have another defendant, Kyle, the social worker.  The

5    social worker was part of the classification process, and

6    so we've sought what that person had access to.  But also

7    that person, Kyle, the social worker, who's now married

8    name is Maytubby -- Kyle at the time -- and this is

9    Osuna's statements -- met with Osuna and would have

10   received those statements.  And those statements very

11   well might not have had -- the COs on duty that night may

12   not have access to it, but Kyle/Maytubby is also a

13   defendant to it.  So those non-C-file records that

14   Mr. Duggan is sequestering are squarely pertinent to the

15   claims against the social worker.

16         THE COURT:  Okay.  So the C-file, that would have

17   been available to the prison officers who were making

18   these decisions, that will be produced.  And, again, the

19   usual confidentiality, bells and whistles will be

20   maintained.

21         So are we now on the docket -- the document, the

22   RFP 48 documents, that pertain to any act of violence by

23   Mr. Osuna?

24         MR. DARLING:  Correct.  Insofar as we're moving

25   away from the C-file, it would be the acts of violence

1     or, you know, desire to commit violence, that these are,

2     you know, statements that were made to Kyle and other,

3     you know, mental health people that were -- you know, in

4     the process of the classification.

5          THE COURT:  And this would have been statements

6     that he made while he was incarcerated about what he

7     wanted to do while incarcerated.

8          MR. DARLING:  Correct, Your Honor.  Correct.

9          THE COURT:  Objection, Mr. Duggan?

10         MR. DUGGAN:  To the extent we're talking about

11    mental health service delivery, the mental health

12    services records that Sergeant Burnes doesn't have access

13    to, they're not in his possession, custody, and control.

14    So this request is directed to Sergeant Burnes.  He

15    doesn't have access to them.

16         THE COURT:  All right.  But you're going to take a

17    deposition or seek the discovery from the entity that

18    does, correct, Mr. Darling?

19         MR. DARLING:  Right.  Maybe this is a cart before

20    the horse thing, but we would need the order, if we do a

21    30(b)(6) deposition, if I'm sending that out, I can be

22    doing the song and dance in 30 days.  We would need the

23    order for a request, either the 30(b)(6) or to social

24    worker Kyle/Maytubby.

25         THE COURT:  The key to the griffin is in your

1    hand.  Get me the formal order.  Get me your motion and

2    formal order.  Mr. Duggan can object, but it needs to be

3    hedged around with all of those confidentiality

4    protections that we discussed.

5         MR. DARLING:  Absolutely, Your Honor.

6         MR. DUGGAN:  We likely will plan to object and

7    CDCR will likely object to the absolute privilege as

8    we've discussed before.

9         THE COURT:  I think we disagree over how absolute

10   absolute is.

11        MR. DARLING:  Your Honor, I will submit this later

12   this week.  Is there -- just because I really appreciate

13   the Court's attention to this, but I know the Court has

14   so many other cases.  Is there a mechanism where if in a

15   week after submitting I can just bother Ms. Hassan just

16   to make sure we can get this?

17        THE COURT:  Yes, just bother Ms. Hassan.

18        MR. DARLING:  Thank you.  I appreciate it.

19        THE COURT:  All right.  I appreciate your

20   concerns, Mr. Duggan, but it is an unusual case and we're

21   dealing with information that is very hard to get.  So

22   we're struggling with the usual restrictions on the type

23   of information that can be obtained in a case that simply

24   can't proceed without that information.  So that --

25        MR. DUGGAN:  Thank you.

1          THE COURT:  So I'm not faulting you for balking.

2          Okay.  That takes us to the IST training?

3          MR. DARLING:  Yes.

4          THE COURT:  As long as it's the training that led

5     to the lapses or the training that corresponds to the

6     lapses that are alleged in the complaint.

7          MR. DARLING:  I'd just request the same deadline

8     apply in a month, March 4, 2025.  Mr. Duggan said that

9     he's going to follow up with this, but he says he doesn't

10    know if there's any documents.  And so I think that the

11    issue here is -- it seems very fishy to me, that they

12    acknowledge that there was a training, that this training

13    occurred and yet there's no record of it.  And it's like

14    trainings are not that just seat of the pants.

15         THE COURT:  That's either going to be producing

16    the records, producing the names of people who would have

17    been either involved in or knowledgeable about providing

18    the trainings, specifically dealt with dealing with

19    window covers, guard wind checks, count procedures, or

20    cell obstructions.

21         MR. DUGGAN:  Okay.  This request is for

22    information about a specific training that took place on

23    March 10th and, I mean, there's not no records.

24    Plaintiff refers to a record of it.  And, you know, so --

25    you know, we haven't been able to locate any other

1    records at this point.

2         THE COURT:  So if the answer is there wasn't

3    anything on March 10th and the question doesn't cover

4    other training on other dates, then perhaps a different

5    question needs to be asked.

6         MR. DARLING:  No, no.  It's my understanding that

7    Mr. Duggan is saying that they acknowledge that there was

8    a training on March 10th.  It's that there --

9         THE COURT:  The documents.

10        MR. DARLING:  There's not these documents and that

11   seems fishy to me.  And so I am just requesting a

12   produce-by date of March 4th.

13        THE COURT:  Well, he said there is no training

14   documents to produce.

15        MR. DUGGAN:  Right.  We haven't found any more

16   documents besides the one that's referenced in the

17   request.

18        THE COURT:  Oh, that's what you got out of the

19   question that you presently framed.

20        84.

21        MR. DARLING:  Okay.  So 84.  And there's 85, they

22   kind of ducktail, Your Honor.

23        THE COURT:  Right.

24        MR. DARLING:  The issue -- the first issue is the

25   cell status review.  It's what documents were reviewed in

1    the process, and in talking just to Mr. Duggan about

2    this, there's -- some part of the ICC review is done by a

3    mental health specialist, who in this case was Defendant

4    Kyle now Maytubby.  Mr. Duggan's position is that

5    pre-mental health review is not -- is not part of the

6    ICC.  It's before the ICC.  And I'm saying, wait a

7    second, that's kind of silly.  If it is the person who is

8    the mental health specialist and is the representative

9    for that purpose for the ICC review, surely, what she

10   reviews is part of the ICC review process because it's

11   her role in the ICC review.

12            THE COURT:  I'm having a little trouble

13   understanding what the difference is between what you say

14   Mr. Duggan says and you're saying.  Is Mr. Duggan saying

15   that the -- that the psychiatrist reviewed before the ICC

16   review took place, but was part -- but that information,

17   her review or his review, was part of what the ICC looked

18   at?

19            MR. DARLING:  I am saying that is part of the ICC

20   and he's saying what they did is pre-ICC review and --

21            THE COURT:  And is it reviewed by the ICC?

22            MR. DARLING:  It's my understanding that it's part

23   of what Kyle brings to the table when she is part of the

24   ICC review, so yes.

25            THE COURT:  So how is what you're saying different

1    from what -- functionally there may be formal

2    differences, procedural differences.  How does it wind up

3    being different?

4          MR. DARLING:  I think for purposes of Mr. Duggan

5    he's saying it's not part of the review and thus not

6    responsive and so they're not going to produce it,

7    besides the other objection they have of saying these are

8    the mental health records and that they're not

9    discoverable, but the Court has already addressed that,

10   you know, with the order.  Essentially the second

11   objection is that these are mental health records and

12   thus that *Jaffee* case applies, but obviously the Court

13   has addressed that issue.  But I think the other

14   objection -- and Mr. Duggan can disagree with me, but

15   it's my understanding, his position is saying that the

16   records that they acknowledge to exist are not part of

17   the ICC review.

18         THE COURT:  The cell status review, is that the

19   review you're talking about?

20         MR. DARLING:  Yeah, yeah, the January 2019 cell

21   status review.  Yes, Your Honor.

22         THE COURT:  So it's not part of it, but is it

23   reviewed in conducting the cell status review?

24         MR. DARLING:  Yes.

25         THE COURT:  Mr. Duggan?

1          MR. DUGGAN:  Yeah.  So --

2          THE COURT:  It doesn't have to be paper-clipped

3   together.

4          MR. DUGGAN:  Right.  The issue that I -- that I

5   brought up with Mr. Darling was that, okay, so it says

6   the Corcoran Prison ICC review in conducting its cell

7   status review only, you know, it's not the whole ICC

8   review that would review those documents, only what the

9   mental health specialists would have access to and would

10  be able to review, and Plaintiff has sued the other

11  members of the ICC as well.  So saying that the ICC --

12         THE COURT:  Wait, wait, wait.  Let me get this

13  straight.  If the -- if a portion, a specialized portion

14  of the ICC reviews the documents, including the mental

15  health documents and then it makes a report to the other

16  members of the ICC so that the cell status review can be

17  conducted by the entire group, be responsible for the

18  classification decisions, doesn't that bring it into

19  discoverability?

20         MR. DUGGAN:  Certainly it's a -- I mean, I think

21  that -- it does bring it into a discoverability and we

22  still are objecting because it's not within Burnes'

23  possession, custody, and control.  But the -- but, yeah,

24  it's just -- my question was more about whether this

25  particular request asks for it because it says the ICC

1  reviewed.

2       THE COURT:  Does Mr. Burns get informed about the

3  results of the ICC review?

4       MR. DARLING:  Burns is part of it, Your Honor, the

5  process.  He was one of the three people.

6       MR. DUGGAN:  Not one of the three.  He was

7  present, but he's not one of the --

8       THE COURT:  He was present.  He knows what

9  happened.  He gets reported to them.  Fair enough?

10      MR. DUGGAN:  He's present for the report.

11      THE COURT:  Okay.  Provide these documents.  I

12  don't see --

13      MR. DUGGAN:  These are the mental health records

14  that Burnes does not have access to.  They are not in his

15  possession, custody, and control --

16      THE COURT:  So Mr. Darling knows how to get them

17  and they will be separately sought and again accompanied

18  with the confidentiality and attorneys' eyes only

19  protections.

20      MR. DARLING:  Perfect, Your Honor.  Thank you.

21      THE COURT:  85, unless we've already --

22      MR. DARLING:  It's similar, but it's -- if

23  anything, some of Mr. Duggan's objections to 84 are

24  addressed by 85 because it includes notes and other work

25  product.  So, in fact, it's all these things that would

1   have been reviewed by the clinical social worker Kyle in

2   that process --

3        THE COURT:  And reported to the cell site -- cell

4   status review folks?

5        MR. DARLING:  Exactly.

6        MR. DUGGAN:  So, yeah, this is -- this asks for

7   documents that the Corcoran Prison ICC produced, in other

8   words, the documents they created.  Those have been

9   produced already.

10       THE COURT:  All right.  Great.  What else --

11       MR. DARLING:  Sorry.  Sorry.  Your Honor, I'm

12  sorry.  It's my understanding based on prior discussions

13  with Mr. Duggan, in fact, that they could not find

14  documents, in that there was this kind of open question

15  that defendants had and what exactly was the universe of

16  documents.  So this is actually new to me because

17  Mr. Duggan has previously represented that the issue is

18  in defining the universe of documents, not that they've

19  actually produced them.

20       THE COURT:  So you've now totally confused me

21  because you said you got these documents and that was

22  totally new to you.

23       MR. DARLING:  Right.

24       THE COURT:  Do you need additional documents that

25  are within category number -- RFP No. 85?

1          MR. DARLING:  Yes.  Yes.

2          THE COURT:  What do you need?

3          MR. DARLING:  The notes and other work product

4    that up until just right now that Mr. Duggan has said he

5    does not have access to or were subject to the mental

6    health records or the mental health privilege.

7          MR. DUGGAN:  Not what I had previously said.

8          THE COURT:  Okay.

9          MR. DUGGAN:  I said that we produced all the

10   documents that the Corcoran Prison ICC produced.

11         MR. DARLING:  My notes from our last meeting,

12   quote, we have mental health records and are waiting for

13   an order, including core mental health records, so we're

14   waiting for an order -- and that he's not taking a

15   position whether ICC reviewed, including mental health

16   records, because some of these notes in our January 30th

17   conversation would be considered core mental health

18   records.  And so now he's saying he's produced it and

19   that's what our prior conversation included.

20         MR. DUGGAN:  I think your notes are for our

21   discussion of 84.

22         On 85, the request is documents Corcoran Prison

23   ICC produced, the documents that the ICC created.  Those

24   have been produced already.

25         MR. DARLING:  Again, it's how you slice it.  If

1    Kyle, in doing the mental health aspect, and as you

2    described, was this kind of pre-ICC part, that is, in

3    fact, part of the ICC, but the mental health component,

4    those mental health records are indeed work product for

5    the ICC and those have not been produced, I thought.

6         MR. DUGGAN:  You're saying notes taken by

7    Kyle/Maytubby in preparing.  Okay.  I don't think there

8    is such a thing, but we can look for it.

9         THE COURT:  Look for it.  Confirm its presence.

10   If you can confirm its presence, explain first to

11   Mr. Darling and then if needed to me why you shouldn't

12   need to produce it.  If you cannot confirm its presence,

13   tell that to Mr. Darling and Mr. Darling can make a

14   decision as to whether he wants to probe that further.

15        MR. DARLING:  Thank you, Your Honor.

16        THE COURT:  I think we reached the end of the

17   list.

18        MR. DARLING:  We have.

19        THE COURT:  I do have two additional questions,

20   maybe three.  Some of it is simply to refresh a fading

21   memory.

22        Ms. Stocker, what is your role in this?  You're on

23   mute.

24        MS. STOCKER:  Your Honor, I represent Officer

25   Silva.

1          THE COURT:  All right.

2          MS. STOCKER:  I am not involved in this particular

3   discovery dispute.  I did however -- if you're asking, we

4   did file a motion to dismiss.

5          THE COURT:  Yes, I'm aware of that.

6          MS. STOCKER:  And that's my role at the moment.

7          THE COURT:  Thank you.

8          Mr. Kuchinsky?

9          MR. KUCHINSKY:  I'm co-counsel with Mr. Duggan,

10  Your Honor.  I work at the Attorney General's Office as

11  well.

12         THE COURT:  All right.  I know we talked earlier

13  about non-adversarial resolutions in this and you

14  mentioned that you already explored some forms.  Does it

15  make sense to be thinking in advance of rulings on the

16  motion to dismiss that are pending, whether there is any

17  hope for any kind of mediation given what you're learning

18  about the case?

19         MR. DARLING:  I would like, Your Honor, just to

20  walk and chew gum.  So we have a mediation scheduled with

21  a respected private mediator.  But then I would also like

22  for these additional defendants to answer, so we can

23  schedule their depositions.  Plaintiff has deposed

24  majority of the individual defendants, but not all.  And

25  so I want to -- ideally have them answer and then they

1  can respond to some discovery requests and then sit for

2  their depositions.

3      THE COURT:  So you're looking at a mediation when?

4  In 2027?

5      MR. DARLING:  No, in a couple months.

6      MR. DUGGAN:  It's March 25th, Your Honor.

7      THE COURT:  And who is the mediator?  I don't know

8  if I'm going to know him or her.

9      MR. DARLING:  Richard Copeland.

10     THE COURT:  In California?

11     MR. DARLING:  Yes, Your Honor.

12     THE COURT:  All right.  Well, let us know what

13  happens after the mediation concludes, please.

14     MR. DARLING:  Thank you, Your Honor.

15     Yeah.  I mean, I think just given how slow it's

16  been to get certain documents, it's just, you know,

17  doing -- just beginning the process, to prepare for these

18  depositions.  Yeah, I just want to again walk and chew

19  gum.

20     THE COURT:  Is this mediation intended to cover

21  both this lawsuit and the lawsuit brought by Ms. Solares

22  about the dissemination of the pictures?

23     MR. DARLING:  Yes, Your Honor.  Yes.

24     THE COURT:  That would be good.

25     MR. DARLING:  I think all parties agree that if

1    there's going to be settlement it will be global.

2             THE COURT:  Very good.  All right.  Well, I'll put

3    the candies out for you and light the candles.

4             MR. DARLING:  Appreciate that.

5             THE COURT:  General question, are the California

6    courts since the fires, at least in the LA area, pretty

7    much back to normal?

8             MR. DARLING:  Yes, they are.

9             THE COURT:  Good.

10            MR. DARLING:  It was a rough January.  But it's

11   now going to be a rainy February, I think it is.

12            THE COURT:  Very good.  I'm impressed.

13            All right.  Anything else for today?

14            MR. DARLING:  The only thing I'm forecasting a

15   problem, if there is additional, I guess, delay or

16   briefing from -- from defense counsel on these mental

17   health records, is there some kind of timeline that we

18   can expect, you know, the order to be issued?

19            THE COURT:  You're going to draft me an order.

20            MR. DARLING:  Yes, Your Honor, this week.

21            THE COURT:  Mr. Duggan is going to look at it and

22   hopefully his objections will be none other than the ones

23   we've already discussed.  And Mr. Darling's formal order

24   will reflect that those discussions and rulings have

25   already taken place.  If the order is presented to me in

1  that fashion, I anticipate no delay in getting it signed.

2          MR. DARLING:  Thank you, Your Honor.

3          THE COURT:  All right.  Have a very pleasant

4  afternoon.

5          MR. DARLING:  Thank you so much.

6          THE COURT:  Enjoy the rain.

7          MS. STOCKER:  We are.

8          THE COURT:  Thank you very much.  You are all

9  excused.

10          MS. STOCKER:  Thank you, Your Honor.

11                        *  *  *  *

12          (WHEREUPON, the proceedings were adjourned.)

13                        *  *  *  *

14                    REPORTER'S CERTIFICATE

15          I, Nichelle N. Drake, RMR, CRR, Official Court
   Reporter, United States District Court, Eastern District
16  of Louisiana, do hereby certify that the foregoing is a
   true and correct transcript, to the best of my ability
17  and understanding, from the record of the proceedings in
   the above-entitled and numbered matter.

18

19                    /s/ Nichelle N. Drake
                   Official Court Reporter
20

21

22

23

24

25