

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

Jamie Osuna BD0868
PO Box 3476
CSP-COR
Corcoran, CA 93212
Third-party in

Dora Solares
           Plaintiff,
v.
Ralph Diaz, et al,
           Defendant.

No. 1:20-cv-00323-LHR-FRS

**REPLY TO DEFENDANTS' OPPOSITION TO NON-PARTY OSUNA'S MOTION FOR PROTECTIVE RELIEF**

    Non-party Jamie Osuna submits this reply to Defendants' opposition (ECF No. 217) for the limited purpose of addressing Defendants' assertion that compelling his deposition during a pending homicide prosecution is necessary and appropriate.

### I. Defendants Admit the Deposition Is Sought as an Exploratory Tool During a Pending Criminal Case

    Defendants do not dispute that Mr. Osuna is a pretrial criminal defendant facing prosecution arising from the same incident at issue here. Nor do Defendants identify any exigent need for his testimony. Instead, Defendants argue that "Osuna's deposition should go ahead" in order to "determine what discovery [the parties] can and cannot get with the criminal matter pending," and only afterward decide whether a stay is appropriate. (ECF No. 217.)

    That admission confirms the impropriety of the request. Civil discovery may not be used as a test mechanism to probe the limits of compelled testimony from a criminal defendant while prosecution is ongoing. *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980) (en banc)

### II. Compelling Osuna's Deposition Is Unnecessary Given Extensive Alternative Civil and Investigative Sources Already in Defendants' Possession

    Defendants' claim that they need Mr. Osuna's deposition—particularly as to events preceding the incident—is incorrect. The California Attorney General's Office already represents defendants in multiple civil actions involving overlapping correctional staff, same facility/unit,

and same time period immediately surrounding the incident at issue here. Those matters include *Osuna v. Burnes*; *Asuna v. Brown* (captioned as docketed), *Jaramillo v. Burnes* (two actions); and *Hammler v. CDCR*, among others, as well as internal investigative materials generated by the Office of Internal Affairs.

Attached as Exhibit A are limited, illustrative excerpts from sworn civil pleadings and an OIA investigative report involving overlapping correctional staff and institutional actors during the relevant timeframe. The excerpts are not offered for the truth of any allegation, not for impeachment or propensity, and not for any merits determination, but solely to demonstrate the availability and scope of alternative civil and investigative sources addressing staff conduct and institutional practices—without compelling testimony from a criminal defendant.

Defendants therefore cannot plausibly claim necessity.

### III. The Deposition Would Serve Only to Create Irreversible Prejudice to a Non-Party Criminal Defendant

Mr. Osuna has provided advance notice that he will not answer deposition questions and will invoke his Fifth Amendment privilege and right to counsel. Forcing the deposition to proceed under these circumstances would be futile and coercive, serving only to create a recorded proceeding that fixes privilege boundaries, reveals defense posture, and creates public docket-level prejudice against a criminal defendant.

This Court should not permit civil discovery to proceed in a manner that imposes one-sided prejudice on a non-party criminal defendant—particularly where the district court has not ruled on multiple pending third-party motions seeking protection.

### IV. Conclusion

For these reasons, and for those stated in Mr. Osuna's motion, the Court should grant protective relief and prohibit Defendants from compelling Mr. Osuna's deposition.

Dated: January 13, 2026

*/s/ Jamie Osuna/*

p.p. Jamie Osuna

# EXHIBIT A

Exhibit A consists of the following illustrative excerpts:

A-1: *Hammler v. State of California*, E.D. Cal. No. 2:20-cv-00884-TLN-DMC

A-2: *Jaramillo v. Burnes*, E.D. Cal. No. 2:23-cv-00797-AC

A-3: *Asuna v. Burnes* (captioned as docketed), E.D. Cal. No 3:19-cv-09913-SI

A-4: OIA Investigative Report (CSP-Corcoran) C-COR-083-20-A

and Pattern of Unconstitutional Behavior is Subjecting Plaintiff to.

10. Plaintiff asserts the Threat to his Safety is longstanding, well Documented by the number of incidents on Record and the Complaints Filed going to the Cookie Cut Facts of each seprate instance, to Point that the news station in 2019 Reported on the number of Complaints being engendered alludes to the issues being pervasive and within the knowledge of each of the Defendants For cause to preclude their Declaring ignorance

11. Plaintiff, on the date of 4,29,2019 at 1:35 pm witness a Patient inside 4R1R. Hallway while seated in a chair, Hand-cuffed Hands behind him, and wearing a spit-mask be suddenly-- Punched in the Face twice by Sgt. Burnes and then thrown to ground and Beaten, Kicked, etc. For over 2 minutes, litarally. C/o Hernandez aiding him and others Plaintiff did not recognize, to Point that C/o Cruz and supervising Psychologist K. Kyle had to clean Blood spatter up with Towells that had Flew some distance away From where the attack had taken place. It should be noted that the Alarm was mandated to be sounded at the start of the incident

9 of 16

4

but was not activated until after they had stopped Beating the Patient. A Pregnant C/O Sanchez being hands Free watched From the office and did not Sound the Alarm, nor did the Femal Sgt. who just paced back and Forth while it all took place.

12. Then on date of 5,20,2019 at 9:30 am Burnes, Cruz, Romero, Toporra..., Alejo and a number of other(s) without cause entered Patient Robinson's Cell in 4A1R. Beating him Bloody without sounding Alarm. Then in escorting Robinson From the Cell Alejo intentionally and with Great Violence and Force Banged Robinson's Head against a Concreat Piller while he was Hand-cuffed Hands behind him and not resistive.

13. On or about the date of 1,12,2020 at or about 8:00 am Plaintiff witnessed Defendant Navarro Escorting a Patient From his Cell who was not in any way resisting or posing threat to him, being Hand-cuffed behind and Defenseless have Navarro Suddenly and without warning throw him to the Ground and into a Blind spot where he repeatedly Punched him while Villa, and HC. Escort Aguirre stood just watching, Failing to Sound the Alarm until after Navarro had stopped his attack. Other incident(s) of the

10 oF 16

A-1

5

Case 2:23-cv-00797-AC   Document 1   Filed 04/27/23   Page 5 of 19  Page 3-A

Cause of of Action, supporting facts continue:

3. Def. A. Hernandez and S. Bartolow where holding the Plaintiffs arms kneeing and punching the face of him. Defs A. Rodriguez and Sgt. J. Burnes stood watching the whole time till they saw the Plaintiff look at them then they took turns kicking the Plaintiff in the face causing a gash in the eyebrow and bruises and swollen areas. From E. Ruiz's baton the back of the Plaintiffs head has a split/gash in it also bleeding.

Defs A. Garcia and M. Darrett are hitting and kneeing the Plaintiffs legs and unecessarily holding the prone legs of his.

Def Burnes finally orders the other Defs to put cuffs and leg irons on the plaintiff at no point did the Plaintiff choose to strike the Defs even though they were attacking him while his left arm was in a full arm splint from the 4·25·19 incident. The Defs couldn't get the splint off to put cuffs on so they attempted to rip and twist it off as shown in the pictures of the incident/injurys.

When the cuffs and leg irons were put on tight as possible the Defs took the Plaintiff to the rotunda next to the office of the C/O S. With the leg irons on and the chair buckwards the Plaintiff couldn't sit down and told the Defs that but they pulled him to the floor and Defs. A. Hernandez and S. Bartolow punched and kneed him a few times and then picked the prone Plaintiff up and he chose to just sit down regularly on the now forward chair.

At this point Def. J. Burnes called on the radio for a ERV and medical to come to 441R. After that he tried to humiliate the plaintiff who's sitting and being held down by the rest of the Defs by saying how does it feel to get battered? The Def hit the Plaintiff twice with a punch and then the Plaintiff said you aint shit! Def E. Ruiz yelled "Don't talk to my Sgt. like that!" and tackled the sitting Plaintiff to the ground and begun punching him and then Def. Burnes ordered one of the Defs to "break that fucking wrist!" It was very painful cause they used the cuffs as leverage but suddenly two Psychtechs came into the block a older white man and female. Def Burnes yelled hesterically "Get out, Get out, Get out if it doesn't concern you!"

A-1 (CONTIN.)

6

Page 3-B Case 2:23-cv-00797-AC   Document 1   Filed 04/27/23   Page 6 of 19

Continuing supporting facts:

3. The Psych techs got scared and ran back out of the block then the Def Burns ordered the rest of the Def to "prck him up and sit him down". The Plaintiff chose to go along with the Defs to get it over with.

Finally Medical, different Psych techs came to see the Plaintiff. They came with the GRV I believe. Once the medical decided the Plaintiff needs to get more treatment. While on the gurney the Def. tried again to humiliate the Plaintiff taunting him with random comments of gang affiliations, baffling the responders and medical. We are paid really to much attention to him though, he kept it up even outside in front of 4A1R Building.

Def's Bartolew and A. Hernandez watched/escorted the Plaintiff during his medical treatment. Again the plaintiff never chose to injure the Defs. Once done with medical a video staff complaint was done at 4A1R with Sgt. Green. After that the Plaintiff was put back in the 25 cell. Dealing daily with harassments and taunts of the Defs.

During the whole incident C/O Def. Villanueva-Garcia was in the tower doing as the Def. Sgt. J. Burns ordered. Even though he did not get a chance to hit and beat the plaintiff.

All the incidents here were done with malice and forethought by the Defs and should be accountable for those actions.

A-2

7

## B. NATURE OF THE CASE

1) Briefly state the background of your case. This is a Civil Rights Action filed by (Jommie Ascuna) a defendant class (State Prisoner/Patient) of Mental Health whom was seriously injured and brutally assaulted and battered by C.S.P-Corcoran Prison (A-Facility) S.H.U Unit Guards/Officials and (I.S.U.) Prison Security Officers who retaliated on (Plaintiff) who was sexually harassed and abused for exercise of his protected conduct violations of the 1st, 4th, 5th, 8th, and 14th Amendments U.S.C. this rights.

## C. CAUSE OF ACTION

### COUNT I

The following civil rights have been violated: That the (Defendants) named illegally used excessive force and brutality on the (Plaintiff) in their custody without provocation violations of his 8th Amendment right to safety and protection. 18 USC 82, 8150, 8241-242, 83(4)(c), 84000-SCnSL, et seq.)

Supporting Facts: (Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each defendant (by name) did to violate your right.) Named Defendants (J. Burce & A. Encinas, Sgts.), Yo-J. Garcia (I.S.U.), S. Gonzales (I.S.U.) - E. Leija; Yo M. Rodriguez; Yo Acid R.N. - L. Valasquez by force put (Plaintiff) into handcuffs restraints on both wrists behind (His) back and put leg irons on (His) ankles so tight the (Plaintiff's) wrist, hands, and ankles went numb with severe pain. (He) was then dragged (30-yards) from (His) cell - to the front of A-Yard Office and placed into a chair. A Spit mask hood was placed over (His) face and his head forced into His lap by named Defendants who punched and kicked (him) in the head, face, ribs, back for (45-minutes) till knocked unconscious.

### COUNT II

The following civil rights have been violated. The actions and omissions of Supervisory Official Defendants named who failed to intervene and prevent harm, constituted deliberate indifference to the (Plaintiff's) welfare, health and safety in violations of the (8th Amendment U.S.C.) as they refused to protect (him) from known risk of harm by rogue subordinate (Defendants) named herein.

312

A-3

8

Internal Affairs Administrative Investigation Report Number C-COR-083-20-A                Page 3

**CONFIDENTIAL**

When they entered the rotunda, RODRIGUEZ stopped Serrano and told him they needed to wand Serrano's legal paperwork. BURNES advised Serrano to give the legal paperwork to RODRIGUEZ. LOZA then began punching Serrano in the face. BURNES "egged" LOZA on by saying, "Get him! Get him! Get him!" The officers then took him down to the ground and put Serrano on his stomach. LOZA turned Serrano's face towards BURNES. BURNES said, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ BURNES then kicked Serrano in the face. ▮▮▮▮▮▮▮▮▮▮▮▮▮ Serrano estimated LOZA punched him between seven to 10 times before he lost consciousness. He guessed BURNES struck him in the face and head more than 15 times before he lost consciousness. Serrano stated they were "going to town on him." Serrano stated he was kicked and punched in the face until he passed out. When he regained consciousness, staff (unknown who) was still attacking him. Arden and Gamboa arrived and one of them (unknown who) twisted his fingers back on his hand which caused extreme pain.

BURNES then ordered the officers put a spit mask on Serrano because he was bleeding so heavily. Once the spit mask was placed on his head, Serrano could not see. Serrano could not breathe and BURNES told him, "Shut the fuck up, you're breathing!" Correctional Lieutenant Anthony Randolph arrived and told Serrano, "Shut your screaming! Ain't nobody doing nothing to you!" An unknown officer continued to twist his fingers in a backward motion.

The officers then sat him on a chair and pushed his head forward against the backrest. The backrest dug into his neck and choked Serrano. Serrano could not breathe so he tried to get "out the way" and the officers yelled at him to "Stop resisting!" Serrano later indicated he likely had a seizure at that time which caused him to sit up. Serrano told them, "You guys are choking me!" Medical staff then arrived and he was transported to the TTA. Serrano stated there was no altercation at the TTA with staff and stated he was cooperative and compliant.

After the incident, the skin around his ankles was torn and bleeding. Serrano believed he suffered a seizure during the incident from the assault. As a result of the injuries he sustained, Serrano has had surgery to repair damage to his nose and still feels residual pain on his hand and fingers.

Serrano denied having three weapons in his possession at the time of the incident. Serrano explained he was wearing orthopedic shoes at the time of the incident. The shoes have metal parts which could explain why one of the metal pieces was found. Serrano stated if he actually had weapons on him at that time, the officers would have found them during their search as he exited the cell. Serrano denied trying to head butt anybody and denied that his face hit the pillar. Serrano also commented that Sanchez was not present as documented in the CDCR reports. Serrano insisted RODRIGUEZ was one of the officers who escorted him that day and the officers are trying to cover for Sanchez by lying in their reports about who was present.

Revised 7/2019                **CONFIDENTIAL**

A-4

Internal Affairs Administrative Investigation Report Number C-COR-083-20-A        Page 5

**CONFIDENTIAL**

documentation as well as synopsize the incident. Once Hodson completes her evaluation of an incident, the incident is discussed at the Incident Executive Review Committee (IERC). Representatives from the Investigative Services Unit (ISU), Medical, In-Service Training Department (IST), Mental Health, area managers, and the Warden or Chief Deputy Warden are all required to attend the IERC. They hear the incident review and go over the package to determine whether or not the force used was in compliance with policy. If there is a disagreement on whether the force used was within policy, the Hiring Authority will either request additional clarification from involved staff, will recommend training, or request a CDCR 989 Internal Affairs Investigation Request. This particular case was never presented at IERC.

In February 2020, Hodson authored a memorandum (**Exhibit 3**) relating to her evaluation of the use of force pertaining to Serrano on June 13, 2019. When Hodson reviewed the incident package, one of Hodson's concerns was that the documented force used on Serrano did not match Serrano's account of what occurred. Staff reports indicated his face struck a pillar however Serrano denied that happened. In Hodson's prior experience, the inmate would generally disclose that type of force because it was "unusual." Also, Hodson did not understand how BURNES was able to see the razor in Serrano's mouth if BURNES was holding Serrano's face down to the ground. Hodson stated she was also concerned with the fact that no other officers mentioned in their reports hearing BURNES order Serrano to drop the weapon. No other staff documented seeing a weapon during or after the incident. In Hodson's opinion, that was unusual and typically the finding of weapons is documented somewhere in other reports. Hodson's understanding was that they got Serrano to his feet and took him to get medically evaluated. While Serrano was waiting for the ERV, he became resistive again and they had to use force on him a second time. During the second use of force, he was pushed forward while sitting in a chair and smashed his face on the ground. Serrano's statement indicated that did not occur and they only assaulted him while he was on the ground. Hodson stated the officers were required per policy to have a second medical evaluation completed since it was technically a different use of force incident. There was no CDCR 7219 from the CTC included in the package.

With respect to the three weapons found on Serrano's person, Hodson also had concerns. Hodson reiterated her concerns about the weapon found in Serrano's mouth. Hodson questioned the thoroughness of the unclothed body search on Serrano. There were two other weapons that were documented by ISU but no staff member involved referenced either of the other two weapons in any of their reports. The fact that nobody referenced the weapons was very unusual. Hodson stated BURNES is typically a very good report writer and his documentation of the event was unusually incomplete. Since BURNES is always so detailed, Hodson found it strange that he failed to document the weapons or even mention in his report that he requested ISU. Furthermore, Hodson stated Serrano did file a CDCR 602, wherein he denied having weapons.

Revised 7/2019                      **CONFIDENTIAL**

**A-4 (CONTIN.)**