Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORA SOLARES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RALPH DIAZ, in his individual capacity, KENNETH CLARK, in his individual capacity, JOSEPH BURNS, in his individual, and DOES 1 TO 15, in their individual capacities<br><br>Defendants. | Case No. 1:20-cv-00323-LHR-BAM<br><br>**PLAINTIFF'S APPLICATION FOR RECONSIDERATION; MEMORANDUM OF POINTS & AUTHORITIES; DECLARATION**<br><br>Date:         March 20, 2026<br>Time:        8:30 a.m. PST<br>                  1:30 a.m. CT<br>Courtroom: Zoom<br>Trial Date:  February 3, 2026<br>Action Filed: March 2, 2020 |

TO THE HONORABLE COURT, ALL DEFENDANTS AND THEIR

ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 20, 2026, or as soon thereafter as the parties may be heard in Courtroom 8 of the above-entitled Court, located at 2500 Tulare Street, Fresno, CA 93721, Plaintiff Dora Solares will and hereby do move the Court to reconsider its order regarding mental health documents, and specifically requests that certain documents that discuss Osuna's homicidal ideations be unredacted and shared with Plaintiff's counsel.

1

1  This motion is made pursuant to Eastern District Local Rule 230(j), Federal Rule
2  of Civil Procedure 60, the documents and declaration that has been filed under seal, the
3  accompanying Memorandum of Points and Authorities, all papers and pleadings on file
4  for this action, and upon such other evidence and argument as the Court deems
5  necessary or convenient, including Plaintiff's argument at the hearing.

Respectfully Submitted,

**LAW OFFICES OF ERIN DARLING**

DATED:  March 6, 2026

By:   /s/ Erin Darling
     Erin Darling
     Attorney for Plaintiff,
     DORA SOLARES

2

## MEMORANDUM OF POINTS & AUTHORITIES

### I. Overview and Relief Requested

At issue are documents that reflect Osuna's homicidal ideations. Eager to avoid the galling level of notice provided to individual defendants, the psychotherapist-patient privilege is the evidentiary hill that defendants will die on. As discussed herein, at every turn the psychotherapist-patient privilege either does not apply, gives way, or has been waived.

On September 12, 2025, the Court granted in part and denied in part CDCR's motion to quash plaintiff's subpoena to the OIG that sought, *inter alia*, documents related to the investigation of Romero's murder. (Dkt. No. 206). The Court has also denied Plaintiff's request for an order for CDCR to provide certain mental health records of Osuna and ruled that the psychotherapist-patient privilege applies and that Osuna did not waive it. (Dkt. No. 213) Here, Plaintiff moves the Court to reconsider that ruling and order defendants (and OIG) to provide unredacted documents showing details of Osuna's homicidal ideations. Plaintiff also references under seal portions filed in support of this motion.

Subsequent developments have since occurred that necessitate this motion. First, Plaintiff's counsel has been able to review document produced in response to the OIG subpoena, which reflect notice of Osuna's homicidal ideations. Second, in February 2026 Plaintiff's counsel has deposed defendants LCSW Maytubby (nee Kyle), Assistant Warden Martin Gamboa, Sergeant Joseph Burnes, and Correctional Counselor Estevan Moreno, all of whom participated in the ICC on January 22, 2019, which designated Osuna to be double celled. The last deposition of these individuals (Gamboa) concluded on February 25, 2026. All four individuals in their depositions stated that LCSW Maytubby (nee Kyle) did not provide information that Osuna posed a threat to others, or did not recollect that she did so. The depositions could have gone the other way: that the ICC members were on notice of Osuna's professed homicidal ideations and ignored it, which would have focused liability in this respect more on the other ICC

3

members, who did not heed the information that the social worker could provide. Thus, it has been confirmed by all ICC participants that a central aspect of claims against LCSW Kyle has been established. The Court may review under seal documents for details of which LCSW Kyle was on notice.

The combination of the document described in the Under Seal portion regarding notice of Osuna's homicidal ideations, and the other ICC members' denial of any notice of these ideations, form a set of circumstances that, when read in light of the operative law, demonstrate that the Court's prior ruling was in error, as described below. However, Plaintiff's argument here is narrower than the argument the Court heard in 2025, as it is focused on documents that were shared within CDCR prior to Romero's murder, not the testimony of LCSW Kyle at trial.

## II.     Standard for Reconsideration

Federal Rule of Civil Procedure 60 provides a means for a party to obtain relief form an order. Fed. Rule Civ. Proc. 60(b). "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993). Per Eastern District of California Local Rule 230, a motion for reconsideration shall be supported by "affidavit or brief" and set forth the facts and circumstances, including: (1) when and to what Judge or Magistrate Judge the prior motion was made; (2) what ruling, decision, or order was made thereon; (3) what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion; and (4) why the facts or circumstances were not shown at the time of the prior motion. E.D. Cal. L.R. 270(j).

In this case, after the parties litigated the issue and the Court ruled on the privilege, there was newly produced evidence pursuant to the OIG subpoena. Some of those documents have been included for consideration as under seal filings. In addition, Plaintiff only concluded depositions of the other ICC members in late

4

1 February 2026. Only then could Plaintiff confirm that defendant LCSW Kyle did not
2 share homicidal ideations, despite sharing other information for purposes of Osuna's
3 classification. The declaration of counsel attached to the request to seal sets forth
4 additional details. Together, this all presents new or different facts or circumstances,
5 since Plaintiff could not know what other ICC members would say, and what the
6 under-seal documents would show. Legally, this presented a set of factors that bore
7 further analysis under caselaw, *inter alia*, and as discussed below, *Jaffee*, *Romo*, and *Chase*.

**III.    Argument**

**A.    The Psychotherapist-Patient Privilee Does Not Apply**

Defendants rely heavily on *Jaffee v. Redmond*, 518 U.S. 1 (1996), even though the Supreme Court expressly declined to hold that the psychotherapist-patient privilege is absolute. The *Jaffee* Court stated: "Because this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours." *Jaffee*, 518 U.S. at 18. The Court further acknowledged that "there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by a therapist." *Id.* at 18 n.19. Subsequent lower court decisions confirm that the federal psychotherapist-patient privilege recognized in *Jaffee* "is not rooted in any constitutional right of privacy." *United States v. Glass*, 133 F.3d 1356, 1358 (10th Cir. 1998); see also *United States v. Chase,* 340 F.3d 978, 993 (9th Cir. 2003)[1] ("a violation of the psychotherapist-patient privilege is not a constitutional error"); *United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (the psychotherapist-patient privilege recognized in *Jaffee* "is a testimonial or evidentiary one, and not constitutionally based.")

The psychotherapist-patient privilege is a *testimonial* privilege. Although generally disfavored, the Supreme Court in *Jaffee* a noted that an "exception from the general rule

---

[1] Plaintiff thanks the Court for permitting this motion and acknowledges that the *Chase* case cited in the "Additional Issue Re: Pre-Motion Hearing" brief on February 26, 2026, does not reflect the *en banc* ruling discussed herein.

5

disfavoring testimonial privileges" was justified due to the public policy goal of mental health. *Jaffee*, 518 U.S. at 10. Here, Plaintiff questions whether that policy goal applies when all parties know mental health information will be shared within CDCR.

The nature of a testimonial privilege is key to understanding why it should not preclude the sharing of documents that evince notice of Osuna's homicidal ideations. The Ninth Circuit in *Chase* held that a therapist cannot be compelled to *testify* in a federal criminal trial about what a dangerous patient said during therapy but left "for another day the questions whether a psychotherapist may testify to…the fact of disclosure of threats as permitted under state law…the content of that disclosure." *Chase,* 340 F.3d at 988 n. 4. However, the question presented here is fundamentally different: whether *records* that an LCSW reviewed, generated, and/or was obligated to share in her capacity as a correctional classification decision-maker are shielded from discovery in a civil rights action, especially in light of mental health records being shared regularly for administrative determinations. Plaintiff's argument operates on at least three levels:

**(1) Mental Health routinely shared documents with CDCR officials making administrative decisions, which means no privilege applies**

Where mental health evaluations, and a patient's own words in the course of treatment, are shared with institutional decision-makers for administrative proceedings (not treatment purposes), any ongoing psychotherapist privilege is inapplicable and/or it has been waived.

Under the Ninth Circuit's framework in *United States v. Romo*, 413 F.3d 1044, 1047 (9th Cir. 2005), the psychotherapist-patient privilege requires that the communication occurred "in the course of diagnosis or treatment." The burden of establishing this element falls on the party asserting the privilege. *Id.* In *Romo*, the Ninth Circuit held that a defendant's confession to a prison counselor was not protected by the psychotherapist-patient privilege. *Romo*, 413 F.3d at 1049. The privilege generally applies only when the results of psychological tests or details of treatment are not

6

disclosed to anyone, however, when communications are recorded in documents that are to be shared then the privilege does not apply and *Jaffee* is inapposite. *Duenez v. City of Manteca*, 2013 U.S. Dist. LEXIS 24954, 20131 WL 684654, at *20 (E.D. Cal. Feb. 22, 2013)(privilege did not apply to psychological evaluations subsequently submitted to employer); *see also Kamper v. Gray*, 182 F.R.D. 597, 599 (E.D. Mo. 1998) (no reasonable expectation of confidentiality where evaluations shared).

Additionally, where someone did not seek treatment but was ordered to see a psychotherapist, "the ensuing psychotherapist-patient relationships were not the type contemplate when the Supreme Court recognized the privilege." *Romo*, 413 F.3d at 1048 (quoting *Barrett v. Vojtas*, 182 F.R.D. 177, 179 (W.D. Pa. 1998) (holding psychotherapist-patient privilege did not apply to conversations and notes taken during counseling sessions with psychiatrist and psychologist where officer was ordered by officials to be examined by them and doctors submitted certain reports to officials). Moreover, a prisoner has no reasonable expectation of privacy in psychological records and reports generated pursuant to routine custodial protocols, as well as observations about his behavior and demeanor while in custody. *United States v. Loughner*, 782 F.Supp.2d 829 (D. Ariz. 2011) (citing *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

CDCR officials (who are not mental health staff) can request mental health assessments and Mental Health will share such assessments, even the direct words of a patient. CDCR routinely conducts administrative proceeding, of which the ICC is just one, that factor in assessments of an inmate's mental health. When defendant LCSW Kyle sat on the CSP-Corcoran ICC on January 22, 2019, she was not engaged in diagnosing or treating Osuna. She was performing a correctional administrative function and participating in a custodial determination about whether Osuna could safely share a cell with another human being. In this role it was expected that she share Osuna's mental health details. Indeed, Kyle shared an assessment of Osuna at the ICC, just not about his homicidal ideations. The ICC is not a therapeutic setting. Its function is to evaluate custody determinations and whether to share a cell.

7

1    Defendant Kyle's dual role (providing/supervising treatment outside of
2 administrative proceeds and when providing details of that treatment to CDCR officials
3 in administrative proceedings) is even more fatal to the privilege claim than the
4 circumstances in *Romo*. In *Romo*, the question was whether a single meeting between a
5 counselor and an inmate was therapeutic. Here, the question is whether records that
6 Kyle reviewed as part of a multi-member classification committee — a committee that
7 included non-clinicians like Sergeant Burnes — retain any character as privileged
8 therapeutic communications. They plainly do not. The moment mental health
9 information is shared with an ICC (or any other CDCR body), it has been
10 communicated outside the therapeutic relationship for an administrative purpose. The
11 force of this argument is that it does not require overcoming *Chase* at all. It does not
12 invoke a "dangerous patient exception." It simply holds that the privilege was never
13 established in the first instance because the communications and records at issue were
14 generated in, or disseminated for, a non-therapeutic correctional context.

### (2) *Chase* recognized that the *Tarasoff* duty to disclose is a separate obligation from the testimonial privilege, and Kyle's failure to fulfill that duty is what Plaintiff seeks to prove.

18    The Ninth Circuit in *Chase* separated two concepts: the duty to disclose (a duty
19 which *Chase* upheld) and the testimonial privilege, as in the right to not testify to
20 confidential communications (which *Chase* preserved). This distinction was discussed
21 further in the context of state privilege law: "Almost all the states, then, recognize the
22 distinction between confidentiality (which is affected by the *Tarasoff* duty) and
23 testimonial privilege (which is not)." *Chase*, 340 F.3d at 986. The *Tarasoff* duty is the
24 psychotherapist's state-imposed obligation to report a dangerous patient. *Tarasoff v.*
25 *Regents of Univ. of Cal.*, 17 Cal.3d 425, 442 (Cal. 1976) ("[T]he protective privilege ends
26 where the public peril begins.") For some states, the *Tarasoff* duty can exist, while the
27 psychotherapist "still may not testify to confidential communications." *Chase*, 340 F.3d
28 at 986. However, "California has an evidentiary dangerous-patient exception…In

8

1  California, a psychotherapist not only must disclose to authorities or intended victims
2  the existence of a dangerous patient, but also may testify to threats made in the course
3  of therapy." *Id.*; *see* Cal. Evid. Code § 1024 ("There is no privilege under this article if
4  the psychotherapist has reasonable cause to believe that the patient is in such mental or
5  emotional condition as to be dangerous to himself or to the person or property of
6  another and that disclosure of the communication is necessary to prevent the
7  threatened danger.") Cal. Evid. Code § 1024 permits testimony and requires disclosure.

8        The *Chase* decision further elaborated this distinction between a duty to disclose
9  and a testimonial privilege to not testify later when it addressed footnote 19 in *Jaffee*
10 ("there are situations in which the privilege must give way, for example, if a serious
11 threat of harm to the patient or to others can be averted only by means of a disclosure
12 by a therapist"). Centrally relevant to this case, the *Chase* court explained, "[w]e read
13 that footnote as endorsing – albeit elliptically – a duty to disclose threats to the
14 intended victim and to the authorities." *Chase*, 340 F.3d at 984. The *Chase* court then
15 dropped a footnote itself, which stated: "We believe that the *Jaffee* footnote was
16 intended to extend this non-testimonial disclosure rule to psychotherapist-patient
17 relationships to which federal law applies (such as treatment by federally employed
18 psychologists at overseas army hospitals)." *Chase*, 340 F.3d at 984 n. 2.

19       Defendants have no shelter: either California's *Tarasoff* duty and Evidence Code
20 § 1024 apply, or the federal non-testimonial disclosure rule elaborated in *Chase* applies.
21 Either way, on January 22, 2019, LCSW Kyle had a duty to disclose Osuna's
22 dangerousness to the ICC. If LCSW Kyle fulfilled that duty (which seems unlikely
23 given that no one on the ICC recalls her sharing a threat), the statements she made are
24 not therapeutic treatment but administrative communications putting others on notice
25 of Osuna's dangerousness. If LCSW Kyle breached that duty, then the records
26 demonstrating what she was on notice of (regarding Osuna's homicidal ideations) are
27 necessary to establish Plaintiff's claims of deliberate indifference. In either scenario, the
28 testimonial privilege recognized in *Chase* is not implicated because Plaintiff is not

9

1  seeking to compel Kyle's testimony about confidential therapeutic conversations.
2  Plaintiff is seeking *records* — documents that were either shared with the ICC for
3  classification purposes or that should have been shared under Kyle's professional
4  obligation to protect identifiable potential victims (i.e. anyone forced to share a cell
5  with Osuna). As a matter of fact, mental health records are routinely shared outside of
6  Mental Health to other CDCR bodies for administrative determinations.

7  This is the critical factual distinction from what was at issue in *Chase*. In *Chase*,
8  the government sought to have a doctor testify at a criminal trial about threats a patient
9  made during therapy sessions, but the doctor had already notified the FBI of the
10 patient's articulated danger to others, meaning the doctor had already complied with
11 her *Tarasoff* duty. Here, Plaintiff seeks documents that a social worker on a classification
12 committee either reviewed, generated, or was obligated to share with non-clinical
13 correctional officials as part of a housing assignment decision that directly resulted
14 Romero's death. These are categorically different questions, and *Chase*'s holding on the
15 testimonial privilege simply does not reach them, but *Chase*'s interpretation of the *Jaffee*
16 footnote does. *Chase*, 340 F.3d at 984 n. 2 ("We believe that the *Jaffee* footnote was
17 intended to extend this non-testimonial disclosure rule to psychotherapist-patient
18 relationships to which federal law applies.")

19 **(3) *Chase* acknowledges California's statutory duty to disclose and applies
20 it federally, and Osuna had no expectation of privacy in his homicidal
21 ideations.**

22 While *Chase* declined to adopt a federal dangerous-patient exception to the
23 testimonial privilege, it also brought federal law into line with state law regarding the
24 non-testimonial duty to disclose. Plaintiff has alleged that Osuna articulated homicidal
25 ideations to LCSW Kyle (or those she supervised). *See* Dkt. No. 134 at ¶ 16. Under
26 California law, at the time Osuna articulated these ideations he could have had no
27 reasonable expectation that they would remain confidential. California law expressly
28 provides that such statements fall outside the privilege and that a therapist who learns

10

1  of such threats has an affirmative duty to protect potential victims. *See Tarasoff v. Regents*
2  *of the University of California*, 17 Cal. 3d 425, 431 (1976); Cal. Evid. Code § 1024. *Chase*
3  recognized that state-law confidentiality rules inform a patient's reasonable
4  expectations, and that "the legal rule itself, whatever it may be, will govern the patient's
5  expectations." *Chase*, 340 F.3d at 988-89. "Communications that are intended to be
6  disclosed to third parties are generally not protected by a testimonial privilege" because
7  "there would be no reasonable expectation of confidentiality." *Barrett v. Vojtas*, 182
8  F.R.D. at 179. Thus, Osuna never had a reasonable expectation of privacy that
9  homicidal ideations shared with a mental health professional at CSP-Corcoran would
10 not be shared.

11       The Fifth Circuit adopted this precise reasoning in *United States v. Auster*, 517 F3d
12 312, 319 (5th Cir. 2008), holding that a patient who makes threats of violence to a
13 therapist has no reasonable expectation of confidentiality because the patient knows, or
14 should know, that such statements trigger a duty of disclosure. The communication of
15 homicidal ideations is not "confidential" under *Jaffee* and so privilege never attaches to
16 them. Put another way, Plaintiff does not argue for "dangerous patient exception" to
17 the testimonial privilege, but that the communication of homicidal ideations was never
18 privileged under *Chase* in the first place.

19       **Synthesizing the above, Plaintiff makes the following points: (a)**
20 **defendant Kyle had a state duty to inform the ICC of Osuna's homicidal**
21 **ideations; (b) there was no federal privilege that prevented her from doing so,**
22 **and in fact, mental health information was routinely shared with CDCR officials**
23 **making administrative decisions; (c) documents that establish what she should**
24 **have known about Osuna's homicidal ideations are not privileged.**

25       Defendant Kyle, as a licensed clinical social worker serving on the January 22,
26 2019 ICC, occupied a role that required her to evaluate Osuna's dangerousness for
27 purposes of making a classification decision with direct implications for the safety of
28 other inmates. In that role, Kyle either had access to — or should have obtained —

11

1  Osuna's mental health records documenting his homicidal ideations and desire to kill.
2  Under California's *Tarasoff* framework, which *Chase* itself endorsed as a separate and
3  surviving obligation, Kyle had a duty to disclose that information to the ICC to protect
4  potential victims. And under the Ninth Circuit's analysis in *Romo*, any records Kyle
5  generated, reviewed, or shared in her capacity as an ICC member — as opposed to her
6  capacity as Osuna's treating therapist — were not created "in the course of diagnosis or
7  treatment" and therefore never fell within the privilege.

8  Under the Fourteenth Amendment failure-to-protect framework applicable in
9  the Ninth Circuit, Plaintiff must show that defendants failed to take reasonable
10  measures to abate a substantial risk of serious harm. *Castro v. County of Los Angeles*, 833
11  F.3d 1060, 1071 (9th Cir. 2016) (*en banc*). The mental health records documenting
12  Osuna's articulated desire to kill are the most direct evidence of what CDCR officials
13  knew — and what Kyle, in particular, should have known — when the ICC decided to
14  permit Osuna to share a cell with another human being.

15  To permit the privilege to shield precisely the records that would demonstrate
16  Kyle's knowledge of Osuna's homicidal tendencies would be, as the Supreme Court
17  recognized in footnote 19 of *Jaffee*, one of those "situations in which the privilege must
18  give way." 518 U.S. at 18 n.19. The Court's language in that footnote was not idle dicta;
19  it was an acknowledgment that the privilege cannot be permitted to function as a
20  barrier to accountability when serious harm to others is at stake. While the Ninth
21  Circuit in *Chase* declined to adopt a blanket "dangerous patient exception" to the
22  *testimonial* privilege in *criminal* proceedings, the court's reasoning was grounded in the
23  concern that compelled *testimony* by a therapist would undermine the therapeutic
24  relationship. The instant case presents fundamentally different circumstances: Plaintiff
25  seeks *records* — documents that were already shared with correctional decision-makers
26  for administrative purposes — in a *civil rights action* brought by the mother of the man
27  whom CDCR officials permitted to be killed. CDCR inmate mental health records are
28  routinely shared with non-mental health officials for purposes of making administrative

decisions, such as punishment, classification or housing.

Not only does a mental health provider have a *Tarasoff* duty and the inmate have no expectation of privacy, but mental health records of in fact routinely shared. Such documents cannot be deemed privileged, even if a mental health provider can invoke the testimonial privilege. Moreover, as explained below, CDCR's practice of sharing an inmate's mental health records with custodial staff for purposes of making administrative determinations means that any privilege, should it exist, is waived.

**B.   Waiver**

The Supreme Court in *Jaffe* recognized that the psychotherapist-patient privilege could be waived: "Of course, the psychotherapist-patient privilege, like other privileges, can be waived." *Jaffee*, 518 U.S. at 15 n. 14. In *Jaffee*, the Supreme Court repeatedly analogized the psychotherapist- patient privilege to the attorney-client privilege. In the context of the attorney-client privilege, nonwaiver must be proved by the party asserting the privilege. *See, e.g. United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002. Here, a review of the under-seal documents and declaration show that any purported privilege was waived.

**C.   Protective Order**

To the extent any privacy interest remains, the Stipulated Protective Order entered January 8, 2024 (ECF No. 76) provides robust protections. Documents designated "CONFIDENTIAL — ATTORNEYS' EYES ONLY" may not be disclosed to any non-attorney party, any inmate, any CDCR employee, or the public. These protections extend beyond final disposition of the litigation.

Courts have consistently held that where a protective order is in place, any residual privacy concerns are adequately addressed, the privilege should not bar production. *Soto v. City of Concord*, 162 F.R.D. 603, 617 (N.D. Cal. 1995) (privacy interests sufficiently protected by tightly drawn protective order); *Debeaubien*, Case No. 2:19-cv-1329-WBS, 2021 U.S. Dist. LEXIS 79498, at *6 (E.D. Cal. Apr. 26, 2021) (privilege inapplicable where defendants failed to explain why existing protective order

was insufficient); *I.R. v. City of Fresno*, Case No. 1:12-cv-558-AWI, 2014 U.S. Dist. LEXIS 52094, at *11-12 (E.D. Cal. Apr. 11, 2014) (privilege waived where protective order was in place).

The Court can review the documents in question and see what is shared within CDCR, and what has been shared with counsel subject to a protective order and conclude that any privacy interests (outside of the privilege issue discussed above) can be properly addressed.

### IV.    Conclusion

Plaintiff respectfully requests that the Court grant the motion for reconsideration and order that documents reflecting Osuna's homicidal ideations be unredacted and/or produced. The Court can review for itself what defendants have already shared with Plaintiff, and what defendants wish to avoid, claw back, or keep hidden. The policy goals articulated in *Jaffee* do not contemplate such perverse results.

Respectfully Submitted,

DATED:  March 6, 2026                               **LAW OFFICES OF ERIN DARLING**

By:   /s/ Erin Darling
        Erin Darling
        Attorney for Plaintiff,
        DORA SOLARES