ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7666
 Fax:  (916) 324-5205
 E-mail:  Jeremy.Duggan@doj.ca.gov
*Attorneys for Defendants Burnes, Gamboa,
Garcia, Gallemore, Maytubby, Munoz, Loza,
and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br><br>                                      Plaintiff,<br><br>            **v.**<br><br>**RALPH DIAZ, et al.,**<br><br>                                      Defendants. | 1:20-CV-00323-LHR-FRS (PC)<br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  September 11, 2026<br>Time: 9:00 a.m. (Pacific time)<br>Judge:          Hon.  Lee H. Rosenthal<br>Action Filed:  March 2, 2020 |

     Pursuant to Local Rule 260(a), and Federal Rule of Civil Procedure 56, Defendants Burnes, Gamboa, Garcia, Gallemore, Maytubby, Munoz, Loza, and Pena submit this statement of undisputed facts in support of their motion for summary judgment.  These facts are undisputed for purposes of this motion only, and Defendants reserve the right to present different or additional facts at trial.

/ / /

/ / /

1

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 1.    An Institutional Classification Committee (ICC) at a California Department of Corrections and Rehabilitation (CDCR) prison reviews an inmate's case factors, such as custody level, disabilities, medical needs, restricted housing, and mental health participation, and makes determinations regarding where within the prison system that inmate can and should be housed. | Moreno Decl. ¶ 3; Gamboa Decl. ¶ 3; Cal. Code Regs. tit. 15, § 3375 (2019). |
| 2.    An ICC consists of three members: (1) a correctional counselor; (2) a captain or acting captain, and (3) the warden or warden's designee, who acts as the chairperson.  An ICC can also include additional participants, such as a correctional officer or sergeant and a mental health representative. | Moreno Decl. ¶ 4; Gamboa Decl. ¶ 5. |
| 3.    Before the committee, the correctional counselor reviews the inmates' files and prepares a recommendation of any actions for the committee to take as to each inmate.  For each inmate, the correctional counselor gives a presentation, goes over the inmate's history and any key documents, and makes a recommendation to the committee. | Moreno Decl. ¶ 5; Gamboa Decl. ¶ 6. |
| 4.    During committee, the committee chair sits behind a computer so they can review any part of the inmate's file that is relevant to the committee action. | Gamboa Decl. ¶ 6. |
| 5.    Jaime Osuna is currently serving his third term in CDCR custody, which started in 2017.  In his first two terms, from August 2006 to September 2007, and from December 2008 to October 2011, Osuna had a cellmate for most of the time, with few gaps. | Lynch Decl. at 23; Osuna Cellmate history DEF 009212-009217 (Moreno Decl. Ex. A.) |
| 6.    On September 6, 2018, an ICC was held at California State Prison, Sacramento, for inmate Jaime Osuna.  The ICC cleared Osuna | Burnes Decl. ¶ 17; Lynch Decl. at 25. |

2

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| for double-cell status, meaning he could have a cellmate. | |
| 7. Jaime Osuna arrived at California State Prison, Corcoran (from California State Prison, Sacramento) on September 13, 2018. | Burnes Decl. ¶ 9. |
| 8. Defendant Sergeant Burnes completed an Initial Housing Review (IHR) for Osuna on September 13, 2018. | Burnes Decl. ¶ 9 & Ex. A. |
| 9. An IHR is completed on the day an inmate arrives at an institution to ensure that the inmate is being properly housed. The official performing the review reviews the inmate's housing history and case factors, confirms that the inmate is being properly housed under the criteria established by CDCR, and completes a required form. | Burnes Decl. ¶ 9-10. |
| 10. Burnes's review confirmed that Osuna had been cleared for double celling by an ICC at his previous institution. | Burnes Decl. ¶ 10 & Ex. A. |
| 11. Burnes reviewed Osuna's file and confirmed that there was no history that would require a further evaluation for single-cell status under title 15, section 3269(d). | Burnes Decl. ¶¶ 11-12. |
| 12. Osuna did not have a history of in-cell assaults or in-cell violence toward a cell partner, a history of in-cell sexual abuse, or any verified predatory behavior toward a cell partner. | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 13; Moreno Decl. ¶ 7; Munoz Decl. ¶ 17. |
| 13. Osuna did not have a history of being victimized by cell partners and did not have other factors, such as incontinence or gender dysphoria, which would increase the risk of victimization by a cell partner. | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 13; Moreno Decl. ¶ 7; Munoz Decl. ¶ 17. |
| 14. ████████████████████████ | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 14; Moreno Decl. ¶ 8; Munoz Decl. ¶ 18. |

3

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 15. ▮▮▮▮▮▮▮▮▮▮ | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 14; Moreno Decl. ¶ 8; Munoz Decl. ¶ 18. |
| 16. ▮▮▮▮▮▮▮▮▮▮ | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 15; Moreno Decl. ¶ 8; Munoz Decl. ¶ 19. |
| 17. ▮▮▮▮▮▮▮▮▮▮ | Burnes Decl. ¶ 12; Gamboa Decl. ¶ 15; Moreno Decl. ¶¶ 8-9; Munoz Decl. ¶ 19. |
| 18.  An ICC for Osuna was held at California State Prison, Corcoran on September 25, 2018. | Burnes Decl. ¶ 17; Maytubby Decl. ¶¶ 16-17; Lynch Decl. at 25; ICC Chrono (Moreno Decl. Ex. B.) |
| 19.  The September 25, 2018 ICC continued Osuna's double-cell, general population (GP) status. | Burnes Decl. ¶ 17; Maytubby Decl. ¶¶ 16-17; Lynch Decl. at 25; ICC Chrono (Moreno Decl. Ex. B.) |
| 20.  From September 2018 to March 9, 2019, Osuna was housed in building 4A1R, which is designated LTRH (long term restricted housing), which was housing for inmates who had committed rules violations in prison and were required to serve disciplinary terms in restrictive housing because of those violations | Burnes Decl. ¶¶ 8, 12, 21; Gamboa Decl. ¶¶ 9-10. |
| 21.  Many of the inmates in LTRH have committed murder or other violent crimes, have assaulted staff in prison, have assaulted other inmates in prison, have used weapons in prison, and have tattoos on their faces. Under CDCR policy, those factors do not prevent them from being housed in LTRH, and those factors do not prevent them from having a cellmate in LTRH. | Burnes Decl. ¶¶ 12, 13, 16; Gamboa Decl. ¶ 10. |

4

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 22.    A second ICC for Osuna took place on January 22, 2019. | Burnes Decl. ¶ 19; Gamboa Decl. ¶ 7 & Ex. A; Maytubby Decl. ¶¶ 18-19; Moreno Decl. ¶ 4. |
| 23.    At the January 22, 2019 ICC for Osuna, Defendant Gamboa was the committee chair, the correctional counselor was E. Moreno, and the captain was A. Randolph.  There were two additional staff members present, Licensed Clinical Social Worker K. Kyle, and Sergeant J. Burnes. | Gamboa Decl. ¶ 7 & Ex. A; Moreno Decl. ¶ 4; Burnes Decl. ¶ 19; Maytubby Decl. ¶ 18. |
| 24.    The January 22, 2019 ICC for Osuna was convened to change Osuna's status from general population (GP) to sensitive needs yard (SNY) ▇▇▇▇▇▇▇▇▇▇ ▇▇ Correctional Counselor Moreno presented his recommendation that Osuna's status should be changed from double-cell GP to double-cell SNY. | Burnes Decl. ¶ 21; Maytubby Decl. ¶ 19; Gamboa Decl. ¶ 8; Moreno Decl. ¶ 10. |
| 25.    The January 22, 2019 ICC conducted a cell review regarding Osuna's double-cell status. Under CDCR policy, inmates are presumed to be assigned to double-cell status unless they have certain factors that warrant consideration of single-cell status. Those factors are described in California Code of Regulations title 15, section 3269(d), as follows: "a history of in-cell abuse, significant in-cell violence towards a cell partner, verification of predatory behavior towards a cell partner, or who have been victimized in-cell by another inmate." | Gamboa Decl. ¶¶ 12-13 & Ex. A; Moreno Decl. ¶¶ 6-10; Burnes Decl. ¶ 22; Duggan Decl. ¶ 2 & Ex. A (Cal. Code Regs. tit. 15, § 3269(d) (2019 version)). |
| 26.    The January 22, 2019 committee reviewed Osuna's case factors and found that Osuna did not have any factors warranting further consideration of single-cell status under title 15 section 3269(d). | Gamboa Decl. ¶¶ 12-13 & Ex. A; Moreno Decl. ¶¶ 6-7; Burnes Decl. ¶ 22. |

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 27.  Osuna's case factors and disciplinary history, ▮▮▮▮▮▮▮▮ but no history of in-cell predatory or in-cell assaultive behavior toward cellmates, did not warrant single-cell status under CDCR policy. | Gamboa Decl. ¶¶ 14-20 & Ex. A; Moreno Decl. ¶¶ 6-10; Burnes Decl. ¶ 22. |
| 28.  The committee adopted Moreno's recommendation and changed Osuna's status from double-cell GP to double-cell SNY. | Gamboa Decl. ¶ 7; Moreno Decl ¶ 10. |
| 29.  Defendant Gamboa was not aware, at any time before Luis Romero's death, that Osuna was a danger to a potential cellmate. | Gamboa Decl. ¶¶ 22-23. |
| 30.  The January 22, 2019 decision to continue Osuna's double-cell status was in accordance with CDCR policy. | Burnes Decl. ¶ 22; Gamboa Decl. ¶ 13; Lynch Decl. ¶ 26. |
| 31.  At ICCs where the inmate is in CDCR's mental health services delivery system (MHSDS), a mental health representative is present in addition to the three committee members described above. | Maytubby Decl. ¶ 6. |
| 32.  The role of the mental health representative in an ICC is to speak with the inmate and confirm to the committee that the inmate understands and can participate in the proceedings, and to provide information to the committee regarding the inmate's mental health status and activities of daily living. | Maytubby Decl. ¶ 15. |
| 33.  The inmate's conversations with mental health staff in a clinical setting are confidential and protected by psychotherapist-patient privilege, so the mental health representative does not share that information with the ICC. | Maytubby Decl. ¶ 15. |
| 34.  The mental health representative does not decide an inmate's classification; instead, it is custody staff who determine whether past behavior, such as the prisoner's crime, rules | Maytubby Decl. ¶ 14. |

Defs.' Statement of UMF in Support of Mot. for Summ. J.  (1:20-CV-00323-LHR-FJS)

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| violations, violence toward other inmates, and violence toward staff, warrants single-cell status. | |
| 35.   In an ICC, the mental health participant weighs in on single-cell or double-cell status only if the prisoner's mental health condition warrants one status or the other. | Maytubby Decl. ¶ 14; Grey Decl. at 5. |
| 36.   A history of generalized homicidal ideations does not warrant single-cell status for CDCR mental health patients. | Maytubby Decl. ¶ 14; Grey Decl. at 5. |
| 37.   Defendant Maytubby was the mental health representative at the January 22, 2019 ICC for Osuna. | Maytubby Decl. ¶ 18. |
| 38.   Osuna did not attend the committee, so Maytubby's role was to inform the committee of Osuna's mental health status, level of care, and any likelihood of decompensation due to being housed in a restricted housing unit. | Maytubby Decl. ¶ 18; Grey Decl. at 6. |
| 39.   Maytubby provided the committee with information regarding Osuna's mental health status, level of care, and likelihood of decompensation. | Maytubby Decl. ¶ 18; Grey Decl. at 6. |
| 40.   At the January 22, 2019 ICC, Maytubby did not comment on double-cell versus single-cell housing status because Osuna's mental health did not affect his suitability for one status or the other. | Maytubby Decl. ¶ 18. |
| 41.   Separate from an ICC, mental health staff are required to report any threat to the safety of an individual (of which custody staff is not already aware) to custody staff. | Maytubby Decl. ¶¶ 12-13; Grey Decl. at 4. |
| 42.   If the threat necessitates a specific type of housing, such as single-cell or double-cell, mental health staff would convene an Interdisciplinary Treatment Team (IDTT) to make documented findings and a | Maytubby Decl. ¶¶ 12-13; Grey Decl. at 4. |

7

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| recommendation to custody staff on a form 128-C. | |
| 43.   Maytubby did not know, and did not have any reason to know, before Luis Romero died in March 2019, that Jaime Osuna presented a threat to other inmates generally. | Maytubby Decl. ¶ 8-10, 13. |
| 44.   Defendant Maytubby did not know before Luis Romero's death that Jaime Osuna presented a danger to Luis Romero. | Maytubby Decl. ¶¶ 8-10. |
| 45.   Defendant Burnes did not know at any time before Luis Romero's death, that Osuna was a danger to a potential cellmate. | Burnes Decl. ¶ 6. |
| 46.   Under CDCR policy, when a new inmate arrives at California State Prison, Corcoran, or any CDCR prison, and the new inmate is double-cell cleared, the inmate can, and should, be housed with a compatible cellmate on the same day in order to maximize cell usage. | Burnes Decl. ¶ 31; Munoz Decl. ¶ 12; Loza Decl. ¶ 9. |
| 47.   The process for assigning more than one inmate to a cell in a restricted housing unit is described in Department Operations Manual section 54046.7.1 (2019 version).  The process is initiated by either a staff recommendation or a request by the inmate. | Munoz Decl. ¶ 13; Loza Decl. ¶ 12; Burnes Decl. ¶ 32; Duggan Decl. ¶ 3 & Ex. B (DOM § 54046.7.1). |
| 48.   Before two inmates can be celled together, a correctional officer reviews the inmates' central files, speaks with each inmate, and evaluates any security concerns. | Munoz Decl. ¶ 13; Loza Decl. ¶ 12; Burnes Decl. ¶ 32. |
| 49.   In Facility 4A at California State Prison, Corcoran, staff's practice was to have the two potential cellmates meet and speak to one another before agreeing to cell together by placing them in the two holding cells in the rotunda where they can see one another and talk. The holding cells are small cells without beds where inmates can be temporarily | Munoz Decl. ¶ 13; Loza Decl. ¶ 11-12; Burnes Decl. ¶ 32. |

8

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| placed and monitored by 4A1R staff from their office. | |
| 50.  If both inmate candidates agree, the correctional officer gathers their signatures and completes a CDCR Form 1882-B by signing and dating it, and then forwards the signed 1882-B to a correctional lieutenant for review. | Munoz Decl. ¶ 13; Loza Decl. ¶ 12; Burnes Decl. ¶ 32. |
| 51.  In February or March 2019, Osuna told Defendant Loza that he was requesting a cellmate. | Loza Decl. ¶ 10. |
| 52.  On March 7, 2019, Luis Romero arrived at California State Prison, Corcoran. | Loza Decl. ¶ 11; Munoz Decl. ¶ 11; Burnes Decl. ¶ 30. |
| 53.  On March 7, 2019, Defendant Burnes conducted an IHR for Romero. | Burnes Decl. ¶ 23 & Ex. B. |
| 54.  During the IHR review, Burnes confirmed Romero's double-cell status and that there was no history that would require an evaluation for single-cell status under CDCR policy. Romero did have an in-cell fight in 2016, but multiple ICCs had reviewed that incident and retained Romero's double-cell status. | Burnes Decl. ¶¶ 23-28. |
| 55.  Burnes's review found that Romero had been sent to LTRH to serve a disciplinary term because he had been found guilty of possessing a weapon after a fight with another inmate in the dining hall at Mule Creek State Prison. | Burnes Decl. ¶ 24. |
| 56.  Burnes's review found that Romero had a history of aggression toward staff and multiple batteries on peace officers. | Burnes Decl. ¶ 25. |

9

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 57.  Burnes's review found that Romero had a history of aggression toward other inmates, including multiple batteries. | Burnes Decl. ¶ 25. |
| 58.  Romero's history of aggression against staff and other inmates did not prevent him from being double-cell cleared under CDCR policy. | Burnes Decl. ¶ 25. |
| 59.  Burnes's review also found that Romero's commitment offense was a 1992 murder of a 15-year-old girl in Compton, California. That commitment offense did not prevent Romero from being double-cell cleared under CDCR policy. | Burnes Decl. ¶ 26. |
| 60.  Burnes also reviewed the list of inmates for whom Romero had separation alerts and concluded that none of them were housed at California State Prison, Corcoran. | Burnes Decl. ¶ 27. |
| 61.  Burnes's review found that Romero's case factors, taken together, did not warrant any further single-cell evaluation. | Burnes Decl. ¶ 28. |
| 62.  Based on Burnes's Initial Housing Reviews, Romero and Osuna were compatible to cell together under CDCR policy because they both had similar crimes (both had murdered a female), were the same race, ███████████████████ ███████████████████ | Burnes Decl. ¶ 34. |
| 63.  On March 7, 2019, Burnes was not aware of any information indicating that there was a security concern from housing Romero and Osuna together. | Burnes Decl. ¶ 36. |
| 64.   . Shortly after arriving at California State Prison, Corcoran, Romero was escorted to housing unit 4A1R and placed in one of the two holding cells in the rotunda. Defendant Loza spoke with Romero, and Romero informed Loza that he was | Loza Decl. ¶ 11-13; Burnes Decl. ¶ 30. |

10

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| requesting a cellmate. Loza therefore started the process to determine whether Romero and Osuna were compatible as cellmates. | |
| 65.   On March 7, 2019, officer Loza reviewed Osuna and Romero's central files to confirm they were compatible as cellmates. | Loza Decl. ¶ 13. |
| 66.   Romero and Osuna both had similar crimes (both had murdered a female), were the same race, ███████████ ██████ | Loza Decl. ¶ 13; Munoz Decl. ¶ 15; Burnes Decl. ¶ 34. |
| 67.   Both Romero and Osuna had been to ICC within the previous two months where their double-cell status was continued. | Loza Decl. ¶ 13; Burnes Decl. ¶ 34. |
| 68.   Officer Loza did not see any information indicating that there was a security concern from housing Romero and Osuna together. | Loza Decl. ¶ 13. |
| 69.   Because Romero and Osuna were compatible based on their central files, Loza moved on to the next step and placed Osuna in the holding cell next to Romero's holding cell so that the two could talk. | Loza Decl. ¶ 13. |
| 70.   While Romero and Osuna talked, Loza was nearby in the office, where he could see the inmates talking but could not hear what they were saying. | Loza Decl. ¶ 14. |
| 71.   After Romero and Osuna spoke for about half an hour, Loza returned and they confirmed that they had agreed to be housed together in the same cell. | Loza Decl. ¶ 14. |
| 72.   Loza handed them the 1882-B form to sign, and they both signed the document. | Loza Decl. ¶ 14. |
| 73.   Loza then signed the 1882-B and provided it to Lieutenant F. Munoz for his review. | Loza Decl. ¶ 14. |

11

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 74.   Loza left work at 2:00 p.m. when his shift ended. At that time, Romero was still in the holding cell waiting for his housing to be approved. | Loza Decl. ¶ 15. |
| 75.   Loza did not know that being celled with Jaime Osuna presented a substantial risk of serious harm to Luis Romero at any time before Luis Romero's death. | Loza Decl. ¶¶ 4-5. |
| 76.   On March 7, 2019, Lieutenant Munoz conducted his review of Romero's and Osuna's files and confirmed that they were compatible as cellmates. | Munoz Decl. ¶ 15. |
| 77.   Munoz further reviewed their central files and disciplinary history to confirm that their double-cell status was correct under California Code of Regulations title 15, section 3269(d). | Munoz Decl. ¶ 16. |
| 78.   Munoz's review of both inmates' histories found that ████████████ ██████████████████████████ ██████████████████████ | Munoz Decl. ¶¶ 17-23. |
| 79.   Munoz did not find any facts in his review that prevented Osuna and Romero from celling together under CDCR policy. And Munoz did not know that being celled with Jaime Osuna presented an excessive risk of substantial harm to Luis Romero.  Romero was placed in the cell with Osuna on March 7, 2019. | Munoz Decl. ¶¶ 6-7, 15-23. |
| 80.   Defendant Burnes was not involved in the 1882-B process to cell Osuna and Romero together on March 7, 2019. | Munoz Decl. Ex. A; Burnes Decl. ¶¶ 33. |
| 81.   On the night of March 8-9, 2019, Defendant Gallemore was stationed as the control-booth officer in building 4A1R for the 10:00 p.m.-6:00 a.m. shift (first watch). | Gallemore Decl. ¶¶ 4, 9. |

12

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| The control booth is an elevated room without direct access to the floor of the housing unit. | |
| 82.  On the morning of March 9, 2019, Defendant Garcia was stationed as the control-booth officer in building 4A1R for the 6:00 a.m.-2:00 p.m. shift (second watch). | Garcia Decl. ¶¶ 3, 9 |
| 83.  Control-booth officers are responsible for monitoring the unit and providing coverage for the floor officers while they conducted their duties inside the housing unit. | Garcia Decl. ¶ 5; Gallemore Decl. ¶ 5. |
| 84.  Although Gallemore and Garcia could observe the housing unit from the control booth, they could not see into the cells or determine whether cell windows were covered and preventing the floor officers from conducting their checks. Instead, they relied upon the floor officers to notify them if they could not see into a cell or properly conduct the cell checks. | Garcia Decl. ¶ 6; Gallemore Decl. ¶ 6. |
| 85.  If a floor officer notified Gallemore or Garcia that a cell's window was covered up, Gallemore or Garcia could call for assistance from other officers. | Garcia Decl. ¶ 6; Gallemore Decl. ¶ 6. |
| 86.  If Gallemore and Garcia became aware that an inmate needed assistance or was being disruptive, they would notify their floor officers to take action. | Garcia Decl. ¶¶ 7-8; Gallemore Decl. ¶¶ 7-8. |
| 87.  Gallemore and Garcia were familiar with Osuna and his history in prison, and they knew that Romero had recently been housed with Osuna, but they had no reason to think that Romero faced a risk of harm from housing with Osuna. | Garcia Decl. ¶ 11; Gallemore Decl. ¶ 11. |
| 88.  When Gallemore began his first-watch shift, nothing appeared to be out of the ordinary. | Gallemore Decl. ¶¶ 10-13. |

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 89.   For that first-watch shift, the floor officer was Defendant Silva. Gallemore had worked with floor officer Silva on previous occasions and believed him to be a dependable officer who performed his duties appropriately. | Gallemore Decl. ¶ 9. |
| 90.   During the first-watch shift, it appeared to Gallemore that there was some sort of obstruction in one of the windows in Cell 46 (where Romero and Osuna were housed), but he observed Silva as he appeared to conduct his thirty-minute checks as normal throughout the first-watch shift. | Gallemore Decl. ¶ 15. |
| 91.   Gallemore also observed Silva conduct three counts of the inmates at 12:30 a.m., 2:30 a.m., and 5:00 a.m. | Gallemore Decl. ¶ 15. |
| 92.   Silva did not alert Gallemore to any issues with Cell 46, and the two did not have any discussions about Romero or Osuna . | Gallemore Decl. ¶ 15. |
| 93.   Nothing that occurred on Gallemore's shift brought his attention to or raised any concerns about Cell 46. There were no sounds of a struggle or distress indicating anyone had been harmed in Cell 46, and Gallemore did not hear any inmates communicating with each other from inside their cells. He had no reason to believe that Silva was not conducting his checks as normal, that Romero was at risk of any harm, or that Romero had been harmed during his shift. | Gallemore Decl. ¶ 17. |
| 94.   Garcia began his second-watch shift with nothing appearing to be out of the ordinary. | Garcia Decl. ¶ 12. |
| 95.   Garcia relied upon floor officer Defendant Pena to conduct periodic checks and notify him if he encountered any issues on the morning of March 9, 2019. | Garcia Decl. ¶ 18. |

14

| Undisputed Material Facts | Supporting Evidence |
| --- | --- |
| 96.   Garcia had worked with Pena in the past and had no reason to think he was not conducting his checks properly. | Garcia Decl. ¶ 9. |
| 97.   Garcia observed Pena conduct multiple checks on each of the cells in 4A1R, including Cell 46. | Garcia Decl. ¶ 18. |
| 98.   Garcia could not tell whether the windows were covered in Cell 46, but it did not appear that Pena had any issues completing his checks on Cell 46. | Garcia Decl. ¶ 12. |
| 99.   Pena stopped briefly at Cell 46, as he had done at other cells during the shift, and then moved on to the next cell. | Garcia Decl. ¶ 12. |
| 100. It appeared to Garcia that food and medication were distributed to the inmates as normal. | Garcia Decl. ¶ 14. |
| 101. Garcia first learned that Cell 46's window was covered when Pena came into the staff office to alert Sergeant Martinez. | Garcia Decl. ¶ 14. |
| 102. Garcia then saw Martinez and Pena go to Cell 46, heard them say that there was no movement in the cell, and then heard the alarm activate. | Garcia Decl. ¶ 15. |
| 103. Staff responded to the alarm, Garcia opened the cell door when ordered, and Osuna was escorted out. | Garcia Decl. ¶ 16. |
| 104. Defendant Pena was the floor officer in 4A1R during second watch on March 9, 2019. | Pena Decl. ¶ 8. |
| 105. Before his shift started, Pena was familiar with Osuna and aware that he had been designated a gasser (inmate who has thrown liquids at staff), but did not believe that Osuna was more dangerous than any other inmate in 4A1R. | Pena Decl. ¶ 8. |

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 106. Pena was also familiar with and had spoken with Romero before March 9, 2019, and knew that Romero had recently been housed with Osuna. At the beginning of his shift, no reason to think that there was any risk from the two of them housing together. | Pena Decl. ¶ 9. |
| 107. Throughout his shift, Pena did not hear any sounds of distress or struggle or any other indication that Romero was being harmed in Cell 46. | Pena Decl. ¶ 10. |
| 108. ███████████ | Pena Decl. ¶ 11. |
| 109. ███████████ | Pena Decl. ¶ 11. |
| 110. ███████████ | Pena Decl. ¶ 14. |
| 111. ███████████ | Pena Decl. ¶ 15. |
| 112. ███████████ | Pena Decl. ¶¶ 16-17. |
| 113. When an officer sees an in-cell attack in progress, CDCR's response protocol requires the officer to activate their alarm and summon staff for assistance, not make immediate entry. | Pena Decl. ¶ 6. |

16

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| 114. Plaintiff's retained forensic pathologist, Dr. Carpenter, testified that the mechanism of death was "a rapid attack, controlled, getting to the throat vessels rather quickly, loss of consciousness within ten to thirty seconds and death within two to five minutes." Once the carotid artery was cut, no medical intervention would have saved Romero. | Carpenter Dep. 31:17–25; Carpenter Dep. 41:6–16. |
| 115. Burnes trained the officers working under him in accordance with CDCR policy, including to conduct Guard One visual cell checks every thirty minutes, to order inmates to remove window coverings, and if an inmate did not comply, to report the situation to the on-duty sergeant. | Burnes Decl. ¶ 39. |
| 116. Burnes, who was a second-watch sergeant, was not working on the evening of March 8, 2019, or the morning of March 9, 2019, and was not supervising Gallemore, Garcia, Silva, Pena, or any other CDCR staff member when Romero was killed and his body was discovered. | Burnes Decl. ¶ 40. |
| 117. The primary role of the correctional sergeant at an ICC is to scribe any information regarding the inmate's housing that the committee wants recorded, and to provide safety and security in the committee room. A correctional sergeant in an ICC does not have a vote and does not sign the ICC's decision. | Burnes Decl. ¶ 19. |
| 118. During the January 22, 2019 ICC, Sergeant Burnes was available to answer any questions that the committee members had about Osuna. But it was not necessary for Burnes to provide the committee with information that was already in Osuna's file, such as information about his commitment offense, rule violations in prison, and the results of previous ICCs because committee members have access to the inmate's electronically stored central file, and that file | Burnes Decl. ¶ 20. |

17

| Undisputed Material Facts | Supporting Evidence |
|---|---|
| is reviewed before the committee by the correctional counselor. | |
| 119.  Factors such as committing murder, multiple assaults on prison staff, including gassing (throwing liquid such as blood or urine on officers), multiple assaults on inmates (outside the cell) including one that resulted in the victim needing sixty-seven stitches, threats against prison staff, past expressions of a desire to harm or kill others, face tattoos, destruction of state sheets, having voodoo dolls in a cell, and drawing on the walls or floor of a cell, do not prevent an incarcerated person from being double-celled under CDCR policy. | Gamboa Decl. ¶¶ 14-20; Burnes Decl. ¶¶ 12-16, 22; Maytubby Decl. ¶ 14; Munoz Decl. ¶¶ 18-23. |

Dated:  August 3, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JON S. ALLIN
Supervising Deputy Attorney General
JEREMY DUGGAN
Deputy Attorney General


*/s/David Kuchinsky*
DAVID KUCHINKSY
Deputy Attorney General
*Attorneys for Defendants Burnes, Gamboa, Garcia, Gallemore, Maytubby, Munoz, Loza, and Pena*

SA2019101902
Solares I MSJ UMF.docx