Rob Bonta, State Bar No. 202668
Attorney General of California
Jon S. Allin, State Bar No. 155069
Supervising Deputy Attorney General
Jeremy Duggan, State Bar No. 229854
Deputy Attorney General
David E. Kuchinsky, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone: (916) 210-7666
 Fax: (916) 324-5205
 E-mail: David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants Burnes, Loza, Gamboa,
Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br><br>Plaintiff,<br><br>v.<br><br>**RALPH DIAZ, et al.,**<br><br>Defendants. | 1:20-CV-00323-LHR-FJS<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       September 11, 2026<br>Time:      11:00 a.m. Central<br>             9:00 a.m. Pacific<br>Dept:      Zoom<br>Judge:    Hon. Lee H. Rosenthal<br>Trial Date: Not set<br>Action Filed: 3/02/2020 |

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................... 1

Nature and Stage of the Proceeding ......................................................................... 1

Statement of Issues ................................................................................................... 1

Statement of Facts .................................................................................................... 2

Standard for Summary Judgment ............................................................................. 5

Argument ................................................................................................................... 6

    I.    Defendants Were Not Deliberately Indifferent to a Substantial Risk of Serious Harm to Romero, and They Did Not Cause His Death (First, Second, and Fourth Claims for Relief). ...................................................... 6

        A.    Standard for Deliberate Indifference to a Substantial Risk of Harm .......... 6

        B.    Continuing Osuna's Double-Cell Status Accorded with CDCR Policies and Was Not Deliberately Indifferent. ......................................... 7

            1.    Deliberate Indifference Requires a Showing that the ICC Defendants Subjectively Knew of an Excessive Risk of Harm and Disregarded that Risk. ..................................................... 8

            2.    Defendant Gamboa Was Not Deliberately Indifferent to an Excessive Risk of Harm. ................................................................ 8

            3.    Defendant Maytubby Was Not Deliberately Indifferent to an Excessive Risk of Harm. ................................................................ 10

            4.    Defendant Burnes Was Not Deliberately Indifferent to an Excessive Risk of Harm. ................................................................ 11

        C.    The Decision to Approve Romero and Osuna to Share a Cell Accorded with CDCR Policies and Was Not Deliberately Indifferent. ................................................................................................ 12

            1.    Defendant Loza Was Not Deliberately Indifferent to an Excessive Risk of Harm. ................................................................ 13

            2.    Defendant Munoz Was Not Deliberately Indifferent to an Excessive Risk of Harm. ................................................................ 14

            3.    Defendant Burnes Was Not Deliberately Indifferent to an Excessive Risk of Harm from Romero and Osuna Housing Together. ................................................................................... 15

        D.    Control-Booth Officers Gallemore and Garcia Properly Relied on Their Floor Officers to Conduct Safety Checks and Were Not Aware of a Risk of Harm to Romero. ...................................................... 15

        E.    Floor Officer Pena Was Not Aware of a Substantial Risk of Harm to Romero. ................................................................................................ 17

        F.    Romero's Murder Would Not Have Been Prevented by More Diligent Cell Checks. ................................................................................ 18

    II.    There Is No Evidence that Defendant Burnes Failed to Train or Supervise His Officers (Third Claim for Relief). ......................................... 20

i

**TABLE OF CONTENTS**
(continued)

Page

III.  Defendants Are Entitled to Qualified Immunity Because No Constitutional Violations Occurred and It Would Not Have Been Clear to Every Reasonable Officer That Their Conduct Was Unconstitutional. .......................... 21

  A.  Standard for Qualified Immunity ................................................................. 21

  B.  It Was not Clearly Established that Approving a Prisoner with Osuna's Case Factors for Double-Cell Status, and Approving Romero and Osuna to Be Celled Together, Was Unlawful. ..................... 22

  C.  There Was No Clearly Established Right to Have Regular Cell Checks or for Cell Windows to Be Uncovered. ......................................... 25

IV.  Romero's Death Was Not Caused By Defendants' Breach of a Duty Under State Law (Fifth Claim For Relief). ........................................................................ 26

  A.  Osuna and Romero Were Appropriately Housed Together Under CDCR Policies Designed to Protect Prisoners from Causing Each Other Harm............................................................................................. 26

  B.  Plaintiff Cannot Establish that the Manner in Which Defendants Conducted Cell Checks Was the Proximate Cause of Romero's Death. ........................................................................................................ 28

V.  Defendants Gallemore, Garcia, and Pena Did Not Fail to Summon Medical Care that Would Have Prevented Romero's Death (Sixth Claim for Relief). ...... 29

VI.  In the Alternative, the Court Should Decline Supplemental Jurisdiction Over Plaintiff's State-Law Claims. ......................................................................... 30

Conclusion ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)............................................................................................................ 6

*Arnold v. International Business Machines Corp.*
637 F.2d 1355 ................................................................................................................... 18

*Ashcroft v. al-Kidd*
563 U.S. 731 (2011)..................................................................................................... 21, 22

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)......................................................................................................... 20

*Baptiste v. Martinez*
No. 19-cv-06551-HSG, 2021 U.S. Dist. LEXIS 142802 (N.D. Cal. July 30,
2021) .................................................................................................................................. 8

*Bell v. Wolfish*
441 U.S. 520 (1979).......................................................................................................... 7

*Brown v. Marshall*
Case No. C 91-1177 BAC, 1994 U.S. Dist. LEXIS 4445 (N.D. Cal. Apr. 1,
1994) .................................................................................................................................. 8

*Campbell v. Callis*
No. 21-cv-05187-JST, 2024 U.S. Dist. LEXIS 28873 (N.D. Cal. Feb. 20, 2024).................. 24

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)........................................................................................................... 5

*City of Canton v. Harris*
489 U.S. 378 (1989)......................................................................................................... 20

*Cousins v. Lockyer*
568 F.3d 1063 (9th Cir. 2009)......................................................................................... 20

*Crowley v. Bannister*
734 F.3d 967 (9th Cir. 2013)........................................................................................... 20

*Estate of Ford v. Ramirez-Palmer*
301 F.3d 1043 (9th Cir. 2002)................................................................................. 22, 23, 24

*Farmer v. Brennan*
511 U.S. 825 (1994)................................................................................................... 6, 7, 23

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Gordon v. County of Orange*
  888 F.3d 1118 (9th Cir. 2018)............................................................................... 18

*Harlow v. Fitzgerald*
  457 U.S. 800 (1982)............................................................................................... 21

*Harper v. City of Los Angeles*
  533 F.3d 1010 (9th Cir. 2008)............................................................................... 18

*Hearns v. Terhune*
  413 F.3d 1036 (9th Cir. 2005)................................................................................. 6

*Hydrick v. Hunter*
  669 F.3d 937 (9th Cir. 2012)................................................................................. 20

*J.L. v. Children's Institute, Inc.*
  (2009) 177 Cal.App.4th 388 ................................................................................. 26

*Jones v. Williams*
  297 F.3d 930 (9th Cir. 2002).................................................................................. 20

*Labatad v. Corr. Corp. of Am.*
  714 F.3d 1155 (9th Cir. 2013)................................................................................. 8

*Leer v. Murphy*
  844 F.2d 628 (9th Cir. 1988).................................................................................. 18

*Lemire v. California Dep't of Corr. & Rehab.*
  726 F.3d 1062 (9th Cir. 2013)................................................................................. 7

*Lemire v. California Dept. of Corrections and Rehabilitation*
  762 F.2d 1062 (9th Cir. 2013)............................................................................... 18

*Mattos v. Agarano*
  661 F.3d 433 (9th Cir. 2011) (en banc)................................................................ 21

*May v. Baldwin*
  109 F.3d 557 (9th Cir. 1997)................................................................................. 22

*Mullenix v. Luna*
  577 U.S. 7 (2015) .................................................................................................. 22

*Muniz v. Pfeiffer*
  No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199 (E.D. Cal.
  Jan. 13, 2023) ........................................................................................................ 27

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Ottele v. Martinez*
No. 1:22-cv-00187-JLT-CDB, 2024 U.S. Dist. LEXIS 151718 (E.D. Cal. Aug. 23, 2024) ................................................................................................. 25

*Palmer v. Vasquez*
No. 1:13-cv-1400 AWI JLT, 2015 U.S. Dist. LEXIS 108213 (E.D. Cal. Aug. 17, 2015) ................................................................................................. 8

*Pearson v. Callahan*
555 U.S. 223 (2009) ......................................................................................... 21, 22

*Rhodes v. Chapman*
452 U.S. 337 (1981) ................................................................................................. 8

*Romero v. Los Angeles Rams*
91 Cal.App.5th 562 (2023) ................................................................................. 26, 28

*Saucier v. Katz*
533 U.S. 194 (2001) ............................................................................................... 22

*Sena v. Coleman*
772 F.App'x 551 (9th Cir. June 21, 2019) .......................................................... 23, 25

*Simmons v. Navajo Cnty., Ariz.*
609 F.3d 1011 (9th Cir. 2010) ............................................................................... 17

*Starr v. Baca*
652 F.3d 1202 (9th Cir. 2011) ............................................................................... 20

*Taylor v. Barkes*
135 S. Ct. 2042 (2015) (per curiam) .................................................................... 22

*Taylor v. List*
880 F.2d 1040 (9th Cir. 1989) ............................................................................... 20

*Toguchi v. Chung*
391 F.3d 1051 (9th Cir. 2004) ................................................................................. 6

*Turner v. Safley*
482 U.S. 78 (1987) ................................................................................................... 7

*United Mine Workers of America v. Gibbs*
383 U.S. 715 (1966) ............................................................................................... 30

*United Steelworkers of Am. v. Phelps Dodge Corp.*
865 F.2d 1539 (9th Cir. 1989) ................................................................................. 6

v

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Valencia v. Harris*
    No. 1:10-CV-01725-MJS (PC), 2011 U.S. Dist. LEXIS 149410 (E.D. Cal.
    Dec. 28, 2011) .................................................................................................... 6

*Vander Lind v. Superior Court*
    (1983) 146 Cal.App.3d 358 ............................................................................... 26

*Whitley v. Albers*
    475 U.S. 312 (1986) ........................................................................................... 7

*Ziglar v. Abassi*
    582 U.S. 120 ............................................................................................... 21, 22

**STATUTES**

United States Code
    Title 28, § 1367(a) ............................................................................................. 30
    Title 28, § 1367(c)(3) ........................................................................................ 30
    Title 42, § 1983 ........................................................................................... 18, 20

California Code of Civil Procedure
    § 377.60 ............................................................................................................. 26

California Government Code
    § 845.6 ............................................................................................................... 29

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ................................................................................. 1, 7, 8, 23
    Fourteenth Amendment ................................................................................ *passim*

**COURT RULES**

Federal Rules of Civil Procedure
    56(a) ................................................................................................................... 5
    56(c) ................................................................................................................... 5

**OTHER AUTHORITIES**

California Code of Regulations Title 15
    § 3269 ................................................................................................................ 11
    § 3269(d) ............................................................................................... 8, 9, 12, 14

Mem. P. & A. in Supp. of Mot. for Summ. J. (1:20-CV-00323-LHR-FRS (PC))

## INTRODUCTION

On the morning of March 9, 2019, staff at California State Prison, Corcoran, discovered that inmate Jaime Osuna had killed inmate Luis Romero in their shared prison cell. Plaintiff, Romero's mother, asserts federal claims that the Defendant prison staff failed to protect Romero from Osuna in violation of the Eighth and Fourteenth Amendments. She also asserts state-law claims for negligence and for failure to summon medical care.

Plaintiff contends that Osuna was known to be unfit to have a cellmate and that the officers' failure to visually check the cell "at least every hour" and remove a covering on the cell window enabled the attack. The Court should grant summary judgment for each of the Defendants because Osuna had been appropriately designated to be double-celled; he and Romero were properly celled together; the homicide would not have been prevented by more diligent cell checks; and medical intervention could not have prevented the death.

Defendants are additionally entitled to qualified immunity because no controlling legal authority, or robust consensus of persuasive authority, existed that would have put every reasonable prison official on fair notice that designating a prisoner with Osuna's case factors as double-cell eligible, and matching him with a cellmate in compliance with official prison policy, was unlawful. Defendants are also entitled to qualified immunity because no case law clearly established a constitutional right to scheduled, visual cell checks.

Accordingly, the Court should grant summary judgment for each Defendant.

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff asserts federal and state-law claims against prison staff arising out of the in-custody homicide of inmate L. Romero by inmate J. Osuna. Discovery is closed, although there are motions relating to discovery issues pending before the Court. (ECF No. 242, 289.) No trial date has been set. A docket call is scheduled for October 9, 2026. (ECF No. 282.)

## STATEMENT OF ISSUES

1.     Were classification-committee staff deliberately indifferent to a substantial risk of serious harm when they continued Osuna's designation to cell with another prisoner?

2.    Was Defendant Maytubby deliberately indifferent to a substantial risk of serious harm when she informed the classification committee of Osuna's mental health status but did not advise against celling him with another prisoner?

3.    Were housing-unit staff deliberately indifferent to a substantial risk of serious harm when they approved Romero and Osuna to cell together?

4.    Were housing-unit staff deliberately indifferent to a substantial risk of serious harm when they did not complete scheduled, visual cell checks?

5.    Would more diligent cell checks have prevented Romero's death?

6.    Would summoning medical intervention for Romero have prevented his death?

7.    Did Defendant Burnes fail to train or supervise subordinate officers?

8.    Are Defendants entitled to qualified immunity because it was not clearly established that designating a prisoner with Osuna's case factors as double-cell eligible was unlawful?

9.    Are Defendants entitled to qualified immunity because it was not clearly established that assigning prisoners with Osuna's and Romero's case factors to cell together was unlawful?

10.    Are Defendants entitled to qualified immunity because it was not clearly established that a prisoner had a constitutional right to scheduled, visual cell checks?

11.    Was Romero's death caused by Defendants' breach of a duty under state law?

12.    Should the Court retain supplemental jurisdiction over Plaintiff's state-law claims if the federal claims are dismissed?

**STATEMENT OF FACTS**

Jaime Osuna arrived at California State Prison, Corcoran on September 13, 2018. (Defs.' Statement of Undisputed Facts (UF) 7.) Before his arrival, he had been cleared for double-cell status by an institutional classification committee (ICC) convened at his previous institution (California State Prison, Sacramento) on September 6, 2018. (UF 6.)

On September 13, 2018, Defendant Correctional Sergeant Burnes conducted an initial housing review (IHR) for Osuna to confirm that Osuna's housing was correct in view of his history and case factors. (UF 8.) Burnes's review confirmed that Osuna's double-cell status was

2

proper and that Osuna did not have factors warranting an additional single-cell review under CDCR policy. (UF 10-11.)

At Corcoran, Osuna was housed in unit 4A1R, which is Long Term Restricted Housing (LTRH). (UF 20.) LTRH is housing for inmates who had committed rules violations in prison and were required to serve disciplinary terms in restrictive housing because of those violations. (UF 20.)

On September 25, 2018, an ICC for Osuna was held at Corcoran. That ICC continued Osuna's general population (GP), double-cell status. (UF 19.) Osuna did not have factors that warranted a further evaluation for single-cell status under CDCR policy such as a history of in-cell assaults or in-cell violence toward a cell partner, a history of in-cell sexual abuse, or any verified predatory behavior toward a cell partner. (UF 11-13.)

On January 22, 2019, another ICC was held for Osuna at Corcoran. Defendant Associate Warden Gamboa was the chairperson of the January 22, 2019, ICC. Defendant Licensed Clinical Social Worker Maytubby was present as the mental health representative, and Defendant Burnes was present as a correctional sergeant. (UF 23.) That ICC continued Osuna's double-cell status and changed Osuna's status from GP to Sensitive Needs Yard (SNY). (UF 28.)

On March 7, 2019, Luis Romero arrived at California State Prison, Corcoran. The same day, Burnes conducted an initial housing review (IHR) to confirm that Romero's housing was correct in view of his history and case factors. (UF 53.) Burnes's review confirmed that Romero's double-cell status was proper and that Romero did not have factors warranting an additional single-cell review under CDCR policy. (UF 54.)

On March 7, 2019, Luis Romero was placed in a holding cell in housing unit 4A1R at Corcoran. (UF 64.) Romero spoke with Defendant Correctional Officer Loza and stated that he was requesting a cellmate. (UF 64.) Loza remembered that Osuna had also requested a cellmate and so began the process to potentially cell the two inmates together. (UF 51, 64.) Loza reviewed the two inmates' files and found that they had compatible factors and that there was not any information indicating a security concern from housing the two together. (UF 65.) Osuna and Romero had similar crimes (both had murdered a female), were the same race, had SNY status as

3

███████████, ███████████████████████████████ UF 66.) Loza moved on to the next step and placed Osuna in the holding cell next to Romero's holding cell so that the two could talk. (UF 69.)

Romero and Osuna spoke for half an hour and agreed to cell together. (UF 71.) They each signed a CDCR Form 1882-B indicating that agreement. (UF 72.) Loza completed the form and signed it himself, then delivered the form to Defendant Lieutenant Munoz for approval. (UF 73.) Munoz reviewed the two inmates' files and found that they both properly had double-cell status and were compatible as cellmates. (UF 74.) Munoz did not find any security concerns preventing Osuna and Romero from celling together. (UF 79.)

None of the Defendants were aware of a substantial risk of harm posed to other inmates from Osuna's double-cell status or from Romero being housed with Osuna. (UF 29, 43-45, 63. 75, 79.)

Romero and Osuna were celled together in Cell 46 of housing unit 4A1R on the evening of March 7, 2019. (UF 79.) The following night, March 8–9, 2019, Defendant Gallemore was the control-booth officer and Defendant Silva was the floor officer for the first-watch shift (10:00 p.m.–6:00 a.m. (UF 81, 89.) On the morning of March 9, 2019, Defendant Garcia was the control-booth officer and Defendant Pena was the floor officer, for the second-watch shift (10:00 p.m.–6:00 a.m. (UF 82, 95.)

Control-booth officers are responsible for monitoring the unit and providing coverage for the floor officers while they conduct their duties inside the housing unit. (UF 83.) The floor officers are required to conduct periodic checks of the cells in the housing unit. (UF 84.) From the control booth, Gallemore and Garcia could not see into the cells or determine whether cell windows were covered from their position. (UF 84.) They relied upon the floor officers to notify them if they could not see into a cell or properly conduct the cell checks. (UF 84.)

During first watch, Silva did not alert Gallemore to any issues with Cell 46, and the two did not have any discussions about Romero or Osuna. (UF 92.) Nothing that occurred on Gallemore's shift brought his attention to or raised any concerns about Cell 46. (UF 93.) Gallemore had no

reason to believe that Silva was not conducting his checks as normal, that Romero was at risk of any harm, or that Romero had been harmed during his shift. (UF 93.)

Nothing appeared to be out of the ordinary at the beginning of Garcia's shift. (UF 94.) Garcia relied upon Defendant Pena to conduct periodic checks and notify him if he encountered any issues on the morning of March 9, 2019. (UF 95.) Garcia observed Pena doing cell checks and was not aware that the window to Osuna and Romero's cell was covered until Pena went into the staff office to alert Sergeant Martinez. (UF 101.) Martinez and Pena then went to the cell door, and shortly thereafter an alarm was activated. (UF 102.) Before Pena went to the sergeant, Garcia did not know, and did not have reason to know, that Romero was at risk of any harm or that Romero had been harmed.  (UF 87, 101.)

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party has the initial burden of identifying an undisputed material fact for which the nonmoving party has the burden of proof. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323–24. Rule 56(c) does not require the moving party to produce evidence *negating* the nonmoving party's claim. *Id*. Rather, the moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*.

5

The burden then shifts to the nonmoving party to present "concrete evidence from which a reasonable jury could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The party opposing summary judgment must present affirmative evidence. *Id*. at 256–57. "The possibility that the plaintiff may discredit the defendant's testimony at trial is not enough for the plaintiff to defeat a properly presented motion …." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (citing *Liberty Lobby* at 257).

## ARGUMENT

**I.  DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT TO A SUBSTANTIAL RISK OF SERIOUS HARM TO ROMERO, AND THEY DID NOT CAUSE HIS DEATH (FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF).**

### A.  Standard for Deliberate Indifference to a Substantial Risk of Harm

Under the Eighth Amendment's prohibition of cruel and unusual punishment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials." *Farmer* at 834. To support a claim for deliberate indifference to safety, a plaintiff must establish that the prison official defendant knew of, and disregarded, an excessive risk to the prisoner's safety. *Farmer* at 837.

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Conduct by a prison official that is negligent or even grossly negligent is insufficient to support such a claim. *Farmer*, 511 U.S. at 835–36. It is not enough to show a defendant should have known of the risk—actual notice on the part of the prison official is required to show deliberate indifference. *Id.* at 837–38 and 843 n.8. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. *Id*. "Mere negligence in discovering [an] attack, or responding to it, will not support a constitutional claim for deliberate indifference." *Valencia v. Harris,* No. 1:10-CV-01725-MJS (PC), 2011 U.S. Dist. LEXIS 149410, at *9 (E.D. Cal. Dec. 28, 2011).

Although the Constitution requires prison officials to protect prisoners, it does not require any specific action by prison officials in ensuring this safety. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm was not averted." *Farmer*, 511 U.S. at 844. This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.*

The security decisions of prison officials are entitled to considerable deference. *Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (courts are "ill-equipped" to deal with issues pertaining to prison administration as "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government"); *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (according prison administrators wide-ranging deference in adoption of policies that "in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventative measures intended to reduce the incident of these or any other breaches of prison discipline." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

The legal standard for Plaintiff's Fourteenth Amendment claim for loss of familial relationship is the same deliberate-indifference standard that applies to the Eighth Amendment claim. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).

**B. Continuing Osuna's Double-Cell Status Accorded with CDCR Policies and Was Not Deliberately Indifferent.**

Plaintiff asserts that Defendants Maytubby, Gamboa, and Burnes were deliberately indifferent to an excessive risk of harm based on their participation in a January 2019 institutional classification committee (ICC) that continued Osuna's double-cell status, which had previously been established at a September 2018 ICC at California State Prison, Sacramento. Defendants were not deliberately indifferent, because they properly evaluated Osuna's double-cell status using the criteria required by the official policies of their agency. Under CDCR policy, inmates

7

are assigned to double-cell status unless they have certain factors that warrant consideration of single-cell status. Those factors are described in California Code of Regulations title 15, section 3269(d), as follows: "a history of in-cell abuse, significant in-cell violence towards a cell partner, verification of predatory behavior towards a cell partner, or [having] been victimized in-cell by another inmate." (UF 25; Cal. Code Regs. tit. 15, § 3269(d) (2019 version).) The committee was entitled to rely upon, and had a duty to comply with, CDCR's double-cell housing policy.

### 1. Deliberate Indifference Requires a Showing that the ICC Defendants Subjectively Knew of an Excessive Risk of Harm and Disregarded that Risk.

Prisoners do not have a constitutional right to single-cell status—it is well-established that double-celling is constitutional. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 350 (1981); *Brown v. Marshall*, Case No. C 91-1177 BAC, 1994 U.S. Dist. LEXIS 4445, at *1–2 (N.D. Cal. Apr. 1, 1994). In the context of classifying an inmate for double-celling, the plaintiff must identify evidence that shows that the Defendant subjectively knew of, and disregarded, an excessive risk of harm from double-celling. *See, e.g., Baptiste v. Martinez*, No. 19-cv-06551-HSG, 2021 U.S. Dist. LEXIS 142802, at *13 (N.D. Cal. July 30, 2021) (committee member was not deliberately indifferent when she reviewed the inmate's factors and concluded that double celling was appropriate); *Palmer v. Vasquez*, No. 1:13-cv-1400 AWI JLT, 2015 U.S. Dist. LEXIS 108213, at *39 (E.D. Cal. Aug. 17, 2015) ("In the absence of evidence that shows subjective awareness of a substantial risk of serious danger, there is no deliberate indifference, and without deliberate indifference, there can be no liability under the Eighth Amendment for failure to protect."); *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1161 (9th Cir. 2013) (no deliberate indifference in absence of evidence that "any of the defendants or officials responsible for making the [cell] assignment were aware that Labatad faced a substantial risk of harm.")

### 2. Defendant Gamboa Was Not Deliberately Indifferent to an Excessive Risk of Harm.

Defendant Gamboa was the chairperson of the ICC for Osuna that took place on January 22, 2019. (UF 23.) The ICC was convened to change Osuna's status from general population (GP) to sensitive needs yard (SNY) ███████████████████. (UF 24.) The ICC

8

consisted of acting Chief Deputy Warden Gamboa, acting Captain A. Randolph, and Correctional Counselor II E. Moreno. (UF 23.) Two additional staff were also present, Licensed Clinical Social Worker K. Kyle (now named Maytubby), and Correctional Sergeant J. Burnes. (UF 23.)

Before the committee, the correctional counselor reviews each inmate's file and plans a recommendation to the committee. (UF 3.) During the committee for each inmate, the counselor gives a presentation, goes over the inmate's history and any key documents, and makes a recommendation. (UF 3.) The other members have computers in front of them so they can review any part of the inmate's file that is relevant to the committee action. (UF 4.)

In the January 22, 2019 committee, Correctional Counselor Moreno presented his recommendation that Osuna's status should be changed from double-cell GP to double-cell SNY. (UF 24.) The committee also reviewed Osuna's double-cell status. (UF 25.) Osuna had been double-cell cleared since a September 6, 2018 ICC at California State Prison, Sacramento. (UF 6.) The January 22, 2019 committee reviewed Osuna's factors and found that Osuna did not have any factors warranting further consideration of single-cell status under title 15 section 3269(d). (UF 25-26.) In particular, the committee noted that Osuna did not have significant in-cell predatory or in-cell assaultive behavior toward cellmates. (UF 25-26.) ██████████████

Defendant Gamboa was not aware, at any time before Luis Romero's death, that Osuna was a danger to a potential cellmate. (UF 29.) The committee therefore adopted Moreno's recommendation and changed Osuna's status from double-cell GP to double-cell SNY. (UF 28.) The decision to double-cell Osuna was appropriate under CDCR policy, and Gamboa was not deliberately indifferent to an excessive risk. Thus, the Court should grant summary judgment for Defendant Gamboa.

**3.  Defendant Maytubby Was Not Deliberately Indifferent to an Excessive Risk of Harm.**

At ICCs where the inmate is in CDCR's mental health services delivery system (MHSDS), a mental health representative is present in addition to the three committee members described above. (UF 31.) The role of the mental health representative in an ICC is to speak with the inmate and confirm to the committee that the inmate understands and can participate in the proceedings, and to provide information to the committee regarding the inmate's mental health status and activities of daily living. (UF 32.) The inmate's conversations with mental health staff are confidential and protected by psychotherapist-patient privilege, so the mental health representative does not share that information with the ICC. (UF 33.) The mental health representative does not decide an inmate's housing status; instead, it is custody staff who determine whether past behavior, such as the prisoner's crime, rules violations, violence toward other inmates, and violence toward staff, warrants single-cell status. (UF 34.) In an ICC, the mental health participant weighs in on single-cell or double-cell status only if the prisoner's mental health condition warrants one status or the other. (UF 35.) Generalized homicidal ideations, not specific to any person, do not warrant single-cell status. (UF 36.)

Defendant Maytubby was the mental health representative at the January 22, 2019 ICC. (UF 37.) Because Osuna did not attend the committee, Maytubby's role was to inform the committee of Osuna's mental health status, level of care, and any likelihood of decompensation due to being housed in a restricted housing unit. (UF 38.) Maytubby provided the committee with that information. (UF 39.) Maytubby did not comment on double-cell versus single-cell housing status because she assessed that Osuna's mental health did not affect his suitability for one status or the other, therefore there was no reason for the mental health representative to comment on that issue. (UF 40.)

Separate from an ICC, mental health staff are required to report any threat to the safety of an individual (of which custody staff is not already aware) to custody staff. (UF 41.) If the threat necessitates a specific type of housing, such as single-cell or double-cell, mental health staff would convene an Interdisciplinary Treatment Team (IDTT) to make documented findings and a

10

recommendation to custody staff on a form 128-C.  (UF 42.)   If Maytubby had been aware of any such threat, she would have reported it to custody staff. (Maytubby Decl. ¶ 12.) Maytubby did not report any such threat because she did not know of any threat posed by Osuna to other inmates. (UF 44-45.)

At no point did Maytubby know of, and disregard, an excessive risk posed by Osuna being double-cell cleared. Thus, the Court should grant summary judgment for Defendant Maytubby.

### 4.    Defendant Burnes Was Not Deliberately Indifferent to an Excessive Risk of Harm.

At the January 22, 2019 ICC for Osuna, Defendant Burnes participated as a correctional sergeant. (UF 23.) The primary role of the correctional sergeant is to scribe any information regarding the inmate's housing that the committee wants recorded, and to provide safety and security in the committee room. (UF 117.) A correctional sergeant in an ICC does not have a vote and does not sign the ICC's decision. (UF 117)

During the January 22, 2019 ICC, Sergeant Burnes was available to answer any questions that the committee members had about Osuna. (UF 118.) But it was not necessary for Burnes to provide the committee with information that was already in Osuna's file, such as information about his commitment offense, rule violations in prison, and the results of previous ICCs because committee members have access to the inmate's electronically stored central file, and that file is reviewed before the committee by the correctional counselor. (UF 118.)

In addition to participating in the January 22, 2019 ICC, Defendant Burnes had earlier conducted Osuna's Initial Housing Review (IHR), on September 13, 2018. (UF 8.) An IHR is completed on the day an inmate arrives at an institution to ensure that the inmate is being properly housed in the unit. (UF 9.) The process is described in California Code of Regulations title 15, section 3269 (2019 version). The official performing the review reviews the inmate's housing history and case factors, confirms that the inmate is being properly housed under the criteria established by CDCR and completes a required form. (UF 9.)

Burnes's review confirmed that Osuna had been cleared for double celling by an ICC at his previous institution, California State Prison, Sacramento, meaning that he could have a cellmate.

11

(UF 10.) Burnes reviewed Osuna's file and confirmed that there was no history that would require a further evaluation for single-cell status under title 15, section 3269(d). (UF 11.) Specifically, Osuna did not have a history of in-cell assaults or in-cell violence toward a cell partner, a history of in-cell sexual abuse, or any verification of predatory behavior toward a cell partner. (UF 12.) In addition, Osuna did not have a history of being victimized by cell partners, and did not have other factors, such as incontinence or gender dysphoria, which would increase the risk of victimization by a cell partner. (UF 13.)

At no point from September 13, 2018, to March 9, 2019 did Defendant Burnes know that Osuna being double-cell cleared was an excessive risk to a potential cellmate. (UF 45.) Burnes did not know of and disregard an excessive risk to Luis Romero's safety, and thus the Court should grant summary judgment for Burnes on that issue.

### C. The Decision to Approve Romero and Osuna to Share a Cell Accorded with CDCR Policies and Was Not Deliberately Indifferent.

Plaintiff asserts that Defendants Loza, Munoz, and Burnes were deliberately indifferent to an excessive risk of harm to Luis Romero based on Romero and Osuna being celled together on March 7, 2019. Defendants were not deliberately indifferent. They followed CDCR policy to house two inmates together who had compatible case factors, had both requested cellmates, and had signed a document agreeing to house together.

The process for assigning more than one inmate to a cell in a restricted housing unit is described in Department Operations Manual section 54046.7.1 (2019 version). The process is initiated by either a staff recommendation or a request by the inmate. (UF 47.) A correctional officer reviews the inmates' central files, speaks with each inmate, and evaluates any security concerns. (UF 48.) The practice in Facility 4A was to have the two inmates meet and speak to one

12

another before agreeing to cell together by placing them in the two holding cells in the rotunda where they can see one another and talk. (UF 49.) If both inmate candidates agree, the officer asks the inmates to sign a CDCR Form 1882-B indicating their agreement to the double-cell assignment and then forwards the 1882-B to a correctional lieutenant for review. (UF 50.) If the lieutenant approves and signs the 1882-B, the two inmates can be celled together.

### 1. Defendant Loza Was Not Deliberately Indifferent to an Excessive Risk of Harm.

On March 7, 2019, Luis Romero arrived at Corcoran. (UF 52.) He was escorted to housing unit 4A1R and placed in one of the two holding cells in the rotunda. (UF 64.) The holding cells are one-person cells without beds where inmates can be temporarily placed and monitored by 4A1R staff from their office. (UF 64.) Correctional Officer Loza spoke with Romero, and Romero informed Loza that he was requesting a cellmate. (UF 64.) Loza remembered that Osuna, who was already housed in the building, had also requested a cellmate. Loza therefore started the process to determine whether Romero and Osuna were compatible as cellmates. (UF 64.)

Loza reviewed Osuna's and Romero's central files to confirm they were compatible as cellmates. (UF 65.) They had similar crimes (both had murdered a female), were the same race, ██████████████████████ Both inmates had been to ICC within the previous two months where their double-cell status was continued. (UF 67.) Officer Loza did not see any information indicating that there was a security concern from housing the two together. (UF 68.) Because they were compatible based on their central files, Loza moved on to the next step and placed Osuna in the holding cell next to Romero's holding cell so that the two could talk. (UF 69.)

While Osuna and Romero talked, Loza was nearby in the office, where he could see the inmates talking but could not hear what they were saying. (UF 70.) After about half an hour, Loza returned and they confirmed that they had agreed to be housed together in the same cell. (UF 71.) Loza handed them the 1882-B form to sign, they both signed, and Loza reviewed and signed the document himself. (UF 72-73.) Loza then provided the 1882-B form to Lieutenant Munoz for his

13

review. (UF 73.) Loza left work at 2:00 p.m. when his shift ended. At that time, Romero was still in the holding cell waiting for his housing to be approved. (UF 74.)

Loza did not know that being celled with Osuna presented a substantial risk of serious harm to Romero at any time before Romero's death. (UF 75.) Thus, the Court should grant summary judgment for Defendant Loza.

### 2. Defendant Munoz Was Not Deliberately Indifferent to an Excessive Risk of Harm.

After receiving the 1882-B form showing that Osuna and Romero had agreed to be cellmates, Lieutenant Munoz conducted his review of Osuna's and Romero's files and confirmed that they appeared to be compatible as cellmates. (UF 76.) Munoz further reviewed their central files and disciplinary history to confirm that their double-cell status was correct under California Code of Regulations title 15, section 3269(d). (UF 78.)

Osuna did not have a history of in-cell assaults or in-cell violence toward a cell partner or a history of in-cell sexual abuse, or any verified predatory behavior toward a cell partner. (UF 77.) In addition, Osuna did not have a history of being victimized by cell partners. (UF 77.)

Romero had an in-cell fight in 2016, but there were only minor injuries and no weapon used, so multiple ICCs had retained Romero's double-cell status after the fight. (Munoz Decl. ¶ 17.) Romero did not have a history of in-cell sexual abuse or a history of being victimized by cell partners. (*Id.*) Lieutenant Munoz therefore found that both inmates' double-cell clearance was correct.  (UF 79.)

Munoz did not find any facts in his review that prevented Osuna and Romero from celling together under CDCR policy. (UF 79.) And Munoz did not know that being celled with Jaime Osuna presented an excessive risk of substantial harm to Luis Romero. (UF 79.) Thus, the Court should grant summary Judgment for Defendant Munoz.

**3.  Defendant Burnes Was Not Deliberately Indifferent to an Excessive Risk of Harm from Romero and Osuna Housing Together.**

Defendant Burnes was not involved in the 1882-B process to cell Osuna and Romero together. (UF 80.) Burnes was familiar with both inmates' housing factors, as he had done the initial housing review for both inmates. (UF 8, 53.) As discussed above, at no point from September 13, 2018, to March 9, 2019 did Defendant Burnes know that Osuna being double-cell cleared was an excessive risk to a potential cellmate, including Romero. (UF 45.) Thus, the Court should grant summary judgment for Defendant Burnes.

**D.  Control-Booth Officers Gallemore and Garcia Properly Relied on Their Floor Officers to Conduct Safety Checks and Were Not Aware of a Risk of Harm to Romero.**

Defendants Gallemore and Garcia were not deliberately indifferent because they were not aware of a substantial risk of harm to Romero. They were stationed in the control booth of 4A1R, Gallemore on first watch and Garcia on second watch. The control booth is an elevated room without direct access to the floor of the housing unit. (UF 81.) Gallemore and Garcia were responsible for monitoring the unit and providing coverage for the floor officers while they conducted their duties inside the housing unit. (UF 83.) Although they could observe the housing unit from the control booth, they could not see into the cells or determine whether cell windows were covered and preventing the floor officers from conducting their checks. (UF 84.) Instead, they relied upon the floor officers to notify them if they could not see into a cell or properly conduct the cell checks. (UF 84.) If a floor officer notified Gallemore or Garcia that a cell's window was covered up, Gallemore or Garcia could call for assistance from other officers. (UF 85.)

Gallemore and Garcia were familiar with Osuna and his history in prison, and they knew that Romero had recently been housed with Osuna, but they had no reason to think that Romero faced any risk of harm from housing with Osuna. (UF 87.)

When Gallemore began his first-watch shift, nothing appeared to be out of the ordinary. (UF 88.) He had worked with floor officer Silva on previous occasions and knew him to be a dependable officer who performed his duties appropriately. (UF 89.) It appeared to Gallemore

15

that there was some sort of obstruction in one of the windows in Cell 46, but he observed Silva as he conducted his thirty-minute checks throughout the first-watch shift. (UF 90.) Silva did not alert Gallemore to any issues with Cell 46, and the two did not have any discussions about Osuna or Romero. (UF 92.) Gallemore saw Silva use his flashlight to conduct his cell checks and also observed Silva conduct three counts of the inmates at 12:30 a.m., 2:30 a.m., and 5:00 a.m. (UF 91.) Silva appeared to be able to complete the count with no issues. (UF 92.) Nothing that occurred on Gallemore's shift brought his attention to or raised any concerns about Cell 46. (UF 93.) There were no sounds of a struggle or distress indicating anyone had been harmed in Cell 46, and Gallemore did not hear any inmates communicating with each other from inside their cells. (UF 93.) He had no reason to believe that Silva was not conducting his checks as normal, that Romero was at risk of any harm, or that Romero had been harmed during his shift. (UF 93.)

Garcia began his second-watch shift with nothing appearing to be out of the ordinary. (UF 94.) And he similarly relied upon Defendant Pena to conduct thirty-minute checks and notify him if he encountered any issues on the morning of March 9, 2019. (UF 95.) Garcia had worked with Pena in the past and had no reason to think he was not conducting his checks properly. (UF 96.) Garcia observed Pena conduct thirty-minute checks on each of the cells in 4A1R. (UF 97.) Garcia could not tell whether the windows were covered in Cell 46, but it did not appear that Pena had any issues completing his checks on Cell 46. (UF 98.) Pena stopped briefly at Cell 46, as he had done at other cells during the shift, and then moved on to the next cell. (UF 99.) It appeared to Garcia that food and medication were distributed to the inmates as normal. (UF 100.)

Garcia first learned that Cell 46's window was covered when Pena came into the staff office to alert Sergeant Martinez. (UF 101.) Garcia then saw Martinez and Pena go to Cell 46, heard them say that there was no movement in the cell, and then heard the alarm activate. (UF 102.) Staff responded, Garcia opened the cell door when ordered, and Osuna was escorted out. (UF 103.)

Neither Gallemore nor Garcia was subjectively aware of a substantial risk of harm to Romero. Both relied upon their floor officers to conduct proper cell checks, and it appeared to

16

both Gallemore and Garcia that Silva and Pena were conducting their checks without any problems. Thus, the Court should grant summary judgment for Defendants Gallemore and Garcia.

### E. Floor Officer Pena Was Not Aware of a Substantial Risk of Harm to Romero.

Failing to comply with a prison policy to conduct regular visual cell checks cannot by itself support a finding of deliberate indifference. *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1020 (9th Cir. 2010). In *Simmons*, an inmate was placed in a housing unit where staff was required to conduct suicide-prevention cell checks every fifteen minutes. *Id*. The defendant officer did not conduct those checks for almost an hour and then discovered that the inmate had committed suicide inside his cell. *Id.* The court found that inmate's suicide-watch status may have alerted the officer to the possibility of suicide, but the magnitude of the risk was not "so obvious that [he] *must* have been subjectively aware of it." *Id*. The court reasoned, "Although a jury might reasonably conclude that [the defendant] acted imprudently, wrongly, or negligently by failing to check on [the inmate] more often and failing to conduct a thorough cell search, the question before us is not whether he did all he could have, but whether he did all the Constitution requires." *Id*. (internal quotation marks omitted).

As the second-watch floor officer, Pena was not subjectively aware of a substantial risk of harm to Romero on March 9, 2019. Before the shift, Pena was familiar with Osuna and aware that he had been designated a gasser, but he did not believe that Osuna was more dangerous than any other inmate in 4A1R. (UF 105.) Pena was also familiar with and had spoken with Romero before March 9, 2019. He knew that Romero and Osuna had recently been housed together, but he had no reason to think that there was any risk from the two of them housing together. (UF 106.).

At no time did Pena hear any sounds of distress or struggle or any other indication that Romero was being harmed in Cell 46. (UF 107.)

17

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Thus, the Court should grant summary judgment for Defendant Pena.

### F. Romero's Murder Would Not Have Been Prevented by More Diligent Cell Checks.

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1025 (9th Cir. 2008). The causation analysis applies to both Eighth and Fourteenth Amendment claims. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018); *Lemire v. California Dept. of Corrections and Rehabilitation*, 762 F.2d 1062, 1074 (9th Cir. 2013). "The causation analysis in a § 1983 case closely resembles the standard foreseeability formulation of proximate cause." *Arnold v. International Business Machines Corp.*, 637 F.2d at 1355. The court is required to "take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988).

Plaintiff's allegation that Romero's murder would have been prevented had staff conducted more diligent cell checks is pure speculation and contradicted by the undisputed forensic evidence in this case, which shows that Romero was quickly mortally wounded, lost consciousness within ten to thirty seconds, and was dead within two to five minutes. Plaintiff's retained forensic pathologist, Dr. Carpenter, testified that the mechanism of death was "a rapid attack, controlled, getting to the throat vessels rather quickly, loss of consciousness within ten to thirty seconds and death within two to five minutes. (UF 114; Carpenter Dep. 31:17–25.) There was "a fast attack with rapid stab wounds in the back of the neck which probably paralyzed the body through spinal cord damage …." (Carpenter Dep. 33:10–12.)

Dr. Carpenter further opined that "after the stabbing to the back of the neck, there is a procedure probably with a rapid move to cut the vessels of the right side of the throat, and that is when you have a countdown ten to thirty seconds before the person loses consciousness, two to five minutes before they bleed out and are dead with the heart still pumping very low blood

18

pressure, and that is basically the end of it." (Carpenter Dep. 35:11–17.) He described the cutting of the throat as the "deathblow." (Carpenter Dep. 35:23-25.) He confirmed "as soon as the equivalent of one carotid artery is cut, then the textbooks put the time until death within two to five minutes." (Carpenter Dep. 37:2–4, 56:14–16.) Once those injuries were inflicted, no physical intervention or medical attention could have saved Romero:

> "If someone is there that applies pressure, whether it is the victim or the paramedics or whatever, of course, it bleeds more slowly. So that is why the clinical experience is important. The ten to thirty seconds is all we have, but it is a general average statement. We don't – I could not find out about variations probably because these people die at the scene mostly. If they do arrive in the emergency room because the paramedic got there or someone there knew enough to put pressure on the vessel, then they get them to the emergency room and then most of them die."

(Carpenter Dep. 41:6–16.)

Carpenter concedes that he cannot estimate what time Romero died, i.e., whether it occurred during first watch or second watch. (Carpenter Dep. 78:23–79:3.) Nor can he determine whether the attack started when Romero was asleep or there was a struggle. (Carpenter Dep. 46:21-47:9).

Thus, Plaintiff's theory that thirty-minute cell checks would have prevented Romero's death cannot be reconciled with her own retained expert's testimony that Romero "rather quickly" sustained a "deathblow" to his carotid artery and was dead within, at most, five minutes. (UF 114; Carpenter Dep. 31:17-25.) There is no reason to believe that had Silva and Pena diligently conducted regular, visual cell checks, one of them would have seen into the cell during the exact moments when Osuna attacked Romero and before the fatal wound was inflicted.

And, even if staff had fortuitously discovered the attack while it was in progress, it is pure speculation that they could have intervened in time to prevent Romero's death. Officers are not trained to enter cells and engage in single, hand-to-hand combat with inmates. If Silva or Pena saw the attack in progress, the response protocol would require them to activate their alarm and summon staff, not make immediate entry. (UF 113.) There is no evidence that even an optimally diligent floor officer would have come upon Osuna's attack before the fatal injuries were inflicted or that they could have stopped the attack in time to prevent Romero's death even if they had.

Accordingly, because no reasonable trier of fact could find that more diligently conducting thirty-minute cell checks, including removing the window coverings more quickly, would have prevented Romero's death, Plaintiff cannot establish causation for her claims against the housing-unit staff and the Court should grant summary judgment for Defendants Gallemore, Garcia, and Pena.

## II.   THERE IS NO EVIDENCE THAT DEFENDANT BURNES FAILED TO TRAIN OR SUPERVISE HIS OFFICERS (THIRD CLAIM FOR RELIEF).

"There is no respondeat superior liability under 42 U.S.C. § 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Officials cannot be held liable solely for unconstitutional conduct of their subordinates. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Instead, an official can only be held liable under § 1983 if there is a showing that the official personally participated in the constitutional deprivation alleged. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Accordingly, a supervisor is only liable under § 1983 if: (1) the supervisor was personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013).

It is insufficient to assert generally that a defendant created policies and procedures that led to the violation, without alleging a specific policy created by him that led to the constitutional violation. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012); *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program ...."); *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (a violation of a departmental policy or regulation does not establish a constitutional violation).

Plaintiff has never identified what supervision and training Burnes allegedly failed to provide, and summary judgment should be granted for that reason alone. As discussed above, the

20

decision to approve inmate Osuna to double-cell was consistent with CDCR policy, and staff followed policy in housing inmates Osuna and Romero together. (UF 25, 27, 30, 46, 47, 78-79.) There is no evidence that Burnes failed to properly train or supervise staff with respect to the double-celling process because no violation of policy occurred. (UF 25, 27, 30, 46, 47, 78-79.) Burnes trained the officers working under him in accordance with CDCR policy, including to conduct Guard One visual cell checks every thirty minutes, to order inmates to remove window coverings, and if an inmate did not comply, to report the situation to the on-duty sergeant. (UF 115.) And it is undisputed that Burnes, who was a second-watch sergeant, was not working on the evening of March 8, 2019, or the morning of March 9, 2019, and was not supervising Gallemore, Garcia, Silva, Pena, or any other CDCR staff member when Romero was killed and his body was discovered. (UF 116.)

Thus, there is no basis to find Burnes liable for failing to supervise or train staff, and the Court should grant summary judgment for Defendant Burnes on Plaintiff's Third Claim for Relief.

**III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE NO CONSTITUTIONAL VIOLATIONS OCCURRED AND IT WOULD NOT HAVE BEEN CLEAR TO EVERY REASONABLE OFFICER THAT THEIR CONDUCT WAS UNCONSTITUTIONAL.**

### A.   Standard for Qualified Immunity

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The rule permits officials to undertake their responsibilities without fear that they will be held liable in damages for actions that appear reasonable at the time but are later held to violate statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). Qualified immunity prohibits second-guessing prison officials, even where it is plausible that the situation could have been handled differently. *See Ziglar v. Abassi*, 582 U.S. 120, 150–51

(stating that qualified immunity gives officials "the breathing room to make reasonable but mistaken judgments").

Courts consider, in either order, whether the alleged facts constitute a constitutional violation and whether the constitutional right at issue was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A favorable determination for the defendants on either establishes qualified immunity. *Pearson*, 555 U.S. at 236. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). To overcome qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 741). Plaintiff bears the burden of demonstrating that the constitutional right in question was clearly established at the time officials acted. *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997).

The right at issue must be framed specifically and the focus is "whether the violative nature of *particular* conduct is clearly established," and whether the unlawfulness of the official's conduct was apparent. *Ziglar*, 582 U.S. 150–51 (citing *Mullenix v. Luna*, 577 U.S. at 12 (emphasis in original).) "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id*. at 152.

### B. It Was not Clearly Established that Approving a Prisoner with Osuna's Case Factors for Double-Cell Status, and Approving Romero and Osuna to Be Celled Together, Was Unlawful.

There is no case law that would have put every reasonable prison official on fair notice that approving Osuna to double-cell, or approving Romero and Osuna to house together, would violate the Constitution.

The Ninth Circuit's decision in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002) is instructive. There, like this matter, inmate Ford was killed by his cellmate Diesso, and Ford's family and estate sued prison officials based on the decisions to continue Diesso's double-cell status and to allow Diesso and Ford to cell together. *Id.* at 1045. The Ninth Circuit pointed out that the standard for what constitutes a substantial risk of serious harm in a double-celling

22

situation has not been clearly established: "[I]t is relevant that neither *Farmer* nor subsequent authorities has fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Id.* at 1051 (quoting *Farmer,* 511 U.S. at 834 n.3). "Thus, it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm." *Id.* at 1051 (emphasis in original).

Applying that reasoning, the Ninth Circuit found that the prison officials were entitled to qualified immunity, reversing the district court:

> Although Caden's decision to continue Diesso as a "D" designation, and Arnold's approval upon Williams's advice to allow Diesso to be double-celled with Ford turned out be quite unfortunate judgments, we cannot say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling.

*Id.* "[I]t would not have been clear to a reasonable correctional officer … that double-celling Diesso, or double-celling him with Ford, posed such a substantial risk of serious harm that doing so would be constitutionally impermissible." *Id.* at 1053.

The case law has not, since the decision in *Estate of Ford,* clearly established a point at which the risk of harm from double-celling inmates with one another changes from being a risk of some harm to a substantial risk of serious harm. *See, e.g., Sena v. Coleman*, 772 F.App'x 551, 552 (9th Cir. June 21, 2019) ("Because existing precedent has not placed beyond debate the question whether, given the information available to Coleman and Clinkscale, double celling a person like Sena with a person like Allen would violate Sena's constitutional rights under the Fourteenth Amendment, the officers are entitled to qualified immunity.").

Applying *Estate of Ford* here, Defendants are entitled to qualified immunity. In *Estate of Ford*, the Court found the following factors for Diesso that would potentially counsel against housing him with another inmate:

> … that Diesso had an extensive history of violent behavior toward inmates and staff, including eleven separate assaults, one of which involved stabbing an inmate seventeen times; that Diesso was classified as a "level four" inmate—the highest security level—and had a "point total" that made him one of the highest security inmates at CMF; that Diesso was classified as a "predator"; that Diesso had acted bizarrely and aggressively towards his cellmate on June 6, 1998, threatening to attack him but apparently failing to do so because his cellmate was approximately twice his size; that after this incident housing Lieutenant

23

Sanchez thought that Diesso should be single-celled; that Diesso was going to be transferred to a special handling unit at Corcoran State Prison, which is reserved for extremely dangerous inmates; and that single cells were available to house Diesso while he awaited his transfer to Corcoran.

*Estate of Ford,* 301 F.3d at 1051. The Ninth Circuit held that it had not been clearly established that it would be unconstitutional to continue double-cell status for an inmate with those factors, and therefore defendants were entitled to qualified immunity. *Id.*

Similarly here, Plaintiff asserts that it was unconstitutional for Defendants Gamboa, Maytubby, and Burnes to continue Osuna's double-cell status at the January 22, 2019, ICC. (Fifth Am. Compl. ¶ 17, ECF No. 134.) Plaintiff asserts that Osuna had the following factors that counsel against double-cell status: that he was incarcerated for the 2011 murder of a Bakersfield woman; ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████ that he had face tattoos; ██████████████████████████████ ████████████████████ (*Id.*)

It was not clearly established, in early 2019, that it would be unconstitutional to continue an inmate on double-cell status because of any or, indeed, all of those factors. *See Estate of Ford* at 1051 (not clearly established that inmate with multiple violent incidents could not constitutionally be double celled); *Campbell v. Callis*, No. 21-cv-05187-JST, 2024 U.S. Dist. LEXIS 28873, at *40 (N.D. Cal. Feb. 20, 2024) (no deliberate indifference where officials continued inmate's double-cell status despite inmate's expression of homicidal ideations).

Because it was not clearly established that Defendants' conduct in continuing Osuna's double-cell status was unconstitutional, the Court should grant summary judgment for Defendants Gamboa, Maytubby, and Burnes based on qualified immunity.

Plaintiff also asserts that it was unconstitutional for Defendants Loza, Munoz, and Burnes to approve Romero and Osuna to cell together. (5th Am. Compl. ¶ 19.) The case law does not establish that it was unconstitutional to cell two inmates such as Romero and Osuna together. *See*

24

*Sena,* 772 F. App'x at 552. Plaintiff does not assert that Romero and Osuna were enemies, or from rival gangs, or that there was any factor that made housing Osuna specifically with Romero obviously unsafe. (*See generally* Pl.'s 5th Am. Compl., ECF No. 134.) Indeed, Romero agreed to house with Osuna and communicated no safety concerns. (UF 71-72.)

Because it was not clearly established that Defendants' conduct in approving Osuna and Romero to house together was unconstitutional, the Court should grant summary judgment for Defendants Loza, Munoz, and Burnes based on qualified immunity.

**C.    There Was No Clearly Established Right to Have Regular Cell Checks or for Cell Windows to Be Uncovered.**

Similarly, there is no clearly established constitutional right to visual cell checks every thirty minutes. *See Ottele v. Martinez,* No. 1:22-cv-00187-JLT-CDB, 2024 U.S. Dist. LEXIS 151718, at *39-41 (E.D. Cal. Aug. 23, 2024). This Court observed as much in ruling on Defendants' motion to dismiss Plaintiff's Fourth Amended Complaint. (Order at 6 ("The court is unaware of case law clearly establishing the same right [to direct-view safety checks] for prisoners like Mr. Romero who have already been convicted of a crime."), ECF No. 130.)

In *Ottele,* the court granted qualified immunity to an officer in a prison mental-health unit who did not conduct required safety checks for almost ninety minutes and then found that the inmate had committed suicide in his cell. The inmate had a long history of suicide attempts and was housed in a unit where officers were trained to conduct regular safety checks to confirm "whether the inmates were alive by visually observing them and counting breathing flesh." *Id.* at *2, 11. Nevertheless, "it was not 'beyond debate' that skipping that safety check amounted to a constitutional violation under these circumstances." *Id.* at *13.

> To define the right, for example, as "the right for inmates in a mental health unit to be checked at regular intervals" would open the door to a finding of deliberate indifference any time an officer failed to timely implement a check in such a unit, so long as the officer is *generally* aware that inmates therein could harm themselves or others and there is a causal connection between the failure to check and that harm. Though this is not illogical, such an articulation would not align[] with Ninth Circuit caselaw focusing on the distinction between acute/imminent risk on the one hand, versus sporadic/chronic risk on the other.

*Id.* at *12.

Because it was not clearly established that a prisoner has a constitutional right to regular visual cell checks, the Court should grant summary judgment for the housing-unit staff Defendants Gallemore, Garcia, and Pena based on qualified immunity.

**IV.    ROMERO'S DEATH WAS NOT CAUSED BY DEFENDANTS' BREACH OF A DUTY UNDER STATE LAW (FIFTH CLAIM FOR RELIEF).**

**A.    Osuna and Romero Were Appropriately Housed Together Under CDCR Policies Designed to Protect Prisoners from Causing Each Other Harm.**

Code of Civil Procedure section 377.60 establishes a statutory cause of action in favor of heirs of a person who dies as a result of the "wrongful act or neglect" of another. Section 377.60 completely occupies the field of wrongful death to the exclusion of any other action or remedy. (*Vander Lind v. Superior Court* (1983) 146 Cal.App.3d 358, 364.)

To establish liability in negligence, there must be a legal duty owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury. (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 396.) "If there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another. The existence of the duty in the first place is a question of law for the court. The existence and scope of any duty, in turn, depends on the foreseeability of the harm, which, in that context, is also a legal issue for the court." (*Id.* [citations omitted].) "The duty analysis developed by the California Supreme Court requires the court in each case (whether trial or appellate) to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake. ... This frames the issue for the court's determination by defining the scope of the duty under consideration." *Romero v. Los Angeles Rams*, 91 Cal.App.5th 562, 569 (2023) (internal citations omitted).

Although prison officials have a duty to protect prisoners from foreseeable harm inflicted by others, that does not encompass a legal duty to deviate from official state policies that are specifically designed to fulfill that responsibility. Defendants who continued Romero's double-cell status, or who approved Romero and Osuna being housed together, did not expose Romero to a foreseeable risk of harm. Rather, as set forth above, they properly followed CDCR policy in clearing Osuna for double-celling and in housing Osuna and Romero together. (*See supra* § I.B-I.C.)

26

The court in *Muniz v. Pfeiffer*, No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199, at *5 (E.D. Cal. Jan. 13, 2023) faced a similar issue. There, the plaintiff alleged that defendant Goss was deliberately indifferent when he authorized decedent Muniz to be double celled with another inmate, Mendoza. *Id.* at *11. According to plaintiff, the two should not have been housed together because of the following factors: "(1) that Muniz was a drop out from the South Side Kings, which placed him at considerable danger given that Mendoza is a Fresno Bulldog drop out, an alleged rival of the South Side Kings; (2) that Mendoza had a history of violence within CDCR facilities; and (3) that Mendoza suffered from mental health issues." *Id.* A classification committee had found that Mendoza was suitable to be double-cell cleared because of "no significant history of in cell victimization or predator behavior towards a cellmate." *Id.* And Muniz and Mendoza had the opportunity to meet and agreed to be housed together before they were placed in the same cell. *Id.* at 12-13.

The court found that the rival gang dropout status did not mean that there was a foreseeable risk of harm—Muniz and Mendoza were both gang dropouts, and there was no evidence of an active gang rivalry. *Id.* at *14–16, 27. The Court further found that Mendoza's history of aggression toward other inmates—which included a 2007 in-cell battery and a 2017 battery on an inmate (outside the cell) that caused serious injury also did not mean there was a foreseeable risk of harm. *Id.* at *3, 12-13, 27. Finally the court found that the evidence regarding Mendoza's mental health was little more than speculation, and therefore did not show a foreseeable risk of harm. *Id.* at 17-18, 27. Finding that "the undisputed facts demonstrate that Mendoza did not pose a foreseeable risk of harm to Muniz of which defendants were aware (or should have been aware)," the court granted defendants motion for summary judgment as to the wrongful death claims.

Here, as in *Muniz,* there was not a foreseeable risk of harm to Romero sufficient to support a finding of negligence. Plaintiff asserts that Osuna's history of aggression against inmates is significant, but as set forth above, there was not a history of in-cell violence against cellmates that would have led to a foreseeable risk of harm. (UF 12.) And the other factors Plaintiff asserts: that Osuna was incarcerated for the 2011 murder of a Bakersfield woman, ███████████

27

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ that he had face tattoos, ███████████████████

███████████████████████████████████████ also did not mean that there was a foreseeable risk of harm to Romero. (UF 119 .)

Defendants Burnes, Gamboa, Maytubby, Loza, and Munoz followed CDCR policy in granting Osuna double-cell status and housing Osuna and Romero together. They did not foresee a significant risk of harm to Romero from being housed with Osuna. (UF 29, 43-45, 63, 75, 79.) Had Defendants been aware of such a risk to Romero's health, they were required to report it, and would have done so. (Munoz Decl. ¶ 7, Burnes Decl. ¶ 7, Gamboa Decl. ¶ 23, Loza Decl. ¶ 6, Maytubby Decl. ¶ 12.) Other staff members also did not foresee such a risk. (UF 6, 19, 23.) And Romero himself did not foresee a risk of housing with Osuna. After meeting Osuna, he agreed to house with him and signed a document memorializing that agreement.

Because there was not a foreseeable risk of harm to Romero sufficient to support a finding of negligence, summary judgment should be granted for Defendants Burnes, Gamboa, Maytubby, Loza, and Munoz as to the wrongful death claims.

**B. Plaintiff Cannot Establish that the Manner in Which Defendants Conducted Cell Checks Was the Proximate Cause of Romero's Death.**

While causation is normally a question of fact, "causation may be decided as a question of law if under the undisputed facts, "there is no room for a reasonable difference of opinion. *Romero*, 91 Cal.App.5th at 568. "On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* at 571–72.

28

For the reasons discussed previously with respect to Plaintiff's Eighth and Fourteenth Amendment claims, the undisputed forensic evidence establishes that Plaintiff cannot support the element of causation for her state-law claim that Romero's death would have been prevented by more diligent, visual cell checks.

Thus, the Court should grant summary judgment for Defendants Gallemore, Garcia, and Pena on the state-law claim for wrongful death.

## V.    DEFENDANTS GALLEMORE, GARCIA, AND PENA DID NOT FAIL TO SUMMON MEDICAL CARE THAT WOULD HAVE PREVENTED ROMERO'S DEATH (SIXTH CLAIM FOR RELIEF).

Citing California Government Code section 845.6, Plaintiff's Sixth Claim for Relief alleges that Defendants Gallemore, Garcia, Silva, and Pena failed to summon medical care for Romero despite having reason to know that he needed immediate medical care and that "[a]s a result, Mr. Romero's injuries worsened, and without timely medical treatment, he died." (5th Am. Compl. ¶¶ 59–60.) Section 845.6 generally immunizes non-medical staff from liability for failure to provide medical care to a prisoner but creates an exception when the defendant "knew or had reason to know of the need for immediate medical care and failed to reasonably summon such care." This claim fails because the undisputed facts show that Defendants did not have reason to know that Romero needed medical care, and his death could not have been prevented by medical intervention.

The Court initially dismissed Plaintiff's claim under section 845.6 because her allegations that Osuna was a known threat and the cell window was obscured by a sheet "did not show that Silva, Pena, Gallemore, and Garcia knew, or should have known, of Romero's urgent need for medical care after he was attacked by Osuna." (*See* Order at 1, ECF No. 152.) Plaintiff then amended the complaint to allege that Defendants could hear "loud sounds of yelling and screaming coming from the Romero/Osuna cell" and that other inmates "yelled out about the attack occurring inside the cell." (5th Am. Compl. ¶¶ 21, 58.) The Court ruled that "Solares's amended claim, asserting that the officer defendants could hear sounds of a violent attack in the cell Romero and Osuna shared, corrects those deficiencies." (Order at 5, ECF No. 152.)

29

The Court should now grant summary judgment because Plaintiff can present no evidence to support that material allegation. Defendants Gallemore, Garcia, and Pena did not hear any sounds of distress or struggle from Romero and Osuna's cell, and they had no knowledge that Romero had been attacked until after his body was discovered. (UF 93, 101-103, 109-112.) And, as earlier discussed, the undisputed forensic evidence establishes that Romero's death could not have been prevented by medical intervention.

Thus, the Court should grant summary judgment for Defendants Gallemore, Garcia, and Pena on the claim for failure to summon medical care.

## VI. IN THE ALTERNATIVE, THE COURT SHOULD DECLINE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE-LAW CLAIMS.

Under 28 U.S.C. § 1367(a), in any civil action in which the district court has original jurisdiction, the court shall have supplemental jurisdiction over all other claims in the action that form part of the same case or controversy. The court may decline to exercise supplemental jurisdiction over a claim "if … the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court has cautioned that "if the federal claims are dismissed before trial, … the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). Thus, in granting summary judgment for Defendants on Plaintiff's federal claims, the Court may decline to exercise supplemental jurisdiction and dismiss Plaintiff's state-law claims.

## CONCLUSION

The undisputed evidence in this case establishes that staff involved in Osuna's classification appropriately continued his double-cell eligibility under CDCR policy because he had no history of in-cell assaults or in-cell violence toward a cell partner or a history of in-cell sexual abuse; had no history of being victimized by cell partners; and had no other factors that would increase the risk of victimization by a cell partner. Romero and Osuna were properly celled together under CDCR policy because the housing-unit staff reviewed each inmate's central file and housing criteria; determined they were double-cell eligible and compatible by case factors; allowed Romero and Osuna to meet each other; and obtained their written consent to share a cell.

30

None of the Defendants knew of an excessive risk posed by Osuna. And the undisputed forensic evidence establishes that the homicide would not have been prevented by more diligent cell checks, removing the window coverings sooner, or providing medical intervention, because Romero rapidly suffered a fatal injury to his carotid artery, lost consciousness within seconds, and was dead within minutes.

Defendants are also entitled to qualified immunity for Plaintiff's federal claims because it would not have been clear to every reasonable prison official that designating a prisoner with Osuna's case factors as double-cell eligible and housing him with Romero in compliance with CDCR policy was unlawful. And there was no clearly established constitutional right to scheduled, visual cell checks.

Accordingly, the Court should grant Defendants' motion for summary judgment.

Dated: August 3, 2026                             Respectfully submitted,

                                                  ROB BONTA
                                                  Attorney General of California
                                                  JON S. ALLIN
                                                  Supervising Deputy Attorney General
                                                  JEREMY DUGGAN
                                                  Deputy Attorney General


                                                  *David E. Kuchinsky*


                                                  DAVID E. KUCHINSKY
                                                  Deputy Attorney General
                                                  *Attorneys for Defendants Burnes,*
                                                  *Loza, Gamboa, Garcia, Gallemore,*
                                                  *Maytubby, Munoz, and Pena*

SA2019101902
95731568.docx

31