ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7666
 Fax:  (916) 324-5205
 E-mail:  David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants Burnes, Loza, Gamboa,*
*Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br><br>Plaintiff,<br><br>v.<br><br>**RALPH DIAZ, et al.,**<br><br>Defendants. | 1:20-CV-00323-LHR-FRS (PC)<br><br>**DECLARATION OF B. GALLEMORE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          September 11, 2026<br>Time:<br>Courtroom:<br>Judge:        Hon.  Lee H. Rosenthal<br>Trial Date:   Not set.<br>Action Filed:  March 2, 2020 |

I, B. Gallemore, hereby declare:

1.     I have personal knowledge of the facts set forth in this declaration.  I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

2.     I retired from the California Department of Corrections and Rehabilitation (CDCR) in August 2023, after working there for twenty-nine years.  I worked my entire career at California State Prison, Corcoran (Corcoran) as a correctional officer.

3.     In March 2019, I was regularly assigned to work in the control booth at Corcoran Yard 4A, Building 1 Right (4A1R), on the first-watch shift, from 10:00 p.m. to 6:00 a.m.  I had worked this assignment since approximately 2011.  In March 2019, 4A1R was a long-term

1

restricted housing unit which was designed to house inmates who had committed crimes while in prison.

4. The control booth in 4A1R was an elevated position with windows into each of the housing unit sections and a control panel which can individually open all of the doors within 4A1R. I could not access the housing units directly from the control booth but entered and exited the control booth from a separate entrance. I was never permitted to leave the control booth during my shift.

5. As a first-watch control-booth officer, I was responsible for supervising inmates and monitoring the unit, providing coverage for floor officers, completing unit logbooks and paperwork, and responding to incidents in the housing unit from the control booth. I was required to maintain visual contact with the floor officer while he or she conducted cell checks every thirty minutes throughout the shift, ensuring that the officer was safe while they conducted the checks. The floor officer would walk from cell to cell and was responsible for checking inside each cell with a flashlight to ensure that each inmate was alive and breathing. Once the officer completed the check, they would tap an electronic device on a pad on the door to document the check and move on to the next cell. Inmates would sometimes make requests of the floor officer during the checks, and the floor officer could communicate those requests to me. From the control booth, I could not see into the cells or see what the floor officers saw, so I relied upon my floor officers to communicate any issues to me so they could be resolved. It was not part of my job duties in the control booth to monitor or observe inside individual cells.

6. There are three windows in each of the cells of 4A1R. From the control booth, I could tell whether a light was on inside an inmate's cell but could not see into the cell. During the first-watch shift, the housing unit lights were dimmed so that the inmates could sleep. I turned off the televisions in the dayroom to reduce noise. The housing unit also had large fan units that I turned off during first watch to reduce noise.

7. I relied on my floor officer to conduct the thirty-minute checks and to inform me if there were any problems or issues that arose during the checks. If inmates had covered their cell windows so that it prevented the floor officer from conducting thirty-minute checks, the floor

2

officer could alert me, and we could call for assistance from other officers or supervisors to assist in getting the covering taken down. From the control booth, it was very difficult to tell whether a cell window was blocked, however if it looked to me as though a cell window was obstructed, I would communicate with the floor officer and, if necessary, summon additional staff to resolve the issue. If I became aware of inmates being disruptive inside their cells or actively covering the cell windows, I would direct the floor officer to speak with the inmate to try to resolve the issue while I remained in the control booth and provided coverage.

8. The control booth is an armed position, and I was equipped with both a Mini-14 rifle, which is a lethal force option, and a 40mm direct impact launcher, which is a less-lethal option. I was trained to use these devices consistent with CDCR's use-of-force policy. While I was assigned to the first watch shift for the 4A1R control booth from approximately 2011 to 2019, I never had to use either the 40mm launcher or the Mini-14 rifle. I am not trained to discharge either the Mini-14 rifle or the 40mm direct impact launcher into a cell to stop an incident. I would not fire either of these devices into a cell to stop an incident because there would be a significant risk that the shot would ricochet or hit an unintended target. Instead, when incidents occur inside a cell, floor officers are trained in the protocols to respond. If I was aware of an incident occurring inside a cell, I could immediately notify my floor officer, activate an alarm, and make a radio call to summon assistance as necessary.

9. I was not working the night of March 7, 2019, when Osuna and Romero were first housed together. I worked the first-watch shift from March 8, 2019, at 10:00 p.m. to March 9, 2019, at 6:00 a.m. I was working with floor officer Luis Silva. I knew Silva to be a dependable officer and had no reason to think he would not perform his duties as required. I had worked with Silva on previous occasions when he had alerted me to problems in the housing unit or inside a cell, and I had no reason to think he would not do that on this shift if any issues arose.

10. During my shift from March 8, 2019, at 10:00 p.m. to March 9, 2019, at 6:00 a.m., the dayroom televisions and the housing unit fans were turned off. The lights were dimmed as normal.

3

11. During my shift from March 8, 2019, at 10:00 p.m. to March 9, 2019, at 6:00 a.m. I did not know, and had no reason to think, that Romero faced any risk of harm or that he had suffered any harm. I was not personally familiar with Osuna or any incidents he had in the unit. I was aware that Osuna, along with other inmates in the unit, had been designated a "gasser", because there was a printout of all such inmates in my control booth. I had never had a discussion about Osuna with other CDCR staff.

12. During my shift from March 8, 2019, at 10:00 p.m. to March 9, 2019, at 6:00 a.m. I was also not personally familiar with inmate Romero. I did not know that he had recently been transferred to Corcoran. Nothing stood out about either Osuna or Romero to me. I had no reason to think that there was any risk from the two of them housing together.

13. I do not recall whether I had been made aware that Romero had just been housed with Osuna the previous day in Cell 46. I had been informed that there had been a fight in different section of the housing unit and a gassing and cell extraction, but I do not recall any information about Romero or Osuna being communicated to me. I communicated the information about those incidents to Silva when our shift began.

14. I observed Silva conducting regular thirty-minute checks throughout the first-watch shift as he was required to do, including for Cell 46 on the first floor of C section, which housed inmates Osuna and Romero. Silva did not alert me to any problems that arose during his thirty-minute checks, and we did not have any discussions about Cell 46, Romero, or Osuna. Instead, after Silva conducted each of his thirty-minute checks, I asked him whether everything was good and he told me it was. I had not seen anything in Cell 46 or any of the cells from my position in the control booth that I believed Silva needed to investigate or that posed a risk to safety in the unit.

15. From my position in the control booth, it did appear that there was some sort of obstruction in one of the windows, but I could not tell if it was complete or partial. However, I observed Silva conducting his regular checks with a flashlight on Cell 46 without any issues, and he consistently relayed that there were no problems or issues with the checks throughout our shift, so I did not feel there was a need to take any further action. I did not believe that it had prevented

4

Silva from conducting a proper check and ensuring that both Romero and Osuna were alive and breathing as required.

16. I also observed Silva conduct three counts of the inmates as required at approximately 12:30 a.m., 2:30 a.m., and 5:00 a.m., and he appeared to do so without any issues. Silva did not communicate to me that there were any issues during his three inmate counts.

17. There was nothing that brought my attention to or raised any concerns about Cell 46, Romero, or Osuna during the first-watch shift. I did not hear any sounds that indicated there was a problem or that anyone had been harmed in Cell 46 or anywhere else in the housing unit. I did not hear Osuna or any other inmates communicating with each other from their cells. I relied upon Silva to conduct his thirty-minute checks, which it appeared he was doing from my position in the control booth, and to communicate any issues that came up during his checks. Silva never communicated any problems with Cell 46.

18. I first learned that inmate Romero had been killed when I came in for my regular shift on the night of March 9, 2019. I was not present when Romero's body was discovered.

19. I was not aware that Romero was at a substantial risk of harm during my first watch shift from March 8, 2019, at 10:00 p.m. to March 9, 2019, at 6:00 a.m. I was not aware and had no reason to think that Romero was harmed during my shift. I was not aware and do not know whether Silva saw both Romero and Osuna alive and breathing during his checks, but it did not appear that Silva had any issues with his checks in Cell 46 or any cell in the housing unit, and he never communicated any issues to me. As a control-booth officer, I relied upon the observations and communication of my floor officer to conduct my duties.

///

///

///

///

///

///

///

5

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: July 31, 2026, at Tulare, California.


*/s/ B. Gallemore*

B. Gallemore

SA201910190

6