ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone:  (916) 210-7666
  Fax:  (916) 324-5205
  E-mail:  David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants Burnes, Loza, Gamboa,*
*Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,** | 1:20-CV-00323-LHR-FRS (PC) |
| Plaintiff, | **DECLARATION OF J. GARCIA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **RALPH DIAZ, et al.,** | Date:          September 11, 2026 |
| | Time: |
| | Courtroom: |
| Defendants. | Judge:        Hon.  Lee H. Rosenthal |
| | Trial Date:    Not set. |
| | Action Filed:  March 2, 2020 |

I, J. Garcia, hereby declare:

1.     I have personal knowledge of the facts set forth in this declaration.  I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

2.     I am currently retired from the California Department of Corrections and Rehabilitation (CDCR).  I worked at CDCR as a correctional officer at California State Prison, Corcoran (Corcoran) for my entire career from 1999 until I retired in 2020.

3.     In March 2019, I was regularly assigned to work in the control booth at Corcoran Yard 4A, Building 1 Right (4A1R), on the second-watch shift, from 6:00 a.m to 2:00 p.m.  I had worked in this assignment for six months to a year before March 9, 2019.  In March 2019, 4A1R

1

was a long-term restricted housing unit which was designed to house inmates who had committed crimes while in prison.

4.    The control booth in 4A1R was an elevated position with windows into each of the housing unit sections and a control panel which can individually open all of the doors within 4A1R.  I could not access the housing units directly from the control booth but entered and exited the control booth from a separate entrance.  I was never permitted to leave the control booth during my post.

5.    As a second-watch control-booth officer, I was responsible for monitoring the unit and the inmates housed there, providing coverage for floor officers, completing logbooks and documentation, and responding to incidents in the housing unit from the control booth.  I was required to maintain a visual of the floor officer while he or she conducted cell checks every thirty minutes throughout the shift, ensuring that the officer was safe while they conducted the checks.  The floor officer would walk from cell to cell and was responsible for checking inside each cell to ensure that each inmate was alive and breathing.  Once the officer completed the check, they would tap an electronic device on a pad on the door to document the check and move on to the next cell.  Inmates would sometimes make requests of the floor officer during the checks, and the floor officer could communicate those requests to me.  From the control booth, I could not see into the cells or see what the floor officers saw, so I relied upon my floor officers to communicate any issues to me so they could be resolved.  It was not part of my job duties in the control booth to monitor or observe inside individual cells.

6.    There are three windows into each of the cells of 4A1R.  From the control booth, I could not see into the cells.  There was also glare on the cell windows from the housing unit lights.  I relied on my floor officer to conduct the thirty-minute checks and to inform me if there were any problems or issues that arose during the checks.  If there were issues with inmates covering their cells windows that prevented the floor officer from conducting thirty-minute checks, the floor officer could alert me and we could call for assistance from other officers or supervisors to assist in getting the covering taken down.  From the control booth, it was very difficult to tell whether a cell window was blocked, but if it looked to me as though a cell window

2

was obstructed, I would communicate with the floor officer and, if necessary, summon additional staff to resolve the issue.  If I became aware of inmates being disruptive inside their cells, I would direct the floor officer to speak with the inmate to try to resolve the issue while I remained in the control booth and provided coverage.

7.      The control booth is an armed position, and I was equipped with both a Mini-14 rifle, which is a lethal force option, and a 40mm direct impact launcher, which is a less-lethal option.  I was trained to use these devices consistent with CDCR's use-of-force policy.  Generally, when I have had to use force, it has been in response to an incident in the housing-unit dayroom or immediately outside the housing unit.  I am not trained to discharge either the Mini-14 rifle or the 40mm direct impact launcher into a cell to stop an incident.  I would not fire either of these devices into a cell to stop an incident because there would be a great risk of ricochet or hitting the wrong person.  Instead, when incidents occur inside a cell, floor officers are trained in the protocols to respond.  If I was aware of an incident occurring inside a cell, I could immediately notify my floor officer, activate an alarm, and make a radio call to summon assistance as necessary.

8.      When second watch starts at 6:00 a.m., an initial cell check is typically conducted by a floor officer within fifteen minutes of the shift starting.  The housing unit is typically quiet between 6:00 a.m. and 8:00 a.m. because the inmates are still waking up and getting ready for the day.

9.      I was not working on March 7, 2019, the day Osuna and Romero were first housed together, or on March 8, 2019, as these were my regularly scheduled days off.  I worked the second-watch shift on March 9, 2019, starting at 6:00 a.m. but did not work through the end of the shift at 2:00 p.m.  I was working with floor officer Leonel Pena.  I had worked with Pena before March 9, 2019, and had no reason to think he was not conducting his checks properly.  I expected that he would notify me if there were any issues with the checks, including if he could not see into a cell to complete the check.

10.      Before my shift on March 9, 2019, I did not know, and had no reason to think, that Romero faced any risk of harm or that he had suffered any harm.  I was familiar with Osuna and

3

was aware that he, along with other inmates in the unit, had been designated a "gasser," meaning someone who has thrown bodily fluids at correctional officers. I was aware that Osuna had incidents in prison but had not had discussions about him with other staff at Corcoran.

11.    Before and during my shift on March 9, 2019, I was not personally familiar with inmate Romero, but I had been informed that he and Osuna had recently been housed together. Nothing stood out about either Osuna or Romero to me. I had no reason to think that there was any risk from the two of them housing together.

12.    When I began my shift on March 9, 2019, at 6:00 a.m., nothing appeared to be out of the ordinary. I counted equipment and began conducting my duties. I observed Pena conducting his regular checks and other staff conducting their duties. I recall seeing Pena conduct checks on all cells, including Cell 46, which housed Osuna and Romero. From my position in the control booth, it appeared that the lights were off in Cell 46, and I could not tell whether the windows on Cell 46 were covered, but Pena did appear to be looking into the cell. It did not appear to me that Pena had any issues completing the check on Cell 46. From 6:00 a.m. until 7:30 a.m., Pena never communicated to me that he was having any issues seeing into Cell 46. It did appear to me as though Pena stopped briefly at Cell 46, as he had done at other cells in the unit that day, but then he moved on to the next cell, so I did not believe he had any trouble at Cell 46.

13.    Until 7:30 a.m. on March 9, 2019, I did not hear any sounds of a disturbance or other cause for concern from Cell 46 or anywhere else in the housing unit. No inmates or staff members communicated that there was a problem in Cell 46. I had no reason to think that Romero had been harmed or was being harmed.

14.    At approximately 7:30 a.m., while food and medications were being distributed to the inmates in the unit, Pena came into the staff office below my control booth and called the sergeant to report that Cell 46 had its windows obstructed. Pena then informed me that Cell 46 was covered up and the inmates were not responding to him.

15.    Sergeant Martinez came to the unit, and he and Pena went to Cell 46 and appeared to be talking to the occupants of the cell, but I could not hear what they were saying. I heard

4

Martinez and Pena say that there was no movement in the cell, and Pena activated his alarm. I opened the unit door for responding staff to enter the unit.

16. I could not see into Cell 46 because Martinez and Pena were standing in front of the cell door and other staff began to respond and gather around. Lieutenant Randolph instructed me to open the door to Cell 46, which I did, and Osuna was escorted out of the cell to the rotunda. I closed the cell door and secured the doors into the section. I then heard that the emergency medical response request was canceled. I was relieved of my post and left the unit.

17. I never saw inside of Cell 46 during or after the incident, but I was informed that Romero had been killed inside. I did not see or speak with Pena for the remainder of the day on March 9, 2019.

18. Until approximately 7:30 a.m., there was nothing that raised any concerns about Cell 46, Romero, or Osuna during my shift. I did not hear any sounds that indicated there was a problem or that anyone had been harmed in Cell 46 or anywhere else in the housing unit. I relied upon Pena to conduct his thirty-minute checks, which it appeared he was doing from my position in the control booth, and to communicate any issues that came up during his checks. Pena never communicated any problems with Cell 46 to me. I learned that there was an obstruction when Pena called Sergeant Martinez and the two of them went to the door of Cell 46.

19. During my shift on March 9, 2019, I was not aware and had no reason to think that Romero was at a substantial risk of harm, that he had been harmed, or that there was a need for immediate medical care for Romero, before Pena pressed his alarm. I was not aware of any issues with Cell 46 or Pena conducting his checks until Pena called the sergeant to announce the incident. As a control-booth officer, I relied upon the observations and communication of my floor officer to conduct my duties and had no reason to think Pena had not performed his duties appropriately.

///

///

///

///

5

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: July 30, 2026 at Strathmore, California.


           */s/ J. Garcia*           

J. Garcia

SA2019101902
Solares I MSJ - Garcia Declaration

6