ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7666
 Fax:  (916) 324-5205
 E-mail:  Jeremy.Duggan@doj.ca.gov
*Attorneys for Defendants Burnes, Gamboa,
Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,** | 1:20-CV-00323-LHR-FRS (PC) |
| Plaintiff, | **DECLARATION OF J. BURNES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **RALPH DIAZ, et al.,** | Judge:        Hon.  Lee H. Rosenthal<br>Action Filed:  March 2, 2020 |
| Defendants. | |

I, J. Burnes, hereby declare:

1.     I have personal knowledge of the facts set forth in this declaration.  I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

2.     I have worked for the California Department of Corrections and Rehabilitation (CDCR) since 2005.  I started as a correctional officer and promoted to sergeant at California State Prison, Corcoran in 2010, and have worked as a sergeant at Corcoran since then.

3.     In 2019, I worked in housing units 4A1R and 4A1L on second watch (6:00 a.m.–2:00 p.m.).  As a correctional sergeant in 4A1, my responsibilities included supervising the correctional officers assigned to the housing unit during my shift, maintaining safety and security

1

of the institution, and ensuring that inmates received the appropriate food, medical care, yard time, and program time.

4.    I understand that the Plaintiff in this matter is asserting that I am at fault for the death of Luis Romero because, according to Plaintiff, I knew that Osuna presented a danger to Romero but did not stop them from being housed together.

5.    Luis Romero and Jaime Osuna became cellmates at California State Prison, Corcoran on March 7, 2019.

6.    I did not know that Jaime Osuna presented a danger to Luis Romero at any time before Luis Romero's death.  In addition, I did not know, before Luis Romero died in March 2019, that Jaime Osuna was a danger to other inmates generally.

7.    Had I believed, at any time between September 2018 (when Osuna arrived at Corcoran) and March 9, 2019, that Osuna was a danger to a potential cellmate, I would have raised the issue with Osuna's counselor, and an Institutional Classification Committee would have reviewed Osuna's double-cell status.

8.    In 2018 and 2019, housing unit 4A1R was Long Term Restricted Housing (LTRH), meaning that it was housing for inmates who had committed rules violations in prison and were required to serve disciplinary terms in restrictive housing because of those violations.  Many of the inmates in LTRH have committed murder or other violent crimes, have assaulted staff in prison, have assaulted other inmates in prison, have used weapons in prison, and have tattoos on their faces.  Under CDCR policy, those factors do not prevent them from being housed in LTRH, and those factors do not prevent them from having a cellmate in LTRH.

9.    On September 13, 2018, when Osuna arrived at California Stated Prison, Corcoran, I completed an Initial Housing Review (IHR) for Osuna.  An IHR is completed when an inmate arrives at an institution to ensure that the inmate is being properly housed in the unit.  The process is described in California Code of Regulations title 15, section 3269 (2019 version).  For the IHR, the official performing the review reads the inmate's housing history and factors and confirms that the inmate is being properly housed under the criteria established by CDCR.

10.    On September 13, 2018, I reviewed Osuna's file and completed the IHR, including filling out the required form.  My review included confirming that Osuna had been cleared for double celling by an Institutional Classification Committee (ICC) at his previous institution, (California State Prison, Sacramento), meaning that he could have a cellmate.  I reviewed Osuna's file and confirmed that there was no history that would require a further evaluation for single-cell status under CDCR policy.

11.    Under CDCR policy, inmates are assigned to double-cell status unless they have certain factors that warrant a single-cell status evaluation.  Under CDCR policy, inmates are presumed to be assigned to double-cell status unless they have certain factors that warrant consideration of single-cell status.  Those factors are described in California Code of Regulations title 15, section 3269(d), as follows: "a history of in-cell abuse, significant in-cell violence towards a cell partner, verification of predatory behavior towards a cell partner, or who have been victimized in-cell by another inmate."  (Cal. Code Regs. tit. 15, § 3269(d) (2019 version).)  When single-cell status is granted, it is not permanent and can be reevaluated at the inmate's next committee.

12.    Osuna did not have a history of in-cell assaults or in-cell violence toward a cell partner, a history of in-cell sexual abuse, or any verification of predatory behavior toward a cell partner.  In addition, Osuna did not have a history of being victimized by cell partners, and did not have other factors, such as incontinence or gender dysphoria, which would increase the risk of victimization by a cell partner.  I reviewed Osuna's file and confirmed that he was properly being housed in 4A1 under CDCR policy.  Osuna was then housed in housing unit 4A1R. In my review

3

████████████████████████████████████████████████████

████████████

13.     In my review I also saw a photograph of Osuna and saw that he had tattoos on his face.  Face tattoos are common in CDCR prisons, especially in Long Term Restricted Housing.  Face tattoos do not prevent an inmate from being double-cell cleared under CDCR policy.

14.     In my review I also saw that Osuna's commitment offense was a 2011 murder of a woman in a Bakersfield hotel room.  That commitment offense did not prevent Osuna from being double-cell cleared under CDCR policy.

15.     ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████

16.     All of Osuna's factors, taken together, did not warrant a further single-cell evaluation. ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

17.     A true and correct copy of the Initial Housing Review document generated from my September 13, 2018 review is attached hereto as exhibit A.  ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████

18.     I participated in an ICC for Osuna on January 22, 2019.  An ICC is a committee at a prison that reviews an inmate's classification factors, such as custody level, disabilities, medical needs, restricted housing, and mental health participation, and makes determinations as to where the inmate can be housed.  An ICC consists of three members:  (1) a correctional counselor; (2) a captain or acting captain, and (3) the warden or warden's designee, who acts as the chairperson.

4

An ICC can also include additional participants, such as a correctional officer or sergeant and a mental health representative.

19. At the January 22, 2019 classification committee for Osuna, I was present as a correctional sergeant. On days when an ICC convenes, the status of several inmates is reviewed by the committee, one at a time. The primary role of the correctional sergeant is to scribe any information regarding the inmate's housing that the committee wants me to record, and to provide safety and security in the committee room. A correctional sergeant in an ICC does not have a vote and does not sign the ICC's decision.

20. During the January 22, 2019 ICC, I was available to answer any questions that the committee members had about Osuna. I do not recall whether I spoke at all during Osuna's January 22, 2019 ICC. During an ICC committee members have access to the inmate's SOMS (Strategic Offender Management System) file, and the inmate's central file is reviewed prior to the committee by the correctional counselor. It is therefore not necessary for a correctional sergeant to inform committee members of information that is already in the inmate's file, such as information about the inmate's commitment offense, violence in prison, and the results of previous ICCs.

21. The purpose of Osuna's January 22, 2019 ICC was to change Osuna's status from General Population to Sensitive Needs Yard (SNY) ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Osuna did not change cells based on the new SNY status because both GP and SNY inmates could be housed in 4A1R since 4A1R is a restricted housing unit where the inmates do not interact with one another, even during yard time.

22. The January 22, 2019 ICC kept Osuna's double-cell status in place. That decision was proper under policy as nothing had changed since Osuna had arrived at Corcoran that would necessitate an evaluation for single-cell status. ▮▮▮▮▮▮▮▮▮▮

5

23.   On March 7, 2019, Luis Romero arrived at California State Prison, Corcoran, transferring from another facility.  The same day, I reviewed Romero's file and completed an IHR for Romero.  My review included confirming Romero's double-cell status.  I reviewed Romero's file and confirmed that there was no history that would require an evaluation for single cell status under CDCR policy.   Romero did have an in-cell fight in 2016, but there were only minor injuries and no weapon used, so multiple ICCs had previously reviewed those factors and retained Romero's double-cell status.  I also reviewed Romero's other factors and confirmed that he was properly being housed in 4A1.

24.   In my review, I found that Romero was being housed in LTRH to serve a Security Housing Unit (SHU) disciplinary term because Romero was found guilty of possessing a weapon that was found on him after a fight with another inmate in the dining hall at Mule Creek State Prison.  Romero had SNY status, the same as Osuna.

25.   In my review, I found that Romero had a history of aggression toward staff, including multiple batteries on peace officers.  I also found that Romero had a history of aggression toward inmates, including multiple batteries.  Those incidents did not prevent Romero from being double-cell cleared under CDCR policy.

26.   In my review, I also saw that Romero's commitment offense was a 1992 murder of a 15-year-old girl in Compton, California.  That commitment offense did not prevent Romero from being double-cell cleared under CDCR policy.

27.   I also reviewed the list of thirteen inmates and former inmates for whom Romero had separation alerts.  I confirmed that none of those inmates were housed at California State Prison, Corcoran.

28.   All of Romero's factors, taken together, did not warrant an additional single-cell evaluation beyond what had already been done at previous ICCs.  Although Romero had an in-cell fight in 2016, the subsequent ICCs reviewing Romero's file had already determined that Romero's double-cell status should continue.

29.   A true and correct copy of the Initial Housing Review document generated from my March 7, 2019 review is attached hereto as exhibit B.  On the document I did note Romero's 2016

6

in-cell fight, but I inadvertently did not check a box for "In-cell Assault History." I also did not check a box under "Incarcerated Sexual Assault." As stated above, I reviewed Romero's file and found no history of sexual assault.

30.    On March 7, 2019, Romero's bus arrived from another prison. I and other staff members from building 4A1 offloaded Romero from the bus. We escorted Romero to a holding cell in building 4A1R. The holding cell is a smaller cell visible from the correctional officers' offices where an inmate can be held temporarily.

31.    When a new inmate arrives at California State Prison, Corcoran, or any CDCR prison, and the new inmate is double-cell cleared, the inmate can, and should, be housed with a compatible cellmate on the same day in order to maximize cell usage. The same was true in 2019.

32.    The process for assigning more than one inmate to a cell in a restricted housing unit is described in Department Operations Manual section 54046.7.1. The process is initiated by either a staff recommendation or a request by the inmate. A correctional officer reviews the inmates' central files, speaks with each inmate, and evaluates any security concerns. The officer then fills out a CDCR Form 1882-B and asks the inmate candidates to sign the form indicating their agreement to the double-cell assignment. In housing unit 4A1, it was our practice to have the two inmates meet and speak to one another before agreeing to cell together by placing them in adjacent holding cells where they could speak, but not touch one another. If both inmate candidates agree, the correctional officer completes the form 1882-B by signing and dating it, and then forwards the signed 1882-B to a correctional lieutenant to review the inmate candidate's case factors and potentially approve the cell assignment.

33.    On March 7, 2019, I observed Romero being placed in a holding cell in building 4A1R during second watch (6:00 a.m.–2:00 p.m. shift). Romero was double cell cleared, so Correctional Officer A. Loza began the process to make a recommendation to find a compatible cellmate for Romero. Loza's review found that Romero and Osuna were compatible. Romero and Osuna spoke with each other and each signed the form 1882-B agreeing to the double-cell assignment. Loza then provided the 1882-B to Lieutenant Munoz for review.

7

34.    Romero and Osuna were compatible to cell together under CDCR policy because they had similar crimes (both had murdered a female), were the same race, and both had SNY status ████████████████████████████████████ ████ Both inmates had been to ICC within the previous two months where their double-cell status was continued.  I did not see any information indicating that there was a security concern from housing the two together.

35.    When second watch ended on March 7, 2019, the assignment of Romero to the same cell as Osuna had not yet been approved, so Romero remained in the holding cell in building 4A1R.  I worked a shift on third watch (2:00 p.m.–10:00 p.m.) that day, in housing unit 4A2.  Because I was in a separate building, I was not present when Romero and Osuna were approved to cell together, and I did not observe when Romero was physically placed in the cell with Osuna.

36.    On March 7, 2019, I had no information showing that being housed with Osuna presented a substantial risk to Romero, and I did not believe that being housed with Osuna presented a substantial risk to Romero.  Their factors indicated that they were compatible, they agreed to be housed together, and neither communicated any safety concern.

37.    I understand that the Plaintiff in this matter is also asserting that I am at fault for Romero's death because, according to Plaintiff, I failed to train subordinate officers to conduct regular, scheduled safety checks of inmates' cells during the night and to enforce rules against sheets being hung up inside cells to obstruct viewing into the cells, or that I knew of and tolerated subordinate officers' failure to conduct safety checks and to enforce rules against obstructing the view inside cells.

38.    In 2018-2019, as a sergeant in 4A1, I did not fail to train or supervise staff with regard to window coverings and safety checks.  I trained the officers working under me in accordance with CDCR policy.  In particular, I trained them to conduct their regular Guard One safety checks every thirty minutes, and that they were required to see live breathing flesh of the inmates in the cell during every check.  If there were window coverings preventing the officer from seeing into the cell, I trained the officers working under me to order the inmate to take down the coverings, and if the inmate did not comply, to report the situation to the sergeant

8

immediately. I personally observed officers as they were doing their checks, and if there were any violations of policy, I conducted training for the officers involved.

39. In 2018-2019, my regular assignment was the second watch sergeant in 4A1. In 2018-2019, worked overtime shifts on third watch (2:00 p.m.-10:00 p.m.), but did not work first watch (10:00 p.m.-6:00 a.m.) in facility 4A.

40. March 7, 2019, was my last day at work before a scheduled vacation. I returned to the California State Prison, Corcoran on Monday March 25, 2019. I was not at the prison from approximately 10:00 p.m. on March 7, 2019 to approximately 6:00 a.m. on March 25, 2019. I was not at the prison when Luis Romero was murdered or when Luis Romero's body was discovered. I did not supervise the staff working in housing unit 4A1R on the night of March 8-9, 2019 when Luis Romero was murdered

41. I did not know Luis Romero before March 7, 2019. I understand that he was at Corcoran Facility 3A for about one month in December 2014 to January 2015. I worked in Facility 3A at that time, but I do not remember him from that time. Facility 3A is a large facility, and it is not surprising that our paths would not cross, or if they did cross, that we would not remember each other.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: July 30, 2026, at _____Corcoran_____, California.

_____

J. Burnes

SA2019101902
Solares I MSJ - Burnes Declaration.docx

9

# Placeholder

# Exhibit A to Declaration of J. Burnes dated 7/30/26

Document Subject to Request to File Under Seal

# Exhibit B

CDCR

IPTT105

# INITIAL HOUSING REVIEW

| CDC#: H56733 | Inmate Name: ROMERO, LUIS G. | Screening Date: 03/07/2019 |
|---|---|---|

**Demographics**

| Date of Birth: 08/27/1974 | Age: 44 | Ethnicity: Other |
|---|---|---|
| Height: 5 ft 07 in | Weight: 160 lbs | Place of Birth: |
| | | Foreign National: Yes |

**Last Movement**

| Arrival Date: 03/07/2019 | Receiving Institution: California State Prison, Corcoran |
|---|---|
| Type: Received from another Facility | Sending Facility: WSP-Facility D |

**Commitment**

Controlling Release Date: 06/04/2007
Type: Minimum Eligible Parole Date
County: Los Angeles
Sentence Length: Life With Parole
Offense/Parole Vio: PC187 2nd[05]

**Custody**

| Security Level: Level 4 | Placement Score: 109 | Custody: Maximum/ |
|---|---|---|
| Work/Privilege Group: D2/D | Escape History: N | Last ICC Action: 02/12/2019 |
| | | Last UCC Action: 12/04/2018 |

**Integrated Housing**

Review Date: 03/13/2018

IHC Type: Racially Eligible

While incarcerated, has this inmate ever been involved in a race based incident?

☐ as a Victim    ☐ as an Assailant    ☐ part of a Race Riot    ☑ None
☐ Inmate Claims    ☐ Documented    ☐ Verified

**Non-Confidential Offender Separation**

| PID | Offender Name | Current Location | Type |
|---|---|---|---|
| 11078854 | BELAIR, LOUIS JOHN | MCSP-Facility A [MCSP-A] | Facility |
| 11492084 | CASTILLO, REFUGIO B | CHCF-Facility E [CHCF-E] | Facility |
| 11593476 | TSAN, BAN V | Not currently incarcerated/supervised | Facility |
| 11643156 | TREJO, OSCAR ISAAC | Not currently incarcerated/supervised | Facility |
| 11646179 | MARTIN, CURTIS GENE | CMC-Facility D [CMC-D] | Facility |
| 11181275 | NUNEZ, JESUS | CTF-Facility B [CTF-B] | Facility |
| 11181858 | HARNESS, KYLE BRENNAN | Not currently incarcerated/supervised | Facility |
| 11502760 | LAMON, BARRY LOUIS | LAC-Facility C [LAC-C] | Facility |
| 11742829 | PEREZ, FRANK | MCSP-Facility A [MCSP-A] | Facility |
| 11779670 | Montanez, Fernando Barrios | Not currently incarcerated/supervised | Facility |
| 11887396 | HERNANDEZ, JOSE MENDOZA | Not currently incarcerated/supervised | Facility |
| 11916340 | SANCHEZ, GREGORY | Not currently incarcerated/supervised | Facility |
| 11820932 | WATTS, GUY PATTON | Not currently incarcerated/supervised | Facility |

**Enemy / Safety Concerns**

☑ Documented    ☐ Inmate Claims    ☐ None

SNY INMATE

**Active Precautions**

| Effective Date | Type | Comments | Status |
|---|---|---|---|
| 01/18/2019 | Administrative Segregation | Generated by ASU Placement Notice signing. | Active |
| 03/13/2018 | History of Aggression | Battery on I/M-12/10/14, 7/23/13, 6/14/05<br>Mutual Combat-3/31/02, 10/27/98<br>Fight-10/01/16 (In Cell)<br><br>11/04/04-Battery on P/O | Active |
| 03/13/2018 | Assaultive | Battery on I/M-12/10/14, 7/23/13, 6/14/05 | Active |

| Effective Date | Type | Comments | Status |
|---|---|---|---|
| | | 11/04/04-Battery on P/O | |
| 03/13/2018 | In-Cell Assault History | Fight-10/01/16 (In Cell) | Active |
| 04/27/2015 | History of Aggression | MULTIPLE BATTERY ON A P/O MULTIPLE BATTERY ON AN I/M FIGHTING | Active |

**History of Aggression**

☑ Towards Staff     ☑ Towards Inmates     ☐ Use of Weapon

☐ Unknown     ☐ None

List inmate's act(s) of aggression, as well as supporting documentation (type and date).

☐ Inmate Claims   ☑ Documented

MULTIPLE BATTERY ON A P/O
MULTIPLE BATTERY ON AN I/M
FIGHTING

**In-Cell Assault History**

☐ As a Victim     ☐ As an Assailant

☐ Unknown     ☐ None

Summarize inmate's claim and/or list all documents (type and date) reflecting in-cell assaults.

☐ Inmate Claims   ☑ Documented

**In-Cell Assault Comments**

Fight-10/01/16 (In Cell)

**Incarcerated Sexual Assault**

☐ As a Victim     ☐ As an Assailant     ☐ None     ☐ Inmate Claims     ☐ Documented

**Previous Special Housing Program Assignments**

| Date | Institution | Program | Single Cell |
|---|---|---|---|
| | No Rows Found | | |

**Previous Temporary Single Cell Status Requests**

| Date | Institution | Staff | Status |
|---|---|---|---|
| | No Rows Found | | |

**Housing Status Information**

☐ Single Cell     ☑ Double Cell     ☐ Dorm

☐ Needs Lower Bunk   ☐ Needs Lower Tier

**STG Affiliations**

| STG Name | STG Set | Affiliation Level | Affiliation Status | Validation Status |
|---|---|---|---|---|
| II - SURENO | N/A | Suspect | Dropout | Referred to STG Investigator |

**Health Information**

Date: 11/16/2017    Current MH LOC: CCCMS- Correction Clinical Case Mgt System    Transport Precaution Code: 92    Current DDP Status: NDD

Date:     Disabilities:

    Housing Restrictions:

**Critical Items for Review**

☑ Did you notice that this is a Maximum Custody inmate?

☑ Did you notice that this is a DPP/DDP inmate?

☑ PREA Requirements were considered.
The following criteria was considered when assessing the risk for sexual victimization or abusiveness for housing: Mental, physical and developmental disability; age and physical build; previous incarceration; if the criminal history is exclusively nonviolent; prior convictions for sexual offenses against a child or adult; if the inmate is perceived to be gay, lesbian, bisexual, transgender, intersex, gender nonconforming; inmate's own perception of vulnerability; and if being detained solely for civil immigration purposes.

**Additional Comments/Concerns**

Solares v. Diaz, E.D. Cal. No. 1:20-cv-00323
DEF 003962

**Screened By**

J. Burnes

Title: sERGEANT                    Screening Date: 03/07/2019