ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7666
 Fax:  (916) 324-5205
 E-mail:  David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants Burnes, Loza, Gamboa,*
*Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br><br>Plaintiff,<br><br>v.<br><br>**RALPH DIAZ, et al.,**<br><br>Defendants. | 1:20-CV-00323-LHR-FRS (PC)<br><br>**DECLARATION OF L. PENA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           September 11, 2026<br>Time:<br>Courtroom:<br>Judge:         Hon.  Lee H. Rosenthal<br>Trial Date:   Not set.<br>Action Filed:  March 2, 2020 |

I, L. Pena, hereby declare:

1.      I have personal knowledge of the facts set forth in this declaration.  I am competent to testify to the matters set forth in this declaration, and if called upon by the Court, I would do so.

2.      I work for the California Department of Corrections and Rehabilitation (CDCR).  I started in 2017 as a correctional officer and was promoted to sergeant in 2025.  I started at California Men's Colony in July 2017 and then transferred to California State Prison, Corcoran (Corcoran) in January 2018.

3.      In February 2019, I was assigned to work as a floor officer at Corcoran Yard 4A, Building 1 Right (4A1R), on the second-watch shift, from 6:00 a.m to 2:00 p.m. In 2019, 4A1R

1

was a long-term restricted housing unit which was designed to house inmates who had committed crimes while in prison and who also had significant mental health treatment needs.  4A1R contains sixty-four cells that are separated into three sections.  On second watch, I worked with three other officers on the floor of the housing unit and a control-booth officer who was posted in an elevated position.  In 4A1R, inmates are not permitted to leave their cells unless they are restrained and at least two officers are present.  Inmates in 4A1R are escorted by at least two officers anytime they are out of their cells.

4.    As a floor officer on second watch, I was responsible for supervising inmates and monitoring the unit, which included ensuring inmates received their meals and were escorted to their various programs and appointments, conducting thirty-minute security welfare checks on every cell in the housing unit, and responding to incidents within the unit.

5.    In order to conduct the thirty-minute checks, I was required to go to each cell in the unit and ensure that the inmate or inmates were alive, breathing, and free from obvious injury.  I was required to ensure that there was a clear view into the cell and to look for damage or signs of misconduct or self-injurious behavior.  I then logged the check by tapping an electronic device on a pad on that cell door and would move on to the next cell.  Inmates would sometimes make requests of me during the checks, and I would try to resolve the issue.  If there was any cause for a delay in conducting the security and welfare checks, I was to notify the unit or facility sergeant.

6.    Inmates were not allowed to cover their windows to obsruct staff's ability to see into the cell.  If I saw that an inmate had covered up their windows, I was required to order the inmate to remove it and, if he did not comply, I was to report the issue to my supervisor.  Prior to March 9, 2019, I encountered inmates who had covered their windows and when I ordered the inmates to remove the coverings, I was able to de-escalate the situation verbally and the inmate complied with my orders and removed the window coverings.  If, during a cell check or at any other time, I discovered an attack in progress inside a cell, response protocol required me to activate my alarm and summon additional staff, not make immediate entry into the cell on my own.

7.    When my second watch starts at 6:00 a.m., I typically conduct my first round of safety welfare checks within fifteen minutes of the shift starting.  The housing unit is typically

2

quiet between 6:00 a.m. and 8:00 a.m. because the inmates are still waking up and getting ready for the day. I collect my equipment and supplies and debrief with the floor officer from the previous watch.

8.    I worked the second-watch shift on March 9, 2019, starting at 6:00 a.m. but did not work through the end of the shift at 2:00 p.m. Before my shift, I did not know, and had no reason to think, that Romero faced any risk of harm or that he had suffered any harm. I was familiar with Osuna and was aware that he, along with other inmates in the unit, had been designated a "gasser," but had not had discussions about him with other staff at Corcoran beyond the gassings. Osuna did not stand out to me as being more dangerous than any other inmate in 4A1R. I was aware that Osuna, like many others in the unit, had been assigned to his own cell before housing with Romero on March 7, 2019. I had not experienced any negative behavior directly from Osuna and believed I had developed a good rapport with him.

9.    Romero had arrived in 4A1R on March 7, 2019. I had spoken to Romero before March 9, 2019 and was aware that he and Osuna had recently been housed together. Nothing stood out about either Osuna or Romero to me. When I began my shift on March 9, 2019, I had no reason to think that there was any risk from the two of them housing together.

10.    When I began my shift on March 9, 2019, at 6:00 a.m., nothing appeared to be out of the ordinary. I debriefed with Correctional Officer Silva who was the first-watch floor officer, and he did not mention anything about Cell 46, Osuna, or Romero. I had not heard any sounds coming from Cell 46. I did not hear any sounds of distress, a struggle, or any other indication that Romero was being harmed in Cell 46 or that anything else was occurring in Cell 46 throughout my shift that morning.

3



Decl. L. Pena in Supp. of Mot. for Summ. J.  (1:20-CV-00323-LHR-FRS (PC))



19.    I then exited the housing unit and met with CDCR peer-support staff.  I left the prison at approximately 9:15 a.m.  I was subsequently assigned to a different post outside of 4A1R.

20.    Before March 9, 2019, I had never encountered or had to respond to a serious in-cell assault or murder. ████████████████████████████, I did not think that either he or Romero had been harmed or that they were harming each other.  I heard no sounds of distress, violence, or a struggle of any kind. ██████████████████████

///
///
///
///
///
///
///

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: , 2026, at Corcoran, California.

L. Pena

SA2019101902
Solares I MSJ - Pena Declaration

6