ROB BONTA, State Bar No. 202668
Attorney General of California
JON S. ALLIN, State Bar No. 155069
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID E. KUCHINSKY, State Bar No. 292861
Deputy Attorney General
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7666
 Fax:  (916) 324-5205
 E-mail:  David.Kuchinsky@doj.ca.gov
*Attorneys for Defendants Burnes, Loza, Gamboa,
Garcia, Gallemore, Maytubby, Munoz, and Pena*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br><br>                                    Plaintiff,<br><br>        **v.**<br><br>**RALPH DIAZ, et al.,**<br><br>                                    Defendants. | 1:20-CV-00323-LHR-FJS (PC)<br><br>**DECLARATION OF D. KUCHINSKY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:              September 11, 2026<br>Time:             11:00 a.m. central<br>                      9:00 a.m. pacific<br>Courtroom:   Zoom<br>Judge:           Hon.  Lee H. Rosenthal<br>Trial Date:     Not set.<br>Action Filed:  March 2, 2020 |

I, D. Kuchinsky, declare:

1.     I am a member of the California State Bar, admitted to practice before this Court, and employed by the Office of the Attorney General of the State of California as a Deputy Attorney General.  I am the attorney of record for Defendants Burnes, Loza, Gamboa, Garcia, Gallemore, Maytubby, Munoz, and Pena in this matter.

2.     On May 28, 2026, I took the deposition of Plaintiff's expert witness Eugene Carpenter, M.D.  Under Local Rule 133(j), true and correct copies of relevant excerpts from Dr. Carpenter's deposition transcript are attached hereto as Exhibit A.

1

3.    Defendants will lodge a complete copy, including the portions designated as confidential per local rule, of Dr. Carpenter's deposition transcript concurrently with their motion for summary judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of August, 2026, in Sacramento, California.


        /s/ David E. Kuchinsky
DAVID E. KUCHINSKY
Deputy Attorney General
*Attorney for Defendants Burnes,*
*Loza, Gamboa, Garcia, Gallemore,*
*Maytubby, Munoz, and Pena*

SA2019101902

Decl. D. Kuchinsky in Supp. of Mot. for Summ. J.  (1:20-CV-00323-LHR-FJS (PC))

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

DORA SOLARES,               )   1:20-CV-00323-LHR-FRS
                            )
          Plaintiff,        )
                            )
v.                          )
                            )
RALPH DIAZ, et al.,         )
                            )
          Defendants.       )
_____ )

PAGES 34, 64, 68, 83, 87, 89, 93, 100, 102, 119
CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXPERT DEPOSITION OF EUGENE CARPENTER

VOLUME 1, PAGES 1 THROUGH 143

THURSDAY, MAY 28, 2026

NON-CONFIDENTIAL PORTION

Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10191786

Case 1:20-cv-00323-LHR-FJS    Document 294-15    Filed 08/03/26    Page 5 of 22

Volume 1                                Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                   Ralph Diaz, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION


DORA SOLARES,              )   1:20-CV-00323-LHR-FRS
                           )
        Plaintiff,         )
                           )
v.                         )
                           )
RALPH DIAZ, et al.,        )
                           )
        Defendants.        )
_____)

        EXPERT DEPOSITION OF EUGENE CARPENTER, commencing at the hour of 11:04 a.m., on Thursday, May 28, 2026, taking place over the Zoom application before Kathleen Madden Keenaghan, Certified Shorthand Reporter Number 14577, in and for the State of California.

APPEARANCES


Attorney for Plaintiff D. Solares:

          BY:  ERIN R. DARLING (SBN 259724)
          LAW OFFICES OF ERIN DARLING
          3435 Wilshire Boulevard, Suite 2910
          Los Angeles, CA 90010-2015
          Telephone:  (323) 736-2230
          E-mail:  Erin@erindarlinglaw.com

          BY:  JUSTIN STERLING (SBN 249491)
          LAW OFFICES OF JUSTIN E.STERLING
          15760 Ventura Blvd, Suite 700
          Encino, CA 91436-3016
          Telephone: 818-995-9452
          Email: Justin@sterlingdefense.com


Attorneys for Defendants:  Burnes Pena, Gamboa, Gallemore,
Loza, Garcia, Munoz, and Maytubby:


          BY:  DAVID E. KUCHINSKY (SBN 292861)
          DEPUTY ATTORNEY GENERAL
          1300 I Street, Suite 125
          Sacramento, CA 95814
          Telephone: (916) 210-7666
          Fax: (916) 324-5205
          E-mail: David.Kuchinsky@doj.ca.gov


Counsel for Defendant L. Silva:

          BY:  LYNNE G. STOCKER (SBN 130333)
          ANDRADA & ASSOCIATES
          1939 Harrison Street, Suite 612
          Oakland, CA 94612-3533
          Telephone: 510-287-4160
          Fax: 510-287-4161
          Email: lstocker@andradalaw.com

Case 1:20-cv-00323-LHR-FJS    Document 294-15    Filed 08/03/26    Page 7 of 22

Volume 1                          Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

BY ATTORNEY KUCHINSKY:

**Q    Go head, Doctor.**

A    There was some mechanism that allowed the attacker to rapidly control the decedent.  And that included what was up front, which was a stab wound to the throat vessels eventually which caused the body to bleed out.

And then there is, well, death is what seems obvious, but was there something else?  Could there have been a wrestling chokehold that caused unconsciousness and then made it easier?  Was a ligature involved?  Was there blunt head trauma that knocked the person out?

So all of these questions have to do with how does a grown adult male overcome another strong adult male.  So there was no evidence that there was any defense wounds on the decedent and according to the reports, there is no evidence of injury to the attacker.

So right away -- well, one of them, the one that seems central is stabbed into the throat vessels, lost consciousness within 10 to 30 seconds, died within two to five minutes.  So the mechanism would then be according to what Osuna says and according to what the autopsy report, that mechanism which would be a rapid attack, controlled, getting to the throat vessels rather quickly, loss of consciousness 10 to 30 seconds and death within two to five minutes.

Case 1:20-cv-00323-LHR-FJS    Document 294-15    Filed 08/03/26    Page 8 of 22
Volume 1                                    Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                                Ralph Diaz, et al.

meant, and he nailed it, and something happened that allowed relatively complete control of Romero.  If it is not the stab wound causing loss of consciousness in 10 to 30 seconds and then death in two to five minutes then what is it.

Q   So are you able just based on your review to come to a conclusion within a reasonable degree of medical certainty about what that mechanism was?

A   Yes.

Q   And what do you believe the mechanism actually was?

A   A fast attack with rapid stab wounds in the back of the neck which probably paralyzed the body through spinal cord damage that is the key, which allowed continue stabbing without a strong individual that Romero is supposed to be being able to push up in a push-up position with his arms or wiggle away or fight and slap back.  So it was a surprise attack.

(Whereupon, we enter into the
Confidential -- Attorney's Eyes Only
portion of EUGENE CARPENTER'S
deposition transcript.)

(Nonconfidential transcript

Beginning at Page 35 as follows:)

THE WITNESS:  And then getting to the back of the neck with the spinal cord right away, not with a cutting weapon, but with a penetrating weapon which one has to allow could get through in the spaces of the spine, could cause paralysis.  That is a control.

So you have the correlation of the history of the circumstances as given by the information from the interviews of the assailant, plus the forensic information which correlates.  And so after the stabbing to the back of the neck, there is a procedure probably with a rapid move to cut the vessels of the right side of the throat, and that is when you have a countdown 10 to 30 seconds before the person loses consciousness, two to five minutes before they bleed out and are dead with the heart still pumping very low blood pressure, and that is basically the end of it.

So the key to know is how soon did this stab wound to the back of the neck occur after the interval started?  So that is important.

And then the stab wound to the neck can be a good explanation as to why the body without any defense wounds being present, and Osuna -- and then rapidly moving to cutting the throat out of the right side, which is, as I repeated, too many times, the final deathblow.

veins were cut.  I do not know.

I think a useful statement is that as soon as the equivalent of one carotid artery is cut, then the textbook put the time until death within two to five minutes.

**Q   And is there any sort of medical literature that talks about -- you talked about loss of consciousness within 10 to 30 seconds of the cuts to the neck.  Is there literature that backs that up as well?**

A   Yes.

ATTORNEY DARLING:  Objection.  Just vague as to timing.  Are you saying time of the initial attack or the time of the carotid -- so just vague as to what is being cut.

BY ATTORNEY KUCHINSKY:

**Q   Did you understand my question, Doctor?**

A   Yes.

**Q   Okay.  You can answer.**

A   The attack is initiated.  There is an interval period of time that is unknown until the body is overcome by stab wounds to the back of the neck and the hypothetical paralysis from the spinal cord injury.

So that attack and unknown interval and then the body is controlled.  Very likely, but not conclusively, established up to the back of the neck.  Which by the way, is a known area where prisoners kill other prisoners.

amounts of blood such as one carotid artery cut or pressure over both carotid arteries, but yeah.  The 10 to 30 seconds losing consciousness was after the brain suddenly loses all of its blood supply.  That is when the 10 to 30 second starts.

So you have the attack.  You have the unknown interval. You have the eventual rapid control with some mechanism -- maybe the stab wounds, maybe it is unknown to us -- some mechanism causes total lack of circulation to the brain and then the 10 to 30 seconds the person is unconscious.

**Q   During that -- and you may not be able to answer this.  I don't know.  But during that 10 to 30 seconds that we have been talking about, is -- does consciousness -- again I don't know if you'll be able to answer this -- does consciousness in full extend from that 10 to 30 seconds and then he just goes out or is it diminishing consciousness over that 10 to 30 seconds as the brain is deprived of more oxygen?  How does that work?**

A   I don't know.  The 10 to 30 seconds is a generalization.  I could not find any person talking about what clinical experience is which allow us to show what the variation is.  It may be more minutes involved in a big strong man.

Also, what is not talked about except in the main textbook if the carotid artery is cut cleanly across, it

goes into spasm, and that spasm remarkably slows down the amount of blood that is lost with every heartbeat.  If it is cuts in diagonally, it can go into spasm and it bleeds more with every heart beat.  70 milliliters of blood squirts out of it.

If someone is there that applies pressure, whether it is the victim or the paramedics or whatever, of course, it bleeds more slowly.  So that is why the clinical experience is important.  The 10 to 30 seconds is all we have, but it is a general average statement.  We don't -- I could not find out about variations probably because these people die at the scene mostly.

If they do arrive in the emergency room because the paramedic got there or someone there knew enough to put pressure on the vessel, then they get them to the emergency room and then most of them die.

**Q    And there is -- you have any reason to believe that Osuna provided pressure for wounds for Romero in this case?**

A    No.

**Q    Does not seem very likely, right?**

A    Correct.  Although one never knows when people have irrational behavior irrational events can occur.

**Q    Very true, very true indeed.  Let me ask you this. You've described Romero as a big, strong guy and a big, strong inmate.  You listed in your report the height and**

**weight.  Do you recall it off the top of your head?**

A    180 pounds, 68 inches maybe, is my recollection, but I don't know.

**Q    It looks like he was about 5-foot 7, 156.  That is what you listed in your report, would those figures make a difference in we are talking about the clinical experience of 10 to 30 seconds knowing his height and weight too?  Does that help you determine the range better?**

A    No.  We do not have enough clinical data on that to make any difference.  The general statement of 10 to 30 seconds is a good general statement without knowing the variation between individuals.  So I don't think there is any wiggle room to make any difference one way or the other. I can point out if there was a struggle of some sort before complete control by whatever mechanism that 10 seconds is more likely than 30 seconds.

**Q    And why is that?**

A    The body is using up its oxygen already.  The difference between a resting and a sleeping individual being attacked and controlled rapidly then 30 seconds.  If a person who just ran a marathon and then is attacked in the same way, they are going to lose consciousness right away. I mean, marathon runners will if you talk to them when they are trying to rest.

**Q    Now, is that -- again, you may not be able to answer**

Case 1:20-cv-00323-LHR-FJS   Document 294-15   Filed 08/03/26   Page 14 of 22

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

**this, but is that due to oxygenation being depleted in the blood or is that because of a higher pulse rate in the body pumping the blood more quickly?**

    A    Both.

    **Q    Okay.**

    A    The heart could have gone up from the usual 70 to 75 beats per minute to 100.  The heart will squish out 70 milliliters of blood which is probably about a quarter of a cup.  I am not sure, but 70 milliliters of blood per beat. So 70 milliliters per minute and 70 milliliters of blood loss per minute, depending on the carotid artery and which end it is or not.

    And so also the person is exhausted.  They have carbon dioxide buildup, and they have low oxygen because it is being used up by the muscles and then the heart is beating at 90 to 100 beats per minute.  So it makes a difference how long the brain can then survive and remain conscious after its blood supply is disrupted in a significant quick manner. And when a carotid artery is cut, not only does it lose its supply, but whatever blood it had could be sucked out of the brain.

    So it could be quite rapid.  If the person is relaxed or taken by surprised, that may or may not have happened in this case, then it is more like 30 seconds.  It may even be longer.  Because there is plenty of blood up in their brain

for a while until the circulation is stopped.  And so the

tissues already have blood and oxygen and glucose.  And it

is something that we cannot be dogmatic about because number

one, we started off with a general statement.  It is just

average.  And we don't know the clinical variations that may

have been reported because these people die before they can

really let us know.

     **Q   I understand.  And I understand in your report you**

**mentioned that because of the -- and I assume you are**

**prepared of the graphic nature of this -- but because the**

**head was decapitated, does that pose some problems for**

**figuring out the sequence of wounds or what initial areas of**

**the neck or back of the neck were injured before the**

**decapitation?**

     A   Yes.  Of course.  I can see that the front part over

the voicebox in the photographs did not look as bloodied as

the right front throat areas.  And this five stab wounds to

the back of the neck and over to the right of the back of

the neck are -- to be very clear, the pathologist only

measured the length of the wounds of the skin surface.  We

do not know the depths.  The knife blade was measured and

could be seen in photographs and is long enough, it seems to

me, to get through the bone of the spine into the spinal

cord.  So it is not impossible for that particular weapon to

have done it.  The five established wounds on the other

Case 1:20-cv-00323-LHR-FJS    Document 294-15    Filed 08/03/26    Page 16 of 22
Volume 1                              Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                Ralph Diaz, et al.

hand, we don't know the depth.  The physician was not doing an autopsy to determine pain and suffering in a prophecy future civil court case, did not measure the depth, nor did a pathologist do a detailed examination of the throat issue to see if they were bruised or not from neck compressions, but this is okay.  It will be one of those easy criminal court cases for that particular doctor.  For us, it does not matter.

**Q   Did you form any opinion about the interval between when Osuna purportedly first attacked Romero, and when the wound to the neck was inflicted?  Are you able to determine that at all?**

ATTORNEY DARLING:  Objection.  Asked and answered. You can say it again.  You can answer.

BY ATTORNEY KUCHINSKY:

**Q   You can answer, Doctor.**

A   Yes.  No.  That seems to fall clearly in the expertise of someone who is very experienced in combat.  You know, if you have, like, two fighters in an enclosed ring or in a room and they come at each other, one of them -- let's say one of them hypothetically is an expert in killing, and the other one is just a stranger.  Then the question to that expert is combat, not in wounds.  I'm an expert only in wounds, not at the scene.  And in many areas I am trained to be an expert, but unless I have practiced it for years, I am

not going to say I am qualified.

So that question, as soon as he is attacked could have been -- I would guess it was a surprise, but I am not an expert.  So someone who has been in fights or trained in the military to sneak up on people and kill them or surprise them and kill them, they are the only ones that can really tell us how difficult this might be and how unlikely what Osuna says is true or how likely it is true and it is completely understandable.  So that the unknown area from the attack at the beginning to the time the body is controlled and bleeding to death probably the best hypothesis.  Bleeding to death is not known.  I have no way of knowing that.  I have no way of knowing from my own perspective when the stab wound to the eye occurred or when that 5-inch across the front of the upper abdomen occurred.  I cannot figure that out.  I have no way to contribute to our understanding of what happened.  And so one has to listen in a professional way to what Osuna says and know what is reliable and isn't reliable.  I don't know.  I can't do that.

Q   **Understood.  Is there a way that you can tell or maybe for any medical professional to tell whether the attack started when Romero was asleep or whether there was a struggle when the attack started?  Is there any way to know that?**

ATTORNEY DARLING:  Objection.  Asked and answered.

BY ATTORNEY KUCHINSKY:

**Q   You can answer, Doctor.**

A   No.  Not that I know of.  But once again, it is beyond, Dr. Carpenter, what does this wound mean, et cetera. I can point something out very important; however, and I don't understand when I try to imagine stuff in the area that I'm not really qualified to be an expert area witness on.  It is important for me to try to imagine how it might have happened.  There are two prominent abrasions seen in the photographs at the upper abdomen, over the lower front chest cage below the mutilation of the left chest wall and above the 5-inch horizontal cut.  Those are abrasions that had -- number one, could not have occurred if the person was still in bed at the time those injuries occurred.  Those types of abrasions would be shiny, if at all, from back and forth movements during a struggle on the bed linen.  The abrasions that we see on the photographs are consistent with the body being on a floor or a hard rough surface.  It cannot be on a smooth floor like linoleum.  It has to be a hard rough surface.

So that is one of the mysteries that I have not been able to figure out, with the other two areas being the stab wound to the eye or the horizontal slash.  It's hard to say and hard to understand that without information from a

after the cuts to the neck?

A    Yes.

Q    And about how long do you believe he was breathing after the cuts to the neck?

A    Two to five minutes.

Q    Okay.  So you believe he was continuing to breathe for up to five minutes after the neck was cut?

A    Or within reasonable medical certainty, but one has to be cautious because two to five minutes is the interval that one expects death from such a wound.  We don't know how severe the wound was after that time.  It could have been the vessels of the vein that might have been cut.  We don't know.

So but the general statement holds and the general statement is he is alive for two to five minutes after the equivalent of one carotid artery has been severed.

Q    Okay.  And is that distinguished from how long he is conscious after that one carotid artery has been sustained?

A    Yes.

Q    Okay.  And how so?

A    He is conscious for one carotid artery, equivalent of vessel damage is done in 10 to 30 seconds.

Q    Okay.  I think I understand.  So he could have continued to breathe for up to five minutes, that seems like the interval that he would have died -- passed away or

Case 1:20-cv-00323-LHR-FJS    Document 294-15    Filed 08/03/26    Page 20 of 22

Volume 1                          Non-Confidential                     Dora Solares vs.
Eugene Carpenter                                                        Ralph Diaz, et al.

range?  Meaning it could not have been longer than --
obviously we know Romero was alive at some point that night,
but it could not have been more than 12 hours ago or 18
hours ago, is there any way to do an upper end on that?

A    Well, as soon as you know the last time he was alive
and the time his body died, probably not at all closer than
two hours prior to when the body was pronounced dead.

So at any time during his last known alive and found
dead, if you go back at least two hours out, somewhere in
there, somewhere in there.  But without temperature --
temperature is the only sign of the three postmortem signs
that has, maybe, a value.  So we have resorted to is the
body warm?  Is it cool?  Now, modern advances are occurring,
but without temperature, you cannot tell.  I am sorry.

Q    I want to talk a little bit -- and I think I am
almost done here.  But I want to talk a little bit about the
response you did in your rebuttal to both Dr. Pitruszka and
Dr. Omalu.

Let me start with Dr. Omalu because that is the subject
we are on.  You mention in here, and I will talk first about
the liver mortis section.  You're talking about a posterior
liver in the body found in a seated position against a wall
is precisely what a death several hours earlier would
predict.  Massive blood loss diminishes the prominence of
liver mortem.

And so does that degree of liver mortise, it sounds like that is not as crucial in your determination -- or it's not dispositive one way or the other about the timeframe, or are you able to make a conclusion from that?

A   Basic mainstream textbooks, especially when I was in training, basically said that we have learned that liver mortise is worthless in determining time of death.

You can do -- statistically, very valuable, but there is so much variation and we have no idea what the variation in liver mortem should be.  It is worthless.

Q   And it sounds like you then disagree with --

ATTORNEY DARLING:  David, you're cutting out.

ATTORNEY STOCKER:  David, we can't hear you.

ATTORNEY KUCHINSKY:  My apologies.  I knew this might happen.  Can you hear me now?

ATTORNEY DARLING:  Yes.  Better.

BY ATTORNEY KUCHINSKY:

Q   Let's talk about the conclusion of Dr. Omalu and your response.  You disagree with Dr. Omalu's conclusion; is that right?

A   No.

Q   Okay.

A   He has his opinion.  I cannot concur.  I don't have the ability.  That is his opinion, and he has all of these qualifications, et cetera, and that is the information that

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 19th day of June, 2026.

_____

Kathleen Madden Keenaghan

CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)