Deposition of

# Eugene Carpenter

May 28, 2026

Volume 1

Dora Solares

vs.

Ralph Diaz, et al.

**Non-Confidential**



www.aptusCR.com | 866.999.8310

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 2 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

DORA SOLARES,                    )   1:20-CV-00323-LHR-FRS
                                 )
          Plaintiff,             )
                                 )
v.                               )
                                 )
RALPH DIAZ, et al.,              )
                                 )
          Defendants.            )
_____)

PAGES 34, 64, 68, 83, 87, 89, 93, 100, 102, 119
CONFIDENTIAL – ATTORNEYS' EYES ONLY

EXPERT DEPOSITION OF EUGENE CARPENTER

VOLUME 1, PAGES 1 THROUGH 143

THURSDAY, MAY 28, 2026

NON-CONFIDENTIAL PORTION

Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10191786

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 3 of 163
Volume 1                           Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                        Ralph Diaz, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION


DORA SOLARES,              )   1:20-CV-00323-LHR-FRS
                           )
        Plaintiff,         )
                           )
v.                         )
                           )
RALPH DIAZ, et al.,        )
                           )
        Defendants.        )
_____   )


        EXPERT DEPOSITION OF EUGENE CARPENTER, commencing at the hour of 11:04 a.m., on Thursday, May 28, 2026, taking place over the Zoom application before Kathleen Madden Keenaghan, Certified Shorthand Reporter Number 14577, in and for the State of California.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 4 of 163
Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

                              APPEARANCES


  Attorney for Plaintiff D. Solares:

            BY:  ERIN R. DARLING (SBN 259724)
            LAW OFFICES OF ERIN DARLING
            3435 Wilshire Boulevard, Suite 2910
            Los Angeles, CA 90010-2015
            Telephone:  (323) 736-2230
            E-mail:  Erin@erindarlinglaw.com

            BY:  JUSTIN STERLING (SBN 249491)
            LAW OFFICES OF JUSTIN E.STERLING
            15760 Ventura Blvd, Suite 700
            Encino, CA 91436-3016
            Telephone: 818-995-9452
            Email: Justin@sterlingdefense.com


  Attorneys for Defendants:  Burnes Pena, Gamboa, Gallemore,
  Loza, Garcia, Munoz, and Maytubby:

            BY:  DAVID E. KUCHINSKY (SBN 292861)
            DEPUTY ATTORNEY GENERAL
            1300 I Street, Suite 125
            Sacramento, CA 95814
            Telephone: (916) 210-7666
            Fax: (916) 324-5205
            E-mail: David.Kuchinsky@doj.ca.gov


  Counsel for Defendant L. Silva:

            BY:  LYNNE G. STOCKER (SBN 130333)
            ANDRADA & ASSOCIATES
            1939 Harrison Street, Suite 612
            Oakland, CA 94612-3533
            Telephone: 510-287-4160
            Fax: 510-287-4161
            Email: lstocker@andradalaw.com

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 5 of 163
Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

                              I N D E X

Witness:  EUGENE CARPENTER


Examination by:                                              Page

ATTORNEY KUCHINSKY                                           6, 127

ATTORNEY STOCKER                                             98

ATTORNEY DARLING                                            116

Thursday, May 28, 2026

11:04 a.m.

THE COURT REPORTER:  Good morning.  We are now on the record.  Today's date is May 28th, 2026, and the time is 11:04 a.m.  We are here for the remote deposition of Eugene Carpenter in the matter of Dora Solares versus Ralph Diaz, et al, case number 20-CV-00323-LHR-FRS, taking place over the Zoom application with all attendees appearing remote.

My name is Kathleen Keenaghan.  I am a California certified shorthand reporter and code compliant deposition officer for today's proceeding.  My California license number is 14577.  Will counsel please state your appearances for the record, beginning with the noticing attorney.

ATTORNEY KUCHINSKY:  Good morning.  David Kuchinsky, Deputy Attorney General.  I represent all defendants except for Defendant Silva.

ATTORNEY STOCKER:  Good morning.  Lynne Stocker for Defendant Silva.

ATTORNEY DARLING:  Good morning.  Erin Darling on behalf of plaintiff.

ATTORNEY STERLING:  Good morning.  Justin Sterling on behalf of plaintiff.

THE COURT REPORTER:  Thank you.  Dr. Carpenter, will you please hold up your right hand so I may administer the oath?

                         EUGENE CARPENTER,

having been first duly sworn, was examined and testified as

follows:

                         EXAMINATION

BY ATTORNEY KUCHINSKY:

    **Q    Good morning, Dr. Carpenter.**

    A    Good morning.

    **Q    We are here today to conduct your deposition in the
Solares versus Diaz case, and I understand that you have had
your deposition taken before in the past; is that right?**

    A    Yes.

    **Q    About how many times, if you recall?**

    A    About two or three times.

    **Q    Do you recall when the most recent time was that you
had your deposition taken?**

    A    That would be back in 2012 -- no.  No.  The most
recent was in this case just several months ago, and I have
been reminded to let you know that I had three more cases
that occurred that I did not mention with my list of
qualifications for the cases with testimonies that I had at
the time.  One was a deposition that was about -- back in
March, and that was the most recent one.  The other two, one
is an inmate case of a stabbing case in Fresno Courthouse on
Tularia Avenue, and the other is a civil wrongful death
officer involved case where I was the percipient witness for

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 8 of 163

Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

the plaintiff with the law firm of Galipo which occurred last year.  The stabbing case was with the Deputy Attorney General in the Fresno area, Stephanie -- I think -- Slowbook.

     Q   Okay.  So on one of those cases you were retained by Galipo's office and on the other you are retained by my office, it sounds like?

     A   Correct.

          ATTORNEY DARLING:  Sorry.  David, I e-mailed you the list with the case names just so you have this.  I believe he was a percipient witness, not a retained witness.

BY ATTORNEY KUCHINSKY:

     Q   Okay.  So which case was it that you are a retained witness, was that by my office or Mr. Golipos?

     A   It was by your office, and they made the mistake of calling me a percipient witness and paying me as a percipient witness.  I let them know they had made an error and the Deputy Attorney General agreed if there had been an error in my pay, and they did owe me $800 because I was, for them, an expert witness not a percipient witness.

     It was a criminal case with a multiple stabbing death and she agreed to pay me back, but she pointed out to correct that kind of mistake would be a difficult thing to do.  So I recently, when I wanted to get to the information about the case number et cetera, reminded her to look into

it.

So that case was a criminal court case at the federal level.  That was your case.  The other case was a wrongful death officer involved shooting case at the federal courthouse where I was then a percipient witness as is usual in civil wrongful death cases.  And that was still -- I was not deposed in that one.

Q    **Did you testify in that wrongful death case?**

A    Yes.

Q    **Was that in front of Judge Sherriff about a year and a half ago that that trial occurred?**

A    I don't know the judge's name, but it was -- it was Kern County versus -- I think Louis Lewis Junior -- Kenneth Lewis Junior.

Q    **Okay.**

A    And so if that is the case, that is the case.

Q    **Understood.  Thank you, Doctor.  So in light of all the experience that you have had with testifying with depositions, I am just going to quickly go over a couple of guidelines for today.  I don't anticipate us taking more than a couple of hours or a few hours at most.**

**But you are familiar with a deposition and you understand that you are under oath and that oath has the same effect as if you are testifying in court, correct?**

A    Yes.

Q   Okay.  And just because you are on video for this deposition, if I could remind you to please wait until I finish asking my question before you start to answer.  I'm sure you will know where I'm going with a lot of these questions, but if you could wait for our court reporter to be able to make a record.  And I will do my very best to wait for you to answer my questions before I ask another one.

A   Yes.

Q   Wonderful.  Okay.  Are you prepared to proceed with your deposition today in the Solares matter today?

A   Yes.

Q   Wonderful.  So we went over a couple of the cases that you had testified in before.  Let's start with what do you currently do for your occupation?

A   I am still under the contract with Kern County Sheriff's Coroner's Office.  This will be my 13th year.  I plan to retire at the end of June of this year, and I have placed myself under the Seak, S-E-A-K, directory as a potential expert witness for future consultations with everyone that is interested and just the labor of ordinary autopsy procedures, and I have no other plans than that after June.

Q   Okay.  So you do both work in the coroner's office as part of the state and the city, and you also maintain

separate expert work that you maintain and currently do

right now?

    A   Yes.  At Kern County Sheriff, I'm still a contract

pathologist, not employee.  And I do a few cases as they

come in mostly just telling the public defender and/or

district attorney that they don't really need me.  They can

go with the original pathologist.  That is the best way for

them to go.  So then often after I review for free, I do not

hear back from them.

    Q  Fair.

    A  Which is good, which is good.

    Q  Probably more of what you were going for on, it

sounds like?

    A  Yeah, happier just to be of help.  I do not have to

earn a living anymore.

    Q  Is it fair to say that the majority of the cases

that you have been involved in or requested to approve are

criminal cases?

    A  Oh, yes.  Overwhelmingly.

    Q  And can you estimate -- I imagine it's a pretty

large number with your years of experiences, but how many

cases do you think you have testified to or in criminal

court?

    A  As a minimum, 600 times, mostly gunshot wounds and

the occasional stab wounds, occasional blunt force trauma, a

few rape and strangulation cases.

**Q   Okay.  Tell me, how long have you been a forensic pathologist?**

A   Since my fellowship in 1989 in Los Angeles Coroner's Office.

**Q   Okay.  Tell me about the education that you have that qualifies you to do a forensic pathology work?**

A   I was trained as a fellow in Los Angeles after which I came onto staff there, but one year later I became a senior forensic pathologist at the coroner's office.  It was one of three positions.

Prior to that, I did an anatomic fellowship at the Long Beach Memorial Medical Center in order to prepare for and finally passed the forensic exam -- I mean the anatomic and clinical examinations by the national board.  After my fellowship at the coroner's office, I took and passed the forensic pathology certification examination.  I was trained in -- out of the medical center, Long Beach Memorial, the VA hospital in Long Beach, a clinical rotating internship after medical school at USC Medical Center, and I graduated from Tulane School of Medicine in 1972.  I was licensed here in California in 1973 to practice general medicine and surgery.

**Q   And did you also go to the University of North Dakota for some of your medical school, or is that undergrad for your bachelor's?**

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 13 of 163

Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

A    I went to their undergraduate for my Bachelor's of Arts and then after the three years for that, I did two years at the medical school there which was only a two-year school.  I received my Bachelor's of Science, and then was lucky to be transferred to Tulane School of Medicine to finish it.  The school is now a four-year school but at the time, they were a two-year school like South Dakota.

**Q    And it looks like just from your CV, you conducted approximately or more than 10,000 forensic autopsies?**

A    Yes.  Myself.

**Q    Okay.  And is it in addition to that you also supervise 10,000 autopsies by residents?**

A    Yes.  At LA County Coroner's Office that was part of my job as the senior forensic pathologist, and we had several unlicensed doctors doing homicide, and I would check out to those homicide cases, maybe three or four a day for many years.

**Q    You mentioned earlier that the primary or the majority of the work that you had done potentially related to gunshot wounds, but you did mention that you had handled some stabbing homicides.  Do you remember about how many cases you have worked on that involved a stabbing homicide?**

A    The first response to your question was how many times about court testimony.  That was majority gunshot wounds.  In practice, gunshot wound cases amounted to about

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 14 of 163

Volume 1                    Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                Ralph Diaz, et al.

20 percent of the 10,000 that I had done and then a larger number, maybe, 40 percent of the supervisions.  In general, you get about 20 percent homicides and most of those are gunshot wound cases.  I have done probably about 200 or so stab wound cases, equally blunt force trauma cases, maybe 50 child abuse deaths, maybe 10 to 20 rape strangulation cases.  Some of those goes to court too, but mostly they don't.  Mostly it is stipulation and the gunshot wound cases occasionally go to court, but I have done -- significantly I have done, maybe, five to ten in custody prison stab wound cases.

All of those out in the yard -- in the exercise yard.  I have never done one in the cell.  And then I have done several inmate death cases basically where the head was almost torn off, just not subtle.

**Q    Okay.  You have done several cases where there was like a partial decapitation but not a full decapitation it sounds like?**

A    Yes.  The case involved a previous professional football player who was in jail for murder and when he killed his cellmate, he almost torn the head off.  The bond was broken.  The muscles were torn off, and the skin was the only thing was keeping the head on.

The reason I mentioned that is because usually the cases that I have seen, there are very limited ways that prisoners

can kill prisoners and really the only one if there is no sharp object available is just to overcome them and choke them to death or, you know, carotid artery pressure is really the only way to kill someone.  You cannot really smother them.  Usually the inmates are too strong for that.

     **Q   Okay.  What about just blunt force trauma to the head?  I know you said carotid artery cutting off the airways, but have you seen cases where it is not a stabbing, but just blunt force trauma that had fractured a skull or blunt force trauma to the head that caused the death rather than strangulation?**

     A   Yes.  Many, many cases of traffic accidents of blunt force trauma to the head, but as far as homicide go, yes, with a heavy object occasionally slamming the head against the concrete floor but less so.  People just go for handguns right away if they are not in custody.  I have never had a blunt force trauma to the head in custody death, but I have only had a few of those, like, five to ten in custody homicides and that is because I was at Kern County.  I have had none of those when I was in Los Angeles County.

     **Q   Okay.  Understood.  And then one other question about those in custody cases.  Have you run into the situation where the victim inmate was tied up with any ligature or rope during the course of the murder?**

     A   No.

Q    All right.  Let's shift then to this case.  Were you retained by Mr. Darling or Mr. Sterling to do work in this case?

A    Yes.

Q    And have you worked with either Mr. Darling or Mr. Starling on a case before this one?

A    No.

Q    About when were you contacted by either Mr. Darling or Mr. Sterling to work on this case?

A    Around the end of the year, beginning of a new year, somewhere around there.

Q    So the end of 2025 or the early part of 2026?

A    That is the way it seems to be right now.  Yes.

Q    Okay.  And was it Mr. Darling or Mr. Sterling that contacted you?

A    Attorney Darling.

Q    Do you recall what it was that Mr. Darling asked you to do in this case?

A    He asked me if I would look over the autopsy materials and photographs concerning this case.

Q    And what did --

A    Yes.

Q    Sorry.  Go ahead.

A    And I said yes.

Q    And did he ask you to do anything after looking at

the material?

A   Yes.  Just to write a report.  And I wrote several rough drafts, and we talked about the case.

Q   Okay.  Did he have a specific area that he asked you to address in the report or specific questions in the report?

A   No.

Q   Okay.  You just said --

A   Later, Attorney Darling brought up some very good questions for me to address, which I had already done.  But what was required was to speak the forensic pathology language in a translated manner that attorneys could understand.  And so I did that.  So we would talk back and forth about what this means and what the interpretation might be and the fact that we need to stick to facts and not speculate.

Q   Okay.  Do you recall was there any particular question that Mr. Darling or, later on, Mr. Sterling wanted you to specifically answer for them?

A   No.

ATTORNEY DARLING:  Objection.  Asked and answered, but you can go ahead.

THE WITNESS:  No.

BY ATTORNEY KUCHINSKY:

Q   Okay.  So just look at the material, and we will

talk later?

A    Right.  It was an overwhelming amount of extremely difficult material in this unique case.  I had never done such a case as a wrongful death civil case where it might need to address pain and suffering.  I had never done that before.

So all of a sudden, I was into an area that my 37 years of experience had not entailed.  And so I worked very, very hard on my own to look at the autopsy report, what was there and what was not there, and then look at the photographs very, very carefully and be able to speak about what was there and what was not there.

It was not until I saw the report by Dr. Pitruszka that I realized that, wow.  This is a focus on pain and suffering.  It is about how long the decedent was conscious and might feel pain.  That was new to me.  The attorneys did not bring that up.  I discovered that myself, and then I had to work hard again to try to figure it out, think it through, stay factual, stay focused on what is a forensic pathologist role and how does a forensic pathologist serve the court without favoring either side because the value is to know as factually as possible what happened or might have happened.

Q    Right.  Okay.  And then once you conducted the initial review before you got Pitruszka's report, you wrote

your own report; is that right?

A   Yes.

Q   And as you are writing that report, were there specific questions that you were asked to answer in that report?

A   No.  There were specific questions that I brought up as essential, and then we would talk about those, but I was guiding things.

Q   Okay.  Understood.  All right.  Let's talk then about the material you reviewed.  You mentioned looking at the autopsy report.  You mentioned looking at photographs. I am assuming those are photographs of the scene where the body was recovered or the body was located?

A   The photographs of the scene.  Mainly, I am focusing almost all just on the body, which is the jurisdiction of the coroner, not the scene which I have no expertise in.  I can only take a general overview of the scene when I focus on the body and if it's all bloody.  And then I focus on the body photographs at the autopsy service floor in King's County Coroner.

Q   So photos both from prison and the autopsy itself. Is that a fair summary of it?

A   Yes.  That's the main one because there's blood all over the place of the body is photographed as it is at the coroner's autopsy service floor and then it is photographed

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 20 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

after it is washed.  So the photographs after the body has been washed in -- also being guided by having a copy of the autopsy report and the diagram.

Q   So we've got the autopsy report, the diagram, photos from the prison and then photos taken during the autopsy after the body was washed.  Was there anything else you looked at or considered in reviewing this case?

ATTORNEY DARLING:  I'm going to object to that question as vague as Dr. Carpenter's report sets out the particular Bates pages and no individual could recount individual Bates numbers, but if you are asking more specifically, I would refer to his own report as to his memory.

So to the extent you are asking for particular documents, I would think that the question is vague.

ATTORNEY KUCHINSKY:  Okay.  Are you instructing Dr. Carpenter not to answer that question?

ATTORNEY DARLING:  No.  Absolutely not.  I'm just saying if you are referring to particular things, then refer to the report.

BY ATTORNEY KUCHINSKY:

Q   And Dr. Carpenter, you understand what I'm asking. I'm not asking for specific page numbers.  I'm looking at what materials you looked at such as photographs and autopsy reports.  Does that question make sense?

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 21 of 163

Volume 1                                    Non-Confidential                        Dora Solares vs.
Eugene Carpenter                                                                    Ralph Diaz, et al.

A    Yes.

Q    So I am not asking for Bates stamp numbers or page numbers, but generally you told me you looked at an autopsy report you looked at, diagram photos from the prison and photos from the autopsy itself.  Is there any other documentation that you can recall reviewing when you looked at this case?

A    Yes.

Q    Okay.  And what is that?

A    It is listed on the report, and I was asked -- which is new to me that this is a civil court case, and that it was customary to look at many more materials than in a criminal court case.  I mentioned that after 37 years in criminal court cases and autopsies are easy.  I was told that I need to review these cases.

So I looked at the autopsy report and the photographs in detail first.  I thought about it first.  I brought up questions in my mind first, and then I basically scanned through a careful scan through numerous documents that have to do with the history of the circumstances, the interview with the suspect, et cetera, looking for information that would jump out at me as relevant.

So then I needed to do that for the record, and I did do that, but my practice for 37 years is to stick to the facts as obtained from direct body observations.  And in my

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 22 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

practice, I very seldom ever needed to look at photographs

because I make extensive diagrams in my reports for 37

years.  So the photographs were new to me.  So I paid a lot

of attention to them.  The other materials, I scanned them

looking for relevant information after I had prepared

solidly for knowing what was factual as possible within

reasonable medical certainty from the autopsy report and

photographs.

**Q   Okay.  So on your initial report and again on your**

**rebuttal reports, there is some additional information**

**added.  That is why I wanted to go through this.  Did you**

**also look at the incident report for this case and that**

**includes narratives from various staff members?**

A   Yes.

**Q   And is that one of the documents you skimmed through**

**rather than taking an in-depth review?**

A   Yes.

ATTORNEY DARLING:  Objection.  Argumentative.  You
can answer.

ATTORNEY KUCHINSKY:  I do not hear the objection.

ATTORNEY DARLING:  Argumentative.  You can answer.

BY ATTORNEY KUCHINSKY:

**Q   So I am asking a lot of the documents you skimmed**

**looking for relevant materials, were one of those sets of**

**documents the incident report in this case?**

A   Yes.  I documented in the list of documents I looked at.  If it is not documented, I cannot depend on my memory to say I did.  But I have reviewed that and one of the reports is called an incident report and that would be basic.  I see the material that I did in my criminal court case situation as preliminary, maybe, maybe not true, type of material, whose function is to be a general guideline as to what seems to has happened.

The keyword is what seems to have happened.  So I looked at it.  And once again, having been already been prepared as previously described, I could see what jumps out as important to me.

**Q   Understood.  And in your rebuttal reports and I think in your original report as well you list out to specific staff member incident reports.  Is it safe for me to assume or is it true for me to assume that if it is not listed on that section or not report, you did not review it in coming to your conclusions in this case?**

A   Correct.  And on top of that, I would have no documentation that I did.

**Q   Understood.**

A   So that list is important.

**Q   Okay.**

A   It documents what I was asked to review and what I did.

Q    Perfect.  Thank you for clarifying that.  One of the questions I do have about documents reviewed and this may just be a wording issued using the exhibits to the internal affairs reports including two exhibits by Osuna.

Do you recall if there were any other exhibits to the internal affairs reports that were reviewed but not listed?

A    I cannot recall, but I would just -- it's detailed on the documented list.

Q    Okay.  So it's an updated report?

A    It is an accurate document that lists the documentation.

Q    Understood.  Thank you for clarifying that.

And the last two things I see are the expert reports of Marvin Pitruszka and Bennett Omalu.  It looks like you reviewed both of those as well, at least before the rebuttal reports that you provided?

A    Yes.

Q    Okay.  Have you ever worked with or had a case where Marvin Pitruszka was on the other side?

A    I believe so.  Yes.  I believe I have seen his name several times on certain cases.  Only a few cases of my courtroom testimony experience are cases that might require a good forensic pathologist on the other side, and I have seen his name on occasion.  He probably is familiar with me either having reviewed a lot of my reports in preparation

for potential testimony or for actual testimony in cases that are more difficult than the usual gunshot wounds, stabbing case.

Q   Okay.  So more complexity and more material to review, that kind of thing?

A   Yes.  And I will point out now it is the child death particularly that is shaking an infant or blunt head trauma cases, delayed homicide deaths where someone is sick for several years and then they died.  That takes someone like Dr. Pitruszka's expertise to help evaluate if the defense needs that and then there is the officer involved shootings which are criminal court cases.

But those are the three areas where things are legitimately contested and become controversial.  The other cases are straightforward and most of those cases are stipulated to.  And the ones that I go to after 36 years, I realize, is primarily to help the young prosecutors train to know how to interview a forensic pathologist.  Most of them are stipulated except for that reason, which is a bit deglamorizing.

Q   So it's sort of let the young DAs handle a direct examination on a lower value case, kind of, thing?

A   Yes.  And very quickly, once a supervising district attorney was left having to handle a case and he said, "Dr. Carpenter, what was the manner of death?"  And I said,

"multiple gunshot wounds and homicide."

"Thank you."

Q   Speed things up a little bit when you get some more experienced guys in there a little bit, I guess.

A   Yeah.  Yeah.  It's all necessary.

Q   Understood.  Yes.  You have to build a foundation before you can get right to the answer, right?

A   Yes.

Q   All right.  Well, I appreciate that, Doctor.  Thank you for giving me that background information and, sort of, explaining the involvement.

Let's talk then about to the reports and the opinions that you formed in the case.  Now, you produced two separate reports to Mr. Darling, who then produced them to us in this litigation; is that right?

A   Yes.

Q   One of them was the initial report which was dated February 27th, 2026, or thereabouts.  Do you recall that?

A   Yes.

Q   And then there was a rebuttal report from May 8th, just a few weeks back, that contains some additional material review that we talked about and then some additional analysis and opinion.  Is that fair to say?

A   Yes.

Q   Okay.  So let's start with just the initial report.

Can you tell me that -- obviously, we both read the report.
You wrote the reports.  You wrote the report.  Tell me, what
are your opinions in this case?

ATTORNEY DARLING:  Objection.  Calls for narrative.
Vague.  Document speaks for itself.  You can answer.

BY ATTORNEY KUCHINSKY:

Q   Doctor, if you like, I can break it down more if
that would be easier.

A   No.  I can answer.

Q   Okay.  So the question was, what opinions have you
formed in this case?

A   The cause of death is multiple sharp force injuries.
The manner of death is homicide.  The mechanism of death is
injuries with a sharp object.  And the next opinion is that
key to this case is there are no defense wounds.  Such cases
can happen with an inmate killing another inmate, but I
don't know of any, because of my lack of experience, where
there are no defense wounds.

No defense wounds can entail that the attack was a
surprise attack.  That the inmate attacked may have been
sleeping or not paying attention or unaware.  The weapon may
be small and its efficiency very questionable.  And then
there may have been some sort of overwhelming wrestling hold
that caused carotid artery pressure, that caused the rapid
loss of consciousness, thereby allowing the victim in a

wrestling scenario to be quickly overcome and choked out.
The chokehold is used by police even by big strong
individuals in order to do that.

So central is why are there no sharp force defense
wounds and really minimal evidence of what might be seen as
small abrasions that might be evidence of a struggle.

Now, the key to it is to understand how the body of a
strong, healthy, 44-year-old man can be overcome so quickly
and be controlled so quickly.  So that is the key question
here in this particular case.

And then the next question is, when did something happen
that caused a loss of consciousness, and how long was the
person conscious after that event?  So you have the attack,
and you have the unknown interval of time before the body
was controlled, and the body lost consciousness, and then
you have the estimate of the time of death between control
and loss of consciousness.  And then you have the estimates
of the time of death that controls the loss of consciousness
and the death.  So that lays it out as to what my opinion
was.  There were a lot of unknowns, and if it is unknown, it
is unknown.

So my job is -- with the other forensic pathologists is
to come up within reasonable medical certainty what happened
in this particular case.  And then I have to support that,
and every time there is an opinion given, it must be

followed with something equivalent to proof, not just an opinion because I have done 37 years of work, or I graduated from the best schools in the world.  It always needs reason.

So I have to give reasons for my opinions.  So right now I have outlined basically the general questions that need to be answered by any and all of the forensic pathologists involved in this case.

**Q   Okay.  And so you mentioned that the key question for you was the lack of defensive wounds, and it was a key question of when the mechanism that caused a loss of consciousness happened, how long was conscious after that? Did you form a conclusion to either of those or any of those questions?**

A   Yes.  As my practice has been for 37 years, I stick to the information gained at the autopsy and the photographs available at the autopsy.  For 37 years, any history of circumstances is preliminary, potentially truthful information whose function is to help picture what probably happened or what may or may not have happened.

And in my practice because I am asked -- you know -- Doctor, the preliminary information you got, you relied on that to form your opinion, and my answer is always no.  I cannot rely on that.  It is preliminary information.  I do not know the reliability of the sources.  I do not know the qualifications of the individual officers or deputy

examiners involved.  And is helpful, but I base my opinions -- and they are limited -- based on the findings of the autopsy as substantiated by the photographs and my diagrams.  So I may not have answered your question.  I kind of wandered a bit.  I hope I have.

     Q    No.  I think you did, and I think we are moving in the right direction towards that.

     Let me ask you this.  Did you form a conclusion about what caused Romero to lose consciousness in this case?

     A    No.  I had my own hypotheses based just on the autopsy information and the photographs, but I was asked to consider -- and it's a reasonable question -- what did the assailant say as to how the killing occurred?  How it happened and would allow one to suggest that the explanation by the assailant was sufficient to explain why there are no defense wounds.

     And so I went back over the interviews, the first one and the second one, of what the assailant said, how the killing occurred and found then that information, which I do not know if it is true or not, that information could be seen by a forensic pathologist as sufficient to allow one to explain why there were no defense wounds.  It is a tiny weapon.  The decedent may have been surprised.  They may have been restrained by sitting on the body, and then the stabbing occurs when the body is in the prone position.

So there are two parts.  There's evidence seen in the autopsy report and photographs, and then there is whatever reliable information there might be from the interviews by professional law enforcement and prison officials and the Deputy Attorney General.

Q    And also it sounds like the inmate, right?

A    The defendant -- who?

Q    The inmate, inmate Osuna?

A    Yes.  That was -- I stick to the autopsy and photographs to formulate a basis of what the evidence tends to show within reasonable degree of medical certainty.  And then as a hypothetical, I am asked, well, if Osuna is asked and this is what he says he did.  Does your solid review of the evidence and the photographs support what he says or conflict with what he says?  So I have to stick to that space.  I can be as -- know what I found, what I see in the autopsy report, what I see in photographs, is that consistent with what is then said by the assailant himself or should we conflict, and should we question it very carefully?  And so that is the position I am left in.

Q    Okay.  And you mentioned earlier you formed a hypothesis before looking at Osuna's statements or reading Osuna's statements.  What was that hypothesis?

ATTORNEY DARLING:  Objection.  Calls for speculation.  You can answer.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 32 of 163
Volume 1                                    Non-Confidential                              Dora Solares vs.
Eugene Carpenter                                                                          Ralph Diaz, et al.

BY ATTORNEY KUCHINSKY:

Q   Go head, Doctor.

A   There was some mechanism that allowed the attacker to rapidly control the decedent.  And that included what was up front, which was a stab wound to the throat vessels eventually which caused the body to bleed out.

And then there is, well, death is what seems obvious, but was there something else?  Could there have been a wrestling chokehold that caused unconsciousness and then made it easier?  Was a ligature involved?  Was there blunt head trauma that knocked the person out?

So all of these questions have to do with how does a grown adult male overcome another strong adult male.  So there was no evidence that there was any defense wounds on the decedent and according to the reports, there is no evidence of injury to the attacker.

So right away -- well, one of them, the one that seems central is stabbed into the throat vessels, lost consciousness within 10 to 30 seconds, died within two to five minutes.  So the mechanism would then be according to what Osuna says and according to what the autopsy report, that mechanism which would be a rapid attack, controlled, getting to the throat vessels rather quickly, loss of consciousness 10 to 30 seconds and death within two to five minutes.

So that is in there.  But then if one questions that, Dr. Pitruszka mentions that also back to the assailant has said he hyperextended the neck, and that perhaps some mechanism such as pressure on a carotid artery which has been known in rare circumstances to cause loss of consciousness or stretch of the carotid arteries may have.

But what he and I agree on is one of the mechanisms besides from the one that seems fairly obvious.  Aside from that one, that some mechanism causing loss of consciousness rapidly, which allows further attack to occur without the defendant being able to fight back.  Now, his idea of a mechanism was hyperextension of the neck, that was one of the givens by the assailant and testimony after interview. Whether that is reliable or not, both of us don't know.

I was able to see that, yes, hyperextension of the neck can cause loss of consciousness, but it is in the context of whiplash and automobiles.  I could not find any support for a wrestling type of altercation that allows a reasonably strong individual to hyperextend anyone's neck because the neck muscles are too strong, and they guard.

So there would have had to be loss of consciousness before that, such as by the stabbing.  So the hyperextension of the neck can't really occur.  It does not really cause loss of consciousness, and it really can't occur until the victim is helpless.  But I could see what Dr. Pitruszka

meant, and he nailed it, and something happened that allowed relatively complete control of Romero.  If it is not the stab wound causing loss of consciousness in 10 to 30 seconds and then death in two to five minutes then what is it.

**Q   So are you able just based on your review to come to a conclusion within a reasonable degree of medical certainty about what that mechanism was?**

A   Yes.

**Q   And what do you believe the mechanism actually was?**

A   A fast attack with rapid stab wounds in the back of the neck which probably paralyzed the body through spinal cord damage that is the key, which allowed continue stabbing without a strong individual that Romero is supposed to be being able to push up in a push-up position with his arms or wiggle away or fight and slap back.  So it was a surprise attack.

(Whereupon, we enter into the
Confidential -- Attorney's Eyes Only
portion of EUGENE CARPENTER'S
deposition transcript.)

(Nonconfidential transcript

Beginning at Page 35 as follows:)

THE WITNESS:  And then getting to the back of the neck with the spinal cord right away, not with a cutting weapon, but with a penetrating weapon which one has to allow could get through in the spaces of the spine, could cause paralysis.  That is a control.

So you have the correlation of the history of the circumstances as given by the information from the interviews of the assailant, plus the forensic information which correlates.  And so after the stabbing to the back of the neck, there is a procedure probably with a rapid move to cut the vessels of the right side of the throat, and that is when you have a countdown 10 to 30 seconds before the person loses consciousness, two to five minutes before they bleed out and are dead with the heart still pumping very low blood pressure, and that is basically the end of it.

So the key to know is how soon did this stab wound to the back of the neck occur after the interval started?  So that is important.

And then the stab wound to the neck can be a good explanation as to why the body without any defense wounds being present, and Osuna -- and then rapidly moving to cutting the throat out of the right side, which is, as I repeated, too many times, the final deathblow.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 36 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

BY ATTORNEY KUCHINSKY:

Q    What about the cut to the right side of the neck? What parts of the body do you believe that damage was a fatal injury?

A    The right -- over the right throat vessels over the larynx.

ATTORNEY STOCKER:  I'm sorry.  I think Mr. Darling had an objection.

ATTORNEY DARLING:  Objection.  Calls for speculation.  You can answer.

BY ATTORNEY KUCHINSKY:

Q    I'm sorry.  You can go ahead, Doctor.

A    Yes.  There's very dense purple bleeding of inches of tissues and throat skin of tissues in several areas of the throat indicating the blood pressure where that part of the attack occurred.  And my evaluation of -- the evaluation of the photographs, none of this pain and suffering type of death does not need to be in an original autopsy report, but when data becomes the focus and you go to the photographs, you can see a lot of hemorrhage and bleeding so that the person was still conscious.

Well, I can't say that.  The heart was providing good blood pressure when the right side of the throat was cut and he starts to bleed out.  So I do not know whether it was just in the veins that were cut and then the artery and the

veins were cut.  I do not know.

I think a useful statement is that as soon as the equivalent of one carotid artery is cut, then the textbook put the time until death within two to five minutes.

**Q   And is there any sort of medical literature that talks about -- you talked about loss of consciousness within 10 to 30 seconds of the cuts to the neck.  Is there literature that backs that up as well?**

A   Yes.

ATTORNEY DARLING:  Objection.  Just vague as to timing.  Are you saying time of the initial attack or the time of the carotid -- so just vague as to what is being cut.

BY ATTORNEY KUCHINSKY:

**Q   Did you understand my question, Doctor?**

A   Yes.

**Q   Okay.  You can answer.**

A   The attack is initiated.  There is an interval period of time that is unknown until the body is overcome by stab wounds to the back of the neck and the hypothetical paralysis from the spinal cord injury.

So that attack and unknown interval and then the body is controlled.  Very likely, but not conclusively, established up to the back of the neck.  Which by the way, is a known area where prisoners kill other prisoners.

Example, inmate in the exercise yard gets jumped on by five people.  They all have shanks.  They are all stabbing him.  He gets 23 to 30 stab wounds and one to the back of the neck.  That is a target area apparently from my experience.  Okay.

Now, I have lost track of what you asked me.

**Q   The question was earlier you mentioned in the testimony about -- and I could be wrong about how you phrased this, but it sounds like you and Dr. Pitruszka agreed that once the neck wound was inflicted.  This mechanism, whether it to was the front of the neck, the side of the neck or the back of the neck, but the loss of consciousness would have occurred within 10 to 30 seconds of that happening or did I hear that wrong?**

A   No.  You heard wrong.

**Q   Okay.**

A   And to clarify, I think Dr. Pitruszka and I agree that once the circulation of blood to and from the brain was inhibited significantly by whatever mechanism, stab wounds or chokehold, blunt force trauma to the head with a sandbag, that won't leave a bruise, whatever the mechanism and he is thinking, well, maybe it was the hyperextension of the neck, but whenever that happens, whenever the circulation of the brain suddenly fails, whether it is from stab wounds or pressure on the carotid arteries.  Then the 10 to 30 second

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 39 of 163

Volume 1                        Non-Confidential                     Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

interval before there is loss of consciousness is seemingly the standard agreed upon conventional forensic pathology answer.

However, the clinical experience by those who suffer such stab wounds with a paramedic in the emergency room is also important.

So the two have to go together.  One is a general statement that I see as valid as a general statement and the other is specific experience which will point out to us what the variation can be between men and women and children and 220 pounders.  There will be a clinical variation.

And then mechanically, 10 seconds to 30 seconds after significant loss of circulation to the brain is a reasonably good, general answer according to just many, many searches in the major textbooks.

**Q   And do you agree with that interval in this case?**

A   Yes.

ATTORNEY DARLING:  Objection.  Vague as to interval between.  And argumentative as to initial attack versus the carotid.  You can answer.

BY ATTORNEY KUCHINSKY:

**Q   Do you agree with the 10 to 30 second time frame you just discussed in your previous answer as applicable to this case?**

A   As soon as the brain is deprived of significant

amounts of blood such as one carotid artery cut or pressure over both carotid arteries, but yeah.  The 10 to 30 seconds losing consciousness was after the brain suddenly loses all of its blood supply.  That is when the 10 to 30 second starts.

So you have the attack.  You have the unknown interval. You have the eventual rapid control with some mechanism -- maybe the stab wounds, maybe it is unknown to us -- some mechanism causes total lack of circulation to the brain and then the 10 to 30 seconds the person is unconscious.

**Q   During that -- and you may not be able to answer this.  I don't know.  But during that 10 to 30 seconds that we have been talking about, is -- does consciousness -- again I don't know if you'll be able to answer this -- does consciousness in full extend from that 10 to 30 seconds and then he just goes out or is it diminishing consciousness over that 10 to 30 seconds as the brain is deprived of more oxygen?  How does that work?**

A   I don't know.  The 10 to 30 seconds is a generalization.  I could not find any person talking about what clinical experience is which allow us to show what the variation is.  It may be more minutes involved in a big strong man.

Also, what is not talked about except in the main textbook if the carotid artery is cut cleanly across, it

goes into spasm, and that spasm remarkably slows down the amount of blood that is lost with every heartbeat.  If it is cuts in diagonally, it can go into spasm and it bleeds more with every heart beat.  70 milliliters of blood squirts out of it.

If someone is there that applies pressure, whether it is the victim or the paramedics or whatever, of course, it bleeds more slowly.  So that is why the clinical experience is important.  The 10 to 30 seconds is all we have, but it is a general average statement.  We don't -- I could not find out about variations probably because these people die at the scene mostly.

If they do arrive in the emergency room because the paramedic got there or someone there knew enough to put pressure on the vessel, then they get them to the emergency room and then most of them die.

**Q    And there is -- you have any reason to believe that Osuna provided pressure for wounds for Romero in this case?**

A    No.

**Q    Does not seem very likely, right?**

A    Correct.  Although one never knows when people have irrational behavior irrational events can occur.

**Q    Very true, very true indeed.  Let me ask you this. You've described Romero as a big, strong guy and a big, strong inmate.  You listed in your report the height and**

weight.  Do you recall it off the top of your head?

A    180 pounds, 68 inches maybe, is my recollection, but I don't know.

Q    It looks like he was about 5-foot 7, 156.  That is what you listed in your report, would those figures make a difference in we are talking about the clinical experience of 10 to 30 seconds knowing his height and weight too?  Does that help you determine the range better?

A    No.  We do not have enough clinical data on that to make any difference.  The general statement of 10 to 30 seconds is a good general statement without knowing the variation between individuals.  So I don't think there is any wiggle room to make any difference one way or the other. I can point out if there was a struggle of some sort before complete control by whatever mechanism that 10 seconds is more likely than 30 seconds.

Q    And why is that?

A    The body is using up its oxygen already.  The difference between a resting and a sleeping individual being attacked and controlled rapidly then 30 seconds.  If a person who just ran a marathon and then is attacked in the same way, they are going to lose consciousness right away. I mean, marathon runners will if you talk to them when they are trying to rest.

Q    Now, is that -- again, you may not be able to answer

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 43 of 163

Volume 1                        Non-Confidential                        Dora Solares vs.
Eugene Carpenter                                                        Ralph Diaz, et al.

**this, but is that due to oxygenation being depleted in the blood or is that because of a higher pulse rate in the body pumping the blood more quickly?**

    A    Both.

    **Q    Okay.**

    A    The heart could have gone up from the usual 70 to 75 beats per minute to 100.  The heart will squish out 70 milliliters of blood which is probably about a quarter of a cup.  I am not sure, but 70 milliliters of blood per beat. So 70 milliliters per minute and 70 milliliters of blood loss per minute, depending on the carotid artery and which end it is or not.

    And so also the person is exhausted.  They have carbon dioxide buildup, and they have low oxygen because it is being used up by the muscles and then the heart is beating at 90 to 100 beats per minute.  So it makes a difference how long the brain can then survive and remain conscious after its blood supply is disrupted in a significant quick manner. And when a carotid artery is cut, not only does it lose its supply, but whatever blood it had could be sucked out of the brain.

    So it could be quite rapid.  If the person is relaxed or taken by surprised, that may or may not have happened in this case, then it is more like 30 seconds.  It may even be longer.  Because there is plenty of blood up in their brain

for a while until the circulation is stopped.  And so the

tissues already have blood and oxygen and glucose.  And it

is something that we cannot be dogmatic about because number

one, we started off with a general statement.  It is just

average.  And we don't know the clinical variations that may

have been reported because these people die before they can

really let us know.

**Q   I understand.  And I understand in your report you mentioned that because of the -- and I assume you are prepared of the graphic nature of this -- but because the head was decapitated, does that pose some problems for figuring out the sequence of wounds or what initial areas of the neck or back of the neck were injured before the decapitation?**

A   Yes.  Of course.  I can see that the front part over

the voicebox in the photographs did not look as bloodied as

the right front throat areas.  And this five stab wounds to

the back of the neck and over to the right of the back of

the neck are -- to be very clear, the pathologist only

measured the length of the wounds of the skin surface.  We

do not know the depths.  The knife blade was measured and

could be seen in photographs and is long enough, it seems to

me, to get through the bone of the spine into the spinal

cord.  So it is not impossible for that particular weapon to

have done it.  The five established wounds on the other

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 45 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

hand, we don't know the depth.  The physician was not doing an autopsy to determine pain and suffering in a prophecy future civil court case, did not measure the depth, nor did a pathologist do a detailed examination of the throat issue to see if they were bruised or not from neck compressions, but this is okay.  It will be one of those easy criminal court cases for that particular doctor.  For us, it does not matter.

**Q   Did you form any opinion about the interval between when Osuna purportedly first attacked Romero, and when the wound to the neck was inflicted?  Are you able to determine that at all?**

ATTORNEY DARLING:  Objection.  Asked and answered. You can say it again.  You can answer.

BY ATTORNEY KUCHINSKY:

**Q   You can answer, Doctor.**

A   Yes.  No.  That seems to fall clearly in the expertise of someone who is very experienced in combat.  You know, if you have, like, two fighters in an enclosed ring or in a room and they come at each other, one of them -- let's say one of them hypothetically is an expert in killing, and the other one is just a stranger.  Then the question to that expert is combat, not in wounds.  I'm an expert only in wounds, not at the scene.  And in many areas I am trained to be an expert, but unless I have practiced it for years, I am

not going to say I am qualified.

So that question, as soon as he is attacked could have been -- I would guess it was a surprise, but I am not an expert.  So someone who has been in fights or trained in the military to sneak up on people and kill them or surprise them and kill them, they are the only ones that can really tell us how difficult this might be and how unlikely what Osuna says is true or how likely it is true and it is completely understandable.  So that the unknown area from the attack at the beginning to the time the body is controlled and bleeding to death probably the best hypothesis.  Bleeding to death is not known.  I have no way of knowing that.  I have no way of knowing from my own perspective when the stab wound to the eye occurred or when that 5-inch across the front of the upper abdomen occurred. I cannot figure that out.  I have no way to contribute to our understanding of what happened.  And so one has to listen in a professional way to what Osuna says and know what is reliable and isn't reliable.  I don't know.  I can't do that.

Q   Understood.  Is there a way that you can tell or maybe for any medical professional to tell whether the attack started when Romero was asleep or whether there was a struggle when the attack started?  Is there any way to know that?

ATTORNEY DARLING:  Objection.  Asked and answered.

BY ATTORNEY KUCHINSKY:

**Q    You can answer, Doctor.**

A    No.  Not that I know of.  But once again, it is beyond, Dr. Carpenter, what does this wound mean, et cetera. I can point something out very important; however, and I don't understand when I try to imagine stuff in the area that I'm not really qualified to be an expert area witness on.  It is important for me to try to imagine how it might have happened.  There are two prominent abrasions seen in the photographs at the upper abdomen, over the lower front chest cage below the mutilation of the left chest wall and above the 5-inch horizontal cut.  Those are abrasions that had -- number one, could not have occurred if the person was still in bed at the time those injuries occurred.  Those types of abrasions would be shiny, if at all, from back and forth movements during a struggle on the bed linen.  The abrasions that we see on the photographs are consistent with the body being on a floor or a hard rough surface.  It cannot be on a smooth floor like linoleum.  It has to be a hard rough surface.

So that is one of the mysteries that I have not been able to figure out, with the other two areas being the stab wound to the eye or the horizontal slash.  It's hard to say and hard to understand that without information from a

witness.

**Q    Is there any way for you to tell or when -- or let me ask it this way.  Is there any way to tell if those abrasions to the chest were pre-existing to the attack or not?**

A    Very unlikely because they fit in perfectly with a hypothetical of the attacker sitting on the body while the body is prone on a hard, rough surface and hyperextending the neck.

So are you going to have this towards the head, towards the feet, towards the head, towards the feet movement during a struggle when the decedent is conscious or moving reflexively or not.  These abrasions are like road burn abrasions where a motorcycle slides over the concrete.  They are focal on each side.  They are symmetrical.  They are completely consistent with struggling or movement.  I have to say, I can't say struggling.  All I can say is the body is moving back and forth in towards the head, towards the feet motion, maybe during the decapitation.  I cannot rule that out.

If there is still enough blood in the tissues to make the wounds look and see antemortem, the wounds are probably antemortem.  But I cannot say for sure if that is going to be argued upon.

**Q    There's no way to say whether more likely than not**

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 49 of 163

Volume 1                                        Non-Confidential                                    Dora Solares vs.
Eugene Carpenter                                                                                    Ralph Diaz, et al.

the wounds are antemortem?

ATTORNEY DARLING:  Objection.  Vague as to which wounds.  There's plenty of reference to antemortem wounds in the reports, and there are so many wounds that it is vague as to which one.

BY ATTORNEY KUCHINSKY:

**Q   And, Doctor, you understood the wounds that I was talking about in the previous question, right?**

A   Yes.

**Q   Okay.  You can answer.**

A   In the photographs, those wounds are prominent. They are discrete.  They are symmetrical.  They are bloodied.

According to the way they appear in the photographs, the way they are described in the autopsy report, they are described with a very general overstatement -- overriding statement -- perhaps an overstatement, but an overriding statement that they have vital signs.

It is my opinion within reasonable degree of medical certainty that these two lesions are due to hard, rough surface friction during a time when the heart is still pumping blood, and there is pressure enough -- the reason is that the abrasions that are not one have a golden pale brown appearance.  They are very distinctive.

You see these when someone breaks their neck in an

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 50 of 163

Volume 1                          Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

automobile accident or a motorcycle accident and then slides on the pavement.  They have these yellow, pale abrasions that are not bloodied.  These have signs of bleeding.

Q   Are you able to tell whether those abrasions that we have been talking about, the two abrasions to the chest, those occurred while Romero was still conscious?

A   No.

Q   You just cannot tell that one way or the other?

A   No.  I can't.

ATTORNEY KUCHINSKY:  Okay.  Understood.  You know, I just noticed we're a little over an hour.  I'm fine to keep going, but Madam Court Reporter, you might want to break, and Dr. Carpenter you might want a short break.  I will leave it up to you guys.

ATTORNEY DARLING:  I would like a break.

ATTORNEY KUCHINSKY:  It's 12:15.  Do we want to come back at 12:25?

THE COURT REPORTER:  Off the record at 12:15.

(Recess taken.)

THE COURT REPORTER:  On the record at 12:44 p.m.

BY ATTORNEY KUCHINSKY:

Q   Good afternoon, Doctor.  We took about a half an hour break from your deposition.  Are you ready to proceed?

A   Yes.

Q   And aside from the technological issues, did you

have any substantive conversations with Mr. Darling about the questions that I'm asking or your answers during that break?

A   No.

Q   Okay.  Thank you.  I want to turn to we talked about this, about the blood pressure being present, the antemortem nature of some of the wounds.  Can you tell me some of this? I can, kind of, go through wound by wound, but you know to that injury to the left eye and the right here are antemortem, and there is evidence of bleeding at the edges of the wounded skin.

So can you tell me about that?  What does the evidence of bleeding show you?  Why does that lead you to conclude that those wounds were antemortem?

A   This is correct and accurate for the left eye wound as there is maybe an eighth of a cup of coagulating blood coming out of the eye socket.

For the ear, as a general statement, there is a vital reaction meaning that the ear appears to be bleeding.  But it is not sufficient if there is a controversy within sections of that, your tissue must be taken and histology must be done.

So as a general statement, yes, bleeding out of the right eye is antemortem out of the abundant evidence in the photograph of the bleeding out of the ear and general areas

is, in general, accurate, but if they were to be part of a crucial argument, more studies would have to be done.

Q   Okay.  Now, are you able to distinguish an injury being antemortem from an injury occurring while a person's conscious?  Is there any way for you to do that?

A   No.

Q   And when you say the wounds are antemortem, later in the report you say this -- you say that wounds are antemortem and this means that there is blood pressure at the time of the injuries.  Does that mean consciousness or is that separate and apart from the idea whether the person is conscious?

A   Yes.  All it means is there is a bleeding tissue wound.  It means that the bleeding tissue at the end of the wound, and is consistent with.  It could be argued it's not consistent for, but it is consistent with being an antemortem wound, and sometimes the word perimortem term is used instead which means a little bit before death or a little bit after death.  So it is a general term like abrasions or any other wound that needs to be taken in together with the other evidence.

Now the other part of your question was what?

Q   Well, let me ask you this.  You say the wounds on the chest of that you talk about, the rectangular wounds on the left chest all have signs of antemortem injury.  This

means there is blood pressure at the time of these injuries. Is that -- that is a correct statement.  I'm assuming that antemortem means there is blood pressure in the area of the time of the injury.  Am I reading that right?

A    Yes.  A refinement would be that the signs of bleeding, which is obvious in the photographs, are consistent with there still being enough blood pressure either in the tissues or with the heart still beating.  That blood is oozing out of the muscle edges, oozing out of the skin, and it is also being forced underneath the shiny, translucent, lining of the inside of the lung.  So it is consistent with there being still some blood pressure.  It can't be dogmatically said specific for it.  What it is not, it is not pale and yellow.  So it is not postmortem for sure, and it is consistent with there being enough blood pressure that the tissues are bleeding, and it is a general statement.  It has to be taken with a grain of salt.

Q    Okay.  I think I understand.  Are you able to determine from what you are using -- and why don't we stay with the wounds in the left chest with what we are talking about -- with whether those wounds were inflicted before or after the stab wounds to the neck?  Is there any way to tell that?

A    Yes.  The overall picture is post -- nearly postmortem or postmortem wounding of the chest wall after

the blood is basically drained out of the body.  I mean these wound signs are consistent with a little bit of blood pressure left, maybe just tissue pressure within the edges of bleeding.  One has to be very careful about it and to be very cautious about putting too much weight on such assignment.

It is clearly after the body is basically nearly bled to death or bled to death.  If it becomes controversial, then one goes back and if there is any tissue saved, which is unlikely, one does microscopic studies.  But it is not crucial in this case from my perspective, but it favors that the heart is still beating, even though very weakly.  The fact of the lung being depleted of blood favors nearly dead.

**Q   And that does lead me to the next question.  You do mention that there was blood aspirated into the lungs, and I think you mentioned that also into the chest cavity; isn't that right?**

A   No.  No.  Just into the left lung.  I think it also -- I think it mainly must be in the right lung, but that is not observed or photographed in the autopsy.  So it means it is only seen at the main airway of the left lung and then clear signs of blood being inhaled into the lung and then clear signs of a little bit of it being swallowed.

These are two reliable signs that the body was breathing at the times the injuries were occurring to the throat in or

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 55 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

around the top of the airway or the larynx.

    **Q    Okay.  So did you have a conclusion about that, and you may have just said it, but I am trying to understand it. Do you have a conclusion about whether Romero was still alive when the neck wounds were inflicted?  I think you do. It sounds like you think he was alive and conscious when the neck wounds were inflicted?**

    A    Yes.

     ATTORNEY DARLING:  Asked and answered.  But please explain.

BY ATTORNEY KUCHINSKY:

    **Q    You can answer, Doctor.**

    A    Yes.  The blood aspiration signs are patchwork speckle, spotty signs of blood in the lung which only can occur if the person is alive and breathing while the blood is getting into his upper airway.

    And then also with the swallowing.  So blood is gushing into the area of the upper airway and upper pharynx.  The person is still alive swallowing and breathing during the period of trauma to the vessels of the throat.

    **Q    Okay.  I think I understand that.  And we are not able to determine with any degree of certainty exactly how long that interval is, right?  Like, how long -- well, let me ask it to this way.**

    **Are you able to tell me how long Romero was breathing**

after the cuts to the neck?

A   Yes.

Q   And about how long do you believe he was breathing after the cuts to the neck?

A   Two to five minutes.

Q   Okay.  So you believe he was continuing to breathe for up to five minutes after the neck was cut?

A   Or within reasonable medical certainty, but one has to be cautious because two to five minutes is the interval that one expects death from such a wound.  We don't know how severe the wound was after that time.  It could have been the vessels of the vein that might have been cut.  We don't know.

So but the general statement holds and the general statement is he is alive for two to five minutes after the equivalent of one carotid artery has been severed.

Q   Okay.  And is that distinguished from how long he is conscious after that one carotid artery has been sustained?

A   Yes.

Q   Okay.  And how so?

A   He is conscious for one carotid artery, equivalent of vessel damage is done in 10 to 30 seconds.

Q   Okay.  I think I understand.  So he could have continued to breathe for up to five minutes, that seems like the interval that he would have died -- passed away or

expired after that wound was inflicted, but the consciousness does not extend out for five minutes, in your opinion?

A    Correct.  Consciousness after that wound is afflicted, 10 to 30 seconds.

Q    Okay.  Thank you.  I wanted to understand the blood into the lungs.

Now, can I ask you also have some details about blood being in -- I believe it was blood on the inner surfaces of the chest wall.  Is that why it is not aspirated to the lungs but just inside the body cavity?

A    That is if you open up the chest, ignore the lung and look at the lining of the inner surface chest wall. That is like plastic wrap.  Underneath that plastic wrap like tissue, you can see blood.  That is from the post -- that is from the peri-mortal mutilation of four or five costal arteries which can bleed profusely if damaged.

So it is a sign that is consistent with enough blood pressure or -- and/or tissue pressure in the chest wall to continue to squeeze out blood to give you that sign.  What it is not consistent with is a blow to the abdomen.

Q    Okay.  And you say in that paragraph that you cannot distinguish the blood from a postmortem drainage; is that right?

A    No.  That statement refers to the pool of blood,

Case 1:20-cv-00323-LHR-FJS     Document 295     Filed 08/04/26     Page 58 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

maybe a half a cup that one sees in the photograph.  That can be just drainage after the body has been dead for minutes or hours.  It is just seeping out before it gets the autopsy observation.

**Q   Okay.  I think I understand.  So the blood that just pooled in there, that is postmortem.  That is drainage. That can be from something else.  But the blood that is lining the chest wall and the organ tissues, in your opinion, that is perimortem right either right before or right after the death?**

ATTORNEY DARLING:  Objection as to -- just argumentative as to the description of perimortem, but you can answer.

BY ATTORNEY KUCHINSKY:

**Q   Go ahead, sir.**

A   It's all correct, except for the pooled blood seen in the photograph is either antemortem causation or postmortem drainage.

**Q   I see.  It could be either one of those?**

A   Yeah.  We don't know.

**Q   I see.  Okay.  All right.  So the other question I have is, I think you say other than one of the other injuries to the face -- and I want to just make sure I have this right -- the forehead and the right cheek you believe were the only clear perimortem wounds.  Are the rest**

antemortem, or are they antemortem and perimortem?

A   The forehead letters and the abrasion to the right cheek, they are yellow.  They have no signs of bleeding. They are clearly postmortem where there is no blood pressure in the skin.

The other wounds, in general, are consistent with the body still being alive to some degree, but one cannot get dogmatic about that.  If that is controversial, then one has to do microscopic studies.

Q   Okay.  I think I understand.  And I may have asked this, and I apologize if I do, but is there any way for you to tell, just looking at the body, in general, the sequence that the wounds were inflicted in?

A   Through a certain limited extent.

Q   Okay.  Can you tell me if you do have any opinions about the sequence?  I know we talked about the wound to the neck.  But after the neck wound is inflicted, do you have any opinion about the sequence of injuries from there?

A   Yes.

Q   And what is that opinion?

A   That I don't know about -- if I stick to the autopsy report and photographs, which is my training, I don't know when, for sure, the left eye wound occurred, nor the 5-inch horizontal cut across the front, upper abdomen.  And I don't know after the beginning of the attack when the stab wounds

to the back of the neck over the spinal cord occurred.

That interval between the onset of the attack to that point where the body can be controlled to damaging the spinal cord, that interval is completely unknown.  And if I stick to just what I get from the autopsy report, I don't know when that stab wound to the eye occurred, and I don't know when the slash to the abdomen occurred.

But after that, once the body is controlled by whatever mechanism, and one must consider high on the list the sharp force injuries to the spinal cord area as very highly probably the one that caused the body to go passive.

After that, the sequence would be more stab wounds to the back, right side of the neck and the upper, inner shoulder region at the top, five stab wounds altogether. And then I don't know the interval.  Since the body in this hypothetical is passive, I do not know how long it was before the vessels to the right side of the throat were damaged, but that would be next.

And also, let's go back.  I don't know when the bruise to the abdomen occurred.  And then after we get to the stab wounds to the throat, we are in familiar territory.  This -- as soon as the brain is deprived by whatever mechanism, it is what we said before over and over.

Q    Okay.

A    The main thing is that there is no knowledge at the

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 61 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

interval at the onset of the attack and when the brain gets

depleted from its necessary oxygen and glucose.

  Q   Okay.  So that interval, no way to tell.  The

interval between the neck being cut or opened and death, we

have said on the high end is five minutes; is that right?

  A   It is a very general statement based on averaging

observations.  Yeah.  Two to five minutes, half of the blood

supply that will be drained out of the body.  The average

case -- and we are speaking statistically.  We do not know

about the individual.  There is a variation -- but on the

average, two to five minutes.

  Q   Okay.  Thank you.  I think I understand that.  And I

do want to ask some questions about the potential paralysis.

So you have written in your report that it is possible that

one of these stabs penetrated the spinal cord and severed

it; is that right?

  A   I don't know if it was severed, but it could have

been significantly injured.

  Q   Okay.  And what do you base that opinion on?

  A   The multiple stab wound wounding is in the area over

the upper area of the upper spine, right over the spinal

cord.

  Also, it is just about the only target area where such a

shank-type weapon can kill.  The person being attacked is

going to protect their throat.  And it is if the stab wound

Case 1:20-cv-00323-LHR-FJS     Document 295     Filed 08/04/26     Page 62 of 163

Volume 1                          Non-Confidential                     Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

to the eye occurred early, they are going to turn away with the back of the head towards the attacker, and that will be the target area if there is any hope of controlling the person in only a sharp force way.

Q   Okay.  You mentioned the hard, bony structure surrounding the spine.  You said, and this might at first seem very unlikely because of the nature of the instrument and the protection that the hard bone provides.

So what are you basing your opinion on that the weapon used would have gotten through all the protection that the hard bone provides?

A   It could get through because there are gaps in between the vertebral bodies.  So that it is possible that a penetrating weapon of this type could get to the spinal cord and cause damage.  It is --

Q   Are you able to -- I'm sorry.  I did not mean to interrupt.

A   No.  I have nothing else.

THE COURT REPORTER:  I missed -- I'm sorry.  I missed that last bit you were saying after cause damage.

THE WITNESS:  I would just say it can get through and cause damage.

BY ATTORNEY KUCHINSKY:

Q   And are you able to say that whether it is more likely than not that that is what occurred, or it is just a

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 63 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

possibility of what occurred?

ATTORNEY DARLING:  Objection.  Asked and answered.  You can answer.

THE WITNESS:  It is more likely than not.  It correlates with what information, reliable or not reliable, we have from the assailant himself.  It all fits; therefore, it is the simplest explanation of how the death occurred.

ATTORNEY KUCHINSKY:  Okay.  Now, I wanted to then -- so let me follow up on that.

(Whereupon, we enter into the Confidential -- Attorney's Eyes Only Portion of EUGENE CARPENTER'S deposition transcript.)

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 64 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

(Nonconfidential transcript

Beginning at Page 65 as follows:)

BY ATTORNEY KUCHINSKY:

Q   So I think based on that statement of Osuna, why is it more likely than not that Romero's spinal cord was severed as opposed to the carotid artery being cut?

ATTORNEY DARLING:  Just objection.  Argumentative. And I -- that's enough.  You can answer.

BY ATTORNEY KUCHINSKY:

Q   You can answer, Doctor.

A   The key question is, how in the world is Romero controlled?  Romero is going to be protecting the throat vessels.  It is instinctive.  He is not going to let that knife get close to his throat.  He is going to -- it is predictable that he will put his back of his head, the back of his neck, in between himself and the attacker with the sharp object.  He is going to use all of his muscles to protect his throat.  However, once his spinal cord is injured, he goes limp and cannot defend himself.  That is when his neck is -- that is the first time when his neck is loose enough to be hyperextended and his throat cut.

Q   Okay.  So is it your opinion that his throat could not have been cut unless his neck was hyperextended?

A   It would be very difficult because the neck muscles would be guarding the throat as if you are carrying an

orange underneath your chin.  It will be hyper flexed over those muscles.  It is a reflex.  And no one is going to pull anyone's head back.  I mean, if you had experience in wrestling, no one is going to pull anybody's head back unless they are incapacitated.

Q   So --

A   So that's why you have stab wounds over the spinal cord which would cause passivity, which would be the only thing, so far, that would allow Romero's neck to be pushed -- pulled into hyperextension and then the throat is cut.

Q   Okay.

A   Otherwise, the throat is being guarded.  It is being guarded with all of Romero's strength.  And I am speaking hypothetically.  I don't know.

**Q   So that actually brings up a question in my mind. You talk about the muscles in the neck.  Would the muscles in your neck tighten and protect against stabs to the spinal cord?**

A   No.  There is no way of the body doing that.

**Q   Okay.  So is the spinal cord just, kind of, exposed under the skin or are there muscles and tissue protecting it in the back of the neck?**

A   There is about a quarter inch of skin and subcutaneous tissue and right underneath that is bone.  One

can feel the seventh vertebral body spine right underneath the neck there.

Actually, that's lower about level with the shoulders. But there's a soft spot right underneath the skull where the spine and the skull join.  That is the vulnerable area. That is the area that seems to have been attacked.

Q   And why do you --

A   And that's the only way -- that's the only way without any other hypothetical mechanism to cause the body of Romero to go limp, and then allow for the first time for the head to be hyperextended and the vessels of the throat cut.

**Q   So your opinion is that if Romero was trying to protect his throat, there's no way Osuna could have pulled his head back to cut the throat?**

A   Correct.  It would be too strong.  You can try it on a volunteer.

Q   Okay.

A   We protect our throats.

(Whereupon, we enter into the
Confidential -- Attorney's Eyes Only
Portion of EUGENE CARPENTER'S deposition
transcript.)

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 67 of 163

Volume 1                              Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                  Ralph Diaz, et al.

(Nonconfidential transcript

Beginning at Page 69 as follows:)

THE WITNESS:  Yes.

BY ATTORNEY KUCHINSKY:

Q   **Would that have any effect -- and maybe you don't know this -- but would that have any affect on his ability to tense up and protect his neck when he's got a deep, penetrating wound to the eye that he just suffered?**

A   No.

Q   **And why not?**

A   It damages the eye and a tiny bit of bone, but it does not reach the brain.  It does not cause any hemorrhaging into or around the brain.  There is no mechanism known where it can allow the head to be hyperextended.

The only mechanism is if it caused immediate shock, traumatic shock, where it could be so painful that Romero just collapsed in the heap.  Then --

Q   **In your experience, have people that have been stabbed through their eyeball experienced enough pain to fall down?**

ATTORNEY DARLING:  Misstates -- objection. Misstates testimony.  It was collapses in a heap, not fall down.

ATTORNEY KUCHINSKY:  Sure.  Why don't we say

collapses in a heap.  That's even more descriptive.

BY ATTORNEY KUCHINSKY:

**Q   Doctor, is that your experience that people stabbed through their eyeball don't collapse in a heap of pain?**

A   Yup.  No.  I don't have that experience.  There is a reasonable medical certainty that it is a good possibility with somebody experiencing sudden, extreme pain that they can go into shock, cardiovascular shock.

**Q   And would being stabbed through the eyeball be sufficient to trigger that shock?**

A   It qualifies as extreme pain.  Whether or not the decedent felt pain, that is subjective.  We never really know for sure, but it is very likely from our own experience.

**Q   And I did want to follow up again on the paralysis idea.  And again, this is more my lack of medical knowledge, but would you be able to conclude at any point at what level the paralysis was inflicted on?  Like, what level of the neck or what vertebrae?  I know you talked about the base of the skull, but do you have a reason to believe that is where the base of the skull was severed?**

A   Only based on the autopsy report which mentions it was between the first -- it is at the first cervical cord segment and the second serve cervical cord segment.  One needs to not get confused between the first vertebral body

and a second vertebral body.

Q   So --

THE COURT REPORTER:  Counsel, you cut out.  I missed the whole first part of your question.

ATTORNEY KUCHINSKY:  Sorry about that.

BY ATTORNEY KUCHINSKY:

**Q   Were you referring to -- or when we talk about the spine, is that C1 and C2, is that the area?**

A   Of the spinal cord itself.

**Q   Okay.**

A   Which does not respond to the vertebral body numbering system.

**Q   Oh, okay.  So if we were to talk about the actual spinal cord itself, are you able to say where that stab wound was inflicted that severed it?**

A   I can only refer to the autopsy report.  It is cervical one and cervical two.

**Q   Okay.  And that is where the entire head was decapitated; is that right?**

A   Correct.

**Q   Once -- if there is paralysis, that would be because this spinal cord was severed or damaged such to the point that it is no longer connecting to the brain; is that right?**

A   It does not have to be fully, but for -- for sensory perception to occur, just the posterior or back part of the

spinal cord needs to be injured sufficiently.  For motor or muscle paralysis, the front part of the spinal cord needs to be injured.  So it would have to be, if not severed, nearly severed at that level for muscle paralysis.

**Q   And you said from the back of the neck if that is severed, that is just sensation perception, but he could still move his body?**

ATTORNEY DARLING:  Objection.  Misstates testimony.

BY ATTORNEY KUCHINSKY:

**Q   You can answer, Doctor.**

A   One can say if just the back half of the cord was severed, that would be through the sensory perception area, but that itself would cause a spinal cord malfunction or shock.  So any time the cord is injured, there is a phenomenon called spinal cord shock, and it is outside of my every day experience.  But once the cord is sufficiently injured, then the whole cord can just shut down, whether the motor section is actually cut or not.

**Q   Okay.  I think I understand.  And so that is, you lose both, sort of, the motor function ability, the reflexes and any sensation below that level of the injury?**

ATTORNEY DARLING:  Objection.  Calls for speculation as to sensation.  It's subjective as to sensation.  Asked and answered to that.  You can answer.

BY ATTORNEY KUCHINSKY:

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 71 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

**Q   You can answer, Doctor.**

A   Yes.  The hypothetical includes the phenomenon which seems necessary that the body is totally incapacitated allowing for the throat to be cut.

So when that occurs, from just book-learning perspective, that would mean that the spinal cord injury in this particular reasonable hypothetical would be such that there is paralysis.  And it is paralysis, not the loss of sensation, that is required in this hypothetical to allow for the neck to be hyperextended and the throat cut.

**Q   Okay.  And that -- we talk about the mechanism of delivering those stab wounds.  That is all to the back of the neck; is that correct, or to the back and side of the neck, not to the front?**

A   Yeah.  Right underneath the midline head.

**Q   Okay.  So both the back and the front of the spinal cord would have to be severely damaged in order to get to the motor function paralysis, right?**

ATTORNEY DARLING:  Objection.  Misstates the testimony in terms of back and front.  Argumentative.  You can answer.

THE WITNESS:  I can only say that sufficient damage needs to be done to part of the cord which would cause the cord to stop functioning.

BY ATTORNEY KUCHINSKY:

Q   Okay.  And you believe that is a possibility of what happened here given the weapon and pattern of injuries?

ATTORNEY DARLING:  Objection.  Misstates prior testimony as a possibility in terms of the words he used, more likely.  You can clarify.

THE WITNESS:  Please repeat.

BY ATTORNEY KUCHINSKY:

Q   So the question is -- well, let me ask it this way.  You say, one might very reasonably wonder whether or not this area might be wounded.  So that a vital area of the spinal cord might, perchance, be damaged.

And so the question I have is, the conclusion that there may have been spinal cord damage, is that one of a couple of possibilities, or is that what you believe actually occurred?

A   Partially because of the help of this deposition, I think it is highly probable that that must have been what occurred because one cannot hyperextend another human being's neck unless there is a reason, like they are unconscious or their cord has been injured, or they already bled out sufficiently from an unlucky stab wound to the throat.

Q   And I think you also added there -- go ahead.

A   I am just saying, yes.  As we continue to discuss it, it becomes more and more clear.  That if we discuss that

the neck was indeed hyperextended during this assault, then the body must have been paralyzed.

Q   And is it --

A   It strengthens the hypothesis.

**Q   I'm sorry, Doctor.  I don't mean to keep interrupting you.  I thought you were finished.  Go ahead, please.**

A   No.  It strengthens the hypothesis.

**Q   Once paralysis occurs, do you have an opinion on whether Romero was able to perceive or feel what was happening to him?**

A   Perceive, yes.  Feeling, I don't know.

**Q   Let's start -- go through both of those.  Go ahead.**

A   Perceiving, he is still conscious for about 10 to 30 seconds when the brain is deprived of oxygen.  So if he gets stabbed in the back, the spinal cord is damaged, and it makes the spinal cord really flexible and loose, his head and neck are hyperextended and his muscles are cut.

So perception is going to be there all the way up until about 10 to 30 second interval after the vessel has been cut sufficiently.

Sensation, it is expected he will not be able to feel anything below the level of the cord injury.  He is paralyzed below that level.  His sensation behind that level is gone.  He is still conscious until sufficient bleeding

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 74 of 163

Volume 1                          Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

has occurred.

Q   Okay.  I think I understand that.  Thank you for that clarification.  I think I only have a few more questions.  Let me ask a few more and then I might want to take a few seconds break.

Do you recall reviewing in the reports that you read that Romero's body was found somewhere around 7:30 a.m., on the morning of March 9th, 2018?

A   Yes.

Q   And you recall in the autopsy report or at least in the reports from staff, that the time of death is marked at 7:35, essentially the same time that his body was discovered?

A   Yes.  But that time of death is the time that the body is pronounced dead.  It is not the time that the body died.

Q   Okay.  That is what I -- I wanted to clarify that. Do you have an opinion about the time that Romero was killed?  Are you able to conclude that at all?

A   Yes.  I have an opinion.

Q   And what is that opinion?

A   As a premise, if we know the temperature of the body, which we don't, and we know rigor mortis, which we do, and we know signs of lividity, which we do, then knowing the temperature is key because we don't know it in this case.

But if we know all three, the very best -- the very best

experts in determining time of death -- let's say a super

research team shows up after a fresh kill, is plus or minus

2.8 hours.  I rounded off to three hours.  Without

temperature, which is considered the only thing that might

be of help, the other two are not of help.  It's just too

much variation and statistical information, and it doesn't

work.  And we know it doesn't work.

    With -- if the temperature is known and used in a fresh

kill, the very best is plus or minus 2.8, three hours.  So

if the estimation is 4:00 o'clock, it means anywhere between

1:00 o'clock in the morning and 7:00 o'clock in the evening.

    The general rule is that the determining cause of death

is extremely difficult.  The only thing that helps is

temperature of the body.  And if you know the temperature

and you can see the other signs of death, the best that --

the best you can do in a fresh kill is plus or minus 2.8

hours.

    So the answer is no.  I do not know any time later in

the evening towards -- within two hours of when the body was

found.  It is just not possible from my perspective.  I

don't have that ability, and it has never come up except for

two cases in 36 years.  So I don't have the expertise.  I

have never even struggled with trying.

    **Q   Are you at all able to tell an upper end of that**

range?  Meaning it could not have been longer than --
obviously we know Romero was alive at some point that night,
but it could not have been more than 12 hours ago or 18
hours ago, is there any way to do an upper end on that?

A    Well, as soon as you know the last time he was alive
and the time his body died, probably not at all closer than
two hours prior to when the body was pronounced dead.

So at any time during his last known alive and found
dead, if you go back at least two hours out, somewhere in
there, somewhere in there.  But without temperature --
temperature is the only sign of the three postmortem signs
that has, maybe, a value.  So we have resorted to is the
body warm?  Is it cool?  Now, modern advances are occurring,
but without temperature, you cannot tell.  I am sorry.

Q    I want to talk a little bit -- and I think I am
almost done here.  But I want to talk a little bit about the
response you did in your rebuttal to both Dr. Pitruszka and
Dr. Omalu.

Let me start with Dr. Omalu because that is the subject
we are on.  You mention in here, and I will talk first about
the liver mortis section.  You're talking about a posterior
liver in the body found in a seated position against a wall
is precisely what a death several hours earlier would
predict.  Massive blood loss diminishes the prominence of
liver mortem.

And so does that degree of liver mortise, it sounds like that is not as crucial in your determination -- or it's not dispositive one way or the other about the timeframe, or are you able to make a conclusion from that?

A    Basic mainstream textbooks, especially when I was in training, basically said that we have learned that liver mortise is worthless in determining time of death.

You can do -- statistically, very valuable, but there is so much variation and we have no idea what the variation in liver mortem should be.  It is worthless.

Q    And it sounds like you then disagree with --

ATTORNEY DARLING:  David, you're cutting out.

ATTORNEY STOCKER:  David, we can't hear you.

ATTORNEY KUCHINSKY:  My apologies.  I knew this might happen.  Can you hear me now?

ATTORNEY DARLING:  Yes.  Better.

BY ATTORNEY KUCHINSKY:

Q    Let's talk about the conclusion of Dr. Omalu and your response.  You disagree with Dr. Omalu's conclusion; is that right?

A    No.

Q    Okay.

A    He has his opinion.  I cannot concur.  I don't have the ability.  That is his opinion, and he has all of these qualifications, et cetera, and that is the information that

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 78 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

he is delivering to the court system.  But I can't -- I
don't have the ability to give you the estimation of the
time of death.

**Q   It's just that you say Dr. Omalu's reliance on the
two hours as a relevant onset interval is on the short end
of the public range and not supported on the text that he
supports and cites.  But it does not sound like you agree
that it was within two hours?**

A   Correct.  I can't agree, but I honor his opinion and
his ability to show that he is right.  I just have to stay
out of it.

**Q   Okay.  I think I understand.  It is just that there
is not enough for you to specifically conclude a time of
death or to sort of disagree with Omalu with specific
certainty; is that right?  There is not enough there for you
to make that conclusion?**

A   Correct.  In Los Angeles, we took liver temperature,
and we struggle with determining times of death before we
gave up.

At Kern County, they do not even take liver temperatures
whether the body is warm or cool.

So I don't have the ability, as Dr. Omalu may very well
have, to have a good opinion in that area.  I quit trying.

ATTORNEY KUCHINSKY:  I understand.  Thank you for
that, Doctor.  Okay.  Why don't we do this, can I take a

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 79 of 163

Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

five-minute break and look at anything else, then we can

turn it over to Ms. Stocker.  Let's just take a quick

five-minute break, and I can make sure we are using our time

efficiently.

ATTORNEY STOCKER:  Is that enough time for you,

Ms. Keenaghan?

THE COURT REPORTER:  Oh, yes.  Thank you.  Off the

record at 1:30.

(Recess taken.)

THE COURT REPORTER:  On the record at 1:36 p.m.

BY ATTORNEY KUCHINSKY:

Q    Okay.  Doctor, we just took a short break, and I'm

just going to ask a couple questions to finish up and then

turn it over to Ms. Stocker.

We talked a lot about the potential sequence of how this

incident occurred, of the lack of any knowledge of the

interval of the stab -- the potential stab to the eye and

the stab to or the damage to the neck area.

And so I want to ask this.  You say, it seems

disturbingly clear that the body was immobilized at the

beginning of the attack and was alive throughout most of the

wounding.  Then you say, and probably conscious through at

least a few minutes of the early part of the attack during

the wounding process.

And so I want to ask, when you say, was probably

**conscious through at least a few minutes in the early part of the attack, are you referencing the interval between the initial attack to the eye and when the neck or the throat is cut, or what interval of time is that?**

A    That is not clear because I do not know when the attack to the eye occurred.

(Whereupon, we enter into the
Confidential -- Attorney's Eyes Only
Portion of EUGENE CARPENTER'S deposition
transcript.)

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 81 of 163

Volume 1                    Non-Confidential              Dora Solares vs.
Eugene Carpenter                                          Ralph Diaz, et al.

(Nonconfidential transcript

beginning at Page 84 as follows:)

THE WITNESS:  It seems to me that there was -- or would have been with that hypothetical, a minute or two before enough damage could be done to the spinal cord to then cause the body to be in complete control.

BY ATTORNEY KUCHINSKY:

**Q   You say it would be a minute or two.  What did you base that on?**

A   Just common sense experience that we all have, nothing more.

**Q   And you thought it would take a minute or two to stab through the bone in that area?  What is that -- aside from common sense, I don't have experience from that type of injury, and I doubt many of us do.**

**Aside from common sense, what is the one to two minute time frame based on?**

A   Well, let's consider the hypothetical that the first wound is to the left eye.  Then it is a matter of the time it takes to control an unrestrained body, with the body naturally turning away from -- with the face away from the attacker after the stab wound to the eye.

It is the amount of time it takes a normal individual male to control another normal individual male.  So they can go down on some surface, and they sit on them, and they

start stabbing them in the back of the neck.  That interval between the onset of the attack -- well, not the onset of the attack itself, but when the eye is stabbed, to the time the stabbings go into the cord and it causes paralysis, that seems reasonable to be a minute or two, but I don't know. Everyone could have an opinion.

**Q   It sounds like you have an opinion that one to two minutes is reasonable.  And I guess I don't understand the basis of that.  We are not able to tell the sequence of when the wounds were inflicted in other than antemortem, perimortem or postmortem.  So what is the evidence that you looked at that leads you to believe that there is one to two minutes between when Romero got stabbed in the eye and when the neck was damaged?  What evidence are you basing that off?**

A   It is an area where I am not qualified because I am not an expert on combat.

**Q   Okay.**

A   Someone who is an expert on combat, they will have an expert opinion of whether they could even know what the interval is between a stab wound to the eye, and then to be able to control an otherwise strong and active body to the point of being able to target the spinal cord area.

That is a very valuable target in such a situation, but it is also somebody who is an expert in killing that can

really say whether my one to two minute guess is a good guess or whether it could take longer or whether it could be done much more quickly.

I am not an expert in combat.  So I have to stick to the wounds and admit when I don't know.

Q   I think also you are looking at Osuna's statement, right?  And that is how you factor that into the fact -- you factor that into what occurred.  You say it's probably the most reliable source or at least direct source of information.

(Whereupon, we enter into the

Confidential -- Attorney's Eyes Only

Portion of EUGENE CARPENTER'S deposition

transcript.)

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 84 of 163

Volume 1                          Non-Confidential              Dora Solares vs.
Eugene Carpenter                                                Ralph Diaz, et al.

(Nonconfidential transcript

beginning at Page 88 as follows:)

BY ATTORNEY KUCHINSKY:

**Q   So do you have reason to believe that there was a one to two minute delay between when Osuna got on top of him and then started stabbing the neck, or is it just when the stab entered the eye and he started stabbing the neck?**

A   I was giving a nonexpert opinion that at least one to two minutes must have passed before an ordinary male could subdue another ordinary male after a stab wound to the eye.

I'm mean, there is going to be a lot of vigorous defensive activity after someone gets stabbed in the eye. So it is one of the mysteries of the cases.  How can this be done?  How can someone stab another person in the eye, and how long does it take before they are able to control the other person by wrestling or threatening them or any another person goes passive and says okay.  Go ahead and kill me.

(Whereupon, we enter into the

Confidential -- Attorney's Eyes Only

Portion of EUGENE CARPENTER'S deposition

transcript.)

Case 1:20-cv-00323-LHR-FJS     Document 295     Filed 08/04/26     Page 85 of 163

Volume 1                         Non-Confidential                         Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

(Nonconfidential transcript

beginning at Page 90 as follows:)

THE WITNESS:  I am not going to base my opinion on what Osuna says, but if that is the hypothetical, there will be some interval, and it is a combat Green Beret type person might be able to help or might not.  I don't know.

BY ATTORNEY KUCHINSKY:

**Q   And just so we're clear, you said after they stabbed the eye, there would be significant defensive movement.**

**There are no signs of defensive injuries here other than the wounds to the chest; is that right?**

ATTORNEY DARLING:  Objection.  Misstates the testimony.  He said vigorous activity.  He did not say vigorous defensive wounds.

ATTORNEY KUCHINSKY:  Madam Court Reporter, maybe we need to read that portion back.  But I heard vigorous defensive wounds.

ATTORNEY DARLING:  No.  Activity, not wounds, is the distinction.

ATTORNEY KUCHINSKY:  Fine.

BY ATTORNEY KUCHINSKY:

**Q   Do want me to repeat the question, Doctor?**

A   No.  I will just clarify that after a stab wound to the eye, the normal situation, one can expect vigorous defensive activity, wrestling, punching, kicking out,

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 86 of 163

Volume 1                          Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

screaming, hollering, running away, activity.  And then the attacker had the ability of gaining control and stabbing the back of the neck creating paralysis.

How long it takes for that to happen is a -- combat specialist might be able to help.

**Q   And just in your role as a forensic pathologist, if you know or if you believe that there is vigorous defensive activity, would you expect to see some correlating signs of defensive wounds or injuries either on Romero or wounds or injuries from the struggle with Osuna?**

**Would you expect to see either of those if there was vigorous defensive activity?**

ATTORNEY DARLING:  Objection.  Calls for speculation.

BY ATTORNEY KUCHINSKY:

**Q   You can answer if you do know, Doctor, or maybe no one can tell.**

A   The answer would be yes except if a tiny, inadequate weapon is being used.  Then that might be a partial reason why there are no sharp force defensive wounds.  It is a small, little inadequate weapon.

In the usual case where there is a buck knife involved, the person can grab something and then they can cut in the hands -- or they can throw the forearm up and part of the blade may very well hit their forearms or something.  But

with a little tiny homemade weapon, maybe a half of an inch of a cutting blade, that might be part or largely all that the reason that there are no defense wounds.  It is such an inadequate weapon, and it also emphasizes the importance of going for the back of the neck and trying to hit the spinal cord.

(Whereupon, we enter into the
Confidential -- Attorney's Eyes Only
Portion of EUGENE CARPENTER'S deposition
transcript.)

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 88 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

(Nonconfidential transcript

Beginning at Page 94 as follows:)

THE WITNESS:  Yes.  It could be.  I did review it. I scanned it, and Dr. Omalu gives a very clear, apparent description of the interview.  So it, kind of, doubles down on the information.  Yes.  But I don't know if that occurred or not.

BY ATTORNEY KUCHINSKY:

Q   Like, no one knows if Osuna is telling the truth or not, obviously.  But that is the information you have, right?

A   Yes.  One could get a professional to evaluate to the information and then help the court, but not me.

Q   Are you familiar with the size of prison cells at CSP Corporate at all?  Have you ever been inside one?

A   No.  I was at Alcatraz.  So I probably saw something very similar.

Q   They are not very big --

A   I saw the at-scene pictures.

Q   They are not very big cells, right?  They are not a very big areas inside the cells?

A   Correct.

Q   And there are two men that live -- at least inside this one, there were two men?

A   Yes.

Q    There is furniture inside, right?

A    Yes.

Q    Do you know what that furniture is made out of at all?

A    No.

Q    Do you know how much space there is inside of one of those cells or no?

A    No.  Only what can be generally gained from looking at the at-scene photograph of the cell.

Q    Sorry.  I'm just looking.  I think I am almost done or maybe done.  Let me just look at one other note here.  Oh, right.  That's what I wanted to confirm.

So you say that he was conscious.  I want to find the exact wording so I don't mess this up, "through at least the few minutes during the early part of the attack during the wounding processes."  Is it a fair statement of that opinion to say that the few minutes that he was probably conscious, that is a leading up to the neck wound because we know after the neck wound, it is 10 to 30 seconds, approximately?  Is that a fair statement that I made?

ATTORNEY DARLING:  Objection.  Misstates prior testimony.  Argumentative.  Vague.  If you understand, you can answer.

BY ATTORNEY KUCHINSKY:

Q    Did I -- that may not have been a great question,

Doctor.  I can re-ask it.

A   No.  I understand it.  Yes.  At least a few minutes because I can't see that any ideal attack to kill can be faster once it is initiated with the stab wound to the eye.

But once again, I point out that I really don't know. I'm not an expert.  That whole interval between the onset of the attack and the attack to the eye and then from that to the stab wound to the back of the neck, which finally incapacitates the body, that whole thing is -- the purpose of my statement is to say it is not seconds.

Q   You say -- it's not hours.  We know that.  You say when it's finally incapacitated, the body, but you don't know how long that interval is, right?

A   Correct.  It is an unknown.

Q   Okay.

A   You know, the body goes limp after the spinal cord damage, hypothetically.  And then there is plenty of time to mess around, all sorts of different opportunities because there is no longer any possible defense.

Q   Right.

A   As I said, I don't know.

Q   Do you have any basis to say that the other injuries to the body were inflicted before the neck was cut?

A   No.  I don't know when the eye wound, for sure.  I don't know this horizontal 5-inch cut for sure.

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 91 of 163

Volume 1                     Non-Confidential              Dora Solares vs.
Eugene Carpenter                                           Ralph Diaz, et al.

Q   What about the wounds to the chest and to the stomach?

A   The abrasions occurred during the hyperflexion of the neck routine, probably before the heart was -- you know, before the body bled out.  So there was still a struggle for control at that time.  But at the same time, one has to be careful.  It could just be a passive movement that a person forwards as the body is being -- manipulated after loss of -- after the body has become paralyzed in the process of hyperextending the neck is occurring.  There is no more struggling, but there could be some sort of movement in the vigorous mutilation process.

**Q   Okay.  Maybe last two or three questions, we talked about the condition of the spinal cord shock.  We mention that earlier, and you mentioned that earlier and it brought to my mind, I don't know if you are qualified to talk about this and I don't know if this is more of a medical determination.  But do you have any understanding when someone is injured in a very serious way such as maybe hypothetically a knife that goes through their eyes, does their body go into shock in a way that effects their ability to perceive what is happening or perceive pain, or is it that something beyond your ability to talk about?**

ATTORNEY DARLING:  Objection.  Compound.  Calls for speculation.  You can answer.

THE WITNESS:  The stab wound to the eye, whenever that occurs, qualifies for being markedly severe and horrifying pain.  And if it would be consistent with there being shock and collapse of the body, making it more easy to manipulate and control.

So in general, I can say that.  As to whether that happened or not, I don't know.

ATTORNEY KUCHINSKY:  Okay.  Alright.  I think that is all I have.  Thank you very much, Dr. Carpenter.  I will turn it over to Ms. Stocker for any other questions, but I do very much appreciate your time today.

THE WITNESS:  You're welcome.

EXAMINATION

BY ATTORNEY STOCKER:

Q   Good afternoon, Dr. Carpenter.  Can you hear me okay?

A   Yes.  Yes.

Q   Are you able to continue for about another half hour, or are you going to faint from hunger?

A   No.  I'm ready to go all afternoon.  I enjoy talking to you.

Q   Okay.  I introduced myself earlier at the beginning of the deposition.  But again, my name is Lynne Stocker, and I am defense counsel for Officer Silva, S-I-L-V-A.

Just by the nature of a deposition, as I am sure you are

aware, I cannot interrupt when Mr. Kuchinsky is asking questions.  So my questions may seem a little bit out of order.  It's just the nature of the deposition.  I don't mean to be rude.

We will start with something that you wrote in your rebuttal opinion, in your rebuttal report, which is dated May 8th, 2026.

            (Whereupon, we enter into the

            Confidential -- Attorney's Eyes Only

            Portion of EUGENE CARPENTER'S deposition

            transcript.)

(Nonconfidential transcript

Beginning at Page 101 as follows:)

BY ATTORNEY STOCKER:

**Q    Do you remember that part of your report?**

A    Yes.

(Whereupon, we enter into the

Confidential -- Attorney's Eyes Only

portion of EUGENE CARPENTER'S deposition

transcript.)

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 95 of 163

Volume 1                          Non-Confidential              Dora Solares vs.
Eugene Carpenter                                                Ralph Diaz, et al.

(Nonconfidential transcript

Beginning at Page 103 as follows:)

BY ATTORNEY STOCKER:

Q   Do you remember him saying that in that interview?

A   Yes.

Q   Why didn't you put any of that commentary in your report?

A   Because it is all in or around the same time and as I previously testified, it is going to be plus or minus three hours or so on the very best estimation of time of death.

Q   But you left out part of his commentary about the time that he claims that he killed Romero, right?

ATTORNEY DARLING:  Objection.  Argumentative.  You can answer.

THE WITNESS:  Yes.

BY ATTORNEY STOCKER:

Q   Okay.  So do you agree, Dr. Carpenter, that we have talked about that of the body was found on March 9th, 2019, at about 7:30 a.m., right?

A   Yes.

Q   And when was the autopsy conducted?

A   That, I don't recall.  I think about three or four days afterwards, maybe three days afterwards.

Q   If the autopsy report says that the autopsy was

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 96 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

conducted on March 13, 2019, at -- beginning at

approximately 9:45 a.m., would you have any reason to

disagree without?

A    No.  I do not disagree with it.

Q    Okay.  In your report, you state that the suspect

states a time interval that can be seen as about six hours

prior to when the body was examined and moderate rigor

mortis was detected and documented by the Deputy Coroner

Investigator at the scene.  Do you remember that part of

your report?

A    Yes.

Q    Isn't it true, Doctor, that the deputy coroner did

not document the degree of rigor mortis when he was at the

scene?

A    I only know that it was mentioned in the autopsy

report, that it was a moderate.

One second.  I need to plug my laptop in.  It is running

out of battery.

Q    Okay.  Go right ahead.

A    I will get my wife to help me.

THE COURT REPORTER:  Off the record at 1:58 p.m.

THE COURT REPORTER:  On the record at 1:58 p.m.

BY ATTORNEY STOCKER:

Q    Okay.  So Doctor, did you see anything in writing

where the deputy corner, Mr. Brabant, documented the degree

of rigor mortis when he was at the scene?

A    No.  Not that I can reliably recall.

Q    You read Mr. Brabant's deposition transcript, right?

A    Yes.

Q    Do you recall the document that he identified as a first-call report being an exhibit to that deposition?

A    No.  I do not recall that directly.  Okay.

I don't recall that.  I scanned the report for relevant material.

Q    Well, did you not think it was relevant whether Mr. Brabant determined to the degree of rigor mortis after the scene?

ATTORNEY DARLING:  Objection.  Argumentative.  You can answer.

THE WITNESS:  No.  It's not relevant.

BY ATTORNEY KUCHINSKY:

Q    Did you not think it's relevant?

A    No.  I don't think it's relevant.

Q    Well, you say in your report that the deputy coroner documented moderate rigor mortis at the scene.  What was the basis for saying that?

A    That was information given by the autopsy surgeon during the autopsy report, but I don't think it's relevant.

Q    Okay.  Well, whether you think it's relevant or not, I don't understand why you made that comment that you don't

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 98 of 163

Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

think it's relevant.  Please explain.

A    Because it's not relevant.

Q    Okay.  But you put it in your report, so you must've thought it was relevant, right?

A    No.  I put it in my report because it is information that Dr. Omalu is using to determine his estimation and his time of death which is around two hours prior to the body pronounced to being dead.

Q    Okay.  So do you have any --

A    He thinks it's relevant.  He thinks it's relevant. I don't.

Q    But it's not true that the deputy coroner detected moderate rigor mortis at the scene, right?

A    That -- that maybe an error that I made for my rebuttal response, but if so, I do make errors, and I am sorry about it.  But I knew that the autopsy surgeon had reported it, and the autopsy surgeon gets his information from the preliminary information and also direct observation, but three days later, on the 13th.

Q    So when -- Dr. Walter was the autopsy surgeon, right?  Dr. Walter was the autopsy surgeon?

A    Yes.

Q    Okay.  And his report says in his external examination section of his report, he says there is moderate rigor mortis and mild-to-moderate predominantly posterior

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 99 of 163
Volume 1                        Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                  Ralph Diaz, et al.

liver mortis.

That is what he found at the time of his examination, right?

A   Yes.

Q   That is not based on what the deputy coroner found at the scene, right?

A   Correct.

Q   Do you have any history or experience with Dr. Omalu?

A   Yes.

Q   What is that?

A   He has been the defense's expert witness of forensic pathology on a few of my cases including an infant strangulation case.

Q   When you say he was a defense expert, is this a criminal matter?

A   Yes.

Q   So Dr. Omalu was retained on behalf of the accused in those cases?

A   Yes.

Q   I get a little confused, Dr. Carpenter, because civil cases we have plaintiff and defendant.  And the defendant in the criminal case is the accused, right?

A   Yes.  And I am going to get confused too because my experience is criminal cases.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 100 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

Q   Okay.  I will try not to confused you.

You wrote in your rebuttal report that you disagreed.
You said that Dr. Omalu's reliance on the Ramsfelder study
of 2012 and the Smith study of 2012 was overstated as
applied to the scene.  Do you remember saying that?

A   Yes.

Q   And you go on to say that this case is different
than the circumstances in those studies because those
studies use thin films and small pools on standardized
indoor surfaces.  That's what you said, right?

A   Yes.

Q   And you said that's the case -- I'm sorry.  The cell
in this case contained large saturated towels and a
mattress.  Do you think Dr. Omalu is referring to any pools
that could be found in a towel or a mattress?

A   No.

Q   Dr. Omalu is relying on the Ramsfelder and Smith
studies for pools that are found on a hard surface such as a
floor, right?

A   Probably.

Q   And there were -- according to your report, there
were substantial pools of blood on the concrete floor in
this case, right?

A   Yes.

Q   So what is it about the mattress -- the

blood-saturated towel and the blood-saturated mattress -- what is the connection to the studies of the drawings of pools of blood.  Why do you bring those two subjects in?

A   I don't have a good reason.  I point out that I have never been an expert of at-scene, but at the same time, I have no information of which pools of blood, which areas of splatter, or how large the blood pools were, that were used in the assessment of time of death from the blood.

So my best answer to you is I am skeptical, but I have no expertise in the area.  I have looked at the reports, and it didn't -- I don't have the ability.  I am not competent to criticize Dr. Omalu in this area.  I have no experience at the scene.  I am competent to be reasonably skeptical about whether the blood information helps in determining the time of death.

Q   Okay.

A   It may be the most helpful of all the assertions, but I just don't have the ability to properly criticize Dr. Omalu.  I can raise questions as -- I can admit that I don't understand, and this is why I don't understand.

Q   Have you, in past cases where Dr. Omalu is on the opposite side from you, have you in those cases been able to criticize those conclusions?

A   No.  I have -- he has been on the opposite side. There has been no need to criticize the conclusions because

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 102 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

we never went to court against each other.

Q    Okay.

A    He came in, and he looked at the evidence that I had gathered that the child had indeed been strangled.  I had a microscope slide that proved it.  He didn't question it, and it never went to trial.  He was a studious professional who came to the office and cordial.

You asked if I ever had him on the opposing side.  That was the -- probably the only example that I could probably point to.

Q    Okay.  So you never had to testify contrary to his opinion?

A    No.

Q    Okay.  You say in your report that Mr. Osuna actively manipulated the body, dipped writing materials in blood and decorated the cell across many hours.  Do remember writing that?

A    Yes.

Q    What is the source of that information?

ATTORNEY DARLING:  Wait a second.  Argumentative. Asked and answered as to the documents he reviewed. Argumentative as to tone, but you can answer.

ATTORNEY STOCKER:  The tone, did you say, counsel? Tone, did you say counsel?

ATTORNEY DARLING:  Yes.  Argumentative.  As worded

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 103 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

it was argumentative, and I am not instructing him not to answer.

BY ATTORNEY STOCKER:

**Q   Okay.  What was the source of that information, Doctor?**

A   The at-scene photographs and supported by Dr. Omalu's excellent description of the scene, a long, detailed description of the scene.  But my primary is looking at the scene itself and the photographs with the body and the head and the signs and stuff that Dr. Omalu's description is valuable in that it goes into great detail exactly as the scene was described in previous reports.  I relied on photographs that I saw myself of the scene.

**Q   Did you -- I'm sorry.  Are you done with your answer?  I did not mean to interrupt.**

A   I'm done.

**Q   You saw photographs of the scene, correct?**

A   Yes.

**Q   And you saw writings on the wall of the cell, correct?**

A   Yes.

**Q   Do you know what those writings were written -- what the material those writings were written with?**

A   Blood is one -- one material.

**Q   Do you know whether those writings on the walls**

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 104 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

preceded the attack on Mr. Romero?

A    No.  And I don't know for sure whose blood it is.

Q    Dr. Carpenter, you just anticipated my next question.  Thank you very much.

Have you seen any evidence to indicate that those writings were placed on the wall before the incident?

A    No.  I am not an expert at seeing evidence or information.  It is not even my jurisdiction as a pathologist at Kern County or previously at LA County.

Q    Have you had any conversations with Mr. Brabant, the deputy coroner, about this case?

A    No.

Q    You indicated in your rebuttal report that you reviewed the transcripts of the Osuna interviews after you wrote your first report.  Can you explain to me why you felt it was necessary to review those interviews for your rebuttal report?

A    Yes.

Q    Please explain.

A    I was required to review all the pertinent materials prior to my report, which I did.  Then I wrote my report based on the autopsy and the photographs.

As is my practice, I did not rely on the preliminary information, nor on whatever Osuna may or may not have said.

Then after I finished writing my report based on the

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 105 of 163

Volume 1                    Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                              Ralph Diaz, et al.

autopsy and photographs, I was asked to go back and read what Osuna said and then to try to correlate what I found as fact from those -- from the autopsy and photographs and see whether my findings were consistent with what Osuna is reported to have said in the two interviews, and I found no inconsistencies.

Q   Do you have an opinion as to whether Mr. Osuna is a reliable historian as to what happened in the cell?

A   No.  I am skeptical, and I am always skeptical.  I never base any opinion on what suspects say.  And in 37 years, I have never been asked to.  But in this case, it is a mystery of how the killing occurred, and I agree that it is important in this case to listen to what Osuna has said. And I point out also that I am not qualified to determine on whether what he said is reliable information or not. Another reason I am not going to support my opinion on what he says.

Q   Okay.  Thank you very much.  You are aware that Mr. Osuna removed body parts from Mr. Romero's body that have never been found?

A   Yes.  Vaguely aware of that.  The second finger on the left-hand has not been recovered.

Q   And an ear, right?

A   And the ear, correct.  Thanks for the reminder.

Q   Do you have any training in psychiatry?

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 106 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

A   Well, I was honors in medical school, but about is the extent of it -- in psychiatry that was the only course I cared enough about to get an A.  But no other real training except for a five year seminar in Western and Eastern philosophy and psychology, but I don't consider that as qualifying me to have an opinion.

Q   Okay.

A   It just qualifies me to be passionate about the field.

Q   Okay.

A   And I respect -- we had forensic psychiatrists in Los Angeles who helped us with suicide determinations all the time.  We had conferences very frequently with the psychiatry department, but that does not make me qualified. I am not qualified.

Q   Okay.  Thank you for that, Dr. Carpenter.  Is your computer all plugged in now?

A   Yes.  It is.  Thanks for asking.

Q   Okay.  I don't want you to get shorted out or whatever would happen.

A   Me neither.

Q   Okay.  Thank you very much.  Did you read any medical records that relate to Mr. Osuna's mental health diagnoses?

A   No.

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 107 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

Q   Do know anything about what his mental health status was in March of 2019?

A   Minimal, except that he seems to say in the interview, as reported in the interviews, that he really wanted to get back on his own medication schedule, and he felt very uncomfortable and kept asking over and over and over for people to give him proper medications, et cetera. And that had not occurred, and he could feel the dark stranger, so to speak, welling up within him and before he had been on medications that kept the phenomena away, and he felt much better.  That's all I know.  I did not see any, nor did there seem to be any available, any psychiatric examination report.

Q   Okay.  Do you have an opinion as to whether or not the actions of Mr. Osuna as it relates to the attack on Mr. Romero is that of a normal person?

ATTORNEY DARLING:  Objection.  Vague is awarded. Relevance.  You can answer.

THE WITNESS:  Yes.  I have an opinion, but it is not an expert opinion.  And my opinion is he is not normal. He is a remarkably, bizarrely, disturbed individual.

BY ATTORNEY STOCKER:

Q   Okay.  You have not had any conversations with Mr. Osuna, have you?

A   No.

Q    Okay.  Okay.  Do you intend to do anymore work on this case before it goes to trial, if ever?

A    No.

Q    The Smith report on the blood pooling, did you read that abstract or the report?

A    Yes.

Q    Do you recall what the surfaces were that they tested the blood pooling or the drawing of the blood pooling on?

A    No.  Not really.  I realized it was over my head.

Q    Okay.  Have you had any communication with Ms. Erin Parker in this case?

A    No.  I don't know who that is.

ATTORNEY STOCKER:  Okay.  If you give me a minute, if we can go off the record.  I will check my notes, and I may be done.  Can we go off the record?

THE COURT REPORTER:  Off the record at 2:19 p.m.

(Recess taken.)

THE COURT REPORTER:  On the record at 2:24 p.m.

ATTORNEY STOCKER:  Dr. Carpenter, I have no further questions for you.  Thank you for your time.

THE WITNESS:  You're welcome.

EXAMINATION

BY ATTORNEY DARLING:

Q    I just have a few questions, Dr. Carpenter, to

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 109 of 163
Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

**clarify.  First off, can you just define what postmortem versus perimortem?**

A   Yes.  Postmortem is when it is clear and obvious that the wound has no signs of bleeding.  Skin wounds, like abrasions, will be pale and yellow rather than red if they are outside of areas of red lividity.

Perimortem means that we cannot tell whether the body is almost dead or the heart just finished or stopped beating.  Antemortem is where it is clear that the heart is still beating and of there must be some blood pressure left in the system or tissues necessary for bleeding to occur at the edges of the wounds.

**Q   Okay.  Also the distinction here is consciousness and also the ability to perceive pain.  Is it fair to say that one can be unconscious, but we cannot rule out that an unconscious person cannot experience any pain?**

A   I can't.

**Q   And why is that?**

A   The anesthesiology because of the muscle relaxers necessary so that the abdomen and other body parts are operable, has experience that when patients seem to be unconscious, they may appear to be unconscious because of muscle relaxants, not because they are actually clearly unconscious.  There have been cases where patients report still being conscious after they report appear to be

unconscious.

So anesthesiology raises the question of whether people are conscious or unconscious, whether they appear so or not. As a precaution and only as a precaution, anesthesia is given, but also analgesia, or pain relievers, are given in anesthesia cases.

I think it is fair to say that probably when the person is unconscious that there is soon a time when they are not feeling pain, but as it has been pointing out by our profession, forensic pathology, pain is subjective.  It is not objective.

So we have to find out from people who have experienced traumatic injuries, who have experienced being unconscious by head trauma, and who have experienced during anesthesiology.  They have to be interviewed and asking them because it is a subjective experience, not objective.

(Whereupon, we enter into the

Confidential -- Attorney's Eyes Only

Portion of EUGENE CARPENTER'S deposition

transcript.)

(Nonconfidential transcript

beginning at Page 120 as follows:)

THE WITNESS:  It seems the description consistent with reality in that a stab wound to the eye is seen by all of us as having a high probability of being extremely painful.  The eye tissue and the inner ear -- the ear canal tissues are the most sensitive and most pain susceptible parts of tissues of the human body.

So yes, that description can be substantiated by our experience interviewing patients who have received such injuries.

BY ATTORNEY DARLING:

**Q   And then generally, because of the lack of other evidence, is it fair to say that you cannot rule out Osuna's description of his killing of Romero when applying that to the forensic evidence that you reviewed?**

ATTORNEY KUCHINSKY:  I think that's asked and answered and leading, but go ahead.

ATTORNEY DARLING:  In terms of asked and answered, you can ask -- in terms of my own deposition, I can ask.

ATTORNEY KUCHINSKY:  Well, you asked it already and then asked it again, but go ahead.

THE WITNESS:  The autopsy and the photographs after a very careful assessment and review are available as a fact.  When asked to go outside of my usual practice because

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 112 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

of the simplicity of most criminal court cases, to open my

mind to what the killer has said, how he killed the body, I

do that and I can see that in the description of how the

body was killed is consistent with the findings of the

autopsy and of the photographs and explains -- or allows one

to explain why there are no defense wounds.

So it goes together.  I look for inconsistencies.
I am limited, but I see no inconsistencies with the
information brought forward from the interviews.  According
to the interview people of what he has allegedly told them.

BY ATTORNEY DARLING:

**Q   Okay.  Regarding your rebuttal report as to Dr.
Omalu, you testified earlier about disagreeing versus you
don't concur.  So I just want to get clear on these terms
here.**

**So is it fair to say that -- or actually, what do you
mean when you say you don't concur with Dr. Omalu's
findings?**

A   Thirty-six years of experience, 23 years where liver

temperature was taken in all of our cases at LA County.  And

knowing with liver temperature and knowing that the signs of

liver mortise are worthless.  The signs of rigor mortis are

nearly worthless, and the only thing that helps in trying to

get a time of death estimation is temperature of the body,

and we don't have temperature of the body in this case, I

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 113 of 163
Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

don't believe it can be done.

The body died anytime between the last time it was known to be alive and within about two hours of the time the body was pronounced dead.  To narrow it down, from my perspective, it is impossible.  And the blood evidence that is used to help determine a rather precise time of death, which I don't believe, the blood evidence is outside my ability to judge.  Except by reviewing the papers cited, I don't understand how Dr. Omalu can use that in helping to determine the time of death which is not even supported by liver mortise and not supported by rigor mortis.  Both of those being basically no value in determining the time of death.

**Q   Okay.  And as for Dr. Pitruszka, the statement that it was a matter of seconds between potentially carotid compression and unconsciousness, about ten seconds, but then you testified earlier about -- you know, what you were saying with being stabbed in the eye, and then in the time period that we don't know between the initial attack and unconsciousness.**

**So can you just kind of clarify for me why it would be potentially speculative to -- to limit the time between the initial attack and unconsciousness to a matter of seconds?**

A   Yes.  Neither Dr. Pitruszka nor myself understand what deprived the brain of its necessary blood supply.  If

we, as traditionally practice, confine ourselves and limit ourselves to autopsy reports and photographs, not taking into account what the killers say and how they killed, for each of us, it is a mystery as to what caused a sudden lack of blood to the brain.

Whatever that mechanism is, whether it is a hypothetical, pressure on both carotid arteries at the same time, or the stab wound damaged to at least one carotid artery.  It is only when the brain is in some way deprived of blood supply and deprived of it suddenly that consciousness would be lost.

In general, speaking in a textbook statistical manner, within 10 to 30 seconds, and death within a statistical period, two to five minutes.  Neither of us knows how long the interval was between the onset of the attack when the decedent was conscious and when the brain was deprived by some manner of blood.

**Q   Okay.  And is there anything -- the fact that there are no neck compression marks, or liver marks or potential marks on the skin, does that factor at all into an estimate nature of time of consciousness?**

A   Yes.  The soft ligature used at the wrist or the ankles or around the throat and neck, by definition, a soft ligature does not leave a mark.  And so one sees a mark around the neck, the wrist or the ankles, that is a hard

ligature, whether it is cloth, rope or sheet or whatever it might be.

So there is no evidence of any ligature marks and because part of the question is, could the hands have been tied together prior to the initial attack for the left eye for example, which limited the ability of the decedents to defend.

That is a real question because the dolls found at the scene, one had their hands tied and the other had the head gone.  And in this bizarre type of unique case, one wonders.  However, from the perspective of the autopsy or photographs, no ligature marks are seen.

**Q   Okay.  Another topic here, we can all agree that Osuna is not a normal guy.  What opinion, if any, do you have of relying on a killer's own description of how he killed as far as its reliability, even assuming that killer is, you know -- we might say weird or crazy or anything else?**

A   This is the type of very good question that can be asked to and answered by a specialist in the field.  It is very probable that part of the information has high reliability.  Such as, how did you kill your -- this acquaintance of yours?  How did you kill them?  The description of how the person was killed might be seen as being very reliable as substantiated by interviews, by

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 116 of 163

Volume 1                        Non-Confidential                        Dora Solares vs.
Eugene Carpenter                                                        Ralph Diaz, et al.

professionals and officers at the prison, and in the legal

system, in general.  That however, is not to be determined

by me.  But I can say that a professional could interview

and review all the previous informational documents that I

have seen and tell you what the experience is as to what

might be reliable information from such an individual.

And that is important because one, we must open -- we

must take in all information and determine how reliable that

information is from these sources.  And then admit that as

factual material to be considered in further understanding

what happened.

**Q    Thank you.  Another topic just about the pools of**

**blood.  You reviewed photographs of the scene.  So you saw**

**the amount of blood on the bed, on the floor.**

**Does that itself, just having observed the amount of**

**blood, lead you personally to believe that that amount of**

**blood would not evaporate in a few hours?**

A    Of course.  It may have varying times of drying, but

my best answer is, I don't know.  My other part of my answer

is it is not clear as to how Dr. Omalu has evaluated the

scene and the blood to pool, and the tool that was used and

how he comes to his conclusion.

So I respect is defendant opinion, and he will defend

it.  But I admit that I just don't understand how it fits

and there's just no much more than not I don't know the

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 117 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

details of how he came to his conclusion.  He is the one that seems to be experienced in that area, not me.

**Q    Okay.  You have been in this field for over 35 years.  Have you ever seen a killing as brutal as this?**

A    No.

**Q    Okay.  The facts that you have not seen a killing as brutal as this, do you think that precludes you from having opinions about that, or is it fair to say that you just have never seen something as grisly?**

A    I have never seen something as brutal.  But all of my opinions have to be backed up by reason that other intelligent unqualified people can see is reasonable. Authority is the weakest form and argument, and my authority -- I could have worked a hundred years, but it will not help.  My experience lets me know what is important and what is not as important.  But when it comes right down to it, in any argument, I have to explain my reasoning process.  So it bears a chance that others in the argument can accept it as a being reasonable, and then I listen carefully to them. And I either say that I am skeptical, or I don't understand, or I accept their argument.  Not based on authority or credentials or professorships or anything like that.  It is all a matter of communication and using reason as essential.

ATTORNEY DARLING:  Thank you.  No further questions.

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 118 of 163

Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

FURTHER EXAMINATION

BY ATTORNEY KUCHINSKY:

Q    I have a couple of follow-up questions based on what Mr. Darling asked you.

Dr. Carpenter, when Mr. Darling asked you about a distinction between being unconscious and still being able to proceed is there a medical distinction between unconscious and the ability to perceive.  Can someone still be unconscious and still perceive?

ATTORNEY DARLING:  Objection.  Vague as to perceive versus pain, but you can if you understand.

BY ATTORNEY KUCHINSKY:

Q    You can answer, Doctor.

A    Yes.  There is a reason for discussion for the evaluation of someone who appears to be unconscious and whether they are actually unconscious or whether they just can't move because of muscle paralysis or chronic disease like paraplegia.

So the thing that comes up in anesthesiology is they look like they are unconscious, but then they report that they weren't.  And a few reported that they were actually having pain.  And a few report I don't know how relevant it is to this case here.

Q    Well, let me ask you this, Doctor.  The question is someone who is unconscious.  Not someone who appears

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 119 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

unconscious because they are under anesthesia or have some disease, but someone who is unconscious.  Can that person experience pain, from a medical perspective?

A   Probably not.  And Dr. Pitruszka's stand reasoning practices are standard, good, reasoning processes.

Q   That's not what I'm acting, Doctor.  You said someone that is unconscious that can still perceive, and then you gave an example of someone that is not actually unconscious, but just appeared unconscious.  So I want to make sure I understand the distinction here.  Is someone who is medically unconscious able to perceive pain?

A   Probably not.

Q   Are you qualified to determine that or do you not have a background and experience to say whether someone who is unconscious can experience pain?

ATTORNEY DARLING:  No.  Just objection.  Misstates testimony about subjective pain versus studies.  You can explain.  You can answer.

THE WITNESS:  As a forensic pathologist, I do what Dr. Pitruszka does and other forensic pathologists.  I rely on the experience and statistical information and clinical information as reported to us and then as a group, rely on mainstream, peer-reviewed articles and textbooks.  We relay the information that the field of forensic pathology has deemed standard.  And it is standard to agree that after a

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 120 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

true loss of consciousness, that there is a certain amount of times, seconds to minutes, before the brain is no longer able to feel any pain.

It is also true that I am not an expert in determining whether or not or how long it takes before the brain stops perceiving pain, nor do I know that others in my field are, and I point out that pain is subjective.  And we depend on people surviving severe injuries surviving unconscious and then telling us whether they felt pain or not.

So my ability, like anybody else in the field, is limited.

BY ATTORNEY KUCHINSKY:

**Q   When you said that when the neck was but, the carotid artery was severed or punctured, that 10 to 30 seconds of loss of consciousness was not actual loss of consciousness, or do you think it was 10 to 30 seconds and then Romero just appeared to be unconscious?**

A   It would be actual loss of consciousness.  As agreed upon by the body of the forensic pathologist who shared information and within the mainstream texts and articles with associations.  That is the statistical conclusion that is used and suggested to be the standard answer that all of us will give.

**Q   Is there a standard definition in the medical field**

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 121 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

to the term unconscious?

A    That is -- I don't know.

Q    Okay.  You said that there is a body of literature that establishes that the brain can still perceive pain for seconds up to minutes after the person is unconscious.  What literature did you rely on to state that?

A    I don't know.  That is what I got from my understanding of Dr. Pitruszka's opinion.

Q    Okay.  And where in Dr. Pitruszka's opinion does it state that after unconsciousness the brain can still experience pain for a minute -- for seconds up to minutes plural?

ATTORNEY DARLING:  Objection.  Misstates the testimony.  You can answer.

BY ATTORNEY KUCHINSKY:

Q    I don't understand the objection.  But go ahead, Doctor.

A    The first statement that is with in ten seconds -- within ten seconds after the brain is deprived by whatever mechanism of its blood supply, he states that within ten seconds, there is loss of consciousness.  Then he states that the parts of the brain that perceive pain after seconds to minutes stop perceiving pain.

So that is as much as I can understand and accept.  So he would have to sort that out for us.

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 122 of 163

Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

Q   Okay.

A   It's ten seconds, and then he mentions after -- it says ten seconds and then he mentions that to the brain is unable to perceive pain from seconds to minutes.  So it's an area that I don't have any ability to relay any information except that is relayed by mainstream pathology, and I would ask him to clarify thoughts for us.

**Q   Okay.  So the literature that forms the basis of what you just said, that there are seconds to minutes of unconsciousness that the brain can still perceive pain that is Dr. Pitruszka's report; is that right?**

A   It seems to be what he is saying to me I do not know if that is what he intended to say.

**Q   I guess I'm trying to understand if someone is medically unconscious you said there brain can still perceive pain for seconds to minutes, which is a large span of time.  That could be one second.  That could be five minutes, right?  So what is that statement based on other than your interpretation of what Dr. Pitruszka's conclusion was?**

A   Nothing.

**Q   Okay.  And then I had a question.  You talk about soft versus hard ligatures and gave example of hard ligatures.  What would a soft literature consist of?  What would that be?**

A    The classic is a bedsheet in a jail cell with a suicide hanging, which is a gentle process that does not cause much damage.

**Q    The hanging -- the hanging of a bedsheet is a gentle process?**

A    Yes.  Is a gently lower themselves into it until they feel that they are going to be unconscious.  They might stop and then they lower themselves again and I may just pass out.  It is not a violent process in general.

**Q    I see.**

A    That is the best example, and it does not leave much other than a little redness which we call a ligature mark.

**Q    Do you have any evidence at all that any ligatures were used during this incident?**

A    Yes.

**Q    What is that evidence?**

A    It is vague and hard to understand.

**Q    My question about what evidence that ligatures used is vague?**

A    No.  Your question is really good.

**Q    Okay.  Okay.**

A    The evidence is vague and hard to interpret.  There is blue cloth in one of the photographs at the stump of the neck.  There is twine and blue cloth remnants photographed in the autopsy photographs.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 124 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

Q   Are there any other corresponding markers on the body of Romero -- obviously, the neck is very damaged, but are there any other markings on the body of Romero that would indicate that the straps of those materials were used to tie him up?

A   No.

Q   Okay.  Do you have any evidence that Romero's hands were tied before he was attacked?

A   No.  I just point out again, that one of the dolls had its hand tied, and it was a ritual like killing.

Q   Okay.  And do you have any background in forensic psychology or looking into the motivation behind a someone does what they do?  Do you have any sort of scientific background in that?

A   Only the frequent collaboration is a group of forensic pathologists with forensic psychologist at USC Medical Center in order to try to determine whether a case of death is a suicide versus an accident, like Freddie Prinze, shot right through the head, clearly a suicide. Turns out it was an accident, and we were able to show that it was an accident.  So that, only that.  So more than most forensic pathologists, but not enough to qualify me other than help guide people through the process.

Q   And so any significance of the positioning of dolls, you have no scientific basis to say that that was reflected

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 125 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

or that did reflect how that killed Romero?  That's just your own speculation?

A   No.  I am only qualified to ask the questions, but I am not qualified to interpret the evidence.

Q   So is there any significance from a forensic pathologist perspective that the dolls appeared to have their hands tied?

A   Yes.

Q   Okay.  Can you just -- how is that significant to the death of Romero --

A   It could --

Q   -- from a forensic pathologist perspective?

A   It could help one explain why there are no defense wounds.  Is a tiny sharp bladed weapon to easily kill someone unless you stab them in the back of the neck.  And then there are no defensive wounds.

So if the body was restrained at the legs, the hands, or both, or tied up to the bed at some time, that is a significant question.  The doll -- one of the dolls had the head chopped off.  The other doll had the hands tied behind their back.

So that is exactly what we forensic pathologists are looking for to help us explain why there are no defense forms.  There are several classic reasons; confinement in a small area, maybe sleeping and surprised, maybe the hands

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 126 of 163

Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

and feet were tied or just the hands, sudden attack, sudden attack with traumatic shock and horror, just overtaking the person so that the rest of the killing process could occur. So it is very significant of the hands were tied with a soft ligature which does not really leave a mark.  And --

Q   Go ahead.

A   One other thing if you sit on someone and they are under the sheets and blankets and you sit on them, that is confining.  That will also restrict their ability to defend themselves.

Q   Do you have any evidence that Romero would have consented to having his hands tied before he began to be stabbed or something?  How would he have tied his hands together consensually like that?

A   No.  That would just get into this unbelievable clever scenario that I can't relate to, but the answer is no.

Q   Okay.  If someone's hands were tied together, even with a soft ligature such as a sheet, and they were stabbed through the eyeball, would you expect there to be corresponding marks even from that soft ligature when they react to that shock?

A   It can't be.  Soft ligature is defined as leaving no marks.

Q   Okay.

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 127 of 163

Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

A   As soon as it leaves marks that's, by definition, hard ligature, even if it is soft material.

**Q   So a sheet would not leave those marks?**

A   No.  It wouldn't leave -- if it leaves marks, it's not soft ligature.

**Q   Okay.  Just so I am clear, there is no evidence from the scene that when Romero's body was found, his hands were tied, right?**

A   Correct.  No ligature marks, in other words.

**Q   Did you see any sheets that were twisted up to be used as a ligature in the photos at the scene?**

ATTORNEY DARLING:  Objection as to -- argumentative as to -- and speculative as worded.  You can answer.

BY ATTORNEY KUCHINSKY:

**Q   I'm asking what you saw in the photographs?  Did you see any sheets that were rolled up first about?**

A   No, not specifically.  Although, in the information that I reviewed briefly, but mainly in Dr. Omalu's report, it is described as strips of cloth being present at the scene.

ATTORNEY KUCHINSKY:  Okay.  I have nothing further thank you.

THE COURT REPORTER:  Ms Stockton, do you have any further questions?

ATTORNEY STOCKER:  No.  Thank you very much,

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 128 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

Doctor.

THE COURT REPORTER:  And Ms. Stocker, would you like a copy of the transcript?

ATTORNEY STOCKER:  No, thank you.

THE COURT REPORTER:  Okay.  And Mr. Darling?

ATTORNEY DARLING:  Well, he has to review it.  Doesn't he?

THE COURT REPORTER:  Yes.  And Dr. Carpenter, can I have your e-mail address?

THE WITNESS:  Yes.  You may.  But I am willing to waive --

ATTORNEY DARLING:  No, no.  Doctor, you need to review it.

THE COURT REPORTER:  We can go off the record.

ATTORNEY KUCHINSKY:  Well, can we stay on the record because of the protective order in this case, much of the details of what was discussed may be confidential.  So the defense reserves the right under the protective order to identify such sections of this deposition which should be designated as Confidential or Attorneys Eyes Only and to return that to the court reporter.

And so we will do that, I think we will do that within 30 days, but I will double check that.

ATTORNEY STOCKER:  I think you need to ask for a rough.

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 129 of 163

Volume 1                         Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                     Ralph Diaz, et al.

ATTORNEY KUCHINSKY:  Right.  Before it goes to the deponent, right?

ATTORNEY DARLING:  No.  Actually --

ATTORNEY KUCHINSKY:  Sorry -- 21 days, excuse me.

ATTORNEY DARLING:  David, I just don't know that -- does that -- does checking -- that does not preclude sending it to the deponent, right?  I thought it was finalized.

ATTORNEY KUCHINSKY:  I know he is bound by the protective order with signed an acknowledgment.  We just need to review to determine if there's any portions that need to be marked confidential.

ATTORNEY STOCKER:  Of course, like, every other Depo.

ATTORNEY KUCHINSKY:  Just that the protective order gives us 21 days to do that, but I don't need that to interfere with your view.

THE COURT REPORTER:  Okay.  So Mr. Darling, do you want to copy of the transcript?

ATTORNEY DARLING:  Not right now.  He can review it, and then we will decide.

THE COURT REPORTER:  Okay.  He'll review it, and I think that the production team will send it under, like, a locked version for him to review.  And so if you want to copy to purchase, they can send it to you separately.

ATTORNEY DARLING:  We will do it after.

THE COURT REPORTER:  Okay.  And then off the record at 3:01 p.m.

(The deposition concluded at 3:01 p.m.)

Case 1:20-cv-00323-LHR-FJS     Document 295     Filed 08/04/26     Page 131 of 163
Volume 1                                    Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                      Ralph Diaz, et al.

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 19th day of June, 2026.

_____

Kathleen Madden Keenaghan

CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 132 of 163

Volume 1                          Non-Confidential              Dora Solares vs.
Eugene Carpenter                                                Ralph Diaz, et al.

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Dora Solares
        vs. Ralph Diaz, et al.
Date of Deposition: 05/28/2026

Job No.: 10191786


        I, EUGENE CARPENTER, hereby certify

under penalty of perjury under the laws of the State of

_____ that the foregoing is true and correct.

        Executed this _____ day of

_____, 2026, at _____.




                    _____

                    EUGENE CARPENTER


NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on

this _____ day of _____, 20__,

by_____,    proved to me on the

basis of satisfactory evidence to be the person

who appeared before me.

Signature: _____ (Seal)

DEPOSITION ERRATA SHEET
Case Name: Dora Solares
        vs. Ralph Diaz, et al.
Name of Witness: Eugene Carpenter
Date of Deposition: 05/28/2026
Job No.: 10191786
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____
EUGENE CARPENTER

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 135 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

## $

**$800** 7:19

## 1

**10** 13:6 31:19,24 33:3 35:14 37:7 38:13,25 39:12,22 40:2,4,10, 12,15,17,19 41:9 42:7,10,15 56:22 57:5 75:14,20 95:19 123:13 129:15,17

**10,000** 12:9,12 13:1

**100** 43:7,16

**101** 101:2

**103** 103:2

**11:04** 5:2,5

**12** 78:3

**120** 120:2

**12:15** 50:16,18

**12:25** 50:17

**12:44** 50:20

**13** 104:1

**13th** 9:17 106:19

**14577** 5:12

**156** 42:4

**18** 78:3

**180** 42:2

**1972** 11:21

**1973** 11:22

**1989** 11:4

**1:00** 77:12

**1:30** 81:8

**1:36** 81:10

**1:58** 104:21,22

## 2

**2.8** 77:4,10,17

**20** 13:1,3,6

**20-CV-00323-LHR-FRS** 5:7

**200** 13:4

**2012** 6:16 108:4

**2018** 76:8

**2019** 103:19 104:1 115:2

**2025** 15:12

**2026** 5:1,4 15:12 25:18 99:7

**21** 138:4,15

**220** 39:11

**23** 38:3 121:19

**27th** 25:18

**28** 5:1

**28th** 5:4

**2:19** 116:17

**2:24** 116:19

## 3

**30** 31:19,24 33:3 35:14 37:7 38:3,13, 25 39:12,22 40:2,4, 10,12,15,17,19 41:9 42:7,10,16,20 43:24 56:22 57:5 75:14,20 95:19 123:13 129:15,17 137:23

**35** 35:2 126:3

**36** 24:16 77:23

**37** 17:7 20:13,24 21:2 28:2,14,16 113:10

**3:01** 139:2,3

## 4

**40** 13:2

**44-year-old** 27:8

**4:00** 77:11

## 5

**5-foot** 42:4

**5-inch** 46:15 47:13 59:23 96:25

**50** 13:5

## 6

**600** 10:24

**65** 65:2

**68** 42:2

**69** 69:2

## 7

**7** 42:4

**70** 41:4 43:6,8,9,10

**75** 43:6

**7:00** 77:12

**7:30** 76:7 103:20

**7:35** 76:12

## 8

**84** 84:2

**88** 88:2

**8th** 25:20 99:7

## 9

**90** 43:16 90:2

**94** 94:2

**9:45** 104:2

**9th** 76:8 103:19

## A

**a.m.** 5:2,5 76:7 103:20 104:2

**abdomen** 46:15 47:11 57:21 59:24 60:7,20 117:20

**ability** 69:6 72:20 77:22 79:24 80:2,10, 22 91:2 97:21,23 109:11,18 117:14 122:8 124:6 127:8 129:11 131:5 135:9

**able** 9:6 17:11 32:11, 15 33:5,14 40:11,14 42:25 45:11 47:23 50:4 52:3 53:18 55:22,25 62:16,24 70:17 71:14 75:10, 22 76:19 77:25 79:4 85:9,22,23 88:16 90:6 91:5 98:18 109:22 127:6 128:11 129:3 133:20

**abrasion** 59:2

**abrasions** 27:6 47:10,13,16,18 48:4, 13,14 49:23 50:2,4,5 52:20 97:3 117:5

**Absolutely** 19:18

**abstract** 116:5

**abundant** 51:24

**abuse** 13:6

**accept** 126:18,21 130:24

**accident** 50:1 133:18, 20,21

**accidents** 14:12

**account** 123:3

**accurate** 23:10 51:15 52:1

**accused** 107:18,23

**acknowledgment** 138:9

**acquaintance** 124:23

**acting** 128:6

**actions** 115:15

**active** 85:22

**actively** 110:15

**activity** 88:13 90:13, 18,25 91:1,8,12

**actual** 24:1 71:13 129:16,19

**added** 21:11 74:23

**addition** 12:11

**additional** 21:10 25:21,23

**address** 16:5,10 17:5 137:9

**administer** 5:24

**admit** 86:5 109:19 125:9,24

**adult** 31:13

**advances** 78:13

**affairs** 23:4,6

**affect** 69:6

**afflicted** 57:5

**afternoon** 50:22 98:15,20

**ago** 6:17 8:11 78:3,4

**agree** 32:7 38:17 39:16,22 80:7,9 103:18 113:12 124:13 128:25

**agreed** 7:18,22 38:10 39:2 129:19

**ahead** 15:23 16:22 36:12 58:15 74:23 75:6,13 88:18 104:19 120:18,22 130:16 135:6

**airway** 54:21 55:1,16, 18

**airways** 14:8

**Alcatraz** 94:16

**alive** 55:5,6,15,19 56:15 59:7 78:2,5,8 81:21 122:3

**allegedly** 121:10

**allow** 29:14,21 35:5 40:21 66:9 67:10 69:14 73:9

**allowed** 31:3 33:1,12

**allowing** 26:25 73:4

**allows** 32:10,18 121:5

**Alright** 98:8

**altercation** 32:18

**altogether** 60:14

**amount** 17:2 41:2 84:23 125:14,15,16 129:1

**amounted** 12:25

**amounts** 40:1

**analgesia** 118:5

**analysis** 25:23

**anatomic** 11:12,14

**and/or** 10:5 57:19

**anesthesia** 118:4,6 128:1

**anesthesiology** 117:19 118:2,15 127:19

**Angeles** 11:4,8 14:20 80:17 114:12

**ankles** 123:23,25

**answer** 9:3,7 16:19 18:4 19:17 21:19,21 25:7 26:5,9 28:22 30:25 36:10 37:17 39:3,14,20,23 40:11, 14 42:25 45:14,16 47:3 49:10 55:12 58:13 63:3 65:8,10 72:10,24 73:1,21 77:19 91:16,18 95:23 97:25 103:15 105:14 109:9 110:22 111:2,15 115:18 125:19 127:13 128:18 129:23 130:14 135:16 136:13

**answered** 16:21 28:6 29:4 45:13 47:1 55:9 63:2 72:24 110:21 120:18,19 124:20

**answers** 51:2

**antemortem** 48:22,23 49:1,3 51:6,10,14,24 52:4,7,9,17,25 53:3 58:17 59:1 85:10 117:9

**anticipate** 8:20

**anticipated** 112:3

**anybody** 129:11

**anybody's** 66:4

**anymore** 10:15 116:1

**anyone's** 32:19 66:3

**anytime** 122:2

**apart** 52:11

**apologies** 79:14

**apologize** 59:11

**apparent** 94:4

**apparently** 38:4

**appear** 49:14 117:22, 25 118:3

**appearance** 49:24

**appearances** 5:12

**appeared** 128:9 129:18 134:6

**appearing** 5:8

**appears** 51:19 127:15,25

**applicable** 39:23

**application** 5:8

**applied** 108:5

**applies** 41:6

**applying** 120:15

**appreciate** 25:9 98:11

**approve** 10:17

**approximately** 12:9 95:19 104:2

**area** 7:3 16:4 17:7 37:25 38:4 46:9 47:7,8 53:3 55:18 60:10 61:20,21,23

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 137 of 163
Volume 1                                  Non-Confidential                        Dora Solares vs.
Eugene Carpenter                                                                  Ralph Diaz, et al.

62:3 67:5,6 71:8 72:12 74:10 80:23 81:18 84:13 85:16, 23 109:10,12 126:2 131:5 134:25

**areas** 24:13 36:14 44:12,17 45:24 47:23 51:25 94:21 109:6 117:6

**argued** 48:24 52:15

**argument** 52:2 126:13,17,18,21

**argumentative** 21:18, 21 39:19 58:12 65:7 73:20 95:22 103:14 105:13 110:20,22,25 111:1 136:12

**arms** 33:14

**arrive** 41:13

**arteries** 32:6 38:25 40:2 57:17 123:7

**artery** 14:3,7 26:24 32:4 36:25 37:3 40:1,25 43:11,19 56:16,18,21 65:6 123:9 129:15

**articles** 128:23 129:21

**Arts** 12:2

**aside** 32:8 50:25 84:13,16

**asked** 15:17,19 16:4, 21 18:4 20:10 22:24 28:20 29:11 30:12 38:6 45:13 47:1 55:9 59:10 63:2 72:24 110:8,21 113:1,11 120:17,19,21,22,25 124:20 127:4,5

**asking** 9:3 19:11,14,

22,23 20:2 21:23 51:2 99:1 114:18 115:6 118:15 136:15

**asleep** 46:23

**aspirated** 54:15 57:10

**aspiration** 55:13

**assailant** 29:13,15,18 30:18 32:2,13 35:10 63:6

**assault** 75:1

**assertions** 109:17

**assessment** 109:8 120:24

**assignment** 54:6

**associations** 129:22

**assume** 22:16 44:9

**assuming** 18:12 53:2 124:16

**at-scene** 94:19 95:9 109:5 111:6

**attack** 26:19,20 27:13 31:22 32:10 33:10, 16 36:16 37:11,18, 22 39:19 40:6 46:10, 23,24 48:4 59:25 60:2 61:1 81:21,23 82:2,3,6 85:2,3 95:15 96:3,7 112:1 115:15 122:19,23 123:15 124:5 135:1, 2

**attacked** 26:20 42:20, 21 45:10 46:2 61:24 67:6 133:8

**attacker** 31:3,16 48:7 62:2 65:16 84:22 91:2

**attendees** 5:8

**attention** 21:4 26:21

**attorney** 5:13,14,15, 17,19,21 6:5 7:2,9, 12,18 10:6 15:16 16:9,21,24 19:8,16, 18,21 21:18,20,21, 22 24:24 26:4,6 30:5,24 31:1 36:1,7, 9,11 37:10,14 39:18, 21 45:13,15 47:1,2 49:2,6 50:10,15,16, 21 55:9,11 58:11,14 62:23 63:2,8 65:3,7, 9 69:4,22,25 70:2 71:5,6 72:8,9,22,25 73:19,25 74:3,7 79:12,13,14,16,17 80:24 81:5,11 84:7 88:3 90:7,12,15,18, 20,21 91:13,15 94:8 95:21,24 97:24 98:8, 14 101:3 103:3,14, 17 104:23 105:13,16 110:20,23,25 111:3 115:17,22 116:14, 20,24 120:12,17,19, 21 121:11 126:24 127:2,10,12 128:16 129:13 130:13,15 136:12,14,21,25 137:4,6,12,15,24 138:1,3,4,5,8,12,14, 19,25

**Attorney's** 33:18 63:11 67:21 82:8 86:12 88:20 92:8 99:9 101:7 118:18

**attorneys** 16:12 17:16 137:20

**authority** 126:13,21

**automobile** 50:1

**automobiles** 32:17

**attention** 21:4 26:21

**autopsies** 12:9,12 20:14

**autopsy** 9:22 15:19 17:9 18:11,19,21,25 19:3,4,5,24 20:3,5, 16 21:7 28:15,16 29:3,11 30:2,9,17 31:21 36:18 45:2 49:15 54:20 58:4 59:21 60:5 70:22 71:16 76:10 103:22, 25 104:15 105:22,23 106:16,17,20,21 112:22 113:1,3 120:23 121:5 123:2 124:11 132:25

**available** 14:2 28:16 115:12 120:24

**Avenue** 6:24

**average** 41:10 44:5 61:8,11

**averaging** 61:6

**awarded** 115:17

**aware** 99:1 113:18,21

**B**

**bachelor's** 11:25 12:1,4

**back** 6:16,21 7:22 10:9 16:13 25:21 29:17 32:2,11 33:10, 15 35:3,11,19 37:20, 24 38:3,12 44:13,18 47:16 48:18 50:17 54:9 60:1,13,19 62:2 65:15 66:3,4,23 67:15 71:25 72:5,11 73:12,13,16,20 75:16 78:9 85:1 90:16 91:3 92:5 96:8 113:1 115:5 134:15,

**Index: areas–back**

Case 1:20-cv-00323-LHR-FJS  Document 295  Filed 08/04/26  Page 138 of 163

Volume 1  Non-Confidential  Dora Solares vs.
Eugene Carpenter  Ralph Diaz, et al.

21

**backed** 126:11

**background** 25:10 128:14 133:11,14

**backs** 37:8

**base** 29:1 61:19 70:19,21 84:9 90:3 113:10

**based** 29:2,10 33:5 61:6 65:4 70:22 84:17 107:5 112:22, 25 126:21 127:3 131:18

**basic** 22:5 79:5

**basically** 13:14 20:18 28:5 35:17 54:1,7 79:6 122:12

**basing** 62:9 85:14

**basis** 30:10 85:9 96:22 105:21 131:8 133:25

**Bates** 19:10,11 20:2

**battery** 104:18

**Beach** 11:13,18,19

**bears** 126:18

**beat** 41:4 43:9

**beating** 43:15 53:8 54:12 117:8,10

**beats** 43:7,16

**bed** 47:15,17 125:14 134:18

**bedsheet** 132:1,4

**began** 135:12

**beginning** 5:13 15:10 35:2 46:10 59:25 65:2 69:2 81:21 84:2 88:2 90:2 94:2 98:22

101:2 103:2 104:1 120:2

**behalf** 5:20,22 107:18

**behavior** 41:22

**being's** 74:19

**believe** 7:11 23:20 33:9 36:3 41:17 56:3,6 57:9 58:24 70:20 74:1,14 85:12 88:4 91:7 122:1,7 125:16

**Bennett** 23:14

**Beret** 90:5

**best** 9:6 10:7 28:3 46:11 77:1,10,16,17 103:10 109:9 125:19 132:11

**better** 42:8 79:16 115:11

**beyond** 47:5 97:23

**big** 27:2 40:22 41:24 94:18,20,21

**bit** 24:19 25:3,4 29:5 52:18,19 54:2,23 62:20 69:11 78:15, 16 99:2

**bizarre** 124:10

**bizarrely** 115:21

**blade** 44:21 91:25 92:2

**bladed** 134:14

**blankets** 135:8

**bled** 54:7,8 74:21 97:5

**bleed** 31:6 35:15 36:24 57:17

**bleeding** 36:13,20 46:11,12 50:3 51:10,

13,19,23,25 52:13, 14 53:6,16 54:4 59:3 75:25 117:4,11

**bleeds** 41:3,8

**blood** 18:23 35:16 36:15,23 38:18 40:1, 4 41:2,4 43:2,3,8,9, 10,18,20,25 44:2 48:21 49:22 51:6,16 52:9 53:1,3,7,9,12, 15 54:1,2,13,15,22 55:13,14,15,17 57:6, 8,9,15,18,20,23,25 58:5,7,16 59:4 61:7 78:24 108:22 109:3, 6,7,8,14 110:16 111:24 112:2 116:4, 8 117:10 122:5,7,25 123:5,10,17 125:13, 14,16,17,21 130:20

**blood-saturated** 109:1

**bloodied** 44:16 49:13 50:3

**bloody** 18:18

**blow** 57:21

**blue** 132:23,24

**blunt** 10:25 13:5 14:6, 9,10,12,17 24:7 31:10 38:20

**board** 11:15

**bodies** 62:13

**body** 18:13,15,18,19, 24 19:1,6 20:25 27:7,14,15 29:24,25 31:6 33:11 35:22 36:3 37:19,22 42:18 43:2 46:10 47:19 48:7,8,17 54:1,7,24 57:11 58:2 59:7,12 60:3,8,11,15 61:8

66:20 67:1,9 70:25 71:1,11 72:7 73:3 75:2 76:7,12,15,23 77:15,20 78:6,7,13, 22 80:21 81:20 84:6, 20 85:22 96:9,12,16, 23 97:5,8,9,21 98:4 103:19 104:7 106:7 110:15 111:9 113:19 117:7,20 120:8 121:2,4,24,25 122:2, 3 129:20 130:3 133:2,3 134:17 136:7

**bond** 13:21

**bone** 44:23 62:8,11 66:25 69:11 84:13

**bony** 62:5

**book-learning** 73:5

**bound** 138:8

**Brabant** 104:25 105:11 112:10

**Brabant's** 105:3

**brain** 38:18,24 39:13, 25 40:3,9,17 43:17, 21,25 60:22 61:1 69:12,13 71:23 75:15 122:25 123:5, 9,16 129:2,6 130:4, 10,19,22 131:3,10, 15

**break** 26:7 50:13,15, 23 51:3 76:5 81:1,3, 12

**breaks** 49:25

**breathe** 56:6,24

**breathing** 54:24 55:15,19,25 56:3

**briefly** 136:18

Index: backed–briefly

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 139 of 163

Volume 1                              Non-Confidential                         Dora Solares vs.
Eugene Carpenter                                                               Ralph Diaz, et al.

**bring** 17:17 109:3

**brings** 66:16

**broken** 13:22

**brought** 16:9 18:6 20:17 97:15 121:9

**brown** 49:23

**bruise** 38:21 60:19

**bruised** 45:5

**brutal** 126:4,7,10

**buck** 91:22

**build** 25:6

**buildup** 43:14

**burn** 48:13

**C**

**C1** 71:8

**C2** 71:8

**cage** 47:12

**California** 5:9,11 11:22

**call** 132:12

**called** 22:4 72:15

**calling** 7:16

**Calls** 26:4 30:24 36:9 72:22 91:13 97:24

**canal** 120:6

**carbon** 43:13

**cardiovascular** 70:8

**cared** 114:3

**careful** 20:19 54:4 97:7 120:24

**carefully** 17:11 30:20 126:19

**carotid** 14:3,7 26:24 32:4,6 37:3,12 38:25 39:20 40:1,2,25 43:11,19 56:16,18, 21 65:6 122:15 123:7,8 129:15

**Carpenter** 5:6,23 6:1, 6 19:17,22 24:25 47:5 50:13 98:9,15 103:18 107:21 112:3 114:16 116:20,25 127:5 137:8

**Carpenter's** 19:9 33:19 63:12 67:22 82:9 86:13 88:21 92:9 99:10 101:8 118:19

**carrying** 65:25

**case** 5:7 6:9,17,23,25 7:2,10,13,21,25 8:2, 3,4,8,16 13:19 15:1, 3,6,9,18,20 16:3 17:3,4 19:7 20:7,11, 13 21:12,25 22:6,18 23:18 24:3,22,24 25:13 26:3,11,15 27:10,24 28:7 29:9 39:16,24 41:18 43:24 45:3 54:11 61:9 76:25 91:22 107:14,23 108:7,12, 13,23 112:11 113:11,13 116:2,12 121:25 124:10 127:23 133:17 137:16

**cases** 6:18,20 7:5 8:6 9:13 10:4,16,18,22 11:1 12:16,22,25 13:4,5,6,8,11,14,16, 24 14:8,12,22 20:14, 15 23:21,22 24:1,8, 12,15 26:15 45:7

77:23 88:14 107:13, 19,22,25 109:21,22 117:24 118:6 121:1, 20

**causation** 58:17

**cause** 26:12 32:5,16, 23 35:6 62:15,20,22 66:8 67:9 69:12 72:13 73:23 77:13 84:6 132:3

**caused** 14:10 26:24 27:12 28:10 29:9 31:6,9 60:11 69:16 123:4

**causes** 40:9 85:4

**causing** 32:9 33:3

**cautious** 54:5 56:9

**cavity** 54:16 57:11

**cell** 13:13 95:9 108:12 110:16 111:19 113:8 132:1

**cellmate** 13:21

**cells** 94:14,20,21 95:7

**center** 11:13,18,20 133:17

**central** 27:4 31:18

**certain** 23:21 59:14 129:1

**certainty** 21:7 27:23 30:11 33:6 49:20 55:22 56:8 70:6 80:15

**certification** 11:17

**certified** 5:10

**cervical** 70:23,24 71:17

**cetera** 7:25 20:21

47:5 79:25 115:7

**chance** 126:18

**check** 12:15 116:15 137:23

**checking** 138:6

**cheek** 58:24 59:3

**chest** 47:12 48:4 50:5 52:24,25 53:20,25 54:16 57:10,12,13, 19 58:8 90:11 97:1

**child** 13:6 24:6 110:4

**children** 39:10

**chin** 66:1

**choke** 14:2

**choked** 27:1

**chokehold** 27:2 31:9 38:20

**chopped** 134:20

**chronic** 127:17

**circulation** 38:18,23 39:13 40:9 44:1

**circumstances** 20:20 28:17 32:5 35:9 108:8

**cited** 122:8

**cites** 80:7

**city** 9:25

**civil** 6:24 8:6 17:4 20:11 45:3 107:22

**claims** 103:13

**clarification** 76:3

**clarify** 38:17 74:5 76:17 90:23 117:1 122:21 131:7

**clarifying** 23:1,12

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 140 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**classic** 132:1 134:24

**cleanly** 40:25

**clear** 44:19 54:22,23
   58:25 74:25 81:20
   82:5 90:8 94:4
   117:3,9 121:14
   125:20 136:6

**clearly** 45:17 54:7
   59:4 117:23 133:19

**clever** 135:16

**clinical** 11:15,19
   39:4,11 40:21 41:8
   42:6,9 44:5 128:21

**close** 65:14

**closer** 78:6

**cloth** 124:1 132:23,24
   136:19

**coagulating** 51:16

**code** 5:10

**collaboration** 133:15

**collapse** 70:4 98:4

**collapsed** 69:18

**collapses** 69:23 70:1

**combat** 45:18,23
   85:17,19 86:4 90:5
   91:4

**come** 10:5 27:23 33:5
   45:20 50:17 77:22

**comes** 125:22 126:16
   127:19

**coming** 22:18 51:17

**comment** 105:25

**commentary** 103:6,
   12

**common** 84:10,14,16

**communication**
   116:11 126:23

**competent** 109:11,13

**complete** 33:2 42:15
   84:6

**completely** 46:9
   48:16 60:4

**complexity** 24:4

**compliant** 5:10

**Compound** 97:24

**compression** 122:16
   123:19

**compressions** 45:5

**computer** 114:17

**concerning** 15:20

**conclude** 51:13 70:17
   76:19 80:13

**concluded** 139:3

**conclusion** 28:12
   29:8 33:6 55:2,4
   74:12 79:4,18,19
   80:16 125:22 126:1
   129:22 131:19

**conclusions** 22:18
   109:23,25

**conclusively** 37:23

**concrete** 14:15 48:14
   108:22

**concur** 79:23 121:14,
   17

**condition** 97:14

**conduct** 6:8

**conducted** 12:8
   17:24 103:22 104:1

**conferences** 114:13

**confidential** 33:18
   63:11 67:21 82:8
   86:12 88:20 92:8
   99:9 101:7 118:18

137:17,20 138:11

**confine** 123:1

**confinement** 134:24

**confining** 135:9

**confirm** 95:12

**conflict** 30:15,19

**confused** 70:25
   107:21,24 108:1

**connecting** 71:23

**connection** 109:2

**conscious** 17:15
   27:13 28:11 36:21
   43:17 48:12 50:6
   52:5,12 55:6 56:18,
   21 75:14,25 81:22
   82:1 95:13,17
   117:25 118:3 123:16

**consciousness**
   26:25 27:12,15,17,
   18 28:11 29:9 31:19,
   24 32:6,9,16,21,24
   33:3 35:15 37:6
   38:13 39:1 40:3,13,
   15,16 42:22 52:10
   57:2,4 117:13
   123:11,21 129:1,16,
   17,19 130:21

**consensually** 135:14

**consented** 135:12

**consider** 29:12 60:9
   84:18 114:5

**considered** 19:7 77:5
   125:10

**consist** 131:24

**consistent** 30:18
   47:18 48:16 52:15,
   16 53:7,12,15 54:2
   57:18,21 59:6 98:3
   113:4 120:3 121:4

**consultations** 9:20

**contacted** 15:8,15

**contained** 108:13

**contains** 25:21

**contested** 24:14

**context** 32:16

**continue** 33:12 57:20
   74:24 98:18

**continued** 56:24

**continuing** 56:6

**contract** 9:16 10:3

**contrary** 110:11

**contribute** 46:16

**control** 27:16 31:4
   33:2 35:7 40:7 42:15
   84:6,20,24 85:22
   88:16 91:2 97:6 98:5

**controlled** 27:9,15
   31:22 37:23 42:20
   46:11 60:3,8 65:12

**controlling** 62:3

**controls** 27:18

**controversial** 24:14
   54:8 59:8

**controversy** 51:20

**conventional** 39:2

**conversations** 51:1
   112:10 115:23

**cool** 78:13 80:21

**copy** 19:2 137:3
   138:18,24

**cord** 33:12 35:4 37:21
   44:24 60:1,4,10
   61:15,22 62:14 65:5,
   18 66:8,19,21 70:23,
   24 71:9,14,22 72:1,
   2,11,13,14,15,16,17

Index: classic–cord

Case 1:20-cv-00323-LHR-FJS  Document 295  Filed 08/04/26  Page 141 of 163

Volume 1                              Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                          Ralph Diaz, et al.

73:6,17,23,24 74:11, 13,20 75:16,17,23 84:5 85:4,23 92:6 96:16 97:14

**cordial** 110:7

**corner** 104:25

**coroner** 18:16,20 104:8,12 105:19 106:12 107:5 112:11

**coroner's** 9:17,24 11:4,10,16 12:13 18:25

**Corporate** 94:15

**correct** 7:8,23 8:24 22:19 41:21 51:15 53:2 57:4 58:16 67:16 71:20 73:13 80:9,17 94:22 96:14 107:7 111:17,20 113:24 136:9

**correlate** 113:2

**correlates** 35:11 63:5

**correlating** 91:8

**correlation** 35:8

**corresponding** 133:1 135:21

**costal** 57:17

**counsel** 5:12 71:3 98:24 110:23,24

**countdown** 35:14

**County** 8:13 9:16 10:3 12:13 14:19,20 18:20 80:20 112:9 121:20

**couple** 8:19,21 9:13 74:13 81:13 127:3

**course** 14:24 41:7 44:15 114:2 125:18 138:12

**court** 5:3,23 8:2,24 9:5 10:23 12:24 13:7,9 17:21 20:11, 13,14 22:5 24:12 45:3,7 50:12,18,20 62:19 71:3 80:1 81:7,10 90:15 94:13 104:21,22 110:1 116:17,19 121:1 136:23 137:2,5,8,14, 21 138:17,21 139:1

**courthouse** 6:23 8:5

**courtroom** 23:22

**crazy** 124:17

**creating** 91:3

**credentials** 126:22

**criminal** 7:21 8:2 10:18,22 20:13,14 22:5 24:12 45:6 107:16,23,25 121:1

**criticize** 109:12,18, 23,25

**crucial** 52:2 54:11 79:2

**CSP** 94:15

**cup** 43:9 51:16 58:1

**currently** 9:15 10:1

**custody** 13:10 14:16, 17,18,22

**customary** 20:12

**cut** 35:13 36:2,23,25 37:1,3,13 40:1,25 43:19 47:13 56:7,12 59:24 61:4 65:6,21, 23 66:11 67:12,15 71:3 72:18 73:4,10 75:18,20 82:4 91:23 96:23,25

**cuts** 37:7 41:3 56:1,4

**cutting** 14:7 35:4,24 79:12 92:2

**CV** 12:8

---

**D**

---

**Dakota** 11:24 12:7

**damage** 33:12 36:3 56:22 62:15,20,22 73:22 74:13 81:18 84:5 96:17 132:3

**damaged** 57:17 60:18 71:22 73:17 74:11 75:16 85:14 123:8 133:2

**damages** 69:11

**damaging** 60:3

**dark** 115:8

**Darling** 5:19 7:9 15:2, 5,8,14,16,17 16:9, 18,21 19:8,18 21:18, 21 25:14 26:4 30:24 36:7,9 37:10 39:18 45:13 47:1 49:2 50:15 51:1 55:9 58:11 63:2 65:7 69:22 72:8,22 73:19 74:3 79:12,16 90:12, 18 91:13 95:21 97:24 103:14 105:13 110:20,25 115:17 116:24 120:12,19 121:11 126:24 127:4,5,10 128:16 130:13 136:12 137:5,6,12 138:3,5, 17,19,25

**DAS** 24:21

**data** 36:19 42:9

**date** 5:4

**dated** 25:17 99:6

**David** 5:14 7:9 79:12, 13 138:5

**day** 12:16 72:16

**days** 103:24 106:19 137:23 138:4,15

**dead** 35:16 54:13 58:2 76:15 78:7,9 106:8 117:8 122:4

**death** 6:24 7:21 8:4,6, 8 13:14 14:3,10,17 17:4 24:6,25 26:12, 13 27:16,18,19 31:7, 24 33:4 36:18 37:4 46:11,12 52:18,19 54:8 56:10 58:10 61:4 63:7 76:11,14 77:2,13,16 78:23 79:7 80:3,14,18 103:11 106:7 109:8, 15 121:24 122:6,10, 13 123:13 133:18 134:10

**deathblow** 35:25

**deaths** 13:6 24:8

**decapitated** 44:11 71:19

**decapitation** 13:17 44:14 48:19

**decedent** 17:15 29:23 31:4,15 48:12 70:12 123:16

**decedents** 124:6

**decide** 138:20

**decorated** 110:16

**deemed** 128:25

**deep** 69:7

**defend** 65:19 124:7 125:23 135:9

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 142 of 163

Volume 1
Eugene Carpenter
Non-Confidential
Dora Solares vs.
Ralph Diaz, et al.

**defendant** 5:16,18 30:7 32:11 107:22, 23 125:23

**defendants** 5:16

**defender** 10:5

**defense** 24:10 26:15, 18,19 27:4 29:16,22 31:14 35:22 92:3 96:19 98:24 107:15 121:6 134:13,23 137:18

**defense's** 107:12

**defensive** 28:9 88:13 90:9,10,14,17,25 91:7,9,12,20 134:16

**define** 117:1

**defined** 135:23

**definition** 123:23 129:25 136:1

**deglamorizing** 24:20

**degree** 30:11 33:6 49:19 55:22 59:7 79:1 104:13,25 105:11

**delay** 88:5

**delayed** 24:8

**delivering** 73:12 80:1

**dense** 36:13

**department** 114:14

**depend** 22:2 129:8

**depending** 43:11

**depleted** 43:1 54:13 61:2

**Depo** 138:13

**deponent** 138:2,7

**deposed** 8:7

**deposition** 5:5,10 6:8,10,15,21 8:22 9:2,11 33:20 50:23 63:12 67:22 74:16 82:9 86:13 88:21 92:9 98:23,25 99:3, 10 101:8 105:3,6 118:19 120:20 137:19 139:3

**depositions** 8:19

**deprived** 39:25 40:17 60:22 75:15 122:25 123:9,10,16 130:19

**depth** 45:1,3

**depths** 44:21

**deputy** 5:15 7:2,18 28:25 30:5 104:8,12, 25 105:19 106:12 107:5 112:11

**described** 22:11 41:24 49:15,16 111:12 136:19

**description** 58:12 94:5 111:7,8,10 120:3,9,15 121:3 124:15,24

**descriptive** 70:1

**designated** 137:20

**detail** 20:17 111:11

**detailed** 23:7 45:4 111:7

**details** 57:8 126:1 137:17

**detected** 104:8 106:12

**determination** 79:2 97:18

**determinations** 114:12

**determine** 42:8 45:2, 11 53:19 55:22 106:6 113:14 122:6, 10 125:8 128:13 133:17 138:10

**determined** 105:11 125:2

**determining** 77:2,13 79:7 80:18 109:14 122:12 129:5

**diagnoses** 114:24

**diagonally** 41:3

**diagram** 19:3,4 20:4

**diagrams** 21:2 29:4

**Diaz** 5:6 6:9

**die** 41:11,16 44:6

**died** 24:9 31:19 56:25 76:16 78:6 122:2

**difference** 42:6,10, 13,19 43:16

**different** 96:18 108:7

**difficult** 7:23 17:3 24:2 46:7 65:24 77:14

**diminishes** 78:24

**diminishing** 40:16

**dioxide** 43:14

**dipped** 110:15

**direct** 20:25 24:21 86:9 106:18

**direction** 29:7

**directly** 105:7

**directory** 9:19

**disagree** 79:11,19 80:14 104:3,4

**disagreed** 108:2

**disagreeing** 121:13

**discovered** 17:17 76:13

**discrete** 49:12

**discuss** 74:24,25

**discussed** 39:23 137:17

**discussion** 127:14

**disease** 127:17 128:2

**dispositive** 79:3

**disrupted** 43:18

**distinction** 90:19 117:13 127:6,7 128:10

**distinctive** 49:24

**distinguish** 52:3 57:23

**distinguished** 56:17

**district** 10:6 24:23

**disturbed** 115:21

**disturbingly** 81:20

**doctor** 8:17 25:9 26:7 28:21 31:2 36:12 37:15 45:7,16 47:3 49:7 50:22 55:12 65:10 70:3 72:10 73:1 75:5 80:25 81:12 90:22 91:16 96:1 104:12,24 111:5 127:13,24 128:6 130:17 137:1, 12

**doctors** 12:15

**document** 23:10 26:5 104:13 105:5

**documentation** 20:6 22:20 23:11

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 143 of 163

Volume 1                          Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                            Ralph Diaz, et al.

**documented** 22:1,2 23:8 104:8,25 105:20

**documents** 19:15 20:19 21:15,23,25 22:1,24 23:2 110:21 125:4

**dogmatic** 44:3 59:8

**dogmatically** 53:13

**doing** 12:15 45:1 66:20

**doll** 134:19,20

**dolls** 124:8 133:9,24 134:6,19

**Dora** 5:6

**double** 137:23

**doubles** 94:5

**doubt** 84:15

**Dr** 5:23 6:6 17:13 19:9,17,22 24:10,24 32:2,25 38:9,17 47:5 50:13 78:17,18,19 79:18,19 80:4,22 94:4 98:9,15 103:18 106:6,20,21 107:8, 18,21 108:3,14,17 109:12,18,21 111:6, 10 112:3 114:16 116:20,25 121:12,17 122:9,14,24 125:20 127:5 128:4,20 130:8,9 131:11,19 136:18 137:8

**drafts** 16:3

**drainage** 57:23 58:2, 6,18

**drained** 54:1 61:8

**drawing** 116:8

**drawings** 109:2

**drying** 125:18

**due** 43:1 49:20

**duly** 6:2

---

**E**

**e-mail** 137:9

**e-mailed** 7:9

**ear** 51:18,19,25 113:23,24 120:6

**earlier** 12:18 30:21 38:7 78:23 97:15 98:22 121:13 122:17

**early** 15:12 62:1 81:23 82:1 95:15

**earn** 10:15

**easier** 26:8 31:10

**easily** 134:14

**Eastern** 114:4

**easy** 20:14 45:6 98:4

**edges** 51:10 53:9 54:3 117:12

**education** 11:6

**effect** 8:24 69:5

**effects** 97:21

**efficiency** 26:22

**efficiently** 81:4

**eighth** 51:16

**either** 15:5,8 17:21 23:25 28:12 53:8 58:9,17,19 91:9,11 126:20

**emergency** 39:5 41:13,15

**emphasizes** 92:4

**employee** 10:4

**enclosed** 45:19

**enforcement** 30:4

**enjoy** 98:20

**entail** 26:19

**entailed** 17:8

**enter** 33:17 63:10 67:20 82:7 86:11 88:19 92:7 99:8 101:6 118:17

**entered** 88:7

**entire** 71:18

**equally** 13:5

**equivalent** 28:1 37:3 56:16,21

**Erin** 5:19 116:11

**error** 7:17,19 106:14

**errors** 106:15

**especially** 79:5

**essential** 18:7 126:23

**essentially** 76:12

**established** 37:23 44:25

**establishes** 130:4

**estimate** 10:20 27:16 123:20

**estimates** 27:17

**estimation** 77:11 80:2 103:10 106:6 121:24

**et** 7:25 20:21 47:5 79:25 115:7

**et al** 5:7

**Eugene** 5:5 6:1 33:19 63:12 67:22 82:9 86:13 88:21 92:9 99:10 101:8 118:19

**evaluate** 24:10 94:12

**evaluated** 125:20

**evaluation** 36:16 127:15

**evaporate** 125:17

**evening** 77:12,20

**event** 27:13

**events** 41:22

**eventual** 40:7

**eventually** 31:6

**evidence** 27:5,6 30:1, 10,14 31:14,16 51:10,12,24 52:21 85:11,14 110:3 112:5,7 120:14,16 122:5,7 124:3 132:13,16,18,22 133:7 134:4 135:11 136:6

**exact** 95:14

**exactly** 55:22 111:11 134:22

**exam** 11:14

**examination** 6:4 11:17 24:22 45:4 98:13 106:24 107:2 115:13 116:23 127:1

**examinations** 11:15

**examined** 6:2 104:7

**examiners** 29:1

**example** 38:1 110:9 124:6 128:8 131:23 132:11

**excellent** 111:7

**excuse** 138:4

**exercise** 13:12 38:1

**exhausted** 43:13

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 144 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                       Ralph Diaz, et al.

**exhibit** 105:6

**exhibits** 23:3,4,5

**expect** 90:24 91:8,11 135:20

**expected** 75:22

**expects** 56:10

**experience** 8:18 17:8 23:22 26:17 38:5 39:4,9 40:21 41:8 42:6 66:3 69:19 70:3,5,14 72:16 84:10,14 107:8,25 109:12 117:16,21 118:16 120:10 121:19 125:5 126:15 128:3,14,15,21 130:11

**experienced** 25:4 45:18 69:20 118:12, 13,14 126:2

**experiences** 10:21

**experiencing** 70:7

**expert** 7:20 9:20 10:1 23:13 45:21,23,25 46:4 47:8 85:17,19, 20,25 86:4 96:6 107:12,15 109:5 112:7 115:20 129:4

**expertise** 18:16 24:10 45:18 77:23 109:10

**experts** 77:2

**expired** 57:1

**explain** 29:15,22 55:10 106:1 112:15, 19 121:6 126:17 128:18 134:13,23

**explaining** 25:11

**explains** 121:5

**explanation** 29:14

35:22 63:7

**exposed** 66:21

**extend** 40:15 57:2

**extensive** 21:2

**extent** 19:14 59:14 114:2

**external** 106:23

**extreme** 70:7,11

**extremely** 17:2 77:14 120:5

**eye** 46:14 47:24 51:9, 15,17,24 59:23 60:6 62:1 69:8,11 81:17 82:3,6 84:19,22 85:3,13,21 88:7,11, 13,15 90:9,24 96:4, 7,24 98:1 120:4,6 122:18 124:5

**eyeball** 69:20 70:4,9 135:20

**eyes** 33:18 63:11 67:21 82:8 86:12 88:20 92:8 97:20 99:9 101:7 118:18 137:20

———————

**F**

———————

**face** 58:23 84:21

**fact** 16:15 54:13 86:7 113:3 120:25 123:18

**factor** 86:7,8 123:20

**facts** 16:15 20:24 126:6

**factual** 17:19 21:6 125:10

**factually** 17:22

**fails** 38:24

**faint** 98:19

**fair** 10:10,16 18:22 25:23 95:16,20 117:14 118:7 120:14 121:16 126:8

**fairly** 32:8

**fall** 45:17 69:21,23

**familiar** 8:22 23:24 60:21 94:14

**far** 14:13 66:9 124:16

**fast** 33:10

**faster** 96:4

**fatal** 36:4

**favoring** 17:21

**favors** 54:11,13

**February** 25:18

**federal** 8:2,4

**feel** 17:16 67:1 75:10, 22 115:8 129:3 132:7

**feeling** 75:12 118:9

**feet** 48:11,19 135:1

**fellow** 11:8

**fellowship** 11:4,12,16

**felt** 70:12 112:15 115:6,11 129:9

**field** 114:9 124:20 126:3 128:24 129:7, 11,25

**fight** 32:11 33:15

**fighters** 45:19

**fights** 46:4

**figure** 17:18 46:16 47:23

**figures** 42:5

**figuring** 44:12

**films** 108:9

**final** 35:25

**finalized** 138:7

**finally** 11:14 96:8,12

**find** 32:17 40:20 41:11 95:13 118:12

**findings** 29:2 113:4 121:4,18

**fine** 50:11 90:20

**finger** 113:21

**finish** 9:3 12:6 81:13

**finished** 75:6 112:25 117:8

**firm** 7:1

**first** 6:2 12:23 20:17, 18 29:17 45:10 62:6 65:20 67:10 70:23, 25 71:4 78:20 84:18 112:15 117:1 130:18 136:16

**first-call** 105:6

**fit** 48:6

**fits** 63:6 125:24

**five** 13:10 14:18 31:20,24 33:4 35:15 37:4 38:2 44:17,25 56:5,7,9,15,24 57:2, 16 60:14 61:5,7,11 114:4 123:14 131:17

**five-minute** 81:1,3

**flexed** 66:1

**flexible** 75:17

**floor** 14:15 18:19,25 47:19,20 108:19,22 125:14

**focal** 48:15

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 145 of 163
Volume 1                                    Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                      Ralph Diaz, et al.

focus 17:14 18:17,18 36:19

focused 17:19

focusing 18:14

follow 63:9 70:15

follow-up 127:3

followed 28:1

follows 6:3 35:2 65:2 69:2 84:2 88:2 90:2 94:2 101:2 103:2 120:2

football 13:20

force 10:25 13:5 14:6, 9,10,13,17 26:12 27:4 38:20 60:10 62:4 91:20

forced 53:10

forearm 91:24

forearms 91:25

forehead 58:24 59:2

forensic 11:2,7,10, 14,17 12:9,14 16:11 17:19,20 23:23 24:18 27:22 28:6 29:21 35:10 39:2 91:6 107:12 114:11 118:10 120:16 128:19,20,24 129:20 133:11,16,22 134:5, 12,22

form 28:12,22 29:8 45:9 126:13

formed 25:13 26:11 30:21

forms 131:8 134:24

formulate 30:10

forth 16:14 47:17 48:18

forward 121:9

forwards 97:8

found 29:19 30:16 76:7 77:21 78:8,22 103:19 107:2,5 108:15,18 113:2,5, 20 124:8 136:7

foundation 25:6

four 12:16 57:16 103:23

four-year 12:6

fractured 14:9

frame 39:22 84:17

Freddie 133:18

free 10:8

frequent 133:15

frequently 114:13

fresh 77:3,9,17

Fresno 6:23 7:3

friction 49:21

front 8:10 31:5 38:11 44:15,17 46:15 47:11 59:24 72:2 73:14,16,20

full 13:17 40:15

fully 71:24

function 22:7 28:18 72:20 73:18

functioning 73:24

furniture 95:1,3

further 32:10 116:20 125:10 126:24 127:1 136:21,24

future 9:20 45:3

---

**G**

---

gained 28:15 95:8

gaining 91:2

Galipo 7:1

Galipo's 7:6

gaps 62:12

gathered 110:4

general 5:15 7:3,18 11:22 13:2 18:17 22:7 28:5 30:5 39:7, 8,14 41:10 42:10,11 44:4 49:16 51:18,23, 25 52:1,19 53:16 56:14 59:6,12 61:6 77:13 98:6 123:12 125:2 132:9

generalization 40:20

generally 20:3 95:8 120:13

gentle 132:2,4

gently 132:6

getting 31:23 35:3 55:16

give 28:4 57:20 80:2 115:7 116:14 129:24

given 27:25 35:9 74:2 105:22 118:5

givens 32:13

gives 94:4 138:15

giving 25:10 88:8

glucose 44:2 61:2

go 8:19 10:7,8 11:23 13:9 14:13,15 15:23 16:22 21:11 24:16 31:2 36:12,19 39:7 41:3 51:8 58:15

60:11,19 67:10 70:8 74:23 75:6,13 78:9 84:25 85:4 88:18 97:21 98:20 104:19 108:7 113:1 116:15, 16 120:18,22,25 130:16 135:6 137:14

goes 13:7 40:16 41:1 54:9 65:19 88:18 96:16 97:20 111:11 116:2 121:7 138:1

going 8:19 9:4 10:12 19:8 42:22 46:1 48:10,23 50:12 61:25 62:1 65:12,13, 14,17 66:2,4 75:19 81:13 88:12 90:3 92:5 98:19 103:9 107:24 113:16 132:7

golden 49:23

Golipos 7:14

good 5:3,14,17,19,21 6:6,7 10:11 16:9 23:23 35:21 36:22 39:14 42:11 50:22 70:6 80:23 86:1 98:15 109:4 124:19 128:5 132:20

gotten 62:10

grab 91:23

graduated 11:20 28:2

grain 53:17

graphic 44:10

great 95:25 111:11

Green 90:5

grisly 126:9

group 128:22 133:15

grown 31:13

guard 32:20

Index: focus–guard

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 146 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**guarded** 66:13,14

**guarding** 65:25

**guess** 25:4 46:3 85:8 86:1,2 131:14

**guide** 133:23

**guided** 19:2

**guideline** 22:7

**guidelines** 8:20

**guiding** 18:8

**gunshot** 10:24 12:20, 24,25 13:4,8 24:2 25:1

**gushing** 55:17

**guy** 41:24 124:14

**guys** 25:4 50:14

---

**H**

---

**half** 8:11 50:22 58:1 61:7 72:11 92:1 98:18

**hand** 5:24 45:1 133:10

**handguns** 14:15

**handle** 24:21,24

**handled** 12:20

**hands** 91:24 124:4,9 133:7 134:7,17,20, 25 135:1,4,12,13,18 136:7

**hanging** 132:2,4

**happen** 26:16 27:11 79:15 91:4 114:20

**happened** 17:22,23 22:8,9 27:23 28:11, 19 29:14 33:1 43:23 46:17 47:10 74:2

98:7 113:8 125:11

**happening** 38:14 75:11 97:22

**happens** 38:23

**happier** 10:14

**hard** 17:9,18 47:19, 21,24,25 48:8 49:20 62:5,8,11 108:18 123:25 131:23 132:17,22 136:2

**He'll** 138:21

**head** 13:14,21,23 14:7,10,13,14,17 24:7 31:2,11 38:20 42:1 44:11 48:10,11, 18 62:2 65:15 66:3,4 67:11,15 69:14 71:18 73:15 75:17 111:9 116:10 118:14 124:9 133:19 134:20

**health** 114:23 115:1

**healthy** 27:8

**heap** 69:18,23 70:1,4

**hear** 10:9 21:20 38:14 79:13,15 98:15

**heard** 38:15 90:16

**heart** 35:16 36:22 41:4 43:6,7,15 49:21 53:8 54:12 97:4 117:8,9

**heartbeat** 41:2

**heavy** 14:14

**height** 41:25 42:7

**help** 10:14 24:10,17 28:18 42:8 74:16 77:6 90:6 91:5 94:13 104:20 122:6 126:15 133:23 134:13,23

**helped** 114:12

**helpful** 29:1 109:17

**helping** 122:9

**helpless** 32:25

**helps** 77:14 109:14 121:23

**hemorrhage** 36:20

**hemorrhaging** 69:13

**high** 60:9 61:5 120:5 124:21

**higher** 43:2

**highly** 60:10 74:17

**histology** 51:21

**historian** 113:8

**history** 20:20 28:16 35:8 107:8

**hit** 91:25 92:5

**hold** 5:24 26:23

**holds** 56:14

**hollering** 91:1

**homemade** 92:1

**homicide** 12:15,16,22 14:13 24:8 25:1 26:13

**homicides** 12:21 13:3 14:19

**honor** 80:9

**honors** 114:1

**hope** 29:5 62:3

**horizontal** 47:13,24 59:24 96:25

**horrifying** 98:3

**horror** 135:2

**hospital** 11:19

**hour** 50:11,23 98:19

**hours** 8:21 58:3 77:4, 10,18,20 78:3,4,7,9, 23 80:5,8 96:11 103:10 104:6 106:7 110:16 122:3 125:17

**human** 74:18 120:8

**hundred** 126:14

**hunger** 98:19

**hyper** 66:1

**hyperextend** 32:19 74:18

**hyperextended** 32:3 65:21,23 67:11 69:15 73:10 75:1,18

**hyperextending** 48:8 97:10

**hyperextension** 32:12,15,22 38:22 66:10

**hyperflexion** 97:3

**hypotheses** 29:10

**hypothesis** 30:22,23 46:12 75:4,8

**hypothetical** 30:12 37:20 48:7 60:16 67:9 73:2,7,9 84:4, 18 90:4 123:7

**hypothetically** 45:21 66:15 96:17 97:20

---

**I**

---

**idea** 32:11 52:11 70:16 79:9

**ideal** 96:3

**identified** 105:5

**identify** 137:19

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 147 of 163
Volume 1                        Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                    Ralph Diaz, et al.

ignore 57:12

imagine 10:20 47:7,9

immediate 69:16

immobilized 81:20

importance 92:4

important 22:12,22
    35:20 39:6 41:9
    47:6,9 113:13 125:7
    126:15,16

impossible 44:24
    122:5

in-depth 21:16

inadequate 91:18,21
    92:4

incapacitated 66:5
    73:3 96:12

incapacitates 96:9

inch 66:24 92:1

inches 36:13 42:2

incident 21:12,25
    22:4,15 81:16 112:6
    132:14

included 31:4

includes 21:13 73:2

including 23:4
    107:13

inconsistencies
    113:6 121:7,8

indicate 112:5 133:4

indicated 112:13

indicating 36:15

individual 19:10,11
    28:25 32:19 33:13
    42:19 61:10 84:23,
    24 115:21 125:6

individuals 27:3
    42:12

indoor 108:10

infant 24:7 107:13

inflicted 38:10 45:11
    53:21 55:5,7 57:1
    59:13,17 70:18
    71:15 85:10 96:23

information 7:24
    20:21 21:5,10 25:10
    28:15,18,21,23
    29:11,19,20 30:3
    35:9,10 47:25 63:5
    77:7 79:25 86:10
    94:6,10,13 105:22
    106:5,17,18 109:6,
    14 110:19 111:4
    112:8,24 113:15
    121:9 124:21 125:6,
    8,9 128:21,22,24
    129:21 131:5 136:17

informational 125:4

inhaled 54:22

inhibited 38:19

initial 17:25 21:9
    25:17,25 37:11
    39:19 44:12 82:3
    122:19,23 124:5

initiated 37:18 96:4

injured 44:13 61:18
    65:19 72:1,3,14,17
    74:20 97:19

injuries 26:12,14
    47:15 52:10 53:1
    54:25 58:23 59:18
    60:10 74:2 90:10
    91:9,10 96:22
    118:13 120:11 129:8

injury 31:16 36:4
    37:21 51:9 52:3,4,25
    53:4 72:21 73:6
    75:23 84:15

inmate 6:23 13:14
    14:23 26:16,20 30:6,
    8 38:1 41:25

inmates 14:5

inner 57:9,13 60:13
    120:6

inside 53:11 57:11
    94:15,21,23 95:1,6

instinctive 65:13

instructing 19:16
    111:1

instrument 62:7

intelligent 126:12

intend 116:1

intended 131:13

interested 9:21

interfere 138:16

internal 23:3,6

internship 11:19

interpret 132:22
    134:4

interpretation 16:14
    131:19

interrupt 62:17 99:1
    111:15

interrupting 75:6

interval 27:14 35:19
    37:18,22 39:1,16,18
    40:6 45:9 55:23
    56:9,25 60:2,4,15
    61:1,3,4 75:20 80:5
    81:17 82:2,4 85:1,21
    90:5 96:6,13 104:6
    123:15

interview 20:20 24:18
    32:13 94:5 103:4
    115:4 121:10 125:3

interviewed 118:15

interviewing 120:10

interviews 29:17 30:3
    35:10 112:14,16
    113:5 115:4 121:9
    124:25

introduced 98:22

Investigator 104:9

involved 6:25 8:4
    10:17 12:22 13:19
    24:11 28:7 29:1
    31:10 40:22 91:22

involvement 25:11

irrational 41:22

issue 45:4

issued 23:3

issues 50:25


J

jail 13:20 132:1

job 12:14 27:22

join 67:5

judge 8:10 122:8

judge's 8:12

jump 20:22

jumped 38:1

jumps 22:11

June 9:18,23

Junior 8:13,14

jurisdiction 18:15
    112:8

Justin 5:21

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 148 of 163

Volume 1                                    Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                       Ralph Diaz, et al.

**K**

**Kathleen** 5:9

**Keenaghan** 5:9 81:6

**keep** 50:12 75:5

**keeping** 13:23

**Kenneth** 8:13

**kept** 115:6,10

**Kern** 8:13 9:16 10:3
    14:19 80:20 112:9

**key** 26:15 27:7,9
    28:8,9 33:12 35:18
    65:11 76:25

**keyword** 22:9

**kicking** 90:25

**kill** 14:1,4 37:25 46:5,
    6 61:24 77:3,10,17
    88:18 96:3 124:22,
    23 134:14

**killed** 13:21 76:19
    103:13 121:2,4
    123:3 124:16,24
    134:1

**killer** 121:2 124:16

**killer's** 124:15

**killers** 123:3

**killing** 26:16 29:13,19
    45:21 85:25 113:12
    120:15 126:4,6
    133:10 135:3

**kind** 7:23 24:5,22
    29:4 51:8 66:21 94:5
    122:21

**King's** 18:19

**knew** 41:14 79:14
    106:16

**knife** 44:21 65:14
    91:22 97:20

**knocked** 31:11

**know** 6:18 7:17 8:12
    9:4 14:3,7 17:22
    24:18 26:17 28:20,
    24 29:20 30:16
    32:14 35:18 36:24
    37:1 40:12,14,19
    42:3 44:5,7,21 45:1,
    19 46:18,19,24 47:4
    50:10 51:8 56:10,13
    58:20 59:16,21,22,
    25 60:6,7,15,16,19
    61:9,17 66:15 69:6
    70:13,19 75:12
    76:22,23,24,25 77:1,
    8,15,19 78:2,5 82:5
    85:5,20 86:5 90:6
    91:7,16 94:6 95:3,6,
    18 96:5,11,13,16,21,
    24,25 97:4,16,17
    98:7 104:15 111:22,
    25 112:2 115:1,11
    116:13 122:17,19
    124:17 125:19,25
    126:15 127:22 129:6
    130:2,7 131:12
    138:5,8

**knowing** 21:6 42:7,11
    46:13 76:24 121:21

**knowledge** 60:25
    70:16 81:16

**known** 32:5 37:24
    46:12 69:14 77:9
    78:8 122:2

**knows** 41:21 94:9
    123:14

**Kuchinsky** 5:14,15
    6:5 7:12 16:24
    19:16,21 21:20,22
    26:6 31:1 36:1,11
    37:14 39:21 45:15

47:2 49:6 50:10,16,
    21 55:11 58:14
    62:23 63:8 65:3,9
    69:4,25 70:2 71:5,6
    72:9,25 73:25 74:7
    79:14,17 80:24
    81:11 84:7 88:3
    90:7,15,20,21 91:15
    94:8 95:24 98:8 99:1
    105:16 120:17,21
    127:2,12 129:13
    130:15 136:14,21
    137:15 138:1,4,8,14

**L**

**LA** 12:13 112:9
    121:20

**labor** 9:21

**lack** 26:17 28:9 40:9
    70:16 81:16 120:13
    123:4

**language** 16:12

**laptop** 104:17

**large** 10:21 108:13
    109:7 131:16

**largely** 92:2

**larger** 13:1

**larynx** 36:6 55:1

**law** 7:1 30:4

**lays** 27:19

**lead** 51:13 54:14
    125:16

**leading** 95:18 120:18

**leads** 85:12

**learned** 79:6

**leave** 38:21 50:14
    123:24 132:11 135:5
    136:3,4

**leaves** 136:1,4

**leaving** 135:23

**left** 24:24 30:20 47:12
    51:9,15 52:25 53:20
    54:3,18,21 59:23
    84:19 103:12 117:10
    124:5

**left-hand** 113:22

**legal** 125:1

**legitimately** 24:14

**legs** 134:17

**length** 44:20

**lesions** 49:20

**let's** 9:14 15:1 18:9
    25:12,25 45:20
    60:19 75:13 77:2
    79:18 81:2 84:18

**letters** 59:2

**level** 8:3 67:3 70:17,
    18 72:4,21 75:23,24

**Lewis** 8:13,14

**license** 5:11

**licensed** 11:21

**ligature** 14:24 31:10
    123:22,24 124:1,3,
    12 132:12 135:5,19,
    21,23 136:2,5,9,11

**ligatures** 131:23,24
    132:13,18

**light** 8:17

**limit** 122:22 123:1

**limited** 13:25 29:2
    59:14 121:8 124:6
    129:12

**limp** 65:19 67:10
    96:16

**linen** 47:17

Index: Kathleen–linen

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 149 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**lining** 53:11 57:13 58:8

**linoleum** 47:20

**list** 6:19 7:10 22:1,14, 22 23:8 60:9

**listed** 20:10 22:17 23:6 41:25 42:5

**listen** 46:18 113:13 126:19

**lists** 23:10

**literature** 37:5,8 130:3,6 131:8,24

**litigation** 25:15

**little** 25:3,4 50:11 52:18,19 54:2,23 78:15,16 91:21 92:1 99:2 107:21 132:12

**live** 94:23

**liver** 78:21,22,25 79:1,6,10 80:17,20 107:1 121:19,21,22 122:11 123:19

**lividity** 76:24 117:6

**living** 10:15

**located** 18:13

**locked** 138:23

**long** 11:2,12,18,19 17:15 27:12 28:11 43:17 44:22 55:23, 25 56:3,17 60:16 88:16 91:4 96:13 111:7 123:14 129:5

**longer** 43:25 71:23 78:1 86:2 96:19 129:2

**look** 7:25 15:19 16:25 17:9,10 20:12 21:1, 12 44:16 48:22 57:13 81:1 95:11

121:7 127:20

**looked** 19:7,24 20:3, 4,6,16 22:1,9 85:12 109:10 110:3

**looking** 15:25 18:10, 11 19:23 20:21 21:5, 24 30:22 59:12 86:6 95:8,10 111:8 133:12 134:23

**looks** 12:8 23:14 42:4

**loose** 65:21 75:17

**Los** 11:4,8 14:20 80:17 114:12

**lose** 29:9 42:22 43:19 72:20

**loses** 35:15 40:3

**losing** 40:3

**loss** 26:25 27:12,17, 18 28:10 31:23 32:5, 9,16,21,24 33:3 37:6 38:12 39:1,13 43:11 73:8 78:24 97:8 129:1,16,19 130:21

**lost** 27:15 31:18 38:6 41:2 123:11

**lot** 9:4 21:3,23 23:25 27:20 36:20 81:15 88:12

**Louis** 8:13

**low** 35:16 43:14

**lower** 24:22 47:11 67:3 132:6,8

**lucky** 12:5

**lung** 53:11 54:13,18, 19,21,22 55:14 57:12

**lungs** 54:15 57:7,11

**Lynne** 5:17 98:23

**M**

**Madam** 50:12 90:15

**main** 18:23 40:24 54:21 60:25

**mainstream** 79:5 128:23 129:21 131:6

**maintain** 9:25 10:1

**major** 39:15

**majority** 10:16 12:19, 24

**making** 98:4

**male** 31:13 84:24 88:9,10

**malfunction** 72:13

**man** 27:8 40:23

**manipulate** 98:5

**manipulated** 97:8 110:15

**manner** 16:12 24:25 26:13 43:18 123:12, 17

**marathon** 42:21,23

**March** 6:22 76:8 103:19 104:1 115:2

**mark** 123:24 132:12 135:5

**marked** 76:11 138:11

**markedly** 98:2

**markers** 133:1

**markings** 133:3

**marks** 123:19,20 124:3,12 135:21,24 136:1,3,4,9

**Marvin** 23:14,19

**Massive** 78:24

**material** 16:1,25 17:3 18:10 22:5,7 24:4 25:22 105:9 111:23, 24 125:10 136:2

**materials** 15:20 19:24 20:12 21:4,24 110:15 112:20 133:4

**matter** 5:6 9:11 45:8 84:19 107:16 122:15,23 126:23

**mattress** 108:14,15, 25 109:1

**may** 5:1,4,24 23:2 25:20 26:20,21,23 28:19 29:4,23 32:6 40:11,22 42:25 43:23,24 44:5 55:3 59:10 74:13 80:22 91:25 95:25 99:2,7 109:17 112:24 116:16 117:22 125:18 132:8 137:10,17

**maybe** 12:16 13:2,5, 6,10 22:6 38:22 40:8 42:2 46:22 48:19 51:16 54:3 58:1 69:5 78:12 90:15 91:16 92:1 95:11 97:13,19 103:24 106:14 134:25

**mean** 11:14 42:23 47:5 52:10 54:1 62:16 66:3 73:6 75:5 88:12 99:4 111:15 121:17

**meaning** 51:19 78:1

**means** 16:14 52:9,13, 14,18 53:1,3 54:20 77:11 117:7

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 150 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

**meant** 33:1

**measure** 45:3

**measured** 44:20,21

**mechanically** 39:12

**mechanism** 26:13
28:10 31:3,20,22
32:4,9,12 33:7,9
38:11,19,21 40:7,9
42:15 60:9,22 67:9
69:14,16 73:11
123:6 130:20

**mechanisms** 32:7

**medical** 11:13,18,20,
24 12:3 21:7 27:23
30:11 33:6 37:5
46:22 49:19 56:8
70:6,16 97:17 114:1,
23 127:7 128:3
129:25 133:17

**medically** 128:11
131:15

**medication** 115:5

**medications** 115:7,
10

**medicine** 11:21,22
12:5

**member** 22:15

**members** 21:13

**Memorial** 11:13,18

**memory** 19:13 22:2

**men** 39:10 94:23,24

**mental** 114:23 115:1

**mention** 6:19 12:20
54:15 78:20 97:14

**mentioned** 12:18
13:24 18:10,11
20:13 28:8 30:21
38:7 44:9 54:16 62:5

97:15 104:15

**mentions** 32:2 70:22
131:2,3

**mess** 95:14 96:18

**microscope** 110:5

**microscopic** 54:10
59:9

**midline** 73:15

**mild-to-moderate**
106:25

**military** 46:5

**milliliters** 41:4 43:8,9,
10

**mind** 20:18 66:16
97:16 121:2

**minimal** 27:5 115:3

**minimum** 10:24

**minus** 77:3,10,17
103:9

**minute** 43:7,10,11,16
84:4,8,12,16 85:5
86:1 88:5 116:14
130:11

**minutes** 31:20,25
33:4 35:15 37:4
40:22 56:5,7,9,15,24
57:2 58:3 61:5,7,11
81:23 82:1 85:8,13
88:9 95:15,17 96:2
123:14 129:2 130:5,
11,23 131:4,9,16,18

**missed** 62:19,20 71:4

**Misstates** 69:22,23
72:8 73:19 74:3
90:12 95:21 128:16
130:13

**mistake** 7:15,23

**moderate** 104:7,16

105:20 106:13,24

**modern** 78:13

**months** 6:17

**morning** 5:3,14,17,
19,21 6:6,7 76:8
77:12

**mortem** 78:25 79:10

**mortis** 76:23 78:21
104:8,13 105:1,11,
20 106:13,25 107:1
121:22 122:11

**mortise** 79:1,7
121:22 122:11

**motion** 48:19

**motivation** 133:12

**motor** 72:1,18,20
73:18

**motorcycle** 48:14
50:1

**move** 35:12 72:7
127:17

**movement** 48:11,16
90:9 97:7,11

**movements** 47:17

**moving** 29:6 35:23
48:12,18

**multiple** 7:21 25:1
26:12 61:20

**murder** 13:20 14:24

**muscle** 53:9 72:2,4
117:19,23 127:17

**muscles** 13:22 32:20
43:15 65:17,24 66:2,
17,22 75:18

**must've** 106:3

**mutilation** 47:12
57:16 97:12

**mysteries** 47:22
88:14

**mystery** 113:12 123:4

---

**N**

---

**nailed** 33:1

**name** 5:9 8:12 23:20,
24 98:23

**names** 7:10

**narrative** 26:4

**narratives** 21:13

**narrow** 122:4

**national** 11:15

**naturally** 84:21

**nature** 44:10 51:7
62:7 98:25 99:3
123:21

**nearly** 53:24 54:7,13
72:3 121:23

**necessary** 25:5 61:2
73:3 112:16 117:11,
20 122:25

**neck** 32:3,12,15,19,
20,23 33:11 35:4,12,
19,21 36:2 37:7,20,
24 38:4,10,11,12,22
44:13,18,19 45:5,11
48:9 49:25 53:22
55:5,7 56:1,4,7
59:17 60:1,13 61:4
65:16,20,23,24 66:9,
17,18,23 67:2 69:7
70:19 72:5 73:10,13,
14 74:19 75:1,18
81:18 82:3 85:1,14
88:6,7 91:3 92:5
95:18,19 96:8,23
97:4,10 123:19,23,
25 129:14 132:24

133:2 134:15

**need** 10:6 16:15 17:5 20:15 28:5 36:18 90:16 104:17 109:25 137:12,24 138:10, 11,15

**needed** 20:23 21:1

**needs** 24:11 28:3 52:20 70:25 72:1,2 73:23

**neither** 114:21 122:24 123:14

**never** 13:13 14:16 17:3,5 41:21 70:12 77:22,24 109:5 110:1,6,11 113:10, 11,20 126:9,10

**new** 15:10 17:16 20:11 21:3

**night** 78:2

**nonconfidential** 35:1 65:1 69:1 84:1 88:1 90:1 94:1 101:1 103:1 120:1

**nonexpert** 88:8

**normal** 84:23,24 90:24 115:16,20 124:14

**North** 11:23

**note** 95:11

**notes** 116:15

**noticed** 50:11

**noticing** 5:13

**number** 5:7,12 7:25 10:21 13:2 44:3 47:14

**numbering** 71:12

**numbers** 19:11,23

20:2,3

**numerous** 20:19

---

**O**

---

**o'clock** 77:11,12

**oath** 5:25 8:23

**object** 14:2,14 19:8 26:14 65:17

**objection** 16:21 21:18,20 26:4 30:24 36:8,9 37:10 39:18 45:13 47:1 49:2 58:11 63:2 65:7 69:22 72:8,22 73:19 74:3 90:12 91:13 95:21 97:24 103:14 105:13 115:17 127:10 128:16 130:13,16 136:12

**objective** 118:11,16

**observation** 58:4 106:19

**observations** 20:25 61:7

**observed** 54:20 125:15

**obtained** 20:25

**obvious** 31:7 32:8 53:6 117:3

**obviously** 26:1 78:2 94:10 133:2

**occasion** 23:24

**occasional** 10:25

**occasionally** 13:9 14:14

**occupation** 9:15

**occur** 32:10,23,24

35:19 41:22 55:15 71:25 117:11 135:3

**occurred** 6:19 7:1 8:11 29:13,19 36:16 38:13 46:14,15 47:14,15 50:6 59:23 60:1,6,7,20 62:1,25 63:1,7 74:15,18 76:1 81:16 82:6 86:8 94:6 97:3 113:12 115:8

**occurring** 52:4 54:25 78:13 97:10

**occurs** 29:25 73:5 75:9 98:2

**office** 7:6,7,14,15 9:17,24 11:5,10,16 12:13 110:7

**officer** 5:11 6:25 8:4 24:11 98:24

**officers** 28:25 125:1

**officials** 30:4

**Oh** 10:19 71:13 81:7 95:12

**okay** 7:5,13 8:15 9:1, 10,24 11:2,6 12:11 13:16 14:6,21 15:14 16:4,8,17,25 17:24 18:9 19:16 20:9 21:9 22:23 23:9,18 24:4 25:25 26:10 28:8 30:21 37:17 38:5,16 43:5 45:6 49:10 50:10 51:5 52:3 53:18 55:2,21 56:6, 17,20,23 57:6,22 58:5,21 59:10,15 60:24 61:3,12,19 62:5 63:8 65:22 66:12,21 67:18 71:10,13,18 72:19 73:11,16 74:1 76:2, 17 79:22 80:12,25

81:12 85:18 88:18 96:15 97:13 98:8,16, 22 103:18 104:5,19, 24 105:7,24 106:3,9, 23 108:1 109:16 110:2,11,14 111:4 113:18 114:7,10,16, 19,22 115:14,23 116:1,11,14 117:13 121:12 122:14 123:18 124:13 126:3,6 130:3,9 131:1,8,22 132:21 133:7,11 134:9 135:18,25 136:6,21 137:5 138:17,21 139:1

**Omalu** 23:14 78:18, 19 79:18 80:14,22 94:4 106:6 107:9,18 108:14,17 109:12, 19,21 121:13 122:9 125:20

**Omalu's** 79:19 80:4 108:3 111:7,10 121:17 136:18

**once** 17:24 22:10 24:23 38:10,18 47:4 60:8 65:18 71:21 72:16 75:9 96:4,5

**ones** 24:16 46:6

**onset** 60:2 61:1 80:5 85:2 96:6 123:15

**oozing** 53:9

**open** 57:12 121:1 125:7

**opened** 61:4

**operable** 117:21

**opinion** 25:23 26:14 27:19,25 28:2,22 45:9 49:19 57:3 58:9

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 152 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

59:18,20 61:19 62:9 65:22 67:13 75:9 76:18,20,21 79:23, 24 80:9,23 85:6,7,20 88:8 90:3 95:16 99:6 110:12 113:7,10,16 114:6 115:14,19,20 124:14 125:23 130:8,9

**opinions** 25:12 26:3, 10 28:4 29:2 59:15 126:8,11

**opportunities** 96:18

**opposed** 65:6

**opposing** 110:8

**opposite** 109:22,24

**orange** 66:1

**order** 11:13 27:3 73:17 99:3 133:17 137:16,18 138:9,14

**ordinary** 9:21 88:9,10

**organ** 58:8

**original** 10:7 22:14 36:18

**Osuna** 23:4 30:8,12 31:21 35:23 41:18 45:10 46:8,18 65:4 67:14 88:5 90:4 91:10 94:9 110:14 112:14,24 113:2,4,7, 13,19 115:15,24 124:14

**Osuna's** 30:22,23 86:6 114:23 120:14

**outlined** 28:5

**outside** 72:15 117:6 120:25 122:7

**overall** 53:24

**overcome** 14:2 27:1,

8 31:13 37:19

**overriding** 49:16,17

**overstated** 108:4

**overstatement** 49:16, 17

**overtaking** 135:2

**overview** 18:17

**overwhelming** 17:2 26:23

**Overwhelmingly** 10:19

**owe** 7:19

**oxygen** 40:18 42:18 43:14 44:2 61:2 75:15

**oxygenation** 43:1

---

**P**

---

**p.m.** 50:20 81:10 104:21,22 116:17,19 139:2,3

**page** 19:23 20:2 35:2 65:2 69:2 84:2 88:2 90:2 94:2 101:2 103:2 120:2

**pages** 19:10

**paid** 21:3

**pain** 17:5,14,16 36:17 45:2 69:20 70:4,7, 11,12 97:22 98:3 117:14,16 118:5,9, 10 120:7 127:11,22 128:3,11,15,17 129:3,6,7,9 130:4, 11,22,23 131:4,10, 16

**painful** 69:17 120:6

**pale** 49:23 50:2 53:14 117:5

**papers** 122:8

**paragraph** 57:22

**paralysis** 35:7 37:21 61:13 70:15,18 71:21 72:2,4 73:8,18 75:9 85:4 91:3 127:17

**paralyzed** 33:11 75:2, 24 97:9

**paramedic** 39:5 41:14

**paramedics** 41:7

**paraplegia** 127:18

**Parker** 116:12

**part** 9:25 12:13 15:12 36:15 44:15 52:1,22 71:4,25 72:2 73:23 81:23 82:1 91:24 92:2 95:15 101:4 103:12 104:9 124:4, 21 125:19

**partial** 13:17 91:19

**Partially** 74:16

**particular** 16:17 19:10,14,19 27:10, 24 44:24 45:7 73:7

**particularly** 24:7

**parts** 30:1 36:3 113:19 117:20 120:8 130:22

**pass** 132:9

**passed** 11:14,16 56:25 88:9

**passionate** 114:8

**passive** 60:11,16 88:18 97:7

**passivity** 66:8

**patchwork** 55:13

**pathologist** 10:4,7 11:3,10 12:14 17:20 23:23 24:18 29:21 44:19 45:4 91:6 112:9 128:19 129:20 134:6,12

**pathologists** 27:22 28:6 128:20 133:16, 22 134:22

**pathology** 11:7,17 16:11 39:2 107:13 118:10 128:24 131:6

**patients** 117:21,24 120:10

**pattern** 74:2

**pavement** 50:2

**pay** 7:19,22

**paying** 7:16 26:21

**peer-reviewed** 128:23

**penetrated** 61:15

**penetrating** 35:5 62:14 69:8

**people** 14:15 38:2 41:11,21 44:6 46:5 69:19 70:3 115:7 118:2,12 121:10 126:12 129:8 133:23

**perceive** 75:10,12 97:22 117:14 127:8, 9,10 128:7,11 130:4, 22 131:4,10,16

**perceiving** 75:14 129:6 130:23

**percent** 13:1,2,3

**perception** 71:25 72:6,12 75:19

Index: opinions–perception

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 153 of 163
Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**perchance** 74:11

**percipient** 6:25 7:11, 16,17,20 8:5

**Perfect** 23:1

**perfectly** 48:6

**peri-mortal** 57:16

**perimortem** 52:17 58:9,12,25 59:1 85:11 117:2,7

**period** 37:19 55:20 122:19 123:14

**person** 27:13 31:11 35:14 36:21 40:10, 20 42:21 43:13,22 47:14 52:11 55:15, 19 61:24 62:4 88:15, 17,18 90:5 91:23 97:7 115:16 117:16 118:7 124:24 128:2 130:5 135:3

**person's** 52:4

**personally** 125:16

**perspective** 46:14 54:11 73:6 77:21 122:5 124:11 128:3 134:6,12

**pertinent** 112:20

**pharynx** 55:18

**phenomena** 115:10

**phenomenon** 72:15 73:2

**philosophy** 114:5

**photograph** 51:25 58:1,17 95:9

**photographed** 18:24, 25 54:20 132:24

**photographs** 15:20 17:10 18:11,12,14,

19 19:1,24 20:16 21:1,3,8 28:15 29:3, 11 30:2,10,14,17 36:17,19 44:16,22 47:11,18 49:11,14 53:6 59:22 111:6,9, 13,17 112:22 113:1, 3 120:23 121:5 123:2 124:11 125:13 132:23,25 136:15

**photos** 18:21 19:4,5 20:4,5 136:11

**phrased** 38:9

**physician** 45:1

**picture** 28:18 53:24

**pictures** 94:19

**Pitruszka** 17:13 23:14,19 32:2,25 38:9,17 78:17 122:14,24 128:20

**Pitruszka's** 17:25 24:10 128:4 130:8,9 131:11,19

**place** 5:7 18:24

**placed** 9:19 112:6

**plaintiff** 5:20,22 7:1 107:22

**plan** 9:18

**plans** 9:22

**plastic** 57:14

**player** 13:20

**please** 5:12,24 9:2 55:9 74:6 75:7 106:1 112:19

**plenty** 43:25 49:3 96:17

**plug** 104:17

**plugged** 114:17

**plural** 130:12

**plus** 35:10 77:3,10,17 103:9

**point** 24:6 39:9 42:14 47:6 60:3 70:17 71:22 78:2 85:23 96:5 109:4 110:10 113:14 129:7 133:9

**pointed** 7:22

**pointing** 118:9

**police** 27:2

**pool** 57:25 125:21

**pooled** 58:6,16

**pooling** 116:4,8

**pools** 108:9,14,18,22 109:3,6,7 125:12

**portion** 33:19 63:12 67:22 82:9 86:13 88:21 90:16 92:9 99:10 101:8 118:19

**portions** 138:10

**pose** 44:11

**position** 29:25 30:20 33:14 78:22

**positioning** 133:24

**positions** 11:11

**possibilities** 74:14

**possibility** 63:1 70:6 74:1,4

**possible** 17:22 21:6 61:14 62:13 77:21 96:19

**post** 53:24 57:15

**posterior** 71:25 78:21 106:25

**postmortem** 53:14,25 57:23 58:6,18 59:4

78:11 85:11 117:1,3

**potential** 9:20 24:1 61:13 81:15,17 123:19

**potentially** 12:19 28:17 122:15,22

**pounders** 39:11

**pounds** 42:2

**practice** 11:22 12:25 20:24 21:1 28:14,20 112:23 120:25 123:1

**practiced** 45:25

**practices** 128:5

**pre-existing** 48:4

**precaution** 118:4

**preceded** 112:1

**precise** 122:6

**precisely** 78:23

**preclude** 138:6

**precludes** 126:7

**predict** 78:24

**predictable** 65:15

**predominantly** 106:25

**preliminary** 22:6 28:17,21,23 106:18 112:23

**premise** 76:22

**preparation** 23:25

**prepare** 11:13

**prepared** 9:10 21:5 22:10 44:10

**present** 35:23 51:6 136:19

**pressure** 14:3 26:24 32:4 35:17 36:15,23

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 154 of 163

Volume 1                                    Non-Confidential                              Dora Solares vs.
Eugene Carpenter                                                                          Ralph Diaz, et al.

38:25 40:1 41:6,15,
18 49:22 51:6 52:9
53:1,3,7,12,16 54:3
57:19 59:4 117:10
123:7

**pretty** 10:20

**previous** 13:19 39:23
49:8 111:12 125:4

**previously** 22:11
103:9 112:9

**primarily** 24:17

**primary** 12:18 111:8

**Prinze** 133:19

**prior** 11:12 74:3 78:7
95:21 104:7 106:7
112:21 124:5

**prison** 13:10 18:21
19:5 20:4 30:4 94:14
125:1

**prisoners** 13:25 14:1
37:25

**probability** 120:5

**probable** 74:17
124:21

**probably** 10:12 13:4
23:24 28:18 33:11
35:12 41:11 43:8
46:11 48:22 60:11
78:6 81:22,25 86:8
94:16 95:17 97:4
108:20 110:9 118:7
128:4,12

**problems** 44:11

**procedure** 35:12

**procedures** 9:22

**proceed** 9:10 50:23
127:7

**proceeding** 5:11

**process** 81:24 97:9,
12 126:17 132:2,5,9
133:23 135:3

**processes** 95:16
128:5

**produced** 25:13,14

**production** 138:22

**profession** 118:10

**professional** 13:19
30:4 46:18,22 94:12
110:6 125:3

**professionals** 125:1

**professorships**
126:22

**profusely** 57:17

**prominence** 78:24

**prominent** 47:10
49:11

**prone** 29:25 48:8

**pronounced** 76:15
78:7 106:8 122:4

**proof** 28:1

**proper** 115:7

**properly** 109:18

**prophecy** 45:2

**prosecutors** 24:17

**protect** 61:25 65:18
66:18 67:14,19 69:7

**protecting** 65:12
66:22

**protection** 62:8,10

**protective** 137:16,18
138:9,14

**proved** 110:5

**provided** 23:16 41:18

**provides** 62:8,11

**providing** 36:22

**psychiatric** 115:12

**psychiatrists** 114:11

**psychiatry** 113:25
114:2,14

**psychologist** 133:16

**psychology** 114:5
133:12

**public** 10:5 80:6

**pull** 66:2,4

**pulled** 66:10 67:14

**pulse** 43:2

**pumping** 35:16 43:3
49:22

**punching** 90:25

**punctured** 129:15

**purchase** 138:24

**purple** 36:13

**purportedly** 45:10

**purpose** 96:9

**push** 33:14

**push-up** 33:14

**pushed** 66:10

**put** 37:4 41:14 65:15
103:6 106:3,5

**putting** 54:5

---

**Q**

---

**qualifications** 6:20
28:25 79:25

**qualified** 46:1 47:8
85:16 97:16 113:14
114:14,15 128:13
134:3,4

**qualifies** 11:7 70:11
98:2 114:8

**qualify** 133:22

**qualifying** 114:6

**quarter** 43:8 66:24

**question** 9:3 12:23
14:21 16:18 19:9,15,
17,25 26:10 27:9,11
28:8,10 29:4,12
30:19 37:15 38:7
45:22 46:2 49:8
52:22 54:14 58:21
65:11 66:16 71:4
74:8,12 90:22 95:25
110:5 112:4 118:2
124:4,8,19 127:24
131:22 132:18,20
134:19

**questionable** 26:22

**questions** 9:5,7 16:5,
10 18:4,6 20:18 23:2
28:5,13 31:12 32:1
51:2 61:13 76:4
81:13 97:13 98:10
99:2 109:19 116:21,
25 126:25 127:3
134:3 136:24

**quick** 43:18 81:2

**quickly** 8:19 24:23
27:1,8,9 31:23 43:3
86:3

**quit** 80:23

**quite** 43:22

---

**R**

---

**raise** 109:19

**raises** 118:2

**Ralph** 5:6

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 155 of 163

Volume 1                              Non-Confidential                          Dora Solares vs.
Eugene Carpenter                                                                Ralph Diaz, et al.

**Ramsfelder** 108:3,17

**ran** 42:21

**range** 42:8 78:1 80:6

**rape** 11:1 13:6

**rapid** 26:24 31:22 33:10 35:12 40:7 43:22

**rapidly** 31:4 32:10 35:23 42:20

**rare** 32:5

**rate** 43:2

**re-ask** 96:1

**reach** 69:12

**react** 135:22

**reaction** 51:19

**read** 26:1 76:6 90:16 105:3 113:1 114:22 116:4

**reading** 30:22 53:4

**ready** 50:23 98:20

**real** 114:3 124:8

**reality** 120:4

**realize** 24:17

**realized** 17:14 116:10

**really** 10:6 14:1,4 27:5 32:23,24 44:7 46:6 47:8 70:12 75:17 86:1 96:5 115:4 116:10 132:20 135:5

**reason** 13:24 24:19 28:3 41:17 49:22 70:20 74:19 88:4 91:19 92:3 104:2 109:4 113:16 126:11,23 127:14

**reasonable** 21:7

27:23 29:12 30:11 33:6 49:19 56:8 70:6 73:7 85:5,8 126:12, 19

**reasonably** 32:18 39:13 74:9 109:13

**reasoning** 126:17 128:4,5

**reasons** 28:4 134:24

**rebuttal** 21:10 22:13 23:15 25:20 78:17 99:6 106:15 108:2 112:13,17 121:12

**recall** 6:12,14 15:17 16:17 20:6 23:5,7 25:18 42:1 76:6,10 103:23 105:2,5,7,8 116:7

**received** 12:4 120:10

**recess** 50:19 81:9 116:18

**recollection** 42:2

**record** 5:4,13 9:6 20:23 50:18,20 81:8, 10 104:21,22 116:15,16,17,19 137:14,16 139:1

**records** 114:23

**recount** 19:10

**recovered** 18:13 113:22

**rectangular** 52:24

**red** 117:5,6

**redness** 132:12

**refer** 19:12,19 71:16

**reference** 49:3

**referencing** 82:2

**referring** 19:19 71:7 108:14

**refers** 57:25

**refinement** 53:5

**reflect** 134:1

**reflected** 133:25

**reflex** 66:2

**reflexes** 72:20

**reflexively** 48:13

**Regarding** 121:12

**region** 60:14

**relate** 114:23 135:16

**related** 12:19

**relates** 115:15

**relatively** 33:2

**relaxants** 117:23

**relaxed** 43:22

**relaxers** 117:19

**relay** 128:23 131:5

**relayed** 131:6

**Relevance** 115:18

**relevant** 20:22 21:5, 24 80:5 105:8,10,15, 17,18,23,24 106:1,2, 4,10 127:22

**reliability** 28:24 124:16,22

**reliable** 30:3 32:14 46:19 54:24 63:5 86:9 113:8,15 124:25 125:6,8

**reliably** 105:2

**reliance** 80:4 108:3

**relied** 28:21 111:12

**relievers** 118:5

**rely** 28:23 112:23 128:20,22 130:6

**relying** 108:17 124:15

**remain** 43:17

**remarkably** 41:1 115:21

**remember** 12:21 101:4 103:4 104:9 108:5 110:16

**remind** 9:2

**reminded** 6:18 7:25

**reminder** 113:24

**remnants** 132:24

**remote** 5:5,8

**removed** 113:19

**repeat** 74:6 90:22

**repeated** 35:25

**report** 16:2,5,6 17:9, 13,25 18:1,3,5,11 19:3,4,9,12,20 20:4, 10,16 21:7,9,12,25 22:4,14,17 23:9 25:17,20,25 26:1,2 30:2,17 31:21 36:18 41:25 42:5 44:8 49:15 52:8 59:22 60:5 61:14 70:22 71:16 76:10 99:6 101:4 103:7,25 104:5,10,16 105:6,8, 19,23 106:3,5,23,24 108:2,21 110:14 112:13,15,17,21,25 115:13 116:4,5 117:24,25 121:12 127:20,22 131:11 136:18

**reported** 44:6 106:17 113:5 115:4 127:21 128:22

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 156 of 163
Volume 1
Eugene Carpenter
Non-Confidential
Dora Solares vs.
Ralph Diaz, et al.

**reporter** 5:3,10,23 9:5 50:12,18,20 62:19 71:3 81:7,10 90:15 104:21,22 116:17,19 136:23 137:2,5,8,14, 21 138:17,21 139:1

**reports** 19:25 21:2,10 22:4,13,15 23:4,6, 13,16,25 25:12,14 26:2 31:15 49:4 76:6,11 109:10 111:12 123:2

**represent** 5:15

**requested** 10:17

**require** 23:22

**required** 16:11 73:9 112:20

**research** 77:3

**reserves** 137:18

**residents** 12:12

**resorted** 78:12

**respect** 114:11 125:23

**respond** 71:11

**response** 12:23 78:17 79:19 106:15

**rest** 42:24 58:25 135:3

**resting** 42:19

**restrained** 29:24 134:17

**restrict** 135:9

**retained** 7:5,6,11,13 15:2 107:18

**retire** 9:18

**return** 137:21

**review** 10:8 17:25

20:15 21:16 22:17, 24 24:5 25:22 30:13 33:5 94:3 112:16,20 120:24 125:4 137:6, 13 138:10,19,21,23

**reviewed** 18:10 22:3 23:2,6,15,25 110:21 112:14 120:16 125:13 136:18

**reviewing** 19:7 20:6 76:6 122:8

**right** 5:24 6:10 10:2 14:16 15:1,13 17:2, 24 18:1,9 25:7,9,15 28:4 29:7 30:6 31:17 35:4,13,24 36:2,5,23 41:20 42:22 44:17, 18 49:8 51:9,24 53:4 54:17,19 55:23 57:24 58:9,10,21,24 59:2 60:13,17 61:5, 16,21 66:25 67:1,4 71:19,23 73:15,18 79:20 80:10,15 86:7 90:11 94:11,20 95:1, 12 96:13,20 103:13, 20 104:19 105:3 106:4,13,21 107:3,6, 23 108:10,19,23 113:23 126:16 131:11,18 133:19 136:8 137:18 138:1, 2,7,19

**rigor** 76:23 104:7,13 105:1,11,20 106:13, 25 121:22 122:11

**ring** 45:19

**ritual** 133:10

**road** 48:13

**role** 17:20 91:6

**rolled** 136:16

**Romero** 29:9 33:2,13 41:18,24 45:10 46:23 50:6 55:4,25 65:11,12 67:10,13 69:17 75:10 76:18 78:2 85:13 91:9 103:13 112:1 115:16 120:15 129:18 133:2,3 134:1,10 135:11

**Romero's** 65:5 66:9, 14 76:7 113:19 133:7 136:7

**room** 39:5 41:13,16 42:13 45:20

**rope** 14:24 124:1

**rotating** 11:19

**rough** 16:3 47:19,21 48:8 49:20 137:25

**rounded** 77:4

**routine** 97:4

**rude** 99:4

**rule** 48:19 77:13 117:15 120:14

**run** 14:22

**runners** 42:23

**running** 91:1 104:17

---

**S**

---

**S-E-A-K** 9:19

**S-I-L-V-A** 98:24

**safe** 22:15

**salt** 53:17

**sandbag** 38:20

**saturated** 108:13

**saved** 54:9

**saw** 17:13 94:16,19 111:13,17,19 125:13 136:15

**saying** 19:19 37:11 62:20 74:24 103:4 105:21 108:5 122:18 131:12

**says** 30:13,14,15 31:21 46:8,18 88:18 90:4 103:25 106:23, 24 113:17 131:3

**scan** 20:19

**scanned** 20:18 21:4 94:4 105:8

**scenario** 27:1 135:16

**scene** 18:12,14,16,17 41:12 45:24 104:9, 14 105:1,12,20 106:13 107:6 108:5 109:13 111:7,8,9,12, 13,17 124:9 125:13, 21 136:7,11,20

**schedule** 115:5

**school** 11:20,21,24 12:3,4,5,6,7 114:1

**schools** 28:3

**Science** 12:4

**scientific** 133:13,25

**screaming** 91:1

**Seak** 9:19

**searches** 39:14

**seated** 78:22

**second** 29:18 38:25 39:22 40:4 70:24 71:1 75:20 104:17 110:20 113:21 131:17

**seconds** 31:19,24 33:3 35:14 37:7

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 157 of 163
Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

38:13 39:12 40:2,10, 12,15,17,19 41:9 42:7,11,15,16,20 43:24 56:22 57:5 75:15 76:5 95:19 96:10 122:15,16,23 123:13 129:2,16,17 130:5,11,18,19,21, 22 131:2,3,4,9,16

**section** 22:17 72:18 78:21 106:24

**sections** 51:21 137:19

**see** 22:5,11 23:13 30:16,17 32:15,25 36:20 39:8 44:15 45:5 47:18 48:22 49:25 57:15 58:19, 21 77:16 91:8,11 96:3 104:24 113:3 115:11 121:3,8 126:12 132:10 136:10,16

**seeing** 112:7

**seemingly** 39:1

**seen** 13:25 14:8 23:20,24 27:5 29:21 30:1 44:22 47:10 54:21 58:16 104:6 112:5 120:4 124:12, 24 125:5 126:4,6,9, 10

**seeping** 58:3

**sees** 58:1 123:24

**segment** 70:24

**seldom** 21:1

**seminar** 114:4

**send** 138:22,24

**sending** 138:6

**senior** 11:10 12:14

**sensation** 72:6,21,23, 24 73:9 75:22,24

**sense** 19:25 84:10, 14,16

**sensitive** 120:7

**sensory** 71:24 72:12

**separate** 10:1 25:13 52:11

**separately** 138:24

**sequence** 44:12 59:12,16,18 60:12 81:15 85:9

**serious** 97:19

**serve** 17:20 70:24

**service** 18:19,25

**sets** 19:9 21:24

**seventh** 67:1

**severe** 56:11 98:2 129:8

**severed** 56:16 61:15, 17 65:6 70:21 71:15, 22 72:3,4,6,12 129:15

**severely** 73:17

**shaking** 24:7

**shank-type** 61:24

**shanks** 38:2

**shared** 129:20

**sharp** 14:2 26:12,14 27:4 60:9 62:4 65:17 91:20 134:14

**sheet** 124:1 135:19 136:3

**sheets** 135:8 136:10, 16

**Sheriff** 10:3

**Sheriff's** 9:17

**Sherriff** 8:10

**shift** 15:1

**shiny** 47:16 53:10

**shock** 69:16,17 70:8, 10 72:14,15 97:14, 21 98:4 135:2,22

**shooting** 8:4

**shootings** 24:11

**short** 50:13 80:5 81:12

**shorted** 114:19

**shorthand** 5:10

**shot** 133:19

**shoulder** 60:14

**shoulders** 67:3

**show** 30:11 40:21 51:13 80:10 133:20

**shows** 77:3

**shut** 72:17

**sick** 24:8

**side** 17:21 23:19,23 35:13,24 36:2,23 38:11 48:15 60:13, 17 73:13 109:22,24 110:8

**sign** 57:18,20 78:11

**signed** 138:9

**significance** 133:24 134:5

**significant** 39:13,25 43:18 90:9 134:9,19 135:4

**significantly** 13:9 38:19 61:18

**signs** 49:18 50:3 52:25 53:5 54:2,22, 23,24 55:13,14 59:3 76:24 77:16 78:11 90:10 91:8 111:10 117:4 121:21,22

**Silva** 5:16,18 98:24

**similar** 94:17

**simplest** 63:7

**simplicity** 121:1

**sir** 58:15

**sit** 84:25 135:7,8

**sitting** 29:24 48:7

**situation** 14:23 22:6 85:24 90:24

**six** 104:6

**size** 94:14

**skeptical** 109:9,13 113:9 126:20

**skimmed** 21:15,23

**skin** 13:22 36:14 44:20 51:11 53:10 59:5 66:22,24 117:4 123:20

**skull** 14:9 67:4,5 70:20,21

**slamming** 14:14

**slap** 33:15

**slash** 47:24 60:7

**sleeping** 26:21 42:19 134:25

**slide** 110:5

**slides** 48:14 50:1

**Slowbook** 7:4

**slowly** 41:8

**slows** 41:1

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 158 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**small** 26:22 27:6 91:21 108:9 134:25

**Smith** 108:4,17 116:4

**smooth** 47:20

**smother** 14:5

**sneak** 46:5

**socket** 51:17

**soft** 67:4 123:22,23 131:23,24 135:4,19, 21,23 136:2,5

**Solares** 5:6 6:9 9:11

**solid** 30:13

**solidly** 21:6

**somebody** 70:7 85:25

**someone's** 135:18

**soon** 35:18 37:2 39:25 46:2 60:22 78:5 118:8 136:1

**sorry** 7:9 15:23 36:7, 12 62:16,19 71:5 75:5 78:14 95:10 106:16 108:12 111:14 138:4

**sort** 24:21 25:10 26:23 37:5 42:14 72:20 80:14 97:11 130:25 133:13

**sorts** 96:18

**sound** 80:7

**sounds** 7:7 10:13 13:18 30:6 38:9 55:6 79:1,11 85:7

**source** 86:9 110:19 111:4

**sources** 28:24 125:9

**South** 12:7

**space** 30:16 95:6

**spaces** 35:6

**span** 131:16

**spasm** 41:1,3

**speak** 16:11 17:11 115:9

**speaking** 61:9 66:14 123:12

**speaks** 26:5

**specialist** 91:5 124:20

**specific** 16:4,5 18:4,6 19:23 22:15 39:9 53:13 80:14

**specifically** 16:19 19:12 80:13 136:17

**speckle** 55:14

**speculate** 16:16

**speculation** 30:25 36:10 72:23 91:14 97:25 134:2

**speculative** 122:22 136:13

**Speed** 25:3

**spinal** 33:11 35:4 37:21 44:23 60:1,4, 10 61:15,21 62:14 65:5,18 66:7,18,21 71:9,14,22 72:1,2, 13,15 73:6,16 74:11, 13 75:16,17 84:5 85:23 92:5 96:16 97:14

**spine** 35:6 44:23 61:21 62:6 67:1,5 71:8

**splatter** 109:7

**spot** 67:4

**spotty** 55:14

**squeeze** 57:20

**squirts** 41:4

**squish** 43:7

**stab** 10:25 13:5,10 31:5 33:3,10 35:18, 21 37:20 38:3,19,24 39:5 40:8 44:17 46:14 47:23 53:22 59:25 60:6,12,14,20 61:20,25 66:7 71:14 73:12 74:21 81:17, 18 84:13,22 85:21 88:7,10,15 90:23 96:4,8 98:1 120:4 123:8 134:15

**stabbed** 31:18 69:20 70:3,9 75:16 85:3,13 88:13 90:8 122:18 135:13,19

**stabbing** 6:23 7:2,21 12:21,22 14:8 24:3 29:25 32:22 33:12 35:11 38:2 85:1 88:6,7 91:2

**stabbings** 85:4

**stabs** 61:15 66:18

**staff** 11:9 21:13 22:15 76:11

**stamp** 20:2

**stand** 128:4

**standard** 39:2 128:5, 25 129:23,25

**standardized** 108:9

**Starling** 15:6

**start** 9:3,14 25:25 75:13 78:19 85:1 99:5

**started** 35:19 44:4

46:23,24 88:6,7

**starts** 36:24 40:5

**state** 5:12 9:25 104:5 130:6,10

**statement** 37:2 39:8 41:10 42:10,11 44:4 49:17,18 51:18,23 53:2,17 56:14,15 57:25 61:6 65:4 86:6 95:16,20 96:10 122:14 130:18 131:18

**statements** 30:22,23

**states** 104:6 130:20, 21

**statistical** 77:7 123:12,13 128:21 129:22

**statistically** 61:9 79:8

**status** 115:1

**stay** 17:19 53:19 80:10 137:15

**Stephanie** 7:3

**Sterling** 5:21 15:2,9, 14 16:18

**stick** 16:15 20:24 28:14 30:9,15 59:21 60:5 86:4

**stipulated** 24:16,19

**stipulation** 13:8

**Stocker** 5:17 36:7 79:13 81:2,5,14 98:10,14,23 101:3 103:3,17 104:23 110:23 111:3 115:22 116:14,20 136:25 137:2,4,24 138:12

**Stockton** 136:23

Index: small–Stockton

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 159 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**stomach** 97:2

**stop** 73:24 130:23 132:8

**stopped** 44:1 117:8

**stops** 129:6

**straightforward** 24:15

**stranger** 45:22 115:9

**strangled** 110:4

**strangulation** 11:1 13:6 14:11 107:14

**straps** 133:4

**strength** 66:14

**strengthens** 75:4,8

**stretch** 32:6

**strips** 136:19

**strong** 14:5 27:2,8 31:13 32:19,20 33:13 40:23 41:24, 25 67:16 85:22

**structure** 62:5

**struggle** 27:6 42:14 46:24 47:17 48:12 80:18 91:10 97:5

**struggled** 77:24

**struggling** 48:16,17 97:11

**studies** 52:2 54:10 59:9 108:8,9,18 109:2 128:17

**studious** 110:6

**study** 108:3,4

**stuff** 47:7 111:10

**stump** 132:23

**subcutaneous** 66:25

**subdue** 88:10

**subject** 78:19

**subjective** 70:12 72:23 118:10,16 128:17 129:7

**subjects** 109:3

**substantial** 108:22

**substantiated** 29:3 120:9 124:25

**substantive** 51:1

**subtle** 13:15

**sucked** 43:20

**sudden** 17:7 70:7 123:4 135:1

**suddenly** 38:24 40:3 123:10

**suffer** 39:4

**suffered** 69:8

**suffering** 17:5,15 36:17 45:2

**sufficient** 29:15,21 51:20 70:10 73:22 75:25

**sufficiently** 72:1,16 74:21 75:21

**suggest** 29:14

**suggested** 129:23

**suicide** 114:12 132:2 133:18,19

**summary** 18:22

**super** 77:2

**supervise** 12:12

**supervising** 24:23

**supervisions** 13:2

**supply** 40:4 43:18,20 61:8 122:25 123:10

130:20

**support** 27:24 30:14 32:17 113:16

**supported** 80:6 111:6 122:10,11

**supports** 80:7

**supposed** 33:13

**sure** 9:4 43:9 48:23 53:15 58:23 59:23 69:25 70:13 81:3 96:24,25 98:25 112:2 128:10

**surface** 44:20 47:19, 21 48:8 49:21 57:13 84:25 108:18

**surfaces** 57:9 108:10 116:7

**surgeon** 105:22 106:16,17,20,21

**surgery** 11:22

**surprise** 26:20 33:15 46:3,5

**surprised** 29:23 43:23 134:25

**surrounding** 62:6

**survive** 43:17

**surviving** 129:8

**susceptible** 120:7

**suspect** 20:21 104:5

**suspects** 113:10

**sustained** 56:18

**swallowed** 54:23

**swallowing** 55:17,19

**sworn** 6:2

**symmetrical** 48:15 49:12

**system** 71:12 80:1 117:11 125:2

---

**T**

**take** 18:17 76:5 80:20,25 81:2 84:12 86:2 88:16 125:8

**taken** 6:10,15 19:5 43:23 50:19 51:21 52:20 53:17 81:9 116:18 121:20

**takes** 24:9 84:20,23 91:4 129:5

**talk** 16:13 17:1 18:7,9 25:12 42:23 52:24 66:17 71:7,13 73:11 78:15,16,20 79:18 97:16,23 131:22

**talked** 16:3 25:22 37:6 40:24 51:5 59:16 70:19 81:15 97:13 103:19

**talking** 40:13,20 42:6 49:8 50:5 53:20 78:21 98:20

**talks** 37:6

**target** 38:4 61:23 62:3 85:23,24

**team** 77:3 138:22

**technological** 50:25

**tell** 11:2,6 26:1,2 46:7,21,22 48:2,3 50:4,8 51:7,12 53:22 55:25 59:12,15 61:3 77:25 78:14 85:9 91:17 117:7 125:5

**telling** 10:5 94:9 129:9

**temperature** 76:22,25

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 160 of 163

Volume 1                          Non-Confidential                    Dora Solares vs.
Eugene Carpenter                                                      Ralph Diaz, et al.

77:5,9,15 78:10,11,
14 80:17 121:20,21,
24,25

**temperatures** 80:20

**ten** 13:10 14:18
122:16 130:18,19,20
131:2,3

**tends** 30:10

**tense** 69:7

**term** 52:17,19 130:1

**terms** 73:20 74:4
120:19,20 121:14

**territory** 60:21

**tested** 116:8

**testified** 6:2 9:14
10:22 103:9 121:13
122:17

**testify** 8:8 110:11

**testifying** 8:18,24

**testimonies** 6:20

**testimony** 12:24
23:22 24:1 32:13
38:8 69:23 72:8
73:20 74:4 90:13
95:22 128:17 130:14

**text** 80:6

**textbook** 37:3 40:25
123:12

**textbooks** 39:15 79:5
128:23

**texts** 129:21

**thank** 5:23 8:17 23:1,
12 25:2,9 51:5 57:6
61:12 76:2 80:24
81:7 98:9 112:4
113:18 114:16,22
116:21 125:12
126:24 136:22,25

137:4

**Thanks** 113:24
114:18

**thereabouts** 25:18

**thin** 108:9

**thing** 7:23 13:23 24:5,
22 60:25 66:9 77:5,
14 96:9 121:23
127:19 135:7

**things** 18:8 19:19
23:13 24:13 25:3

**think** 7:3 8:13 10:22
17:18 19:15 22:14
29:6 36:7 37:2 38:17
42:12 53:18 54:16,
18,19 55:5,6,21
56:23 58:5,22 59:10
61:12 65:4 72:19
74:17,23 76:2,3
78:15 80:12 86:6
95:10 98:8 103:23
105:10,17,18,23,24
106:1 108:14 118:7
120:17 126:7 129:17
137:22,24 138:22

**thinking** 38:22

**thinks** 106:10

**Thirty-six** 121:19

**thought** 20:17 75:6
84:12 106:4 138:7

**thoughts** 131:7

**threatening** 88:17

**three** 6:13,18 11:11
12:2,16 24:13 77:1,
4,10 78:11 97:13
103:10,23,24 106:19

**throat** 31:5,18,23
35:13,24 36:5,14,15,
23 44:17 45:4 54:25
55:20 60:17,21

61:25 65:12,14,18,
21,22,25 66:10,13
67:11,14,15 73:4,10
74:22 82:3 123:23

**throats** 67:19

**throw** 91:24

**Thursday** 5:1

**tie** 133:5

**tied** 14:23 124:5,9
133:8,10 134:7,18,
20 135:1,4,12,13,18
136:8

**tighten** 66:18

**time** 5:4 6:14,21 12:7
27:14,16,18,25 37:4,
11,12,19 39:22
46:10 47:15 49:21
52:10 53:1,4 56:11
65:20 67:10 72:14
76:11,12,14,15,18
77:2,19 78:5,6,8
79:7 80:3,13 81:3,5
82:4 84:17,19,23
85:3 96:17 97:6
98:11 103:8,10,13
104:6 106:7 107:2
109:5,8,15 114:13
116:21 118:8 121:24
122:2,3,6,10,12,18,
22 123:8,21 131:17
134:18

**timeframe** 79:3

**times** 6:12,13 10:24
12:24 23:21 35:25
54:25 80:18 125:18
129:2

**timing** 37:11

**tiny** 29:22 69:11
91:18 92:1 134:14

**tissue** 51:21 52:13,14
54:3,9 57:15,19

66:22,25 120:6

**tissues** 36:14 44:2
48:21 53:8,16 58:8
117:11 120:7,8

**today** 6:8 8:20 9:11
98:11

**today's** 5:4,11

**told** 20:3,14 121:10

**tone** 110:22,23,24

**tool** 125:21

**top** 22:19 42:1 55:1
60:14 88:5

**topic** 124:13 125:12

**torn** 13:15,21,22

**total** 40:9

**totally** 73:3

**towel** 108:15 109:1

**towels** 108:13

**track** 38:6

**traditionally** 123:1

**traffic** 14:12

**train** 24:17

**trained** 11:8,17 45:24
46:4

**training** 59:22 79:6
113:25 114:3

**transcript** 33:20 35:1
63:13 65:1 67:23
69:1 82:10 84:1
86:14 88:1,22 90:1
92:10 94:1 99:11
101:1,9 103:1 105:3
118:20 120:1 137:3
138:18

**transcripts** 112:14

**transferred** 12:5

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 161 of 163

**Volume 1**
**Eugene Carpenter**

**Non-Confidential**

**Dora Solares vs.**
**Ralph Diaz, et al.**

**translated** 16:12

**translucent** 53:11

**trauma** 10:25 13:5
14:6,9,10,13,17 24:7
31:11 38:20 55:20
118:14

**traumatic** 69:17
118:13 135:2

**trial** 8:11 110:6 116:2

**trigger** 70:10

**true** 22:6,16 29:20
41:23 46:8 104:12
106:12 129:1,4

**truth** 94:9

**truthful** 28:17

**try** 17:18 47:7,9 67:16
108:1 113:2 133:17

**trying** 42:24 55:3
67:13 77:24 80:23
92:5 121:23 131:14

**Tulane** 11:21 12:5

**Tularia** 6:24

**turn** 51:5 62:1 81:2,
14 98:10

**turning** 84:21

**Turns** 133:20

**twine** 132:24

**twisted** 136:10

**two** 6:13,22 12:2
23:4,13 25:13 30:1
31:19,24 33:4 35:15
37:4 39:7 45:19
47:10,23 49:20 50:5
54:24 56:5,9,15
61:7,11 71:17 77:6,
20,23 78:7,9 80:5,8
84:4,8,12,16 85:5,7,
12 86:1 88:5,9

94:23,24 97:13
106:7 109:3 113:5
122:3 123:14

**two-year** 12:3,7

**type** 22:6 32:18 36:17
62:14 84:14 90:5
124:10,19

**types** 47:16

---

**U**

---

**unable** 131:4

**unaware** 26:21

**unbelievable** 135:15

**uncomfortable** 115:6

**unconscious** 40:10
74:20 117:15,16,22,
24 118:1,3,8,13
127:6,8,9,15,16,20,
25 128:1,2,7,9,11,15
129:9,18 130:1,5
131:15 132:7

**unconsciousness**
31:9 122:16,20,23
130:10 131:10

**undergrad** 11:24

**undergraduate** 12:1

**underneath** 53:10
57:14 66:1,25 67:1,4
73:15

**understand** 6:9 8:23
16:13 19:22 27:7
37:15 44:8 47:7,25
53:18 55:3,21 56:23
57:6 58:5 59:10
61:12 72:19 76:2
80:12,24 85:8 95:22
96:2 105:25 109:20
122:9,24 125:24
126:20 127:11

128:10 130:16,24
131:14 132:17

**understandable** 46:9

**understanding** 46:17
97:18 125:10 130:8

**understood** 8:17
14:21 18:9 22:13,21
23:12 25:6 46:21
49:7 50:10

**unique** 17:3 124:10

**University** 11:23

**unknown** 27:14,20,21
37:19,22 40:6,8 46:9
60:4 96:14

**unknowns** 27:20

**unlicensed** 12:15

**unlucky** 74:21

**unqualified** 126:12

**unrestrained** 84:20

**updated** 23:9

**upper** 46:15 47:11
55:16,18 59:24
60:13 61:21 77:25
78:4

**USC** 11:20 133:16

**use** 65:17 108:9
122:9

**useful** 37:2

**usual** 8:5 24:2 43:6
91:22 120:25

**usually** 13:24 14:5

---

**V**

---

**VA** 11:18

**vague** 19:9,15 26:5
37:10,12 39:18 49:2,

4 95:22 115:17
127:10 132:17,19,22

**Vaguely** 113:21

**valid** 39:8

**valuable** 79:8 85:24
111:11

**value** 17:21 24:22
78:12 122:12

**variation** 39:10,11
40:22 42:12 61:10
77:7 79:9

**variations** 41:11 44:5

**various** 21:13

**varying** 125:18

**vein** 56:12

**veins** 36:25 37:1

**version** 138:23

**versus** 5:6 6:9 8:13
39:19 117:2 121:13
127:11 128:17
131:23 133:18

**vertebrae** 70:19

**vertebral** 62:13 67:1
70:25 71:1,11

**vessel** 41:15 56:22
75:20

**vessels** 31:5,18,23
35:13 36:5 55:20
56:12 60:17 65:13
67:11

**victim** 14:23 26:25
32:25 41:7

**video** 9:1

**view** 138:16

**vigorous** 88:12
90:13,14,16,24 91:7,
12 97:12

Case 1:20-cv-00323-LHR-FJS   Document 295   Filed 08/04/26   Page 162 of 163

Volume 1
Eugene Carpenter

Non-Confidential

Dora Solares vs.
Ralph Diaz, et al.

**violent** 132:9

**vital** 49:18 51:18 74:10

**voicebox** 44:16

**volunteer** 67:17

**vulnerable** 67:5

---

**W**

---

**wait** 9:2,5,7 110:20

**waive** 137:11

**wall** 47:12 53:25 57:10,13,19 58:8 78:22 111:19 112:6

**walls** 111:25

**Walter** 106:20,21

**wandered** 29:5

**want** 50:12,13,16 51:5 58:23 61:13 70:15 76:4 78:15,16 81:19,25 90:22 95:13 114:19 121:14 128:9 138:18,23

**wanted** 7:24 16:18 21:11 57:6 63:8 76:17 95:12 115:5

**warm** 78:13 80:21

**washed** 19:1,2,6

**way** 10:7 14:4 15:13 37:24 42:13,22 46:12,13,16,18,21, 24 48:2,3,25 49:14, 15 50:8 52:5 53:22 55:24 59:11 61:3 62:4 66:20 67:8,14 74:8 75:19 78:4 79:3 97:19,21 123:9

**ways** 13:25

**we're** 50:11 90:8

**we've** 19:4

**weakest** 126:13

**weakly** 54:12

**weapon** 26:21 29:23 35:5 44:24 61:24 62:9,14 74:2 91:19, 21 92:1,4 134:14

**weeks** 25:21

**weight** 42:1,7 54:5

**weird** 124:17

**welcome** 98:12 116:22

**welling** 115:9

**went** 9:13 12:1 29:17 110:1,6

**weren't** 127:21

**Western** 114:4

**whiplash** 32:17

**wife** 104:20

**wiggle** 33:15 42:13

**willing** 137:10

**witness** 6:25 7:11,14, 16,17,20 8:5 9:20 16:23 35:3 47:8 48:1 62:21 63:4 69:3 73:22 74:6 84:3 90:3 94:3 98:1,12 103:16 105:15 107:12 115:19 116:22 120:3,23 128:19 137:10

**women** 39:10

**wonder** 74:9

**Wonderful** 9:10,13

**wonders** 124:10

**word** 52:17

**worded** 110:25 136:13

**wording** 23:3 95:14

**words** 74:4 136:9

**work** 9:24 10:1 11:7 12:19 15:2,9 17:18 28:2 40:18 77:8 116:1

**worked** 12:22 15:5 17:8 23:18 126:14

**world** 28:3 65:11

**worthless** 79:7,10 121:22,23

**wouldn't** 136:4

**wound** 12:25 13:4,5, 8,10 31:5 33:3 35:18,21 38:10 45:11 46:14 47:5,24 51:8,15 52:14,15,17, 20 54:2 56:10,11 57:1,4 59:16,17,23 60:6 61:20,25 69:8 71:15 74:21 84:19, 22 85:21 88:10 90:23 95:18,19 96:4, 8,24 98:1 117:4 120:4 123:8

**wounded** 51:11 74:10

**wounding** 53:25 61:20 81:22,24 95:16

**wounds** 10:24,25 12:20,25 24:2 25:1 26:15,18,19 27:5 28:9 29:16,22 31:14 33:10 35:22 37:20 38:3,19,24 39:5 40:8 41:18 44:12,17,20, 25 45:23,24 48:22 49:1,3,4,7,11 51:7,

14 52:7,8,23,24 53:20,21,22 55:5,7 58:25 59:6,13,25 60:12,14,21 66:7 73:12 85:10 86:5 90:11,14,17,18 91:9, 20 92:3 97:1 117:4, 12 121:6 134:14,16

**wow** 17:14

**wrap** 57:14

**wrestling** 26:23 27:1 31:9 32:18 66:4 88:17 90:25

**wrist** 123:22,25

**write** 16:2

**writing** 18:3 104:24 110:15,17 112:25

**writings** 111:19,22, 23,25 112:6

**written** 61:14 111:22, 23

**wrong** 38:8,14,15

**wrongful** 6:24 8:3,6,8 17:4

**wrote** 16:2 17:25 26:2 99:5 108:2 112:15, 21

---

**Y**

---

**yard** 13:12 38:1

**yeah** 10:14 25:5 40:2 58:20 61:7 73:15

**year** 7:2 8:10 9:17,18 11:9 15:10 114:4

**years** 10:21 12:2,3,17 17:7 20:13,24 21:3 24:9,16 28:2,14,16 45:25 77:23 113:11

Case 1:20-cv-00323-LHR-FJS    Document 295    Filed 08/04/26    Page 163 of 163
Volume 1                      Non-Confidential                  Dora Solares vs.
Eugene Carpenter                                                Ralph Diaz, et al.

121:19 126:4,14

**yellow**  50:2 53:14
59:3 117:5

**young**  24:17,21

**Yup**  70:5

---

### Z

---

**Zoom**  5:8