Justin E. Sterling, State Bar No. 249491
LAW OFFICES OF JUSTIN STERLING
Justin@SterlingDefense.com
15760 Ventura Blvd. Suite 700
Encino, CA 91436
Tel. (818) 995-9452/Fax. (818) 824-3533

Erin Darling, State Bar No. 259724
LAW OFFICES OF ERIN DARLING
Erin@ErinDarlingLaw.com
3435 Wilshire Blvd. Suite 2910
Los Angeles, CA 90010
Tel. (323) 736-2230

Attorneys for Plaintiff Dora Solares

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DORA SOLARES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RALPH DIAZ, in his individual capacity, KENNETH CLARK, in his individual capacity, JOSEPH BURNS, in his individual, and DOES 1 TO 15, in their individual capacities<br><br>Defendants. | Case No. 1:20-cv-00323-LHR-FJS (PC)<br><br>**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES AND OBJECTIONS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(filed concurrently with Plaintiff's Opposition to Defendants' Motion for Summary Judgment)<br><br>Date: September 11, 2026<br>Time: 9:00 a.m. (Pacific time)<br>Judge: Hon. Lee H. Rosenthal<br>Action Filed: March 2, 2020 |

TO THE HONORABLE COURT, ALL PARTIES, AND TO THEIR ATTORNEYS OF RECORD:

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260(b), Plaintiff Dora Solares hereby submits this Statement of Genuine Disputes and Objections in opposition to the Motion for Summary Judgment of Defendants Burnes, Gamboa,

Garcia, Gallemore, Maytubby, Munoz, Loza, and Pena. The left-hand column below reproduces, in order, the facts asserted in Defendants' Statement of Undisputed Material Facts (ECF No. 294-1) and the evidence Defendants cite in support of each. Plaintiff's response to each asserted fact, together with Plaintiff's evidentiary objections and citations to the record establishing that genuine disputes of material fact preclude summary judgment, appears in the right-hand column.

# PLAINTIFF'S STATEMENT OF GENUINE DISPUTES AND OBJECTIONS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| 1. An Institutional Classification Committee (ICC) at a California Department of Corrections and Rehabilitation (CDCR) prison reviews an inmate's case factors, such as custody level, disabilities, medical needs, restricted housing, and mental health participation, and makes determinations regarding where within the prison system that inmate can and should be housed.<br><br>Moreno Decl. ¶ 3; Gamboa Decl. ¶ 3; Cal. Code Regs. tit. 15, § 3375 (2019). | Objection: Assumes facts, vague and ambiguous, misleading and compound.<br><br>Disputed in part.<br><br>ICC determinations relative to housing inmates are not exclusively predicated on "reviewing" case factors. ICC consults directly with Psychiatric Services Unit, the Warden and/or his designee, Healthcare Services, in addition to relying on applicable state law, California Code of Regulations, title 15, section 3269 and memoranda including "Kernan" memo "Duncan" memo in rendering its housing directives. ICC can also make determinations based on conduct prior to a CDCR term.<br><br>Parker Decl. pg. 2, ¶10 |
| 2. An ICC consists of three members: (1) a correctional counselor; (2) a captain or acting captain, and (3) the warden or warden's designee, who acts as the chairperson. An ICC can also include additional participants, such as a correctional officer or sergeant and a mental health representative.<br><br>Moreno Decl. ¶ 4; Gamboa Decl. ¶ 5. | Undisputed. |
| 3. Before the committee, the correctional counselor reviews the inmates' files and prepares a recommendation of any actions for the committee to take as to | Objection: Assumes facts, lacks foundation, vague, ambiguous, compound and misleading. |

[redacted]

[redacted]

[redacted]

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | [redacted] |
| | 135:13-20; 155:20-156:20; 148:1-4; |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | |
| 1 [redacted] | |
| B [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|

[redacted]

1 [redacted]

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |

[redacted]

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|

[redacted]

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |

[redacted]

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | [redacted] |
|---|---|
| [redacted] | |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | Undisputed. |

[redacted]

[redacted]

| **DEFENDANTS' ALLEGED FACTS AND SUPPORT** | **PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS** |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | [redacted] |
| | [redacted] |
| [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | nonclinical staff is mandatory when [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | Sergeant Barajas's 9/1/2018 chrono , [redacted] |
| 37 [redacted] | [redacted] |
| 38 [redacted] | [redacted] |
| 39 [redacted] | [redacted] |
| 40 [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |
| 41. Separate from an ICC, mental health staff are required to report any threat to the safety of an individual (of which custody staff is not already aware) to | Undisputed. |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| custody staff.<br><br>Maytubby Decl. ¶¶ 12-13; Grey Decl. at 4. | |
| 42. If the threat necessitates a specific type of housing, such as single-cell or double-cell, mental health staff would convene an Interdisciplinary Treatment Team (IDTT) to make documented findings and a recommendation to custody staff on a form 128-C.<br><br>Maytubby Decl. ¶¶ 12-13; Grey Decl. at 4. | Undisputed. |
| 43. Maytubby did not know, and did not have any reason to know, before Luis Romero died in March 2019, that Jaime Osuna presented a threat to other inmates generally.<br><br>Maytubby Decl. ¶¶ 8-10, 13. | Objection: Assumes facts, vague and ambiguous, misleading and compound.<br><br>Disputed<br><br>Maytubby had suspicions about Osuna, had unfettered access to his mental health records, yet told the committee he was acting "appropriate."<br><br>[redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | [redacted] |
| 44. Defendant Maytubby did not know before Luis Romero's death that Jaime Osuna presented a danger to Luis Romero.<br><br>Maytubby Decl. ¶¶ 8-10. | Objection: Assumes facts, vague and ambiguous, misleading and compound.<br><br>Disputed.<br><br>[redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | d[redacted] |
| 45. Defendant Burnes did not know at any time before Luis Romero's death, that Osuna was a danger to a potential cellmate.<br><br>Burnes Decl. ¶ 6. | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted]<br><br>[redacted]<br><br>[redacted]<br><br>[redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |
| 46. Under CDCR policy, when a new inmate arrives at California State Prison, Corcoran, or any CDCR prison, and the new inmate is double-cell cleared, the inmate can, and should, be housed with a compatible cellmate on the same day in order to maximize cell usage.<br><br>Burnes Decl. ¶ 31; Munoz Decl. ¶ 12; Loza Decl. ¶ 9. | [redacted] |
| 47. The process for assigning more than one inmate to a cell in a restricted housing unit is described in Department Operations Manual section 54046.7.1 (2019 version). The process is initiated by either a staff recommendation or a request by the inmate. | Undisputed. |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | meet and speak to one another [redacted] |
| [redacted] | [redacted] |
| 51. [redacted] Loz [redacted] | [redacted] |
| 52. [redacted] Loz [redacted] De [redacted] | [redacted] |
| 53. [redacted] Bur [redacted] | [redacted] |
| 54. [redacted] Bur [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | Burnes mentions a 2016 in-cell fight [redacted] |
| 55. [redacted] Bu [redacted] | [redacted] l [redacted] , [redacted] |
| 56. [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| a histor of a ression toward staff and [redacted] Bu [redacted] | Misleadin . [redacted] |
| 57. [redacted] Bu [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | comprehensive risk assessment [redacted] |
| 58. [redacted] | [redacted] |
| 59. [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |
| 6 | |
| 6 | |
| 6 | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | [redacted] |
| 63. [redacted] Bur [redacted] | [redacted] the review "put him on notice that |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | [redacted] , |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | gassing, his CCCMS, his prior EOP, [redacted] |
| 64 [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | [redacted] l [redacted] a |
| 67. [redacted] Lo | [redacted] |
| 68. [redacted] Loza ec . . | [redacted] , |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | |
| 69. [redacted] Lo [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | 10 83:25-84:22. |
| 72 [redacted] | [redacted] |
| 73 [redacted] | [redacted] |
| 74 [redacted] | [redacted] |
| 75 [redacted] | [redacted] |

| DEFENDANTS’ ALLEGED FACTS AND SUPPORT | PLAINTIFF’S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| [redacted] | [redacted] |
| 76. [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | Munoz was also aware of Osuna's [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| [redacted] | whether Osuna shouldn't be double- [redacted] |
| 77. [redacted] M [redacted] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |

| **DEFENDANTS' ALLEGED FACTS AND SUPPORT** | **PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS** |
|---|---|
| | [redacted] |
| 78. Munoz's review of both inmates' histories found that [REDACTED IN THE PUBLICLY FILED VERSION].<br><br>Munoz Decl. ¶¶ 17-23. | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | Munoz was also aware of Osuna's [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | whether Osuna shouldn't be double- [redacted] |
| 79. Munoz did not find any facts in his review that prevented Osuna and Romero from celling together under CDCR policy. And Munoz did not know that being celled with Jaime Osuna presented an excessive risk of substantial harm to Luis Romero. Romero was placed in the cell with Osuna on March 7, 2019.<br><br>Munoz Decl. ¶¶ 6-7, 15-23. | [redacted]<br><br>Munoz was also aware of Osuna's |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | ’ [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |
| 80. Defendant Burnes was not involved in the 1882-B process to cell Osuna and Romero together on March 7, 2019.<br><br>Munoz Decl. Ex. A; Burnes Decl. ¶ 33. | [redacted] |
| 81. On the night of March 8-9, 2019, Defendant Gallemore was stationed as the control-booth officer in building 4A1R for the 10:00 p.m.-6:00 a.m. shift (first watch). The control booth is an elevated room without direct access to the floor of the housing unit.<br><br>Gallemore Decl. ¶¶ 4, 9. | [redacted] |
| 82. On the morning of March 9, 2019, Defendant Garcia was stationed as the control-booth officer in building 4A1R for the 6:00 a.m.-2:00 p.m. shift (second watch).<br><br>Garcia Decl. ¶¶ 3, 9. | Undisputed. |
| 83. Control-booth officers are responsible | Undisputed. |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| for monitoring the unit and providing coverage for the floor officers while they conducted their duties inside the housing unit.<br><br>Garcia Decl. ¶ 5; Gallemore Decl. ¶ 5. | |
| 84. Although Gallemore and Garcia could observe the housing unit from the control booth, they could not see into the cells or determine whether cell windows were covered and preventing the floor officers from conducting their checks. Instead, they relied upon the floor officers to notify them if they could not see into a cell or properly conduct the cell checks.<br><br>Garcia Decl. ¶ 6; Gallemore Decl. ¶ 6. | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |
| 85. If a floor officer notified Gallemore or Garcia that a cell's window was covered up, Gallemore or Garcia could call for assistance from other officers.<br><br>Garcia Decl. ¶ 6; Gallemore Decl. ¶ 6. | [redacted] contradicted by the evidentiary |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | record olic and relevant orders. [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | |
| 86. If Gallemore and Garcia became aware that an inmate needed assistance or was being disruptive, they would notify their floor officers to take action.<br><br>Garcia Decl. ¶¶ 7-8; Gallemore Decl. ¶¶ 7-8. | Ob ection: Calls for s eculation [redacted] |
| 87. Gallemore and Garcia were familiar with Osuna and his history in prison, and they knew that Romero had recently been housed with Osuna, but they had no reason to think that Romero faced a risk of harm from housing with Osuna.<br><br>Garcia Decl. ¶ 11; Gallemore Decl. ¶ 11. | |
| 88. When Gallemore began his first-watch shift, nothing appeared to be out of the ordinary.<br><br>Gallemore Decl. ¶¶ 10-13. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | " " [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | 22; 86:17-19; 95:6; 116:13–14. [redacted] |
| 89. For that first-watch shift, the floor officer was Defendant Silva. Gallemore had worked with floor officer Silva on previous occasions and believed him to be a dependable officer who performed his duties appropriately.<br><br>Gallemore Decl. ¶ 9. | |
| 90. During the first-watch shift, it appeared to Gallemore that there was some sort of obstruction in one of the windows in Cell 46 (where Romero and Osuna were housed), but he observed Silva as he appeared to conduct his thirty-minute checks as normal throughout the first-watch shift.<br><br>Gallemore Decl. ¶ 15. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | ” [redacted] |
| 91. Gallemore also observed Silva conduct three counts of the inmates at 12:30 a.m., 2:30 a.m., and 5:00 a.m.<br><br>Gallemore Decl. ¶ 15. | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | declaration Defendants have [redacted] |
| 92. Silva did not alert Gallemore to any issues with Cell 46, and the two did not have any discussions about Romero or Osuna.<br><br>Gallemore Decl. ¶ 15. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |
| 93. Nothing that occurred on Gallemore's shift brought his attention to or raised any concerns about Cell 46. There were no sounds of a struggle or distress indicating anyone had been harmed in Cell 46, and Gallemore did not hear any inmates communicating with each other from inside their cells. He had no reason to believe that Silva was not conducting his checks as normal, that Romero was at risk of any harm, or that Romero had been harmed during his shift.<br><br>Gallemore Decl. ¶ 17. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | covered…he could tell if somethin [redacted] |
| 94. Garcia began his second-watch shift with nothing appearing to be out of the ordinary.<br><br>Garcia Decl. ¶ 12. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | ossible that the cell window is [redacted] |
| 95. Garcia relied upon floor officer Defendant Pena to conduct periodic checks and notify him if he encountered | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| any issues on the morning of March 9, 2019.<br><br>Garcia Decl. ¶ 18. | [redacted] |
| 96. Garcia had worked with Pena in the past and had no reason to think he was not conducting his checks properly.<br><br>Garcia Decl. ¶ 9. | [redacted] |
| 97. Garcia observed Pena conduct multiple checks on each of the cells in 4A1R, including Cell 46.<br><br>Garcia Decl. ¶ 18. | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | [redacted] |
| 98. Garcia could not tell whether the windows were covered in Cell 46, but it did not appear that Pena had any issues completing his checks on Cell 46.<br><br>Garcia Decl. ¶ 12. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| | [redacted] |
| 99. Pena stopped briefly at Cell 46, as he had done at other cells during the shift, and then moved on to the next cell.<br><br>Garcia Decl. ¶ 12. | |
| 100. It appeared to Garcia that food and medication were distributed to the inmates as normal.<br><br>Garcia Decl. ¶ 14. | |
| 101. Garcia first learned that Cell 46's window was covered when Pena came into the staff office to alert Sergeant Martinez. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
| --- | --- |
| Garcia Decl. ¶ 14. | On March 9 2019 Garcia observed [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | not covered. [redacted] |
| 102. Garcia then saw Martinez and Pena go to Cell 46, heard them say that there was no movement in the cell, and then heard the alarm activate.<br><br>Garcia Decl. ¶ 15. | |
| 103. Staff responded to the alarm, Garcia opened the cell door when ordered, and Osuna was escorted out.<br><br>Garcia Decl. ¶ 16. | |
| 104. Defendant Pena was the floor officer in 4A1R during second watch on March 9, 2019.<br><br>Pena Decl. ¶ 8. | |
| 105. Before his shift started, Pena was familiar with Osuna and aware that he had been designated a gasser (inmate who has thrown liquids at staff), but did not believe that Osuna was more dangerous than any other inmate in 4A1R.<br><br>Pena Decl. ¶ 8. | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | housed alone for the entire period P[redacted]<br><br>[redacted] |
| 106. Pena was also familiar with and had spoken with Romero before March 9, 2019, and knew that Romero had recently been housed with Osuna. At the beginning of his shift, no reason to think that there was any risk from the two of them housing together.<br><br>Pena Decl. ¶ 9. | [redacted]<br><br>[redacted]<br><br>[redacted]<br><br>[redacted] |
| 107. Throughout his shift, Pena did not hear any sounds of distress or struggle or any other indication that Romero was being harmed in Cell 46.<br><br>Pena Decl. ¶ 10. | [redacted]<br><br>[redacted]<br><br>[redacted]<br><br>[redacted] |
| 108. [REDACTED IN THE PUBLICLY FILED VERSION] | [redacted] |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| Pena Decl. ¶ 11. | a [redacted]<br>[redacted]<br>[redacted]<br>[redacted] |
| [redacted]<br>[redacted] | [redacted]<br>[redacted]<br>[redacted] |
| [redacted]<br>[redacted] | [redacted], argumentative, and misleading. |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | Undisputed. |
| 111. [REDACTED IN THE PUBLICLY FILED VERSION]<br><br>Pena Decl. ¶ 15. | Undisputed. |
| 112. [REDACTED IN THE PUBLICLY FILED VERSION]<br><br>Pena Decl. ¶¶ 16-17. | Undisputed. |
| 113. When an officer sees an in-cell attack in progress, CDCR's response protocol requires the officer to activate their alarm and summon staff for assistance, not make immediate entry.<br><br>Pena Decl. ¶ 6. | Undisputed. |
| 114. Plaintiff's retained forensic pathologist, Dr. Carpenter, testified that the mechanism of death was "a rapid attack, controlled, getting to the throat vessels rather quickly, loss of consciousness within ten to thirty seconds and death within two to five minutes." Once the carotid artery was cut, no medical intervention would have saved Romero.<br><br>Carpenter Dep. 31:17–25; Carpenter Dep. 41:6–16. | Objection: Relevance, FRE 302, compound. Misleading.<br><br>Disputed in part.<br><br>Proper safety checks coupled with correctional officers performing their duties in an objectively reasonable manner would have prevented Romero's murder.<br><br>Parker Declaration pg. 13, ¶83. |
| 115. Burnes trained the officers working under him in accordance with CDCR policy, including to conduct Guard One visual cell checks every thirty minutes, to order inmates to remove window coverings, and if an inmate did not comply, to report the situation to the on-duty sergeant.<br><br>Burnes Decl. ¶ 39. | Objection: Assumes facts, lacks foundation, calls for speculation, vague, ambiguous, compound.<br><br>Disputed.<br><br>Burnes alleges he trained the officers working under him working under him in accordance with CDCR policy however there is no documentation to show that Burnes trained the CDCR staff members. |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | There was no production of OJT records by CDCR of these training documents by Burnes to prove that he completed that training for CDCR staff.<br><br>Parker pg. 15, ¶92. |
| 116. Burnes, who was a second-watch sergeant, was not working on the evening of March 8, 2019, or the morning of March 9, 2019, and was not supervising Gallemore, Garcia, Silva, Pena, or any other CDCR staff member when Romero was killed and his body was discovered.<br><br>Burnes Decl. ¶ 40. | Objection: Assumes facts, lacks foundation, calls for speculation, vague, ambiguous, compound.<br><br>Disputed in part.<br><br>Burnes before the evening of March 8, 2019 and before the morning of March 9, 2019 worked as the primary 2nd watch Sergeant in the building where Osuna was housed and Romero was killed. He was the Sergeant that made the decision to house Osuna and Romero together.<br><br>Parker Declaration pg. 15, ¶93. |
| 117. The primary role of the correctional sergeant at an ICC is to scribe any information regarding the inmate's housing that the committee wants recorded, and to provide safety and security in the committee room. A correctional sergeant in an ICC does not have a vote and does not sign the ICC's decision.<br><br>Burnes Decl. ¶ 19. | Objection: Assumes facts, lacks foundation, calls for speculation, argumentative.<br><br>Disputed in part.<br><br>Burnes was the scribe during Osuna's ICC and indicated in his declaration that he does not have a vote and does not sign the ICC's decision. Burnes admitted in his deposition that he could have provided information about Osuna to the ICC but does not recall providing the ICC with information. He acknowledged he could share |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| | information about the inmate if he knew pertinent information. Based on his multiple conversations with Kyle and his interactions with Osuna, he should have brought up his knowledge of Osuna during the ICC regarding his mental health and his violent behavior.<br><br>Parker Declaration pg. 15, ¶94. |
| 118. During the January 22, 2019 ICC, Sergeant Burnes was available to answer any questions that the committee members had about Osuna. But it was not necessary for Burnes to provide the committee with information that was already in Osuna's file, such as information about his commitment offense, rule violations in prison, and the results of previous ICCs because committee members have access to the inmate's electronically stored central file, and that file is reviewed before the committee by the correctional counselor.<br><br>Burnes Decl. ¶ 20. | Objection: Assumes facts, lacks [redacted] |
| 119. Factors such as committing murder, multiple assaults on prison staff, including gassing (throwing liquid such as blood or urine on officers), multiple assaults on inmates (outside the cell) | |

| DEFENDANTS' ALLEGED FACTS AND SUPPORT | PLAINTIFF'S OBJECTIONS AND OPPOSING POINTS |
|---|---|
| including one that resulted in the victim needing sixty-seven stitches, threats against prison staff, past expressions of a desire to harm or kill others, face tattoos, destruction of state sheets, having voodoo dolls in a cell, and drawing on the walls or floor of a cell, do not prevent an incarcerated person from being double-celled under CDCR policy.<br><br>Gamboa Decl. ¶¶ 14-20; Burnes Decl. ¶¶ 12-16, 22; Maytubby Decl. ¶ 14; Munoz Decl. ¶¶ 18-23. | [redacted] |

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS AND SUPPORTING EVIDENCE ("PMF")

| No | [redacted] |
|---|---|
| [redacted] | |

[redacted]

1 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | | |
|---|---|---|
| | "I got to let [the floor officer] know if they covered it so they can go take care of it." | |
| 68. | Pena logs four safety/welfare checks on Cell 46 without ever seeing a living, breathing inmate. The Guard One printout for Cell 46 shows that safety checks were logged at 0612 (06:12 a.m.), 0623 (06:23 a.m.), 0642 (06:42 a.m.), and 0722 hours (07:22 a.m.). | 68. Exhibit 38-Internal Affairs Investigation Report atDEF 4329; Exhibit 39-Printout for Cell 46 at DEF 4252. |
| 69. | Pena confirmed that he conducted Guard 1 safety checks with the pipe system at 6:12 a.m., 6:23 a.m., 6:42 a.m., and 7:22 a.m. | 69. Exh. 35-Pena Depo. at 36:12-21. |
| 70. | Pena conducted his first check around 6:12 a.m. but he was not able to look into Cell 46 "because it was covered." | 70. Exh. 35-Pena Depo. at 39:9-19. |
| 71. | Pena stated that he could not see in Cell 46 "at all." Despite not being able to look into Cell 46, Pena still tapped the pipe anyway. | 71. Exhibit 38-Internal Affairs Investigation Report at DEF 4357; Exh. 35-Pena Depo. at 39:20-21. |
| 72. | Pena did not notify anyone. Pena later admitted "he should have notified his supervisor that cell #46 had their cell windows completely covered." | 72. Exh. 35-Pena Depo. at 134:11-12; Exhibit 38-Internal Affairs Investigation Report at DEF 4357. |
| 73. | When Pena arrived at Cell 46 at 6:23 a.m. for a second Guard 1 pipe check the window allowing a view into Cell 46 was covered. (Pena 49:16-19) | 73. Exh. 35-Pena Depo. at 49:16-19. |
| 74. | Pena admitted during the second check that "he never saw Inmate Osuna or Inmate Romero." | 74. Exhibit 38-Internal Affairs Investigation Report at DEF 4358. |

| | | |
|---|---|---|
| 75. | Pena ordered Osuna to take down the covering a second time, but Osuna did not comply. However, Pena did not stay at Cell 46 to make sure that Osuna complied with the order. | 75. Exh. 35-Pena Depo. at Pena 50:2-6; 50:7-9. |
| 76. | Pena made Osuna aware that he needed to see Osuna's celly and Osuna mimicked his voice. | 76. Exh. 35-Pena Depo. at Pena depo 50:14-15. |
| 77. | Pena heard a voice appearing to be Inmate Romero's stating, "I'm taking a shit," admitting that "taking a shit" is not a valid reason to put up a cell covering. | 77. Exhibit 38-Internal Affairs Investigation Report at DEF 4358; Exh. 35-Pena Depo. at Pena 54:10-12. |
| 78. | Pena told the inmate that he still needed them to uncover their windows, but the did not stay outside of Cell 46 to make sure that the inmates inside 46 complied with the second order to take down the covering. | 78. Exh. 35-Pena Depo. at 51:12-16. |
| 79. | Pena did not enforce his own order because he "thought they were gonna take it down" Pena confirmed that during his second round of security checks he never saw Inmate Osuna or Inmate Romero. | 79. Exh. 35-Pena Depo. at 50:17-18; Exhibit 38-Internal Affairs Investigation Report at DEF 4358. |
| 80. | Pena did not call a supervisor "because he believed that he could deal with the situation." | 80. Exhibit 38-Internal Affairs Investigation Report at DEF 4358 |
| 81. | Pena returned to Cell 46 for a third safety check at 6:42 a.m. He was not able to see inside Cell 46 because the cell "was covered." | 81. Exh. 35-Pena Depo. at 51:21-24; 51:21-52:5 |
| 82. | Pena told the occupants to uncover their windows and "believed that he heard two separate voices." Pena heard a voice that he "thought was Romero's voice responding." Pena "then continued with his Guard One/security checks" even though "he still had not | 82. Exhibit 38-Internal Affairs Investigation Report at DEF 4358; Exh. 35-Pena Depo. at 52:21-22 |

| | | |
|---|---|---|
| | seen either of the occupants in cell #46 at this point." | |
| 83. | Pena ordered the inmates inside Cell 46 to take down the cell covering three time but did not stay that third time to make sure they took the covering down. Pena testified that he assumed the inmates inside Cell 46 would comply with his order to take down the cell covering. | 83. Exh. 35-Pena Depo. at 54:13-19; 55: 2-6. |
| 84. | Pena admitted that he knew cell coverings that blocked the view inside a cell were not allowed and that inmates in 4A 1R could be dangerous to each other. | 84. Exh. 35-Pena Depo. at 56:13-23. |
| 85. | Pena distributed morning meals and Cell 46 was still covered at approximately 7:10 a.m. Pena instructed the inmates to uncover "for chow and Inmate Osuna responded, 'We have canteen, we're good.'" | 85. Exh. 38-Internal Affairs Investigation Report at 4334. |
| 86. | Pena instructed the inmates to uncover "for chow and Inmate Osuna responded, 'We have canteen, we're good.'" Pena instructed Osuna that he needed a visual of the occupants and Osuna responded, "No worries, we will uncover for meds." | 86. Exh. 38-Internal Affairs Investigation Report at 4334; Exh. 35-Pena Depo. at 111:19-20 |
| 87. | Pena did not notify a supervisor but instead sought out Martin Tamyo, worked as the psychiatric technician distributing medication, to "stop whatever he was doing and go to Cell 46 and issue the meds, and that way I could probably have him finally remove their covering." | 87. Exh. 38-Internal Affairs Investigation Report at 4334; Exh. 35-Pena Depo. at 59:23-60:2. |
| 88. | When Tamayo was at the door with him, Pena again ordered Osuna to uncover the cell door window but Osuna refused. | 88. Exhibit 38-Internal Affairs Investigation Report at 4334 |

| | | |
|---|---|---|
| 89. | Pena returned to Cell 46 but the window was still covered. Pena testified that he tapped the Guard 1 pipe at 7:22 a.m.. Pena "[t]old them again to remove their coverings." (Pena 58:24) It was only at this time that Pena notified his supervisor, Sergeant Jay Martinez | 89. Exh. 35-Pena Depo. at 58:19-24; 73:5-13; 59:1-4; Exh. 39-Printout for Cell 46 at DEF 4252. |
| 90. | Pena and Sergeant Martinez then walked to Cell 46 and Pena told Osuna "that the sergeant was present and that he needed to uncover his cell windows," and Osuna responded that he would uncover his windows, but he wanted Pena to place him in handcuffs and escort him to see a psychologist; Pena agreed. | 90. Exh. 38-Internal Affairs Investigation Report at 4359. |
| 91. | Osuna uncovered his cell door windows and Pena was able to see "Romero's body sitting in front of the left bunk, and his head was on top of the bunk on the left side of his body, and there was blood everywhere," with a body part hanging from the ceiling and "Romero's head was missing the eyes and there was sentences written in – with blood on the walls." | 91. Exh. 38-Internal Affairs Investigation Report at 4359.; Exh. 35-Pena Depo. at118:4-6; 118: 7-11 |
| 92. | Pena activated his personal alarm device and Osuna was removed from the cell. Pena admitted that on March 9, 2019, he violated policy by not observing "live breathing flesh" while conducting security welfare checks utilizing the Guard One device. | 92. Internal Affairs Investigation Report at DEF 4333, 4359. |
| 93. | Pena admitted that he relied on voices for assurance, rather than relying on a visual confirmation and did this despite knowing at the time that he was not permitted to substitute visual confirmation with voices. | 93. Exh. 35-Pena Depo. at 162: 7-11; 163:1-7. |

| | | |
|---|---|---|
| 94. | Pena admitted that he chose to move on to other cells rather than ensure compliance at Cell 46, at that doing so effectively permitted the covering to remain up. | 94. Exh. 35-Pena Depo. at 71:24-72:6 |

| | | |
|---|---|---|
| 95. | Pena admitted that he should have notified his supervisor after the 6:12 a.m. check, and that his failure was a mistake, noting, "I wish I would have notified my supervisor earlier." | 95. Exh. 35-Pena Depo. at 123:8-17; Exh. 38-Internal Affairs Investigation Report at DEF 4357. |
| 96. | Pena admitted that he knew the policy required visual confirmation ("live breathing flesh" and he did not have that but that he "continued on with safety checks at other cells instead." | 96. Exh. 38-Internal Affairs Investigation Report at DEF 4359; Exh. 35-Pena Depo. at 159-160; 160:8-0 |
| 97. | Garcia observed Pena stop at Cell 46 one to two times, for ten to fifteen seconds, which he described as normal. | 97. Garcia 84:9-12; 85:16-25 |
| 98. | Garcia could not see into Cell 46 because there was "like a glare" that was present the entire shift and it looked like it was dark inside Cell 46. | 98. Exh. 34-Garcia Depo. at 87:1-7 |
| 99. | Garcia never brought the issue up to a supervisor or a floor officer and admitted that if he cannot tell if a window is covered or not then it is possible that the cell window is actually covered. | 99. Exh. 34-Garcia Depo. at 110:5-9; 80:2-6) |
| 100. | Garcia said that he relied on the floor officer (Pena) to do his job and would not flag or call attention to a cell if he himself did not have a visual. | 100. Exh. 34-Garcia Depo. at 81:10-20. |
| 101. | Garcia said that he never asked Officer Pena if there were any issues with Cell 46/Osuna's Cell | 101. Exh. 34-Garcia Depo. at 126:10-12. |

| | | |
|---|---|---|
| 102. | When shown a photo of Cell 46 taken by ISU during the morning of March 9, 2019 Garcia confirmed the "gasser" placard on the door of Cell 46 and that the third window to the right side was blocked. | 102. Exhibit 40-IA Investigation Photo Ex. 30 at DEF 5256; Exh. 34-Garcia Depo. at 115:25-116:1; 116:16-25 |
| 103. | Garcia agreed that the blocked window violated the rules | 103. . Exh. 34-Garcia Depo. at 117:1-3. |
| 104. | Garcia conceded that he could not have seen through that window because it was blocked "and also the glare." | 104. Exh. 34-Garcia Depo. at 118:9-11. |
| 105. | Internal Affairs reviewed the photos of Cell 46 and found "the rectangular window on the right side of the cell door covered with pictures." To Internal Affairs, Garcia denied knowing that the vertical cell window was covered the morning of March 9, 2019. | 105. Exh. 38-Internal Affairs Investigation Report at DEF 4337; DEF 4355. |
| 106. | Garia's report, authored eleven days after Romero's murder, on March 20, 2019, avoids the time during Pena's earlier security checks, and his narrative starts at 7:30 a.m. Garcia considered that nothing relevant happened between 6 a.m. and 7:30 a.m. | 106. . Exhibit 41-CDCR Incident Report (Staff Report 2019-03-09) at DEF 4106); Exh. 34-Garcia Depo. at 98:10-17. |
| 107. | Garcia knew on March 9, 2019, that he could not see into the windows of Cell 46, and he did not follow up with a supervisor or the floor officer Pena. | 107. Exh. 34-Garcia Depo. at109:16-110:1 |
| 108. | Garcia admitted that the control booth officer shares liability for ensuring cell windows are not covered. | 108. Exh. 34-Garcia Depo. at 134:11-15. |
| 109. | Pena acknowledged that the window covering posed a risk in that he could not look into the cell to confirm that both inmates were physically safe. | 109. Exh. 35-Pena Depo. at 151:16-19 |

| | | |
|---|---|---|
| | | |
| 110. | Pena could not confirm the inmates' physical safety. | 110. Exh. 35-Pena Depo. at 151:22-152:2 |
| 111. | Pena testified, "I have never had an inmate with failure to comply that long." That day, Osuna was "the only one that refused my order." | 111. Exh. 34-Pena Depo at 191:13-14; 67:14-15 |
| 112. | Osuna stated that he killed Romero in a window of time on March 8 at approximately midnight. | 112. Exh. 28-Osuna Interview Transcript at CDCR (OIG) 818. |
| 113. | Such a time-mark places Romero's death before the institutional count at 0030 (12:30 a.m.) and before all but the first four Guard One pipes. | 113. Exh. 28-Osuna Interview Transcript at CDCR (OIG) 818. |
| 114. | Romero's time of death is a disputed fact in that Osuna stated that he killed Romero in a window of time on March 8 at approximately midnight. | 114. Exh. 28-Osuna Interview Transcript at CDCR (OIG) 818. |
| 115. | A second witness, Inmate Moreno (CDC# BB3690) places the time of death just before midnight as well. | 115. Exhibit 42-CDCR Memorandum to Godina (4-16-2019) at DEF 8964 |
| 116. | At approximately 2300 to 2350 hours" Inmate Moreno got Osuna's attention and Osuna signed to him that he was going to kill the new cellmate and placed his index finger over his mouth for a silence gesture. Shortly thereafter, Moreno saw Osuna approach the cellmate with a weapon and strike the victim "with a downward motion." Moreno was surprised that Osuna | 116. Exhibit 42-CDCR Memorandum to Godina (4-16-2019) at DEF 8965, 8966. |

| | | |
|---|---|---|
| | would do it and put up his window covers and went to bed. The document memorializing this interview noted: "This information should be considered reliable." | |
| 117. | No official source ever fixed the time of Romero's death. The Kings County Sheriff-Coroner listed the "time of injury" as "unknown." Similarly, the Final Autopsy Report makes no time-of-death finding. | 117. Exhibit 43-Coroner's Report at DEF 4162); 4164-4169) |
| 118. | Silva is the only affirmative evidence that Romero was alive after 2235 hours. Silva categorically stated his position regarding the Guard One record: "if I piped the door, therefore, I did the check. | 118. Exh. 33-Silva Depo Vol. I at 231:14-17. |
| 119. | Silva testified that Mr. Romero was alive at the time of his last security check at 5:45 a.m. Under this version, the murder occurred either in a 15 minute window of Silva's shift, or during the hour and twenty-two minutes of Officer Pena's shift during Second Watch.<br><br>Given that Officer Pena was required to complete his first security check at 6:05 a.m. and maintains that Romero's murder did not happen under his watch, whether Romero was killed during Silva's shift or Pena's shift is an issue of fact. | 119. Exh. 33- Silva Depo Vol. I at 279:19-21; Exh. 44-POST Order 283447 4AIR Floor 2 atDEF 5042. |
| 120. | Officer Silva's expert forensic pathologist, Dr. Bennett Omalu, wrote a "Medico-Legal Report," dated April 3, 2026.<br><br>Dr. Omalu opined: "These prevailing evidentiary finding, therefore, confirm that it was less likely and less probable that Romero was killed and died at about 10:00 p.m. to 12: a.m., the prior | 120. Exh. 45-Omalu Report at p. 13 |

| | | |
|---|---|---|
| | night. More likely than not, he died closer to the time his dead body was discovered." | |
| 121. | Dr. Omalu grounded this opinion on the observations from the murder scene photographs and report: "If [Osuna] had killed Romero at about 10:00 p.m. to 12:00 a.m., there would have been an emergent smell, odor, and stench of death and the decomposing and autolyzing dead body and blood by 7:30 a.m. Many flies would have been present, especially given the large amounts of extravasated blood all over the cell. There were none of these." | 121. Exh. 45-Omalu Report at p. 13 |
| 122. | On the other hand, plaintiff's forensic pathologist, Dr. Eugene Carpenter, in his expert rebuttal report dated May 8, 2026, noted that there are considerable variations in the onset of rigor mortis for each individual and that "[t]his makes accurate time of death determinations extremely difficult." | 122. Exh. 46-Dr. Carpenter, May 8, 2026, report, at 8. |
| 123. | Dr. Carpenter opined: "the post mortem signs are not inconsistent with the time of death that is somewhat alluded to by the suspect." | 123. Exh. 46-Dr. Carpenter, May 8, 2026, report, at 8. |
| 124. | Defendants premise that since Romero lost consciousness within seconds and was dead within minutes of his throat being slit (carotid artery) then timely, thirty-minute cell checks would not have prevented Romero's death, is materially incorrect because Dr. Carpenter made clear it was unknown how long the time was between when Osuna initially attacked and when the fatal cutting of the carotid occurred. | 124. Exh. 47-Carpenter Deposition [Excerpts] (hereinafter, "Carpenter Depo." at 27:13-17 |

| | | |
|---|---|---|
| 125. | Dr. Carpenter states that there is an interval period of time that is unknown until the body is overcome by stab wounds to the back of the neck. "So you have an attack. You have the unknown interval." | 125. Exh. 47 Carpenter Depo at 37:18-20; 40:6. |
| 126. | Allegations against Silva included that he "failed to conduct security welfare checks on Inmate Luis Romero…when he failed to see living breathing flesh, and Inmate Romero was later found deceased." Additionally, Silva faced allegations that he "failed to properly conduct inmate counts for Housing Unit 4A1R" and that he "made dishonest statements during an OIA investigation regarding his actions and/or the events surrounding the murder of Inmate Romero." | 126. Exh. 38-Internal Affairs Investigation Report at DEF 4320. |
| 127. | Warden Clark sustained two allegations against Silva. This included the following allegations: Allegation 2, that on or about March 9, 2019, Luis Silva "failed to properly conduct inmate counts for Housing Unit 4A1R"; Allegation 3, that on June 10, 2019, Silva "made dishonest statements during an Office of Internal Affairs investigation regarding" his actions and/or events surrounding the murder of Romero; Allegation 4, that on or about March 9, 2019, Silva "failed to properly conduct the 30 minute Security Welfare checks" on Romero when Silva "failed to see a living breathing person and physically see that person, and inmate Romero was later found deceased." | 127. Exh. 48-February 26, 2020 Memo to Silva re Internal Affairs Investigation atDEF 4738; Exh. 35-Pena Depo at 184:6-14. |
| 128. | Warden Clark issued a Notice of Adverse Action as to Silva on March 21, 2020. that detailed the bases for his dismissal. This included findings that Silva: failed to properly count the | 128. Exhibit 49-Notice of Adverse Action at DEF 4740-4771),DEF 4756-7,DEF 4757) |

| | | |
|---|---|---|
| | inmates in Cell 46 at 003; failed to look into Cell 46 and properly count inmates Osuna and Romero for the 0230 count; failed to look into Cell 46 and properly count inmates Osuna and Romero at the 0500 count. | |
| 129. | Silva went through an administrative "Skelly" hearing and the penalty of dismissal was sustained, effective April 15, 2020. Silva appealed his dismissal and entered into a stipulation for settlement, which was approved on August 28, 2020. Silva was reinstated and went back to work on January 15. | 129. Exhibit 50 -April 15, 2020 Memorandum re Skelly Hearing Results at DEF 4773; Exhibit 51-Decision Approving Stipulation for Settlement at DEF 4730; Exh. 33-Silva Depo. Vol. I at 187:16-19 |
| 130. | Warden Clark sustained two allegations against Pena. | 130. Exh. 52-Letter to Pena re Internal Affairs Investigation Closure at DEF 4700; Exh. 35-Pena Depo at 184:6-14. |
| 131. | This included that on March 9, 2019, Leonel Pena both "failed to ensure the immediate removal of door and/or window coverings" while conducting Security Welfare checks on inmate Luis Romero and inmate Jaime Osuna," and that he "failed to properly conduct Security Welfare checks on inmate Luis Romero and inmate Jaime Osuna," when he "failed to see a living, breathing person and physically see that person and inmate Romero was later found deceased." | 131. Exh. 52-Letter to Pena re Internal Affairs Investigation Closure at DEF 4700. |
| 132. | Pena received an adverse action and his salary was reduced by five percent for thirty-six months, which was reduced to 24 months. | 132. Exh. 35- Pena Depo. at 131:20-132:14 |
| 133. | Pena sustained a bar on promotion or transfer. | 133. Exh. 35-Pena Depo at 132:10-12 |

| | | |
|---|---|---|
| 134. | Pena was ordered to undergo additional training that "had to do with Guard 1 checks." | 134. Exh. 35-Pena Depo. at 132:24 |
| 135. | Objectively, the ICC member' clearing Osuna to be double celled created a substantial risk to anyone who would share a cell with him, including Romero. | 135. Parker Declaration pg. 6, ¶44. |
| 136. | Burnes was aware of the risk Osuna posed to a cellmate but disregarded it evidenced by the fact that he reviewed Osuna's central file himself; he knew the commitment offense; he knew of the weapons batteries and the blood-gassing of officers under his own supervision; he had roughly forty personal interactions with Osuna; and he discussed Osuna's violence with Kyle, the unit's mental health supervisor, "in great depth" and on a weekly basis. | 136. Parker Declaration pg. 6, ¶45. |
| 137. | Burnes had more personal interaction with Osuna than any other ICC member, yet at the January 22 committee, he sat silent, and six weeks later personally selected Mr. Romero for Osuna's cell despite available alternatives. | 137. Parker Declaration pg. 6, ¶46. |
| 138. | LCSW Kyle was aware of the risk Osuna posed to a cellmate in that Osuna told her of his homicidal ideation and his desire to kill again. | 138. Parker Declaration pg. 6, ¶47. |
| 139. | CDCR's Mental Health Services Delivery System Program Guide expressly tasks the ICC mental health representative with assessing and communicating "suitability for single or double celling" and "risk assessment for self-injurious or assaultive behavior," and CDCR's confidentiality-disclosure | 139. Parker Declaration pg. 6, ¶48. |

| | | |
|---|---|---|
| | guidance requires clinicians to warn custody staff where a patient with a history of violence expresses intent to harm foreseeable victims. | |
| 140. | CDCR Policy Memorandum, "The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines for Disclosure," dated April 18, 2007, advises that the disclosure of confidential information to nonclinical staff is mandatory when the inmate "is homicidal, by virtue of either conduct or oral statements, and there is a reasonably identifiable victim." | 140. Parker Declaration pg. 6, ¶49. |
| 141. | Kyle attended the committee that decided whether Osuna could be housed with another person and volunteered none of this, offering instead the anodyne observation that Osuna was unlikely to decompensate. | 141. Parker Declaration pg. 7, ¶50. |
| 142. | Gamboa was aware of the risk Osuna posed to a cellmate but disregarded it under California Code of Regulations title 15 and CDCR's classification framework, when he chaired the committee and bore ultimate responsibility for ensuring that all case factors were reviewed before a housing decision issued. | 142. Parker Declaration pg. 7, ¶51. |
| 143. | The file before his committee contained Osuna's LWOP torture-murder commitment, his attempted-murder conviction, his twenty-eight serious violations, and eighteen months of prior committee findings that repeatedly single-celled Osuna based on his "propensity for violence," yet Gamboa cleared Osuna in absentia, without the Lerdo report, without a safety-concern closure, and, per his own testimony, without reviewing the documents. | 143. Parker Declaration pg. 7, ¶52. |

| | | |
|---|---|---|
| 144. | Gamboa's belief that CDCR policy permitted single-celling only upon in-cell violence against a cellmate is refuted by the governing regulations and memoranda, which mandate a multi-factor safety assessment especially in light of the fact that Osuna had committed in-cell violence, twice against cellmates in 2011 and once in the Lerdo attempted murder. | 144. Parker Declaration pg. 7, ¶53. |
| 145. | Muñoz was aware of the risk that Osuna posed to a cellmate and approved the placement anyway. | 145. Parker Declaration pg. 7, ¶54. |
| 146. | Munoz spent roughly half an hour reviewing both inmates' files, examining "predatory" indicators, single-cell status, committee approval, and in-cell assaults and he reviewed "all the case factors," "the RVRs," and Osuna "victimizing other inmates." | 146. Exh. 5-Munoz Depo. at 76:5–11, 17; 106:11–15. |
| 147. | Munoz was aware of the 2011 battery, the 2012 Lerdo attack that required sixty-seven stitches, and the 2017 RVR for attacking an inmate with a weapon. | 147. Exh. 5-Munoz Depo at 101:11–102:9. |
| 148. | Munoz knew of Osuna's written fantasy about torturing Sergeant Herr's wife, his writing on the walls in his own blood, the stabbing weapon recovered from his cell in November 2018, his retention on single-cell status at CSP-Sacramento for propensity for violence, and prior mental health recommendations for single-cell housing. | 148. Exh. 5-Munoz Depo at 126:21–129:2; 134:6–21; 140:8–141:5; 96:16–98:16; 100:21–101:1. |
| 149. | Muñoz's purported belief that he did not regard Osuna's conduct as predatory because the violence had occurred outside the cell is not sound because Section 3269(e) directs staff to consider "the incarcerated person's pattern of behavior, not just an isolated | 149. Exhibit 53-Double Cell Housing Policy at DEF 14; Exhibit 54-Inmate Housing Assignment Considerations During the Screenin and Housing Process at DEF 21); Exhibit 55-Clarification of Staff |

| | | |
|---|---|---|
| | incident"; the Duncan Memo defines predatory behavior as aggressive, repeated attempts to abuse another inmate without limiting the inquiry to in-cell conduct; the Kernan Memo states expressly that a history of in-cell abuse is not necessary for single-cell approval; and the Runnels Memo warns that the absence of an "S" suffix does not automatically qualify an inmate for double-cell placement. | Responsibilities Relative to Inmate Double-Celling at DEF 19; Parker Declaration pg. 8, ¶55. |
| 150. | The Lerdo attack for which Osuna was convicted of attempted murder began when he called the victim into his own cell and struck him, and ended when he entered the victim's cell armed with a razor and announced that he was going to kill him. | 150. Exhibit 56-Kern County Sheriff's Office Compact (Osuna BD0868) at DEF 8743. |
| 151. | Muñoz testified that this was not predatory conduct. | 151. Exh. 5-Munoz Depo 113:22–114:9. |

| | | |
|---|---|---|
| 152. | Munoz had never, as a lieutenant, declined a double-cell placement on the basis of an inmate's RVR's. | 152. . Exh. 5-Munoz Depo 68:3–8. |
| 153. | Munoz stated that he was "somewhat" numb to conduct in the SHU such as threats to torture people. | 153. Exh. 5-Munoz Depo 136:3–8. |
| 154. | Munoz acknowledged an institutional preference for double-celling because CDCR likes to maximize bed capacity. | 154. Exh. 5-Munoz Depo 153:20–154:1. |
| 155. | Munoz did not consider placing Romero in a vacant cell because the compatibility form had been signed. | 155. Exh. 5-Munoz Depo 155:17–19. |

| | | |
|---|---|---|
| 156. | Sergeant Burnes confirmed that departmental practice favors double-celling cleared inmates even where empty cells exist, to preserve capacity. | 156. Exh. 4-Burnes Depo 268:12–269:4. |
| 157. | Munoz testified that he had authority to conduct an independent review and to decline to house two inmates together, had authority to return a double-cell determination to committee if he disagreed with it, and that he had exercised that authority three or four times. | 157. Exh. 5-Munoz Depo 47:15–20; 116:11–13; 116:23. |
| 158. | Loza avoided the information that would have stopped the placement of Osuna with Romero. | 158. Parker Declaration pg. 8, ¶56. |
| 159. | Loza testified that under Title 15 an inmate with a history of in-cell violence should be single-celled—and then testified that he did not check Osuna's history, because Osuna had been cleared at the most recent committee. He checked only that most recent hearing. | 159. Exh. 30-Loza Depo 83:25–84:22; 74:9–10. |
| 160. | Loza did not review the chrono or the basis for the double-cell determination. | 160. Exh. 30-Loza Depo 57:5–12. |
| 161. | Loza knew he was required to examine Osuna's history, and elected not to look. | 161. Parker Declaration pg. 8, ¶57. |
| 162. | Cell 46 bore a "Gasser" placard visible to anyone on the tier and Osuna's window coverings, blood-writing, and facial tattoos were known throughout 4A1R. | 162. Exh. 32-Gallemore Depo 91:14–[23]. Parker |

| | | |
|---|---|---|
| 163. | But for Loza's selection and Muñoz's approval, Romero would not have been placed in Cell 46 on March 7, 2019 with Osuna under general recognized standards of what is fair and objectively reasonable within a CDCR correctional setting. | 163. Parker Declaration pg. 8, ¶58. |
| 164. | Silva and Peña failed to look inside Cell 46 and verify "living, breathing flesh," despite "piping" the Guard One system timely. | 164. Parker Declaration pg. 8, ¶59. |
| 165. | A covered cell in a segregated housing unit, occupied by a documented gasser with a history of weapons manufacture and a newly arrived stranger, exposes the newcomer to a substantial risk of serious harm. | 165. Parker Declaration pg. 8, ¶60. |
| 166. | Peña stated that inmates sharing a cell face greater risk of violence from one another than inmates housed alone. | 166. Exh. 35-Pena Depo 103:2–12. |
| 167. | Burnes stated that the stakes "are always higher" in a segregated unit and that rates of violence are higher there. | 167. Exh. 4-Burnes Depo 57:22–58:1, 58:10–11. |
| 168. | When Osuna arrived back to CDCR in May 2017, under a sentence of life without the possibility of parole ("LWOP"), Osuna was sent to Wasco State Prison (WSP), where he had a cellmate for less than 24 hours, between May 18 and May 19, 2017. | 168. (DEF 9218) |
| 169. | From May 19, 2017, until March 7, 2019, (almost two years) Osuna did not have a cellmate. | 169. (DEF 9220) |

| | | |
|---|---|---|
| 170. | Osuna accrued twenty-eight serous Rules Violation Reports (RVRs) between May 2017 and March 2019, in a period of twenty-two months during which he was single-celled and had no cellmate to victimize. | 170. Parker Rebuttal Report at 10. |
| 171. | June 30, 2017: Osuna was found with an "inmate manufactured stabbing instrument." | 171. Burnes Ex. AA (DEF 7553) |
| 172. | September 16, 2017: Osuna sustained two RVRS, one, for battery with a deadly weapon after Osuna engaged in a fight with another inmate (Burnes Z1, DEF 7547), and an hour later, after Osuna's cell was searched (Osuna having no cellmate at the time), correctional officers found a nine-and-a-quarter-inch metal weapon with a sharpened point. | 172. Exh. 6-Burnes Exhibit Z2 (DEF 7550) |
| 173. | November 9, 2017: Osuna covered his cell window with paper completely and refused a direct order to take it down, telling the guard, "I don't give a fuck!" | 173. Exh. 7-Burnes Exhibit Y (DEF 7544) |
| 174. | On December 11, 2017, Osuna completely covered his cell door window again, this time "color paper with satanic saying written in his own blood." Osuna "did not respond or remove the window coverings" after receiving a direct order. | 174. Exh. 8-Burnes Ex. X (DEF 7541 |
| 175. | Two days later, on December 13, 2017, Osuna yelled at a correctional officer performing a routine Guard 1 check "I'm going to find out your entire name, where you live and have my homeboys kick in your door and kill you and your family."<br><br>Burnes continued: "Tonight when you come to work I'm boarding up with a bloody sheet and a cup full of my own | 175. Exh. 9- Burnes Ex. W (DEF 7538);<br>Exh. 4-Burnes Depo. 209:2-210:5 |

| | | |
|---|---|---|
| | blood on top of the door so when you enter my cell you will get splashed with it. I'm sick and my blood is disease infested." Osuna continued further: "If my blood doesn't get you, I'm going to stab your ass up!" | |
| 176. | On December 23, 2017, during an unclothed body search, Osuna was found with a razor (wrapped in cloth and plastic) in his rectum; the razor was 1.5 inches in length and a third-of-an-inch wide. | 176. Exh. 10-Burnes Ex. V, (DEF 7535) Exh. 4-Burnes Depo. 205:3-206:12) |
| 177. | On January 27, 2018, Osuna struck a correctional officer with an "unknown liquid substance" in the facial area. Osuna stated, "That's Hep C Mother Fucker!" | 177. Exh. 11-Burnes Ex. T, (DEF 7526) |
| 178. | On January 27, 2018, from the open food port in his cell door, Osuna squirted an unknown liquid on correctional officers collecting food trays. | 178. Exh. 12-Burnes Ex. U, DEF 7529); Exh. 4-Burnes Depo 204:12-22 |
| 179. | On April 13, 2018, after a CO unlocked a security port to hand Osuna his breakfast tray, Osuna squirted the CO with blood. | 179. Exh. 13-Burnes Ex. S (DEF 7523) |
| 180. | On April 17, 2018, Osuna squirted "an unknown red liquid substance that looked and smelled like blood" on a CO's legs. | 180. Exh. 14-Burnes Ex. R (DEF 7520) |
| 181. | On April 25, 2018, after a CO ordered Osuna to remove paper coverings over his cell window, Osuna sprayed the CO with a "reddish liquid from the side of the door where the food ports meets the door frame" "spattered" on the CO's eye protection. | 181. Exh. 15-Burnes Ex. Q (DEF 7517) (Burnes 197-198:15 |
| 182. | On May 13, 2018, Osuna had covered his cell windows with cardboard and hung a bed sheet in front of his bed. Ignoring the COs' yelled orders, officers donned biohazard suits and a GoPro | 182. Exh. 16-Burnes Ex. P, (DEF 7514)) |

| | | |
|---|---|---|
| | camera before spraying him with pepper spray from eight feet away. After Osuna was handcuffed and placed in leg restraints, Osuna complied. Multiple containers of "what appeared to be blood" were removed from his cell. | |
| 183. | In the morning of June 15, 2018, from the open food port on his cell door, sprayed a "reddish liquid with a strong odor" onto the forearm of a correctional officer, who was taken to the hospital for further treatment.<br><br>Later that same day, on June 15, 2018, Osuna filled out a Form 22 addressed to Sergeant Herr in which Osuna wondered what Sgt. Herr's "wifes flesh tastes like…if you think I care about charges or write ups, please, really me and you are going to have a lot of fun I fantasys tieing you to a chair with your eyelids stapled while I torture your family just fantasizing about it, cutting your wifes eyelids off and lips shove her flesh down your throat you might like it why don't you come to me and show me how much pain you can bring." | 183. Exh. 17- Burnes Ex. N (DEF 7505))<br>Exh. 18- Burnes Ex. O (DEF 7508) |
| 184. | On August 29, 2018, Osuna sprayed blood on the ground in front of his cell and threatened gassing and potential violence to the CO who was at the door. The CO modified the Guard One checks to include Osuna's cell. | 184. Exh. 19-Burnes Ex. M (DEF 7502) |
| 185. | On August 30, 2018, a correctional officer opened the food port on Osuna' cell to place a breakfast tray when Osuna sprayed a "red liquid, which appeared to be blood"" on the COs face/check and forearm area.<br><br>Approximately two hours later, during a search of Osuna's cell, correctional | 185. Exh. 20-Burnes Ex. L (DEF 7499)<br>Exh. 21-Burnes Ex. K (DEF 7490) |

| | | |
|---|---|---|
| | officer found a tattoo gun and "metal with jagged edges inside a deodorant bottle that was sitting on the desk." | |
| 186. | On August 31, 2018, during a Guard One check, Osuna told a CO, "I want you to witness something" and started to cut his right arm with an inmate manufactured weapon. The weapon appeared to be "a sate issued toothbrush with a half inch razor blade secured to the handle with string." | 186. (Burnes Ex. J (DEF 7496)) (Exh. 21-Burnes Ex. K (DEF 7490)) |
| 187. | On September 4, 2018, Osuna started a fire in his cell, and the fire department responded and successfully extinguished it. | 187. Exh. 22-Burnes I, (DEF 7493) |
| 188. | Two days later, on September 6, 2018, Osuna was approved to be double-celled. | 188. (DEF 4364) |
| 189. | On September 7, 2018, Osuna sprayed a CO with "a red liquid substance, which appeared to have the same consistency and color of blood: on the entire left side. | 189. Exh. 23-Burnes H, (DEF 7487) |
| 190. | On September 8, 2018, Osuna "was seen actively bleeding and with blood throughout the cell" Osuna was removed for a medical evaluation. | 190. (Burnes Ex. G, (DEF 7484)) |
| 191. | On September 10, 2018, while still at CSP-Sacramento, Osuna was placed on temporary single cell status. | 191. (DEF 4364) |
| 192. | On September 24, 2018, after having been transferred to CSP-Corcoran, Osuna received an RVR after he threw a milk carton with "red fluid substance" in it, soaking the CO' s jump suit. | 192. (Burnes Ex. D (DEF 7478)); (Burnes Ex. E (DEF 7481)) |

| | | |
|---|---|---|
| | Osuna's cell was searched in response, and COs found an inmate manufactured weapon, a "copper piece of metal approximately 5 niches long, sharpened to a point with paper rolled as a handle." | |
| 193. | On November 29, 2018, Osuna's cell was searched and COs found an "inmate manufactured weapon secreted n the center" of his torn mattress. The weapon was "16 inches in length, with what appeared to be four (4) metal prongs sharpened to a point at each end." | 193. (Burnes Ex C (DEF 7475)) |
| 194. | The Classification Committee Chrono dated May 23, 2017 states that [Osuna] was placed single cell at administrative review. After review of all case factors, Committee elects to continue single cell housing due 's' prior county jail disciplinary history (attempted murder, assault on another inmate).<br><br>This ICC showed that a single-cell determination can be made on violent conduct prior to a current CDCR term. | 194. (DEF 6538-6543) |
| 195. | The Classification Committee Chrono dated June 7, 2017 decided to single-cell Osuna, even after noting:<br>[Osuna] has no recent documented history of in-cell violence, no predatory behavior, and no victimization concerns. Battery on inmate (in-cell) 9/18/11 noted… ICC has reviewed and discussed the outside the cell violence: 1/3/2012 Attempted Murder of Prisoner (controlling case); 9/17/11 Battery on Inmate…<br><br>After review of all case factors, committee elects to remain on Single Cell housing status based on propensity | 195. (DEF 6531-6537) (DEF 6536) |

| | | |
|---|---|---|
| | for violence due to [Osuna] prior county jail disciplinary history and prior outside the cell violence (attempted murder, assault on inmate) and Mental Health recommendation based on initial IDTT interaction.<br><br>This ICC showed that a single-cell determination can be made based on the "propensity for violence" factor, not just in-cell violence. | |
| 196. | The Classification Committee Chrono dated July 6, 2017 decided to single-cell Osuna based on propensity for violence.<br><br>Just prior to release from custody, [Osuna] received an ASU Placement Notice on 9/17/11 for allegedly battering his cellmate (Alonso)…ICC dated 9/22/11 states the incident took place outside the cell and an RVR was never issued. [Osuna] was discharged from his sentence on 10/31/11 and returned to CDCR custody with a new term on 5/15/17.<br><br>There is no documented history of in-cell violence, no predatory behavior, and no victimization concerns, however ICC reviewed and discussed the outside the cell violence: 1/3/12, during pre-trial incarceration (Kern County) at Lerdo Pretrial Facility S committed in-custody Battery on I/M w/ Weapon w/ GBI (victim's injuries consisted of laceration to face, neck, and chest requiring 67 stitches); this incident resulted in conviction of Attempted Murder 1st/ADW/GBI. S acknowledged his understanding and agrees with his current cell status. | 196. (DEF 6524-6529) (DEF 6529) |

| | | |
|---|---|---|
| | This ICC showed ICC could continue to rely on Osuna's violent conduct in Kern County custody to continue to single-cell him. | |
| 197. | The Classification Committee Chrono dated August 23, 2017 decided to single-cell Osuna "based on propensity for violence" and noted the same out-of-cell violence as the ICC from July 6, 2017. | 197. (DEF 6517-6523); (DEF 6522). |
| 198. | The Classification Committee Chrono dated September 21, kept Osuna single celled "based on propensity for violence" and noted past out-of-cell violence as the ICCs from August 15, 2017, and July 6, 2017.) | 198. (DEF 6511-6516); (DEF 6516 |
| 199. | The Classification Committee Chrono dated February 20, 2018 kept Osuna on single-cell status despite no in-cell violence noting that Osuna was reviewed for single cell status and did not meet the criteria for an 'S' suffix noting no in-cell violence, however a review of S disciplinary history indicated S had been placed on ASU status for battering his cellmate which ICC dated 9/22/11 indicated took place outside the cell (no RVR issued), S also had RVR's for Battery on inmate dated 9/17/2011 and battery on inmate with weapon dated 9/16/2017.<br><br>In addition an incident documented on 1/3/12 at a pretrial in Kern County was charged with in custody Attempted Murder. Therefore, the committee elected to continue Single Cell status. | 199. (DEF 6498-6504) |

| | | |
|---|---|---|
| 200. | The Classification Committee Chrono dated March 8, 2018 elected to continue to single-cell Osuna, noting the prior acts of out-of-cell violence at the prior ICCs. | 200. (DEF 6491-6496); (DEF 6496) |
| 201. | The Classification Committee Chrono dated May 30, 2018 cited Osuna's prior violence but also stated that he be "retained on single-cell status at SAC-PSU based on physical plant design." | 201. (DEF 6483-6490); (DEF 6489). |
| 202. | Osuna had been housed at CSP-Sacramento in the Psychiatric Services Unit (PSU) at the Enhanced Outpatient Program (EOP)level of mental health care and had not had a cellmate since leaving Wasco | 202. (Moreno 76:25-77:2) |
| 203. | On January 22, 2019, all three ICC members did not apply the correct classification standard, ignored prior ICC determinations, ignored Osuna's history of violence despite personal, subjective awareness of the threat he posed, and applied a circular reasoning that was impossible to ever meet. | 203. Parker pg. 16, ¶96. |
| 204. | Various CDCR policy memoranda described a multi-factor inquiry, not a single factor rule when determining whether to single- or double-cell an inmate. The memorandum issued closest in time to 2019 was titled, "Inmate Housing Assignment Considerations During the Screening and Housing Process," dated January 19, 2016, by Secretary Scott Kernan. | 204. Parker pg. 16, ¶97. (DEF 21-23) |
| 205. | In January 2019, Licensed Social Worker (LCSW) Kristen Kyle (now Maytubby) was the Supervising Psychiatric Social Worker at CSP-Corcoran, and responsible for the | 205. (Maytubby Vol. I, 25:2-24; 37:11-17) |

| | | |
|---|---|---|
| | clinicians assigned to Building 4A1, where Osuna was housed. | |
| 206. | LCSW Kyle was present as the mental health representative at the January 22, 2019. | 206. (DEF 4385) |
| 207. | Just before the start of the January 22, 2019, committee for Osuna, Kyle told CCII Moreno that Osuna was a "weirdo." | 207. (Moreno 167:2-4; 56:20-57:16) |
| 208. | Kyle had "full access" to Osuna's records in the health record (EHR) and admitted that Osuna's September 2017 RVR for committing battery on an inmate with a weapon "would have been reviewed" at the ICC where she was present. | 208. (Maytubby Vol. I, 113:9; 137:16-24) |
| 209. | The chronos available to ICC members showed that Osuna posed a threat to others which included evidence of Osuna's batteries on Coreas and Alonso in 2011 Osuna's attempted murder at Lerdo Pretrial Facility, Osuna. | 209. (DEF 4392), (DEF 6529) |
| 210. | Associate Warden Gamboa did not recall LCSW Kyle raising any safety concerns and could not recall a mental health person in committee tell him they could not share anything that was shared by a patient. | 210. (Gamboa 64:25-65:1; 68:2-18) |
| 211. | CDCR's own memorandum and policy outlines not only the circumstances in which a mental health professional may disclose patient information; but must. | 211. Parker pg. 9, ¶63. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure* |

| | | |
|---|---|---|
| 212. | There are many familiar situations where strict and traditional healthcare confidentiality is compromised, such as during pill lines, during Interdisciplinary Treatment Teams (IDTT) meetings because the team composition includes custody officers, and during cell front visits. | 212. Parker pg. 9, ¶64. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 1. |
| 213. | Custody officers, correctional counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members. | 213. Parker pg. 9, ¶65. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure*, at pg. 2. |
| 214. | Exceptions arise when information obtained by a clinician in the course of a therapeutic encounter, creates a set of security concerns that are much broader than those in the community. | 214. Parker pg. 9, ¶66. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 2. |
| 215. | There are no nationally accepted guidelines/laws that govern all instances of limitations to confidentiality in a correctional setting. | 215. Parker pg. 17, ¶102. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 2. |
| 216. | CDCR developed guidelines regarding the handling of information disclosed in the context of an inmate clinician relationship, and during a clinical encounter and guidelines apply to all clinicians working within, or on behalf of, the CDCR as well as any nonclinical staff who overhear confidential communications. | 216. Parker pg. 9, ¶67. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 2. |

| | | |
|---|---|---|
| 217. | The disclosure of confidential information to appropriate nonclinical staff is mandatory when the inmate is homicidal, by virtue of either conduct or oral statements, and there is a reasonably identifiable victim and/or the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be a danger to him/herself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger. | 217. Parker pg. 9, ¶68. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 3,4. |
| 218. | The disclosure of confidential information to appropriate nonclinical staff is mandatory when an inmate possesses a weapon. | 218. Parker pg. 10, ¶69. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 4. |
| 219. | The disclosure of confidential information to appropriate nonclinical staff is mandatory when the inmate presents a reasonably clear risk of internal disorder. | 219. Parker pg, 10, ¶70. CDCR Memorandum, dated April 18, 2007, *The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines For Disclosure,* at pg. 4. |
| 220. | Defendants left Romero unsupervised without proper safety checks for over seven hours, from just before midnight until 7:22 a.m. This included the First Watch shift of Silva and Gallemore, and the Second Watch shift of Peña and Garcia. | 220. Parker pg. 16, ¶98. |
| 221. | Internal Affairs concluded that Peña "failed to properly conduct Security Welfare checks on inmate Luis Romero and inmate Jaime Osuna "when he "failed to see a living, breathing person and physically see that person and | 221. (DEF 4700) |

| | | |
|---|---|---|
| | inmate Romero was later found deceased." | |
| 222. | Peña received an adverse action and his salary was reduced by five percent for thirty-six months, which was reduced to 24 months. | 222. (Peña Depo. 131:20-132:14) |
| 223. | Silva and Peña did not conduct adequate safety checks at Cell 46 when they left Romero unsupervised while Osuna had time to attack, kill, and behead Romero, carve "HaHa" on Romero's forehead and then have time left over to hang a body part from the ceiling and write in blood on the walls. | 223. Parker pg. 16, ¶99. (DEF 4334) |
| 224. | Defendants failed to meet applicable standards including regulatory standards (Cal. Code Regs., Title 15, § 3271), department manual (DOM § 52020.5), policy requirements (Allison memoranda), institution procedures (OP 226), and post order (Post Order 183443). | 225. Parker pg. 17, ¶100. |
| 226. | CDCR Sergeant Wilson reported that Osuna made threats toward staff on 9/27/18 and was subsequently placed on lock down due to security concerns that Osuna posed to others. | 226. MHR 2111. |
| 227. | Cells 56, 60, and 61 were empty and unused on March 7, 2019. | 227. DEF 4177 |
| 228. | Cells 56, 60, and 61 were empty and unused on the night of Romero's murder. | 228. DEF 4181 |

| | | |
|---|---|---|
| 229. | Defendants contention that CDCR's desire to use and occupy all available cells influenced cell classification in bedding Romero with Osuna is without merit since available unused beds were available. | 229. Parker pg. 17, ¶101. DEF 4177 DEF 4181 |
| 230. | On January 3, 2012, while incarcerated at the Kern County Lerdo Pre-Trial Detention Facility (Lerdo) while the Peña murder case was pending, Osuna attacked another detainee assigned to the same housing dorm. | 230. (DEF 8742) |
| 231. | The victim "was called into the cell by Osuna," and the victim "was approximately half way inside of Osuna's cell when Osuna threw a punch at him" | 231. (DEF 8743) |
| 232. | When the victim turned to walk out of the cell "he felt an injury to his back." | 232. (DEF 8743) |
| 233. | Osuna had slashed the victim's neck, and chest and face. The victim retreated to his own cell, but then Osuna entered the victim's cell "armed with the razor and told him, 'I'm going to kill you, you motherfucker!'" | 233. (DEF 8743) |
| 234. | Other inmates "intervened between them and physically took Osuna back to his cell." | 234. (DEF 8743) |
| 235. | While at Lerdo, Osuna spoke of "getting the photographs from the murder of the lady at the motel" and placing "these photographs on his cell wall." | 235. (DEF 8745) |
| 236. | Osuna also said he was" going to go on trial just 'like Hannibal'…referring to Hannibal Lector, the character in the Silence of the Lambs movies." | 236. (DEF 8745) |

| | | |
|---|---|---|
| 237. | Osuna was convicted for the attempted murder at the Lerdo which occurred in both Osuna's cell and the victim's cell. | 237. (DEF 8741-8752) |
| 238. | On December 13, 2017, Osuna yelled at a correctional officer performing a routine Guard 1 check "I'm going to find out your entire name, where you live and have my homeboys kick in your door and kill you and your family." (Burnes Ex. W (DEF 7538) | 238. (Burnes Ex. W (DEF 7538)) |
| 239. | Osuna continued: "Tonight when you come to work I'm boarding up with a bloody sheet and a cup full of my own blood on top of the door so when you enter my cell you will get splashed with it. I'm sick and my blood is disease infested." | 239. (Burnes Ex. W (DEF 7538)) |
| 240. | Osuna had threatened staff: "I'm going to stab the fact out of you. I'm going to stab you in your flecking face." | 240. (MHR 1662) |
| 241. | The Classification Committee Chrono dated September 21, 2017 kept Osuna single celled "based on propensity for violence" and noted past out-of-cell violence as the ICCs from August 15, 2017, and July 6, 2017. | 241. (DEF 6511-6516) |
| 242. | The Classification Committee Chrono dated October 19, 2019, kept Osuna on single cell status and noted his battery on an inmate with a weapon.) | 242. (DEF 6508) (DEF 6510) |
| 243. | The Classification Committee Chrono dated February 20, 2018 kept Osuna on single-cell status despite no in-cell violence: "[O]suna was reviewed for single cell status and does not meet the criteria for an 'S' suffix noting no in-cell violence, however a review of S disciplinary history indicates S has been placed on ASU status for battering his | 243. (DEF 6498-6504) |

| | | |
|---|---|---|
| | cellmate which ICC dated 9/22/11 indicated took place outside the cell (no RVR issued), S also has RVR's for Battery on inmate dated 9/17/2011 and battery on inmate with weapon dated 9/16/2017. In addition an incident documented on 1/3/12 at a pretrial in Kern County was charged with in custody Attempted Murder. Therefore, committee elects to continue Single Cell status." | |
| 244. | The Classification Committee Chrono dated March 8, 2018 elected to continue to single-cell Osuna, noting the prior acts of out-of-cell violence at the prior ICCs. | 244. (DEF 6491-6496) |
| 245. | The Classification Committee Chrono dated May 30, 2018, cited Osuna's prior violence but also stated that he be "retained on single-cell status at SAC-PSU based on physical plant design." (PMF 201) Osuna had been housed at CSP-Sacramento in the Psychiatric Services Unit (PSU) at the Enhanced Outpatient Program (EOP) level of mental health care. Osuna had not had a cellmate since leaving Wasco | 245. (DEF 6483-6490) |
| 246. | The Classification Committee at CSP-Sacramento on September 6, 2018, decided to double-cell: "S is cleared for double-cell upon transfer." (DEF 6481) | 246. (DEF 6481) |
| 247. | When referenced with Osuna's RVRs, this change in cell status on September 6, occurred after Osuna was found with weapons and committed repeated blood gassings of staff on August 29, 30, 31, and September 4, 2017. | 247. (DEF 7490, 7493, 7496, 7499, 7502) |
| 248. | The Classification Committee on September 10, 2018 (DEF 6468-6473) cleared Osuna to be double-celled. ("Per ICC DTD 9/6/18, Clear for D/C (double-cell)") | 248. (DEF 6473) |

| | | |
|---|---|---|
| 249. | Osuna was moved to CSP-Corcoran on September 12, 2018. | 249. (DEF 9210) |
| 250. | The Classification Committee that met on September 25, 2018, at CSP-Corcoran kept Osuna classified as double-celled, but Osuna did not have a cellmate for the next six months. | 250. (DEF 6461-6467) (DEF 9219-9220) |
| 251. | On January 22, 2019, defendants Burnes, Maytubby (nee Kyle ) and Gamboa, served on the ICC that considered Osuna's housing assignment. | 251. (DEF 4385-86) |
| 252. | The ICC is the highest committee at the institution, chaired by the warden or the warden's designee | 252. (Moreno Depo 17:24-18:24; 40:21:41:3) |
| 253. | In January 2019, cell-status determinations within CDCR were governed by California Code of Regulations, title 15, section 3269. | 253. (DEF 124) |
| 254. | Per section 3269, double-celling constituted the general housing expectation within CDCR institutions, including Administrative Segregation Unit ("ASU"), and Security Housing Unit ("SHU") settings. | 254. (DEF 124) |
| 255. | The regulation also imposed an affirmative obligation upon classification staff to determine if double-cell placement presented an unreasonable safety risk, which was not a per se one-factor test: "Staff shall consider the incarcerated person's pattern of behavior, not just an isolated incident…Factors that must be considered when evaluating single-cell status include: (1) Predatory behavior characterized by repeated attempts to physically or sexually abuse another | 255. (DEF 124) |

| | | |
|---|---|---|
| | incarcerated person." Cal. Code Regs. Tit. 15, § 3269(e). | |
| 256. | California Code of Regulations, title 15, section 3371.1(c) permits a classification committee to affix a single-cell "S" suffix upon "documented evidence that the incarcerated person may not be safely housed in a double cell . . . based on a recommendation by custody staff or a health care clinician." | 256. Cal. Code Regs. tit. 15, § 3377.1(c). |
| 257. | Furthermore, every CDCR employee "regardless of their assignment, is responsible for the safe custody of the incarcerated persons confined in the institutions of this department." | 257. Cal. Code Regs. tit. 15, § 3271. |
| 258. | The memorandum issued closest in time to 2019 was titled, "Inmate Housing Assignment Considerations During the Screening and Housing Process," dated January 19, 2016, by Secretary Scott Kernan (hereinafter referred to as "the Kernan Memo"). | 258. (DEF 21-23) |
| 259. | This "Kernan Memo" reads in pertinent part: "The screening authority weighs many factors regarding the inmate's custodial history and needs when considering housing assignments. During housing reviews, staff must use correctional experience and training, correctional awareness, and a sense of correctional reasonableness to determine an inmate's suitability for dormitory, celled, and single-celled housing. All staff are to be cognizant of all available factors when determining an inmate's housing assignment. Typically, factors thar are weighed during the review process include, but are not limited to: Length of sentence; Enemies and victimization history; | 259. (DEF 21) |

| | | |
|---|---|---|
| | Criminal influence demonstrated over other inmates; Vulnerability of the inmate due to medical, mental health, and disabilities; Reason(s) for segregation; History of "S" suffix determination; History of in-cell assaults and/or violence; Security Threat Group affiliation and/or association; Nature of commitment offense; Adaptive support needs listed on the CDCR Form 128 C-2." | |
| 260. | The Kernan Memo goes on to state explicitly: "It is not necessary that the inmate also demonstrate a history of in cell abuse in order to be approved for single-cell status." | 260. (DEF 21) |
| 261. | Issued on April 23, 2003, "Double-Cell Housing Policy," by Deputy Director W.A. Duncan ("Duncan Memo") states: "Staff are reminded to use correctional experience, correctional awareness, a sense of reasonableness, knowledge of the inmate population, facility environment, and the level of supervision in the housing unit when determining an inmate's need for single-cell housing." | 261. (DEF 13) |
| 262. | "Predatory behavior depicts aggressive, repeated attempts to physically or sexually abuse another inmate. The classification committee shall consider the circumstances of a prior in-cell physical or sexual battery against a cell partner, length of time in General Population without disciplinary violations, precipitating factors, or new issues affecting the inmate's behavior…Staff shall consider the inmate's pattern of behavior, not just an isolated incident." | 262. (DEF 14) |

| | | |
|---|---|---|
| 263. | The "Housing Criteria for Single Cell Status" memorandum issued on August 21, 1998, by Deputy Director David Tristan ("Tristan Memo") stated: "[S]taff are directed to review and determine an inmate's need for Single Cell status as part of Initial and Annual Classification Review. An inmate referred for placement or transfer consideration shall be reviewed for Single Cell Status if there is any indication that the inmate has a history…or verification of predatory behavior towards a cell partner or dormitory partner." | 263. (DEF 16-17) |
| 264. | A memorandum issued on January 6, 2006, "Clarification of Staff Responsibilities Relative to Inmate Double--Celling," by Deputy Director D.L. Runnels ("Runnels Memo") clarifies that "the absence of an 'S' suffix does not automatically qualify an inmate for double-cell placement." | 264. (DEF 19) |
| 265. | Osuna was transferred to CSP-Corcoran on September 13, 2018. | 265. (DEF 9219) |
| 266. | From his arrival, Osuna tried to get a cellmate. | 266. (Muñoz Depo 81:19-20) |
| 267. | Sergeant Burnes performed Osuna's Initial Housing Review on September 13, 2018. | 267. (Burnes 135:13-20)(DEF 4363-64) |
| 268. | Burnes confirmed that the review "put him on notice that Osuna had a history of violence towards fellow inmates and correctional officers." | 268. (Burnes Depo 155:20-156:20) |

| | | |
|---|---|---|
| 269. | Significantly, the form recorded the attempted murder conviction, with enhancements for inflicting great bodily injury and personal use of a deadly weapon for the January 3, 2012, in-custody assault of an inmate who received 67 stitches. | 269. (DEF 4363) (Burnes Depo Ex. A; Burnes Depo 148:1-4) |
| 270. | Burnes remembered it years later (Burnes Depo 133:11-16) Despite this memorable knowledge, Sergeant Burnes did not investigate further because it "[do]oesn't matter…Lots of inmates use weapons to commit acts of violence in prison." | 270. (Burnes Depo. 133:22-25) |
| 271. | "It's prison…It happens all the time." | 271. (Burnes Depo 149:12-14) |
| 272. | Burnes admitted that knowing Osuna's history did not inform his supervision going forward. | 272. (Burnes 149:25-150:8) |
| 273. | Burnes did not give his officers a heads-up about Osuna's pattern of covering his cell windows, preferring the following approach: "We'll deal with the problems as he brings them." | 273. (Burnes 193:8-10) |
| 274. | On September 24, 2018, when Osuna sprayed another CO with blood, Sergeant Burnes sent the officer for decontamination. | 274. (Burnes Depo 170:7-172:10) |
| 275. | Osuna filed a "602" Inmate Appeal alleging on that day "Burnes grabs my hairbun and starts bashing my head up and down and socking me." | 275. (DEF 8848) |
| 276. | Burnes acknowledged he had heard stories Osuna wrote in his own blood. | 276. (Burnes 212:5-7) |

| | | |
|---|---|---|
| 277. | Burnes admitted, "Yes, I knew that Osuna used weapons, and Osuna like to spread his blood around." | 277. (Burnes 185:6-8) |
| 278. | "We know Osuna is a threat to peace officers, inmates, even himself at times." | 278. (Burnes 197:23-24) |
| 279. | Despite such knowledge Burnes testified he had no concerns about Osuna sharing a cell. | 279. (Burnes 270:7-9) |
| 280. | "Osuna is not special to me; he's another inmate that has violence." | 280. (Burnes 271:6-7) |
| 281. | ergeant Burnes' weekly conversations with defendant Kyle belied his cavalier attitude towards Osuna. Burnes testified about his communications with licensed social worker Kyle: "We discussed Osuna at great depth with his violence, his gassing, his CCCMS, his prior EOP, and maybe – I'm sure we spoke to maybe upgrading him to EOP because of his acts." | 281. (Burnes Depo 244:11-14) |
| 282. | When asked how often he would discuss Osuna with Kyle, Burnes answered: "Weekly." | 282. (Burnes 245:22) |
| 283. | The reason was Osuna's "acts of violence and his lashing out." | 283. (Burnes 244:17-18) |
| 284. | For the ICC on January 22, 2019, Burnes acknowledged he was allowed to volunteer information and speak up if he had relevant personal knowledge but stated he would only do so if asked | 284. (Burnes 231:21-233:55) |

| | | |
|---|---|---|
| | or if the committee did not have the answer. | |
| 285. | Burnes admitted he had the ability to share information at the ICC but testified he did not recall sharing any information about Osuna's violence at the ICC because he could not even recall being at the ICC. | 285. (Burnes 227:6-15) |
| 286. | t his deposition, Burnes testified that he did not think Osuna should have been single-celled at the ICC on January 22, 2019, because "Osuna had no in-cell violence, no in-cell sexual assault or sexual crimes; no predatory." | 286. (Burnes 257:6-8) |
| 287. | Burnes could not identify any other factors. | 287. (Burnes 257:8-9) (Burnes Depo 256:6-9). |
| 288. | When asked whether Osuna could have had in-cell violence, Moreno answered, "He couldn't have." | 288. (Moreno Depo 134:11) |
| 289. | "If he hasn't had a cellmate and he doesn't have the history of violence towards his cellmate, he would, essentially, be double-cell cleared." | 289. (Moreno 179:1-4) |
| 290. | Despite this impossibility, and the existence of other factors, when asked directly whether he had any concerns about Osuna sharing a cell, Burnes answered: "No." | 290. (Moreno 179:1-4) |
| 291. | He elaborated: "Osuna is not special to me; he's another inmate that has violence." | 291. (Moreno 179:1-4) |

| | | |
|---|---|---|
| 292. | And: "That's stuff that's seen every day in prison; gassings, violence, weapons. Every day." | 292. (Moreno 179:1-4) |
| 293. | In addition to "weekly" discussions with Burnes about Osuna, Kyle had spoken to Burnes about voodoo dolls being removed from Osuna's housing unit. | 293. (Maytubby Vol. II, 53:1-9) |
| 294. | The Chrono, at the "Clinician comments" section stated "A Mental Health Representative was present as the Mental Health Representative/Committee Member." (DEF 4385) | 294. (DEF 4385) |
| 295. | As to the identity of the clinician, Kyle admitted "That would be me." | 295. (Maytubby Vol. I, 124:22) |
| 296. | Kyle also admitted that Osuna's September 2017 RVR for committing battery on an inmate with a weapon "would have been reviewed" at the ICC where she was present. | 296. (Maytubby Vol. I 137:16-24) |
| 297. | What follows in the "Clinician comments" section in the Chrono is inaccurate given Osuna's record: Osuna's "interactions with staff appear to be appropriate." | 297. (DEF 4385) |
| 298. | Kyle stated Osuna is "unlikely to decompensate." | 298. (DEF 4385) |
| 299. | "In the context of what we're looking at on an inmate's decompensation, the focus was primarily on suicidal ideation." | 299. (Maytubby Vo. I 128:19-120:5) |

| | | |
|---|---|---|
| 300. | Osuna also admitted, "Yeah, if I can kill (inaudible) cellmate, I would try. I've played along with these people…you look at all my fucking chrono's that I had you see those – uh—some of them (inaudible) what I did to this guy to them." | 300. (CDCR (OIG) 821) |
| 301. | Osuna mentioned Kyle by name ("Kyle too") and described his clinician in March 2019, in relation to Kyle, "It's her little mini, like her go-to girl named Cazares." | 301. |
| 302. | The chronos available to ICC members showed that Osuna posed a threat to others. This included evidence of Osuna's batteries on Coreas and Alonso in 2011, Osuna's attempted murder at Lerdo Pretrial Facility, Osuna. Associate Warden Gamboa did not recall LCSW Kyle raising any safety concerns, and could not recall a mental health person in committee tell him they could not share anything that was shared by a patient. | 302. (DEF 4392) (DEF 6529) (PMF 210) |
| 303. | Associate Warden Martin Gamboa chaired the ICC for Osuna on January 22, 2019. | 303. (DEF 4385-6) |
| 304. | At the time, Gamboa held the position of associate warden but was "fulfilling the duties as a chief deputy warden." | 304. (Gamboa 12:18-19, 13:8-9) |
| 305. | He described the role of the ICC chair: "listen to the presentation by the caseworker and anybody else in committee that provides contributing information to make the final decision of the committee." | 305. (Gamboa 44:7-10) |

| | | |
|---|---|---|
| 306. | At his deposition, Gamboa confirmed that cell status is reviewed at every committee, without exception. | 306. (Gamboa 149:20-22) |
| 307. | Gamboa acknowledged that one of the reviews conducted by the ICC "include if an incarcerated person can or cannot be celled with another incarcerated person in the same cell." | 307. (Gamboa 17:19-22) |
| 308. | "During ICC, we do review if an incarcerated person can be double-celled with another incarcerated person in the same cell or if he should be restricted to be in his cell by himself without a cellmate." | 308. (Gamboa 18:20-24) |
| 309. | At his deposition, Gamboa could not remember "doing anything specifically to review inmate Osuna." | 309. (Gamboa 60:19-20) |
| 310. | As a general practice, the documents related to the review of the committee I don't review prior to committee." | 310. (Gamboa 25:13-15) |
| 311. | Gamboa did not review Osuna's Initial Housing Review. (PMF 33) Gamboa testified it was "too long ago" to remember what was presented at the ICC. | 311. (Gamboa 143:24-144:1; 144:13) |
| 312. | Yet Gamboa acknowledged that he came to the committee already aware that Osuna had committed a battery by throwing "some blood on their persons where they had to go to an outside hospital." | 312. (Gamboa 57:6-8) |
| 313. | Gamboa also testified that when a RVR for battery on an inmate with a weapon is presented, "I would generally ask the question of where did this occur? Really for finding out if it occurred inside the cell or didn't occur inside the cell. Because then that would be something | 313. (Gamboa 174:24-175:3) |

| | | |
|---|---|---|
| | to consider." | |
| 314. | The January 22, 2019, chrono expressly references Osuna's September 16, 2017, battery on an inmate with a weapon. | 314. (DEF 4385) |
| 315. | Gamboa testified "everything presented to me is considered" | 315. (Gamboa 110:20-21) |
| 316. | Gamboa testified, "it appears that the review was focused on his lack of any exclusionary violence – acts of violence. He didn't have any in-cell predatory or in-cell assaultive behaviors towards cellmates, resulting in SBI. That's the focus on what's in the narrative here." | 316. (Gamboa 101: 19-25) |
| 317. | Gamboa testified, "[I]t appears that there was no documentation of violence inside his cell and no other information of his safety or others…therefore, he was double cell cleared." | 317. (Gamboa 113: 8-14) |
| 318. | Osuna had battered cellmates before (in September 2011) and had committed an attempted murder in a cell against a dormmate while at Lerdo, yelling, "I'm going to kill you, you motherfucker!"" | 318. (DEF 8743) |
| 319. | Correctional Counselor II Esteban Moreno served as the recorder for Osuna's ICC and confirmed the Classification Review document. | 319. (DEF 6092-6100) (Moreno 151:12-25) |
| 320. | After Romero's killing, Gamboa contacted Moreno to see if "anything was done contrary to policy," but this self-review found that "everything looked to be appropriate and in compliance with policy." | 320. (Gamboa 93:21-24) |

| | | |
|---|---|---|
| 321. | On March 7, 2019, Luis Romero arrived at Corcoran and went through the double-cell review by defendants Correctional Officer Arnoldo Loza and Lieutenant Francisco Muñoz ("Double-Cell Review defendants"). | 321. (DEF 4324, 4323) |
| 322. | That same day, Cell 50, Cell 60, and Cell 61 were unoccupied. | 322. (DEF 4177) |
| 323. | On March 8, 2019, Cell 50, Cell 60, and Cell 61 were unoccupied. | 323. (DEF 4181) |
| 324. | On March 7, 2019, Loza was familiar with Osuna. | 324. (Loza CONFIDENTIAL 7:2-4) |
| 325. | Loza chose Romero to be housed with Osuna. | 325. (Loza Depo 105:4-106:5; 107:25-108:1) |
| 326. | Defendant Loza admitted he was the one to make the double-cell request, including selecting the inmates, conducting research, facilitating the meeting, obtaining the signatures) for Romero to be housed with Osuna. ("The request was my – was me.") | 326. (Loza Depo 105:4-106:5; 107:25-108:1 |
| 327. | Loza checked Osuna's history of RVRs. | 327. (Loza 74:11-14) |
| 328. | Loza was aware that Osuna had engaged in assaultive behavior. | 328. (Loza CONFIDENTIAL 8:8-10) |

| | | |
|---|---|---|
| 329. | The CDCR form "Determine Double Cell Compatibility" requires certain inquiries when making double cell assignments in Administrative Segregated Hosing, which include "Reason(s) for segregation" and "Prior housing due to safety concerns." | 329. (DEF 1044) |
| 330. | Sample questions to ask the inmates includes, "Does either inmate have a history of physical aggression toward cellmates or other inmates?" | 330. (DEF 1044) |
| 331. | Osuna did have a history for being single-celled and did have a history of physical aggression towards cellmate and inmates, but Loza ruled out whether Osuna had a desire to commit violence because "a lot of inmates in there have assaultive conduct." | 331. (Loza 100:20-21) |
| 332. | Loza testified, "You can have a lot of RVRs for violence, but it doesn't mean it's inside a cell." | 332. (Loza 110:22-24) |
| 333. | Loza focused on a single factor, that unless an inmate has a history of in-cell violence then it's ok for that inmate to share a cell, if they've been double celled. | 333. (Loza 11:1-5) |
| 334. | Loza also did not provide background about Osuna to Romero, he just told Romero, "Hey, I got this other guy who wants a cellmate if you want to meet up with him." | 334. (Loza 62:15-17) |
| 335. | Loza then escorted Osuna and a meeting took place in the 4A1R rotunda area where Romero and Osuna were placed in adjoining holding cells where they could "look at each other." | 335. (Loza 62:25-63:1, 51:14, 52:6-7) |
| 336. | Loza stood near the cell in the rotunda where the two men had a conversation for "two or three minutes." | 336. (Loza 65:13-19) |

| | | |
|---|---|---|
| 337. | He then left and Romero and Osuna met for approximately half an hour. | 337. (Loza 50:24) |
| 338. | Loza testified that if Romero had said, "I don't' want to cell up with this guy," there is a consequence, as it is "an RVR to refuse a cellmate." | 338. (Loza 64:8-17) |
| 339. | During Osuna and Romero's brief time in the rotunda holding cell, Loza also had a "brief conversation" with Sgt. Burnes and told Burnes he "was going to put in a double cell review request for Romero and Osuna." | 339. (Loza 98:11, 61:6-7) |
| 340. | Burnes did not articulate any concerns that he had about Osuna. | 340. (Loza 123:6-11) |
| 341. | He just gave them a form, which all men signed, and then took it to Lt. Muñoz. | 341. (Loza 70:3-17)(DEF 112) |
| 342. | Lt. Muñoz did not have any questions for Loza. | 342. (Loza 70:20-21) |
| 343. | Romero's crime occurred when he was seventeen years old, had no juvenile history, and had been drinking alcohol when he demanded a jacket and shot a young woman. | 343. (DEF 1820) |
| 344. | Osuna's murdered Yvette Peña by stabbing her 57 times while speaking to her in a demonic voice, then having sex with her corpse. | 344. (CDCR (OIG) 1063) |
| 345. | The double-cell request form was approved Lieutenant Muñoz on March 7, 2019. | 345. (Loza 72:9-11)(DEF 112) |

| | | |
|---|---|---|
| 346. | Muñoz did not consider Osuna's behavior predatory because violence had occurred out of the cell. | 346. (Muñoz 102:19-25) |
| 347. | Munoz had the authority to send a double-cell determination back to committee if he disagreed with it and had done so "[t]here or four times", however, in this instance he deferred to the ICC. | 347. (Muñoz 116:23, 103:5-23) |
| 348. | Muñoz also relied on a conversation he had with LCSW Kyle regarding whether Osuna shouldn't be double-celled, and Kyle had told him there was no reason. | 348. (Muñoz 86:19-25) |
| 349. | Muñoz relied on that conversation with Kyle as to whether it was ok for Osuna to be double celled. | 349. (Muñoz 85:19-22; 87:25-88:3) |
| 350. | Mr. Romero was placed in Osuna's cell (Cell 46) at 4A 1R at CSP-Corcoran at 17:58 (5:58 p.m.) on March 7, 2018. | 350. (DEF 9220). |
| 351. | CDCR's primary goal is the safety of the public, staff and inmates. "The requirement of custodial security and of staff, incarcerated person and public safety must take precedence over all other considerations" | 351. Cal. Code Regs. Tit. 15, § 3270 |
| 352. | CDCR employees "shall possess the general qualifications of integrity, honesty" and is deemed part of the "minimum qualifications." | 352. Cal. Code Regs. Tit. 2, § 172 (DEF 4741) |
| 353. | A state officer "shall not engage in an" activity "which is clearly inconsistent, in conflict with, or inimical to his or her duties as a state officer." | 353. Cal. Gov't Code § 19990(g) (DEF 4742) |

| | | |
|---|---|---|
| 354. | "Irresponsible or unethical conduct…shall be avoided by all employees." | 354. Cal. Code Regs. Tit. 15, § 3391 (DEF 4743) |
| 355. | Besides regulations, CDCR's Operations Manual ("DOM") defines responsibilities. | 355. DOM § 52020.4.2 |
| 356. | DOM § 52020.5 notes that a positive physical count of an inmate: "A positive/physical count means to count a living, breathing person and physically see that person." | 356. (DEF 4747) |
| 357. | The policy of inmate count is to "accurately account for those inmates at all times." DOM § 52020. (Solares II, DEF 962) CSP-Corcoran, Supplemental § 52020.4.1, Frequency of Counts provides that counts will be conducted at the following times, including: 0030 (Institutional Count), 0230 (Negative Count), 0500 (Institutional Count). | 357. (DEF 4747-8) |
| 358. | CSP-Corcoran Operational Procedure ("OP") 226, "Security/Welfare Check Procedures," dated June 2018, governed welfare checks in the SHU in March 2019. | 358. (DEF 4322) |
| 359. | OP 226 defines security/welfare checks as "a personal observation by a correctional officer" and includes "a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell looking for damages to the cell and/or signs of any misconduct or self-injurious behavior." | 359. (DEF 4905 (6-page doc) |
| 360. | OP 226 repeatedly defines the security/welfare check as a "personal observation by a Correctional Officer of a living, breathing inmate, free from obvious injury," and requires officers | 360. (DEF 4904) |

| | | |
|---|---|---|
| | "conducting the security/welfare check [to] ensure there is a clear and unobstructed view into the cell and identify any: 1. Damage to the cell. 2. Signs of misconduct, safety/security breaches. 3. Signs of obvious injury to any inmate." | |
| 361. | Any "extraordinary circumstance" that case "any delay(s) outside of the mandated time frame of the security/welfare check(s)...shall be immediately reported to the Unit/Facility Sergeant." | 361. (DEF 4905) |
| 362. | The CO conducting the security/welfare check "will use the Guard 1 Rounds Tracker ('PIPE') to record all security/welfare checks. The assigned officer shall conduct a security/welfare check on each cell, at staggered intervals and twice an hour , not to exceed 35 minutes between checks[.]" | 362. (DEF 4906) |
| 363. | "The 'PIPE' captures two levels of information, the time the security/welfare check was made and the location where the security/welfare check was conducted. The officer will touch the 'PIPE' to each button, which is affixed to each cell door in the housing unit." | 363. (DEF 4906) |
| 364. | The purpose of the security/welfare check procedure set forth in OP 226 is "to ensure operational compliance with the Department Operations Manual (DOM), the California Code of Regulations, Title 15, and Coleman court mandates." | 364. (DEF 4903) |
| 365. | sued eleven months prior to Romero's killing, on March 30, 2018, the Memorandum from Director Kathleen Allison titled "Cell Inspections and Removal of Window Coverings And/Or Privacy Screens," further | 365. (DEF 4901) |

| | | |
|---|---|---|
| | detailed requirements for cell inspections. | |
| 366. | The policy memorandum "reiterate[s] the importance of conducting regular cell inspections and ensuring staff have a clear line of sight into inmate cells…If staff's line of sight into a cell is impeded, a cell inspection shall be conducted to remove any cell and/or window covering blocking staff's view into the cell." | 366. (DEF 4901) |
| 367. | Also issued on March 30, 2018, the Memorandum from Director Allison titled "Inmate Count Expectations", provided "direction to staff and reiterate[d] my expectations for conducting daily counts. As evidenced by recent security audits, the failure to properly conduct counts appears to be a systemic issue within our institutions." | 367. (DEF 4898) |
| 368. | The memorandum cites to DOM § 52020.5: "*A positive/physical count means to count a living, breathing person and physically see that person*." | 368. (DEF 4898) (emphasis in the original); see also DOM § 52020.5 (**see Solares II, DEF 962**, in DEF 590) |
| 369. | his Allison Memorandum warns that failure to account during inmate count "is unacceptable, and shall be addressed through the progressive disciplinary process," and directs custody staff to receive on-the-job training, to be completed "within 90 days from the date of this memorandum." | 369. (DEF 4899) |
| 370. | A Post Order describes the specific duties for a correctional officer's post. | 370. (Peña Depo 12:22-24) (Gallemore 59:15-23) |

| | | |
|---|---|---|
| 371. | Post Order 183440 set forth the general duties, special instructions and operational time schedule to be followed by the officer assigned to 4A 1R control booth for First Watch (2200-0600). | 371. (DEF 5010-16) |
| 372. | Post Order 183440 required the control booth officer to "enforce all departmental rules, regulations, policies and procedures" and "familiarize yourself with the Department Operations Manual (DOM), DOM Supplements, Title 15, and local Operational Procedures." | 372. (DEF 5011) |
| 373. | Special Instruction 9 requires the control booth officer to "[p]rovide custodial surveillance, control inmate movements, and armed coverage when necessary," and states: "You are required to direct floor staff to areas of concern when appropriate." | 373. (DEF005012.) |
| 374. | Instruction 11 requires the officer to "[r]eport immediately all unusual incidents or activities to the Sergeant." | 374. (DEF 5013) |
| 375. | Instruction 13 requires the officer to contact his supervisor and be properly relieved "prior to any activity which would restrict visual surveillance of your area." | 375. (DEF 5013) |
| 376. | A daily responsibility included "ensur[ing] photos of all Inmates is available to staff for proper identification." | 376. (DEF 5014) |
| 377. | Defendant Bryan Gallemore signed the "Post Order Acknowledgment" Post Order 183440 for the 4A 1R Control Booth on January 10, 2019 and November 18, 2016. | 377. (DEF 5015) (DEF 50016)(Gallemore Depo. 63:5-20) |

| | | |
|---|---|---|
| 378. | Gallemore acknowledged that his role included maintaining a visual on the floor officer "in front of him, in back of him and for anything out of the — that would stop him from doing his job." | 378. (Gallemore Depo. 23:7–10.) |
| 379. | Gallemore held the post of 4A 1R Control from approximately 2011 to March 2019. | 379. (Gallemore Depo 57:10-14) |
| 380. | Post Order 283447 set forth the general duties, special instructions and operational time schedule to be followed by the officer assigned to 4A1R Floor 2 for Second Watch (0600-1400) (6:00 a.m. to 2:00 p.m.). | 380. (DEF 5039-5043) |
| 381. | In bold font, under "Area of Responsibility": "This post is designated to conduct the Security/Welfare Check "Pipe checks," as per O.P. 226. If for whatever reason you are not available to conduct the Security/Welfare Check you need to immediately notify your unit supervisor." | 381. (DEF 5039) |
| 382. | Enumerated responsibilities included: "Provide direct supervision to inmates assigned to your housing unit. Conduct count…Maintain awareness, control inmate behavior, report all serious misbehavior in a timely fashion." | 382. (DEF 5040) |
| 383. | "Guard 1 Security/Welfare Checks are to be conducted two (2) times per hour pursuant to Operational Procedure 226, Safety/Welfare Check Procedures. These checks are to be conducted on each cell, twice an hour not to exceed 35 minutes between checks." | 383. (DEF 5041) |
| 384. | The Operational Time Schedule required "Complet[ion of] a security check" at 0605 hours. | 384. (DEF 5042) |

| | | |
|---|---|---|
| 385. | Defendant Leonel Peña acknowledged reviewing and signing this post order on February 20, 2019. | 385. (Peña Deposition 14:15-16:14)(DEF 5043) |
| 386. | Post Order 283441 set forth the general duties, special instructions and operational time schedule to be followed by the officer assigned to 4A1R Control Booth for Second Watch (0600-1400). | 386. (DEF 5046-5053) |
| 387. | Post Order 283441 required the control booth officer to "enforce all departmental rules, regulations, policies and procedures" and "familiarize yourself with the Department Operations Manual (DOM), DOM Supplements, Title 15, and local Operational Procedures." | 387. (DEF 5046) |
| 388. | pecial Instructions included to "Report immediately all unusual incidents or activities to the Sergeant." | 388. (DEF 5048) |
| 389. | Defendant Jesse Garcia acknowledged signed this post order on numerous dates, including November 1, 2017, and February 2, 2019. | 389. (DEF 5051) |
| 390. | Silva testified that Osuna had markings "with the words 'ha, ha' all over the wall" of his cell, which had been present since Silva first started in the building and which were not permitted. | 390. (Silva Depo. Vol. *I* 121:17–19.) |
| 391. | Luis Romero arrived at CSP-Corcoran in the morning of March 7, 2019, and was transferred to Osuna's cell (Facility 4A, Cell 46) at approximately 1758 hours the same day. | 391. (DEF 4324) |
| 392. | Romero survived the first night in Osuna's cell, as Osuna admitted, "I just didn't' kill him on the first day because I just wanted to watch him for a night." | 392. (CDCR (OIG) 816) |

| | | |
|---|---|---|
| 393. | Cell 46 sat in C Section on the first floor of 4A 1R. | 393. (Gallemore Depo. 73:1-2) |
| 394. | Its door was perforated top to bottom rather than solid, with Plexiglas added to prevent gassing. | 394. (Silva Depo. Vol. I 214:14-20) |
| 395. | To the right of the cell door was a window, which by Silva's own account, had been covered, "since the first time I arrived to -- to -- to that building." | 395. (Silva Depo. Vol. I 219:17–19; *see also* 215:10-12) |
| 396. | There were three windows at Cell 46: two rectangular windows on the door (an upper rectangle and a lower rectangle) separated by the center bar containing the Guard One nodule, and one narrow window to the right of the door, near the toilet. | 396. (Gallemore Dep. 72:24–79:17; (DEF005256–005258 (Gallemore Dep. Ex. E)) |
| 397. | Gallemore referred to the window to the right of the other two windows on the door the "third window." | 397. (Gallemore Dep. 82:10-17) |
| 398. | The building in which Cell 46 is located is a 180-degree design, divided into three sections (A, B, C), with a single shared control booth. | 398. (CHECK Burnes 19:25-20:19) |
| 399. | Such design makes visual surveillance more challenging than a 270-degree design and requires the control booth officer to stand and move to maintain a visual on all sections. | 399. (Burnes 40:20-41:18). |
| 400. | Gallemore admitted there is no scenario where CDCR staff allow a window into a cell to remain covered. | 400. (Gallemore Depo. 44: 2-4) |

| | | |
|---|---|---|
| 401. | Gallemore also admitted that if it was unclear from his booth whether a cell was completely covered or partially obstructed, his job included notifying the floor officer a cell "might be covered up" so that the floor officer could confirm it. | 401. (Gallemore Depo 47:15-48:10) |
| 402. | Asked whether there was any scenario in which CDCR staff would allow a cell window to remain covered, Gallemore answered: "No." | 402. (Gallemore Depo. 44:1–4.) |
| 403. | Defendant Gallemore acknowledged that his job responsibilities in the control booth included: maintain a visual on the floor officer as he conducted checks; monitor the timing and remind the floor officer when a check was due; to communicate verbally through the open windows facing Sections A, B, and C; listen for sounds from the sections and dispatch the floor officer to investigate; call for Security and Escort officers (S&E) by radio when needed. | 403. (Gallemore Depo. 72:14-17, 28:13–17, 32:19–33:11, 33:21–34:13, 45:1–25) |
| 404. | Prior to March 8, 2019, Gallemore had called for S&E because of obstructed windows on occasions "[t]oo numerous to count" over his career. | 404. (Gallemore Depo. 46:24) |
| 405. | Gallemore estimated that a covered window discovered during the course of a safety check happened more than once a month and was something he was "very accustomed to." | 405. (Gallemore Depo. 55:5-18, 55:21) |
| 406. | On other occasions Gallemore had warned floor officers: when "I thought somebody had covered up, I would tell him that cell or whatever cell might be covered up, yes." | 406. (Gallemore Depo. 48:1–3.) |

| | | |
|---|---|---|
| 407. | Gallemore worked the first shift going into March 9, 2019. | 407. (Gallemore Depo 21:10-12) |
| 408. | As to Cell 46 on March 9, Gallemore first testified that he did not notice or remember any obstruction. He testified, "I didn't notice whether it was or wasn't" and "I didn't even put it into memory whether that cell had a block on the -- the right-side window." | 408. (Gallemore Depo. 73:13, 73:16–17, 76:1–2) |
| 409. | However, Gallemore later acknowledged "yes" "that there was some covering on Cell 46 during the March 9th shift" and he could tell that there was some kind of obstruction on Cell 46. | 409. (Gallemore Depo. 103:24-104:1, 83:25-84:2) |
| 410. | The obstruction was not on the "third window". | 410. (Gallemore Depo. 83:6-8) |
| 411. | Rather, Gallemore noticed "blockage" that he thought was a "courtesy curtain" on the upper and lower windows of the door, "[b]ut it looked like you could see in that cell from that far side, the shower side, like there was an angle there 'cause that's where Silva would shine his flashlight through." | 411. (Gallemore Depo. 117:10-24) |
| 412. | Despite seeing an obstruction, Gallemore could not see the extent of the obstruction. | 412. (Gallemore Depo. 118: 15-17). |
| 413. | At his interview with Internal Affairs, Gallemore minimized this detail about blockage, instead stating he "could not tell if Inmate Osuna's side vertical window was covered…he could tell if something was in the window, but he could not judge the depth of the object." | 413. (DEF 4351) |

| | | |
|---|---|---|
| 414. | Gallemore knew there was at least some obstruction to the door of Cell 46, but "couldn't tell if it was completely blocked or not." | 414. (Gallemore Depo. 86:14-15) |
| 415. | Despite this knowledge, Gallemore never brought this to the attention of Officer Silva. | 415. (Gallemore Depo. 86:17-19). |
| 416. | He never told Officer Silva to check out the covering on Cell 46 to make sure it was not a complete obstruction. | 416. (Gallemore Depo. at 104:2-5) |
| 417. | Gallemore did not have any communication with Officer Silva about Cell 46. Gallimore testified, "I had no discussion with him about 46", including the obstruction. | 417. (Gallemore Depo. 95:6, 84:7-13) |
| 418. | Gallemore testified that the level of obstruction did not change over the course of the shift, that it "appeared to be the same as when we came on shift." | 418. (Gallemore Depo. 116:5–10). |
| 419. | Gallemore confirmed that he never followed up to determine whether it was partial or complete. | 419. (Gallemore Depo. 116:13–14.) |
| 420. | This stands in stark contrast to what he said he *would* do normally: "If I believe the — the window's completely obstructed and that inmate has an issue, I would definitely send my floor cop out there to find out what's going on." | 420. (Gallemore Depo. 97:5–9.) |
| 421. | On March 9 he did nothing of the kind, noting that "[t]here wasn't a step there, I mean, for me to bring attention." | 421. (Gallemore Depo. 100:21–22.) |
| 422. | Gallemore never flagged the risk of a complete obstruction to Cell 46 and relied entirely on Silva's verbal report that "everything was all good" | 422. (Gallemore Depo. 100:22–23) |

| | | |
|---|---|---|
| 423. | Gallemore testified, "I couldn't tell, and Officer Silva, when he did his first check, didn't mention to me that he couldn't see in that cell." | 423. (Gallemore Depo. 97:22-98:3) |
| 424. | Gallemore explained his lack of follow-up on the obstruction to Cell 46 on the basis of his reliance on Silva: "I relied on my floor officer to do his job, to be able to see in the cell, to look for anything out of the ordinary …" | 424. (Gallemore Depo. 96:11–13; *see id.* 95:11–96:25.) |
| 425. | When asked whether he assumed that because Silva reported nothing wrong there was nothing wrong, Gallemore answered: "Exactly." | 425. (Gallemore Depo. 96:25) |
| 426. | Gallemore testified, "When [Silva] did his security check and he said everything was all good, to me, everything was all good. After 11:00, same thing." | 426. (Gallemore Depo. at 100:22–24) |
| 427. | Referring to Silva, Gallemore testified, "I'm assuming based on my amount of time I worked with this officer that he does his job properly." | 427. (Gallemore Depo. 103:18–19.) |
| 428. | Between 2300 and 0600, Gallemore never called anything to Silva's attention from the control booth. | 428. (Gallemore Depo. 85:24–86:3.) |
| 429. | Gallemore testified that he never had any discussion with any other CDCR employee about Jaime Osuna and that he was "not familiar with Jaime Osuna as an individual." | 429. (Gallemore 91:24-92:1, 91:2-3) |
| 430. | Defendant Jesse Garcia's later interview with Internal Affairs would contradict this, as he recalled that Gallemore "told him that Inmate Osuna had received a cellmate." | 430. (DEF 4354) |

| | | |
|---|---|---|
| 431. | Defendant Leonel Peña received training on how to conduct inmate count, and the two Allison memoranda dated March 30, 2018. | 431. (DEF 4325) |
| 432. | Peña confirmed at his deposition that the applicable standard in March 2019 was personal observation by a correctional officer of a living, breathing inmate, free from obvious injury.” | 432. (Peña Depo. 23:14-24:12) |
| 433. | Peña acknowledged that the purpose for the welfare-check requirement policy is that inmates sharing a cellmate are at greater risk of violence from one another than inmates housed alone. | 433. (Peña Depo. 103: 2-12) |
| 434. | Prior to March 9, 2019, Peña knew that Osuna gassed a correctional officer with blood. | 434. (Peña Depo 44:17-45:6) |
| 435. | Prior to March 9, 2019, Peña knew that Osuna had a pentagram drawn on the floor of his cell. | 435. (Peña Depo. 83:23-84:1) |
| 436. | Prior to March 9, 2019, Peña knew that other officers reported Osuna kept “voodoo dolls” in his cell. | 436. (Peña Depo. 84:16-23) |
| 437. | Prior to March 9, 2019, Peña knew that Osuna had extensive facial tattoos including “joker” marking around his eyes and what appeared to be a pentagram or horns on his forehead | 437. (Peña Depo. 85:7-86:11) |
| 438. | Prior to March 9, 2019, Peña knew that Osuna had other RVRs for violence. | 438. (Peña Depo. 102:10-12) |
| 439. | Prior to March 9, 2019, Peña knew that Osuna had been housed alone for the entire period Peña had worked 4A1R, until Romero arrived on March 7, 2019. | 439. (Peña Depo. 91:7-9). |

| | | |
|---|---|---|
| 440. | Defendant Floor Officer Leonel Peña worked the Second Watch shift for 4A1R Floor Officer 2 on March 9, 2019, starting at 6:00 a.m. | 440. (DEF 6) |
| 441. | Guard One logged safety checks at Cell 46 at: 0612 (06:12 a.m.), 0623 (06:23 a.m.), 0642 (06:42 a.m.), and 0722 hours (07:22 a.m.). | 441. (DEF 4329; DEF 4252) |
| 442. | Peña confirmed that he conducted Guard 1 safety checks with the pipe system at 6:12 a.m., 6:23 a.m., 6:42 a.m., and 7:22 a.m. (Peña 36:12-21) | 442. (DEF 4252) |
| 443. | Peña conducted his first check around 6:12 a.m. but he was not able to look into Cell 46 "because it was covered." | 443. (Peña Depo. 39:9-19) |
| 444. | Peña stated that he could not see in Cell 46 "at all." | 444. (DEF 4357) |
| 445. | Despite not being able to look into Cell 46, Peña still tapped the pipe anyway. | 445. (Peña Depo. at 39:20-21) |
| 446. | Under OP 226 and Post Order 283447, this was the moment supervisor notification became mandatory; Peña did not notify anyone. | 446. (Peña Depo. 134:11-12) |
| 447. | Peña later admitted "he should have notified his supervisor that cell #46 had their cell windows completely covered." | 447. (DEF 4357) |

| | | |
|---|---|---|
| 448. | When Peña arrived at Cell 46 at 6:23 a.m. for a second Guard 1 pipe check the window allowing a view into Cell 46 was covered. | 448. (Peña Depo. 49:16-19) |
| 449. | Peña admitted during the second check that "he never saw Inmate Osuna or Inmate Romero." | 449. (DEF 4358) |
| 450. | Peña ordered Osuna to take down the covering a second time, but Osuna did not comply. | 450. (Peña Depo. 50:2-6). |
| 451. | Peña did not stay at Cell 46 to make sure that Osuna complied with the order. | 451. (Peña Depo. 0:7-9) |
| 452. | Peña made Osuna aware that he needed to see Osuna's celly and Osuna mimicked his voice. | 452. (Peña Depo. 50:14-15) |
| 453. | Peña heard a voice appearing to be Inmate Romero's stating, "I'm taking a shit." | 453. (DEF 4358) |
| 454. | At his deposition, Peña admitted that "taking a shit" is not a valid reason to put up a cell covering. | 454. (Peña Depo. 54:10-12) |
| 455. | Peña told the inmate that he still needed them to uncover their windows, but he did not stay outside of Cell 46 to make sure that the inmates inside 46 complied with the second order to take down the covering. | 455. (Peña Depo. 51:12-16) |
| 456. | Peña did not enforce his own order because he "thought they were gonna take it down" | 456. (Peña Depo. at 50:17-18) |

| | | |
|---|---|---|
| 457. | Peña confirmed that during his second round of security checks he never saw Inmate Osuna or Inmate Romero. | 457. (DEF 4358) |
| 458. | Despite not seeing anyone a second time, Peña did not call a supervisor "because he believed that he could deal with the situation." | 458. (DEF 4358) |
| 459. | Peña returned to Cell 46 for a third safety check at 6:42 a.m. | 459. (Peña Depo. 51:21-24) |
| 460. | He was not able to see inside Cell 46 because the cell "was covered." | 460. (Peña Depo. 51:21-52:5) |
| 461. | Peña told the occupants to uncover their windows and "believed that he heard two separate voices." | 461. (DEF 4358) |
| 462. | Peña heard a voice that he "thought was Romero's voice responding." | 462. (Peña Depo. 52:21-22) |
| 463. | Peña "then continued with his Guard One/security checks" even though "he still had not seen either of the occupants in cell #46 at this point." | 463. (DEF 4358) |
| 464. | Peña had ordered the inmates inside Cell 46 to take down the cell covering three time but did not stay that third time to make sure they took the covering down. | 464. (Peña Depo. 54:13-19) |
| 465. | Peña testified that he assumed the inmates inside Cell 46 would comply with his order to take down the cell covering. | 465. (Peña Depo. 55: 2-6) |

| | | |
|---|---|---|
| 466. | Peña admitted that he made this assumption he had not obtained a visual of living, breathing flesh of either inmate inside Cell 46. | 466. (Peña Depo. 55:8-14) |
| 467. | Peña also admitted that he knew cell coverings that blocked the view inside a cell were not allowed and that inmates in 4A 1R could be dangerous to each other. | 467. (Peña Depo. 56:13-23) |
| 468. | Peña distributed morning meals and Cell 46 was still covered at approximately 7:10 a.m. | 468. (DEF 4334) |
| 469. | Peña instructed the inmates to uncover "for chow and Inmate Osuna responded, 'We have canteen, we're good.'" | 469. (DEF 4334) |
| 470. | Peña instructed Osuna that he needed a visual of the occupants and Osuna responded, "No worries, we will uncover for meds." | 470. (DEF 4334)(Peña Depo. 111:19-20) |
| 471. | Despite this fourth refusal to uncover, Peña did not notify a supervisor but instead sought out Martin Tamyo. | 471. (DEF 4334) |
| 472. | Peña asked Tamayo, who worked as the psychiatric technician distributing medication, to "stop whatever he was doing and go to Cell 46 and issue the meds, and that way I could probably have him finally remove their covering." | 472. (Peña Depo. 59:23-60:2) |
| 473. | When Tamayo was at the door with him, Peña again ordered Osuna to uncover the cell door window but Osuna refused. | 473. (DEF 4334) |
| 474. | At 7:22 a.m.: Peña returned to Cell 46 for a fourth check but the window was still covered. | 474. (Peña Depo. 58:19-24) |

| | | |
|---|---|---|
| 475. | Peña testified that he tapped the Guard 1 pipe at 7:22 a.m.. | 475. (Peña Depo. 73:5-13)(DEF 4252) |
| 476. | Peña "[t]old them again to remove their coverings." | 476. (Peña Depo. 58:24) |
| 477. | It was only at this time that Peña notified his supervisor, Sergeant Jay Martinez. | 477. (Peña Depo. 59:1-4) |
| 478. | It was not "the first or second or third time that Osuna disobeyed" his order, "but after the fourth time, at 7:22 a.m." that Osuna disobeyed Peña's order, at that point he thought, "Okay, I got to get Sergeant Martinez." | 478. (Peña Depo. 74:17-23) |
| 479. | Sergeant Martine was in his office, "less than a minute walk" away. | 479. (Peña Depo. 75:2-7) |
| 480. | Peña and Sergeant Martinez then walked to Cell 46 and Peña told Osuna "that the sergeant was present and that he needed to uncover his cell windows." | 480. (DEF 4359) |
| 481. | Osuna responded that he would uncover his windows, but he wanted Peña to place him in handcuffs and escort him to see a psychologist; Peña agreed. | 481. (DEF 4359) |
| 482. | At his deposition, Peña confirmed that a psychologist does not have to be present for the officer to order an inmate to take down a cell covering. | 482. (Peña Depo. 88:18-21) |
| 483. | Osuna uncovered his cell door windows and Peña was able to see inside. | 483. (DEF 4359) |

| | | |
|---|---|---|
| 484. | Pena testified he saw "Romero's body sitting in front of the left bunk, and his head was on top of the bunk on the left side of his body, and there was blood everywhere." | 484. (Peña Depo. 118:4-6) |
| 485. | Pena testified that a body part was hanging from the ceiling and "Romero's head was missing the eyes if I – if I remember right. And there was sentences written in – with blood on the walls." | 485. (Peña Depo. 118: 7-11) |
| 486. | At 7:32 a.m. Peña activated his personal alarm device and Osuna was removed from the cell. | 486. (DEF 4333, 4359) |
| 487. | Peña admitted that on March 9, 2019, he violated policy by not observing "live breathing flesh" while conducting security welfare checks utilizing the Guard One device. | 487. (DEF 4359) |
| 488. | Peña admitted that he knew the policy required visual confirmation, and admitted he did not have that, but that he "continued on with safety checks at other cells instead." | 488. (Peña Depo.160:8-0, 159-160) |
| 489. | Peña admitted that he relied on voices for assurance, rather than relying on a visual confirmation. | 489. (Peña Depo. 162: 7-11) |
| 490. | He did this despite knowing at the time that he was not permitted to substitute visual confirmation with voices. | 490. (Peña Depo. 163:1-7) |
| 491. | Peña acknowledged that OP 226 permitted him to stop at a problem cell and justify late pipe checks elsewhere: "I'm conscious about OP226. And if there's an issue at one cell, I could stop and justify why my pipes were not on time." | 491. (Peña Depo. 157:21-23) |

| | | |
|---|---|---|
| 492. | Peña admitted that Osuna mimicking Romero's voice was among the factors that led him to believe that both inmates were alive. | 492. (Peña Depo. 55:15-56:10; 50:14) |
| 493. | Peña admitted that he chose to move on to other cells rather than ensure compliance at Cell 46, at that doing so effectively permitted the covering to remain up. | 493. (Peña Depo.71:24-72:6) |
| 494. | Peña admitted that he should have notified his supervisor after the 6:12 a.m. check, and that his failure was a mistake, noting, "I wish I would have notified my supervisor earlier." | 494. (Peña Depo. 123:8-17) (DEF 4357) |
| 495. | Defendant Control Booth Jesse Garcia's main duties as a 4A1R control booth officer included maintaining a visual on the floor officer while security checks were conducted. | 495. (Garcia Depo. 16:11-13; 20:20-22) |
| 496. | Garcia testified, if "[s]omething wrong in the cell, then I have to respond." | 496. (Garcia Depo. 21:9-10) |
| 497. | To do this means looking at the cell where the officer is walking towards (Garcia 21:11-15) and "maintain a visual on where he's walking around." | 497. (Garcia Depo. 38:21-24) |
| 498. | About once-a-month Garcia would see a window being covered and flag it for the security officer conducting the security checks. | 498. (Garcia Depo. 37:8-12) |
| 499. | On March 9, 2019, Garcia observed Pena stop at Cell 46 one to two times, for ten to fifteen seconds, which he described as normal. | 499. (Garcia Depo. 84:9-12; 85:16-25) |
| 500. | Garcia could not see into Cell 46: there was "like a glare" that was present the entire shift and it looked like it was dark inside Cell 46. | 500. (Garcia Depo. 87:1-4, 87:5-7) |

| | | |
|---|---|---|
| 501. | The uncertainty of whether he could see into the window of Cell 46 had been an ongoing issue. | 501. (Garcia Depo. 109:16-110:1) |
| 502. | Garcia never brought the issue up to a supervisor or a floor officer. | 502. (Garcia Depo. 110:5-9) |
| 503. | Garcia admitted that if it is he cannot tell if a window is covered or not then it is possible that the cell window is actually covered. | 503. (Garcia Depo. 80:2-6) |
| 504. | Although he acknowledge that he had a responsibility of identifying when a window had been covered if he could see it. | 504. (Garcia Depo. 81:22-24) |
| 505. | Garcia said that he relied on the floor officer (Pena) to do his job and would not flag or call attention to a cell if he himself did not have a visual. | 505. (Garcia Depo. 81:10-20) |
| 506. | Garcia admitted that he never asked Officer Pena if there were any issues with Cell 46/Osuna's Cell. | 506. (Garcia Depo. 126:10-12) |
| 507. | When shown a photo of Cell 46 taken by ISU during the morning of March 9, 2019 (DEF 5255-5256 (Exhibit 30 to IA Investigation), DEF 4895), Garcia confirmed the "gasser" placard on the door of Cell 46 and that the third window to the right side was blocked. | 507. (Garcia Depo. 115:25-116:1; 116:16-25) |
| 508. | Garcia agreed that the blocked window violated the rules. | 508. (Garcia Depo. 117:1-3) |
| 509. | Garcia admitted that he could not look into the cell through this third window. | 509. (Garcia Depo.118:5-8) |

| | | |
|---|---|---|
| 510. | Garcia conceded that he could not have seen through that window because it was blocked "and also the glare." | 510. (Garcia Depo. 118:9-11) |
| 511. | Internal Affairs reviewed the photos of Cell 46 and found "the rectangular window on the right side of the cell door covered with pictures." | 511. (Exhibit 30) (DEF 5254-5263) (DEF 4337) |
| 512. | To Internal Affairs, Garcia denied knowing that the vertical cell window was covered the morning of March 9, 2019. | 512. (DEF 4355) |
| 513. | Garcia's staff report acknowledge that he was unable to see what was happening in front of Cell 46 later that morning for a different reason: "due to my distance and obstructions from the control booth." | 513. (DEF 4106) |
| 514. | Garia's report, authored eleven days after Romero's murder, on March 20, 2019, conspicuously avoids the time during Peña's earlier security checks, and his narrative starts at 7:30 a.m. | 514. (DEF 4106) |
| 515. | Garcia considered that nothing relevant happened between 6 a.m. and 7:30 a.m. | 515. (Garcia Depo. 98:10-17) |
| 516. | Thus, Garcia knew on March 9, 2019, that he could not see into the windows of Cell 46, he did not follow up with a supervisor or the floor officer Pena. | 516. (See above)(Garcia Depo.109:16-110:1, 110:5-9) |
| 517. | Garcia deflected to Pena, "if Inmate Osuna was covering up his windows then PENA should have said something." | 517. (DEF 4355) |
| 518. | Garcia admitted that the control booth officer shares liability for ensuring cell windows are not covered. | 518. (Garcia 134:11-15) |

| | | |
|---|---|---|
| 519. | In a recorded interview with CDCR investigators Osuna stated that he killed Romero in a window of time on March 8 at approximately midnight. | 519. (DEF 5137, pull entire interview for record) |
| 520. | When asked by ISU Investigator Love, "What time that you killed him?" Osuna responded, "I don't know like 12:00 something…It was 12:00." | 520. (DEF 5137) |
| 521. | Inmate Moreno (CDC# BB3690), sat for an interview on March 11, 2019, with ISU investigator R. Rubio. | 521. (DEF 8964) |
| 522. | Inmate Moreno stated that he and Osuna lived in nearby buildings would communicate through the windows of their cell blocks, including at night, via sign language and with written signs. | 522. (DEF 8965) |
| 523. | Inmate Moreno stated that 2-5 gang inmates cannot house with non 2-5 inmates and "If they are housed together the 2-5er has to kill the non 2-5 inmates." | 523. (DEF 8965) |
| 524. | On evening of Friday, March 8, 2019, Inmate Moreno and Osuna communicated through their respective windows that Osuna was going to kill his new cellmate, who was not a 2-5er. | 524. (DEF 8965) |
| 525. | "At approximately 2300 to 2350 hours" Inmate Moreno got Osuna's attention and Osuna signed to him that he was going to kill the new cellmate and placed his index finger over his mouth for a silence gesture. | 525. (DEF 8965) |
| 526. | Shortly thereafter, Moreno saw Osuna approach the cellmate with a weapon and strike the victim "with a downward motion." | 526. (DEF 8965) |

| | | |
|---|---|---|
| 527. | Moreno was surprised that Osuna would do it and put up his window covers and went to bed. | 527. (DEF 8965) |
| 528. | The document memorializing this interview noted: "This information should be considered reliable." | 528. (DEF 8966) |
| 529. | The Kings County Sheriff-Coroner listed the "time of injury" as "unknown." | 529. (DEF 4162) |
| 530. | The Final Autopsy Report makes no time-of-death finding. | 530. (DEF 4164-4169) |
| 531. | At his deposition, Coronor Wayne Brabant confirmed that it was not scientifically determined the time of death ("It is not a scientific time of death"). | 531. (Brabant Depo. 23:11-12) |
| 532. | Any time listed was the time Romero's body was found. | 532. (Brabant Depo. 23:1-6) |
| 533. | Brabant further testified "we don't know the exact time the injuries were sustained." | 533. (Brabant Depo. 24:23-24) |
| 534. | Silva categorically stated his position regarding the Guard One record: "if I piped the door, therefore, I did the check." | 534. (Silva Depo. Vol. I, 231:14-17) |
| 535. | Silva also maintained that that at every check he confirmed "living, breathing flesh" for both inmates. | 535. (Silva Depo. Vol. I, 251:10-13) |

| | | |
|---|---|---|
| 536. | Silva also testified that he saw Romero on his bunk, covered head-to-toe but saw movement indicating breathing during the following counts: the 0030 count; the 0230 count; the 0500 count; the 0545 count | 536. (Silva Depo. Vol. I 193:17-195:6, 195:18-196:2, 206:3-207:22, 256:9-17; 279:19-21) |
| 537. | Silva also testified that he heard no yelling, screaming, or loud noises from Cell 46, or anywhere in 4A1R during the shift. | 537. (Silva Depo. Vol. I 140-:7-141:15) |
| 538. | allemore likewise heard no yelling, loud sounds or disturbances from any cell in C Section during the First Watch shift and testified that nothing that shift interfered with his ability to hear sounds from the sections. | 538. (Gallemore Depo 111:25-115:19) |
| 539. | Such silence can support Silva's position that no murder occurred during the first watch, or it could support bolster the position that Osuna killed Romero relatively quiet just before midnight, followed by over six hours of concealment. Silva testified that Mr. Romero was alive at the time of his last security check at 5:45 a.m. | 539. (Silva Depo. Vol. I, 279:19-21) |
| 540. | Officer Peña was required to complete his first security check at 6:05 a.m. | 540. (DEF 5042) |
| 541. | Officer Silva's expert forensic pathologist, Dr. Bennett Omalu, wrote a "Medico-Legal Report," dated April 3, 2026. | 541. (Silva Expert Disclosure) |
| 542. | Dr. Omalu opined: "These prevailing evidentiary finding, therefore, confirm that it was less likely and less probable that Romero was killed and died at about 10:00 p.m. to 12: a.m., the prior night. More likely than not, he died closer to the time his dead body was discovered." | 542. (Omalu report at p. 13) |

| | | |
|---|---|---|
| 543. | Dr. Omalu grounded this opinion on the observations from the murder scene photographs and report: "If [Osuna] had killed Romero at about 10:00 p.m. to 12:00 a.m., there would have been an emergent smell, odor, and stench of death and the decomposing and autolyzing dead body and blood by 7:30 a.m. Many flies would have been present, especially given the large amounts of extravasated blood all over the cell. There were none of these." | 543. (Omalu letter at 13) |
| 544. | Dr. Omalu also supported his findings with citations to two peer-reviewed studies on bloodstain drying. | 544. (Omalu letter). |
| 545. | Plaintiff's forensic pathologist, Dr. Eugene Carpenter, in his expert rebuttal report dated May 8, 2026, noted that there are considerable variations in the onset of rigor mortis for each individual and that "[t]his makes accurate time of death determinations extremely difficult." | 545. (Dr. Carpenter, May 8, 2026, report, at 8) |
| 546. | Speaking for himself, Dr. Carpenter opined: "the post mortem signs are not inconsistent with the time of death that is somewhat alluded to by the suspect." | 546. (Dr. Carpenter, May 8, 2026, report, at 8) |
| 547. | Dr. Carpenter testified that the period of time between when Osuna initially attacked and when the fatal cutting of the carotid occurred was unknown: "So you have the attack, and you have the unknown interval of time before the body was controlled, and the body lost consciousness, and then you have the estimate of the time of death between control and loss of consciousness." | 547. (Carpenter Depo. 27:13-17) |

| | | |
|---|---|---|
| 548. | Dr. Carpenter testified, "There is an interval period of time that is unknown until the body is overcome by stab wounds to the back of the neck." "So you have an attack. You have the unknown interval." | 548. (Carpenter Depo. 37:18-20, 40:6) |
| 549. | Dr. Carpenter acknowledged sounds that Romero could have made, "after a stab wound to the eye, the normal situation, one can expect vigorous defensive activity, wrestling, punching, kicking out, screaming, hollering, running away, activity. | 549. (Carpenter Depo. 90:23-91:1) |
| 550. | Osuna had time to carve "HaHa" on Romero's forehead, write in blood on the cell walls, hang a body part from the ceiling. | 550. (DEF 4334) |
| 551. | There is "evidence that the body was still alive at the time of these chest injuries." | 551. (Carpenter Initial Report at 5) |
| 552. | Alive at the time of chest wounds, means the chest wounds happened prior to the carotid artery being cut, in an unknown period likely to be characterized by "punching, kicking out, screaming, hollering, running away, activity." | 552. (Carpenter 90:23-91:1) |
| 553. | Both of Plaintiffs' correctional experts opine that this record compelled continued single-cell status and that the double-cell clearance departed from CDCR's own multi-factor framework. | 553. (Smith Rep. at 6–7; Parker Rep. at 24.) |
| 554. | According to Osuna, he "talked about homicidal ideation on 22 Forms, on sick call claims." | 554. (CDCR(OIG) 837) |
| 555. | CDCR's Mental Health Services Delivery System Program Guide expressly tasks the ICC mental health representative with assessing and | 555. (Smith Rep. at 7–9; Parker Supp. Rep. at 4–5.) |

| | | |
|---|---|---|
| | communicating "suitability for single or double celling" and "risk assessment for self-injurious or assaultive behavior," and CDCR's confidentiality-disclosure guidance requires clinicians to warn custody staff where a patient with a history of violence expresses intent to harm foreseeable victims. | |
| 556. | CDCR Policy Memorandum, "The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines for Disclosure," dated April 18, 2007, advises that the disclosure of confidential information to nonclinical staff is mandatory when the inmate "is homicidal, by virtue of either conduct or oral statements, and there is a reasonably identifiable victim." | 556. (The Parameters of Confidentiality of Inmate-Patient Communications and Guidelines for Disclosure," dated April 18, 2007 at p. 3.) |
| 557. | Kyle attended the January 22 ICC that decided whether Osuna could be housed with another person and volunteered none of her knowledge or opinions. The written record shows she painted a sunny picture of Osuna: "interactions with staff appear to be appropriate." | 557. (DEF 4385) |
| 558. | Osuna admitted "if I can kill (inaudible) cellmate, I would try," and that he "talked about homicidal ideation on 22 Forms, on sick call claims." (CDCR(OIG) 837) | 558. (DEF 821) (CDCR(OIG) 837) |
| 559. | Osuna told Kyle's "go-to-girl" Cazares. | 559. (CDCR (OIG) 838) |
| 560. | Loza was subjectively aware of the risk posed by Osuna but thought it did not matter because his focus was on Osuna's purported lack of in-cell violence "Determine Double Cell Compatibility" form requires other considerations, such as reason for | 560. (DEF 1044) |

| | | |
|---|---|---|
| | segregation, prior housing due to safety concerns and asking whether the inmate had a history of physical aggression "toward cellmates or other inmates?" | |
| 561. | Loza checked only Osuna's last ICC, he did not review the chrono or the basis for the double-cell determination. | 561. (Loza Depo. 57:5–12., 74:9–10) |
| 562. | Osuna and Romero were housed in Cell 46 at CSP-Corcoran Building 4A-1R. | 562. (DEF 9220) |
| 563. | Section A or "Alpha" section is segregated housing. | 563. (Burnes Depo. 37:3-4) |
| 564. | Sergeant Burnes confirmed that the "stakes are always higher" in a segregated unit and that rates of violence are higher there. | 564. (Burnes Depo. 57:22–58:1, 58:10–11.) |
| 565. | Peña knew the policy required visual confirmation of "live breathing flesh". | 565. (DEF 4359) |
| 566. | On March 9, 2019, Peña he did not have visual confirmation of "live breathing flesh", the cell was completely covered. | 566. (Peña Depo. 160:8-0) (DEF 4357) |
| 567. | Peña "continued on with safety checks at other cells instead." | 567. (Peña Depo. 159-160) |
| 568. | Peña relied on voices for assurance, rather than relying on a visual confirmation. | 568. (Peña Depo. 162: 7-11) |

| | | |
|---|---|---|
| 56 | [redacted] | |
| 57 | [redacted] | |
| 57 | [redacted] | |
| 57 | [redacted] | |
| 57 | [redacted] | |
| 57 | [redacted] | , |
| 57 | [redacted] | |
| 57 | [redacted] | |

Da [redacted]

Attorney for Plaintiff
DORA SOLARES