ROB BONTA, State Bar No. 202668
Attorney General of California
JAY GOLDMAN, State Bar No. 168141
Supervising Deputy Attorney General
JEREMY DUGGAN, State Bar No. 229854
Deputy Attorney General
DAVID KUCHINSKY, State Bar No. 292861
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone: (916) 210-6008
Fax: (916) 324-5205
E-mail: Jeremy.Duggan@doj.ca.gov
*Attorneys for Defendants*
*Burnes, Maytubby, Garcia, Gamboa, Loza,*
*Gallemore, Munoz, and Pena.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **DORA SOLARES,**<br>Plaintiff,<br>**v.**<br>**RALPH DIAZ, et al.,**<br>Defendants. | 1:20-CV-00323-LHR<br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br>Date: Sept. 11, 2026<br>Time: 9:00 a.m. (Pacific)<br>Courtroom: Zoom<br>Judge: The Honorable Lee H. Rosenthal<br>Action Filed: 3/02/2020 |

## TABLE OF CONTENTS


Page

Introduction ..... 1

I. Defendants Were Not Deliberately Indifferent to a Substantial Risk of Serious Harm to Romero (First, Second, And Fourth Claims for Relief) ..... 2

A. Standard for Deliberate Indifference ..... 2

B. Defendants Gamboa, Burnes, and Maytubby Were Not Deliberately Indifferent ..... 3

1. Plaintiff's supposed "mistakes" are not evidence that defendants knew of a substantial risk of serious harm from continuing Osuna's double cell status ..... 6

2. Plaintiff's arguments specific to defendant Burnes's knowledge fail ..... 8

3. Plaintiff's arguments specific to defendant Maytubby's knowledge fail ..... 9

4. Plaintiff's arguments specific to defendant Gamboa fail ..... 10

C. Defendants Lieutenant Munoz and Correctional Officer Loza were Not Deliberately Indifferent ..... 10

D. Gallemore, Garcia, and Pena Were Not Deliberately Indifferent ..... 12

1. Pena did not fail to take reasonable measures to address the window coverings in cell 46 ..... 13

2. Gallemore and Garcia appropriately relied on their floor officers to properly conduct cell checks and had no reason to think they were not doing so ..... 13

II. Plaintiff Cannot Establish That Romero's Murder Would Have Been Prevented by More Diligent Cell Checks and Cannot Establish Causation (First, Second, Fourth, and Fifth Claims for Relief) ..... 15

III. Defendants Are Entitled to Qualified Immunity ..... 17

A. Plaintiff Incorrectly Analyzes Qualified Immunity and Incorrectly Defines the Right at Issue ..... 17

B. Qualified Immunity Bars Plaintiff's Claims Against Burnes, Maytubby, Gamboa, Munoz, And Loza ..... 19

C. There Is No Clearly Established Right to Regular Cell Checks or for Cell Windows to Be Uncovered ..... 21

IV. Romero's Death Was Not Caused By Defendants' Breach of a Duty Under State Law (Fifth Claim for Relief) ..... 23

A. Defendants Burnes, Maytubby, Gamboa, Loza, and Munoz Are Not Liable for Wrongful Death ..... 23

B. Defendants Gallemore, Garcia, and Pena Are Not Liable for Wrongful Death ..... 24

V. Plaintiff Has Abandoned the Third and Sixth Causes of Action ..... 24

Conclusion ..... 24

## TABLE OF AUTHORITIES

**Page**

**CASES**


*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........ 15

*Castro v. County of Los Angeles*
833 F.3d at 1067 ........ 17, 19, 21

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986.) ........ 15

*City of Escondido v. Emmons*
586 U.S. 38 (2019) ........ 20

*Clem v. Lomeli*
566 F.3d 1177 (9th Cir. 2009) ........ 22, 23

*Clement v. Gomez*
298 F.3d 898 (9th Cir. 2002) ........ 18, 20

*Cunningham v. Gates*
229 F.3d 1271 (9th Cir. 2000) ........ 18

*Estate of Ford v. Ramirez-Palmer*
301 F.3d 1043 (9th Cir. 2002) ........ 19, 20, 21

*Farmer v. Brennan*
511 U.S. 825 (1994) ........ 2, 3, 4, 5

*Hampton v. California*
83 F.4th 754 (9th Cir. 2023) ........ 18, 19

*Hearns v. Terhune*
413 F.3d 1036 (9th Cir. 2005) ........ 21

*Horton by Horton v. City of Santa Maria*
915 F.3d 592 (9th Cir. 2019) ........ 20

*In re Sunset Bay Assoc.*
944 F.2d 1503 (9th Cir. 1991) ........ 9

*Labatad v. Corr. Corp. of Am.*
714 F.3d 1155 (9th Cir. 2013) ........ 4, 6, 11, 12

*Lemire v. Cal. Dep't of Corr. & Rehab.*
726 F.3d 1062 (9th Cir. 2013) ........ 3, 21, 22

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986) .......... 15

*May v. Baldwin*
109 F.3d 557 (9th Cir. 1997) .......... 20

*Mullenix v. Luna*
577 U.S. 7 (2015) .......... 18, 20

*Muniz v. Pfeiffer*
No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199 (E.D. Cal. Jan. 13, 2023) (recommendation adopted by order dated March 7, 2023) .......... 6, 11, 12

*Parsons v. Ryan*
754 F.3d 657 (9th Cir. 2023) .......... 18

*Peralta v. Dillard*
744 F.3d 1076 (9th Cir. 2014) .......... 5, 7

*Taylor v. List*
880 F.2d 1040 (9th Cir. 1989.) .......... 15

*Valencia v. Harris*
No. 1:10-CV-01725-MJS (PC), 2011 U.S. Dist. LEXIS 149410 (E.D. Cal. Dec. 28, 2011) .......... 3

*Wilk v. Neven*
956 F.3d 1143 (9th Cir. 2020) .......... 4

*Ziglar v. Abassi*
582 U.S. 120 (2015) .......... 20

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Eighth Amendment .......... 5, 18, 19
Fourteenth Amendment .......... 19

**COURT RULES**

Federal Rules of Civil Procedure
§ 12(b)(6) .......... 21
§ 56(a)(2) .......... 16
§ 56(e) .......... 16

## TABLE OF AUTHORITIES
**(continued)**

**Page**

Federal Rules of Evidence
§ 801 .......... 9
§ 803 .......... 9
§ 804 .......... 9
§ 804(b) .......... 9
§ 807 .......... 9

**OTHER AUTHORITIES**

California Code of Regulations, Title 15
§ 3269(d) (2019 version) .......... 6, 11

## INTRODUCTION

Plaintiff's opposition fails to demonstrate that there is a genuine dispute of material fact in this case and does not show that it would have been clear to every reasonable prison official that Defendants' conduct was unlawful.

The evidence shows that the Classification Defendants, Gamboa, Burnes, and Maytubby, reviewed Osuna's file and found that he did not pose a substantial risk of serious harm to a potential cellmate, and did not have any of the factors, such as in cell violence against a cellmate, and predatory behavior toward a cellmate, that CDCR considers for single celling. Defendants therefore continued Osuna's double cell status.

The evidence also shows that Defendants Loza reviewed Osuna and Romero's files, confirmed that they were compatible as cellmates, and that both were properly double cell cleared. Loza also arranged for Romero and Osuna to speak with one another from adjacent holding cells. After talking for half an hour, Romero and Osuna agreed to cell together and signed a document indicating their agreement. Loza signed the document and brought it to Munoz, who approved Romero and Osuna to be celled together.

Plaintiff argues that all of these Defendants were deliberately indifferent to a substantial risk of serious harm to Romero, that is, they knew of the substantial risk of serious harm to Romero, but disregarded that risk. Plaintiff concedes that there is no direct evidence that Defendants knew of such a risk, but argue that such knowledge can be shown as to these Defendants by circumstantial evidence showing that the substantial risk of serious harm was obvious. But the actual knowledge requirement remains — that is, to create a genuine issue of material fact, it is not enough for Plaintiff to provide evidence that Defendants should have known, or a reasonable officer would have known, of the existence of a substantial risk of serious harm. Instead, Plaintiff's circumstantial evidence must show that the substantial risk of serious harm was so obvious that it supports a finding that Defendants actually knew of that risk. Plaintiff's evidence cannot support such a finding, and summary judgment is appropriate.

The evidence also shows that Pena did not fail to take reasonable measures to address the window coverings, [redacted]

[redacted] Similarly, the evidence shows that Gallemore and Garcia were not subjectively aware of a risk of harm to Romero, as they could not tell whether the cell windows were completely obstructed, but they observed their floor officers conducting their safety checks as normal and had no reason to think they were not conducting them properly.

Plaintiff cannot establish that more diligent cell checks would have prevented the murder, and thus cannot prove causation, an essential element of her claims. Plaintiff references inadmissible hearsay and asks that a jury be allowed to speculate where no evidence exists for Plaintiff to sustain her burden. Plaintiff argues that because the sequence of events in cell 46 is unknown, a jury is essentially free to arrive at any conclusion they wish. This fails to satisfy Plaintiff's burden on summary judgment and the Court should grant Defendants' motion.

Moreover, Plaintiff incorrectly applies the qualified immunity analysis by defining the right at issue at a vastly overbroad and generalized level. Plaintiff cites to cases that are factually distinct from this case and argues that inmates have a clearly established right not to be left unsupervised for hours at a time, when no evidence of a lack of supervision exists in this case. The cases Plaintiff cites do not put every reasonable prison official in Defendants' position on notice that their conduct was unlawful. Defendants are entitled to qualified immunity.

## I. DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT TO A SUBSTANTIAL RISK OF SERIOUS HARM TO ROMERO (FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF).

### A. Standard for Deliberate Indifference.

In order to show that Defendants were deliberately indifferent to a substantial risk of serious harm to Romero, Plaintiff must set forth evidence that they were subjectively aware of that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not enough to show a defendant should have known of the risk—actual notice on the part of the prison official is required to show deliberate indifference. *Id.* at 837–38 and 843 n.8. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. *Id.* "Mere negligence in discovering [an] attack, or responding to it,

will not support a constitutional claim for deliberate indifference." *Valencia v. Harris,* No. 1:10-CV-01725-MJS (PC), 2011 U.S. Dist. LEXIS 149410, at *9 (E.D. Cal. Dec. 28, 2011).

### B. Defendants Gamboa, Burnes, And Maytubby Were Not Deliberately Indifferent.

Plaintiff asserts that Defendants Gamboa, Burnes, and Maytubby violated Romero's constitutional rights by continuing Osuna's double-cell status at a January 22, 2019 Institutional Classification Committee (ICC). (Pl.'s Opp'n at 30.) In their moving papers, Defendants pointed out that continuing Osuna's double-cell status was in accord with CDCR policies and was not deliberately indifferent. (Defs. Mem. of P. & A. at 7-12, ECF No. 294-2.) The committee reviewed Osuna's file and found that double-cell status was appropriate based on Osuna's factors and history, and therefore continued Osuna's double-cell status. (*Id.* at 9.) At no time before Romero's death was Burnes, Gamboa, or Maytubby aware that Osuna's double-cell status presented a substantial risk of serious harm to any inmate celled with Osuna. (*Id.* at 9, 11, 12.)

In opposition to summary judgment, Plaintiff argues that Defendants were deliberately indifferent because it supposedly was "obvious" under *Farmer*, 511 U.S. 825 (1994) that Osuna presented a substantial risk of serious harm to any cellmate. (Pl.'s Opp'n at 30.) *Farmer* requires a showing that the defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Obviousness can be used to show that the defendant had the required knowledge, but "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known." *Id.* at 843 n.8. Obviousness does not replace the actual knowledge requirement. *Id.* Instead, the circumstantial evidence must show that the substantial risk of serious harm at issue was so obvious that the Defendant <u>actually knew</u> that the substantial risk of serious harm existed, and therefore the actual knowledge requirement is satisfied. *Farmer,* 511 U.S. at 843, n.8. "Moreover, obviousness is not measured by what is obvious to a layman, but rather by what would be obvious 'in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved.'" *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013). So, to prevent summary judgment, the

circumstantial evidence must show that the substantial risk of serious harm at issue was so obvious to a reasonable prison official that the Defendant actually knew that the substantial risk of serious harm existed. *Farmer,* 511 U.S. at 843, n.8.

Evidence that is not sufficient to show that a Defendant actually knew of a substantial risk of serious harm includes evidence of an inmate's past violence against other inmates, and evidence that the two cellmates were in rival gangs. *See, e.g., Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1161 (9th Cir. 2013) (affirming summary judgment of no deliberate indifference in decision to house rival gang members together after one inmate had recently been in a fight with a member of his new cellmate's gang — no evidence that "any of the defendants or officials responsible for making the [cell] assignment were aware that [Plaintiff] faced a substantial risk of harm"). Evidence that may be sufficient to show that a Defendant actually knew of a substantial risk of serious harm includes evidence showing that a Defendant was told that an inmate had physically threatened another inmate, but the Defendant allowed them to be housed where they could have contact, resulting in an attack. *See Wilk v. Neven,* 956 F.3d 1143, 1146 (9th Cir. 2020) (reversing summary judgment).

Here, Plaintiff fails to produce sufficient circumstantial evidence for an obviousness finding. As set forth in Defendants' opening papers, [redacted] (Defs.' Mem. of P. & A. at 9.) Neither those factors, nor any of the information that Defendants reviewed, led them to believe that Osuna presented a substantial risk of serious harm to any potential cellmate. (*Id.* at 9, 11, 12.) And no information is cited in Plaintiff's opposition that would support the conclusion that any Defendant actually knew that Osuna presented a substantial risk of serious harm to any potential cellmate. (Pl.'s Opp'n at 28-33.) Instead, Plaintiff asserts that Defendants made "mistakes" such as applying an incorrect standard or overlooking information when deciding to double cell Osuna. (Pl.'s Opp'n at 30.) Defendants will address those "mistakes" below; suffice it to say here that none of Plaintiff's supposed mistakes shows that any Defendant actually knew that continuing Osuna's double cell status would cause a substantial risk of serious harm to any potential cellmate. Rather it is simply Plaintiff second-

guessing Defendants' process, which is irrelevant to deliberate indifference. *See Farmer,* 511 U.S. at 835-36; *Peralta v. Dillard*, 744 F.3d 1076, 1087 (9th Cir. 2014) ("[I]f a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk.' Because Peralta hasn't shown that Dillard had actual knowledge, judgment as a matter of law was appropriate." (internal citations omitted).)

Plaintiff highlights the following example from *Farmer*, believing it supports Plaintiff's position. It does not:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer,* 511 U.S. 842-43 (quoting respondents' brief). Here, rather than a "substantial risk of inmate attacks," the substantial risk that Defendants must actually know about for deliberate indifference to apply is whether there was "a substantial risk of serious harm to any potential cellmate from continuing Osuna's double cell status." Such a risk was not "longstanding, pervasive, well documented, or expressly noted by prison officials in the past" such that it would have been obvious to any reasonable correctional staff member.

Indeed, the evidence goes the other way: Defendants Burnes, Gamboa, Maytubby, Loza, and Munoz all reviewed Osuna's file and did not find a substantial risk of serious harm to any potential cellmate from continuing Osuna's double cell status. (Defs.' Statement of Undisputed Material Facts (DUF) Nos. 29, 43-45, 75, 79.) In addition, the two non-Defendant members of the January 22, 2019 ICC (Moreno and Randolph) did not find a substantial risk of serious harm to any potential cellmate from continuing Osuna's double cell status. (DUF Nos. 23-28.) And two other ICCs, on September 6, 2018 and September 25, 2018, approved Osuna's double cell status, indicating that they did not find a substantial risk of serious harm to any potential cellmate from Osuna being double cell cleared. (DUF Nos. 6, 19.) In other words, in the September 2018 to January 2019 time frame, at least 13 staff members reviewed Osuna's file, and none of them determined that Osuna presented a substantial risk of serious harm to a potential cellmate.

Plaintiff presents no evidence showing that Defendants actually knew that continuing Osuna's double cell status would result in a substantial risk of serious harm to any potential cellmate. This Court should grant summary judgment for Defendants Burnes, Maytubby, and Gamboa. *See, e.g., Labatad v. Corr. Corp. of Am*., 714 F.3d 1155, 1161 (9th Cir. 2013) (affirming summary judgment of no deliberate indifference in decision to house rival gang members together after one inmate had recently been in a fight with a member of his new cellmate's gang — no evidence that "any of the defendants or officials responsible for making the [cell] assignment were aware that [Plaintiff] faced a substantial risk of harm"); *Muniz v. Pfeiffer*, No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199, at *5 (E.D. Cal. Jan. 13, 2023) (recommendation adopted by order dated March 7, 2023) (granting summary judgment of no deliberate indifference for Defendants who approved double cell status for inmate who had history of violence).

**1. Plaintiff's Supposed "Mistakes" Are Not Evidence that Defendants Knew of a Substantial Risk of Serious Harm from Continuing Osuna's Double Cell Status.**

Plaintiff asserts that ICC Defendants made "key mistakes." (Pl.'s Opp'n at 30.) First, Plaintiff asserts that Defendants applied "an incorrect, over-narrow, single factor standard when a multi-factor test should have been applied to Osuna." (*Id.*) Essentially, according to Plaintiff, Defendants should not have focused on the factors CDCR lists as most important for single cell status, but should instead have applied an unidentified "multi-factor test." (*Id.*)

First, Defendants did review all of Osuna's factors at the January 22, 2019 ICC. (DUF Nos. 1-2, 22-29, Gamboa Decl. Ex. A (Classification Committee Chrono), ECF No. 294-10.) Defendants identified and reviewed the factors considered most important for single cell status under CDCR policy: "a history of in-cell abuse, significant in-cell violence towards a cell partner, verification of predatory behavior towards a cell partner, or [having] been victimized in-cell by another inmate." (DUF 25; Cal. Code Regs. tit. 15, § 3269(d) (2019 version).) And Defendants

reviewed Osuna's other factors to make a complete determination as to Osuna's housing. (DUF 1-2, 22-29; Gamboa Decl. ¶ 20; Burnes Decl. ¶ 16, ECF No. 294-9 (describing review of "all of Osuna's factors").)

Even if Plaintiff's assertion that the ICC Defendants should have reviewed additional factors or done a "multi-factor test" were true, it has no relevance to deliberate indifference. Plaintiff has failed to provide any evidence that Defendants knew of, and disregarded, a substantial risk of serious harm to a potential cellmate from continuing Osuna's double cell status. Defendants' supposed failure to apply Plaintiff's preferred (but unidentified) multi-factor test does not mean that they knew of, and disregarded a substantial risk.

[redacted]

[redacted]

[redacted]

Last, Plaintiff asserts that Defendants "overlooked" "mental health issues that made it obvious that [Osuna] should not share a cell." (Pl.'s Opp'n at 30.) Plaintiff does not identify the "mental health issues" that were supposedly overlooked. (Pl.'s Opp'n at 30-33.) Accordingly, this argument, unsupported by evidence, cannot prevent summary judgment.

**2. Plaintiff's Arguments Specific to Defendant Burnes's Knowledge Fail.**

[redacted]

[redacted]

### 3. Plaintiff's Arguments Specific to Defendant Maytubby's Knowledge Fail.

[redacted] hearsay — that is, they are out of court statements used to prove the truth of the matter asserted. Fed. R. Evid. 801. Hearsay is not evidence, and a party "cannot introduce hearsay to defeat a summary judgment motion." *In re Sunset Bay Assoc.,* 944 F.2d 1503, 1513-14 (9th Cir. 1991).

[redacted]

[redacted]

### 4. Plaintiff's Arguments Specific to Defendant Gamboa Fail.

Plaintiff asserts without support that Defendant Gamboa participated in the ICC "without reviewing the documents." (Pl.'s Opp'n at 33.) In fact Gamboa did review documents during the committee (Gamboa Decl. ¶ 6), and concluded that the factors that he reviewed did not warrant double cell status. (Gamboa Decl. ¶¶ 13-20.)

[redacted]

## C. Defendants Lieutenant Munoz And Correctional Officer Loza Were Not Deliberately Indifferent.

Plaintiff asserts that Defendants Loza and Munoz violated Romero's constitutional rights when they arranged for Romero and Osuna to meet as potential cellmates (Loza), and approved Romero and Osuna to cell together (Munoz). When Romero arrived at California State Prison, Corcoran, on March 7, 2019, Romero informed Loza that he was requesting a cellmate. (DUF 64.) Loza remembered that Osuna, who was already housed in the building, had also requested a cellmate. (DUF 64.) Loza reviewed Osuna's and Romero's central files and confirmed that there were no security concerns from housing the two together. (DUF 68.) Because they were compatible based on their central files, Loza moved on to the next step and placed Osuna in the holding cell next to Romero's holding cell so that the two could talk. (DUF 69.) After about half an hour, Loza returned and Romero and Osuna confirmed that they had agreed to be housed together in the same cell. (DUF 71.) Loza handed them an 1882-B form to sign, they both signed,

and Loza reviewed and signed the document himself. (DUF 72-73.) Loza then provided the 1882-B form to Lieutenant Munoz for his review. (DUF 73.)

After receiving the 1882-B form showing that Osuna and Romero had agreed to be cellmates, Lieutenant Munoz conducted his review of Osuna's and Romero's files and confirmed that they appeared to be compatible as cellmates. (DUF 76.) Munoz further reviewed their central files and disciplinary history to confirm that their double-cell status was correct under California Code of Regulations title 15, section 3269(d). (DUF 78.) Munoz did not find any facts in his review that prevented Osuna and Romero from celling together under CDCR policy. (DUF 79.) And neither Loza nor Munoz knew that being celled with Osuna presented a substantial risk of serious harm to Romero. (DUF 75, 79.) Thus, summary judgment for Defendants Loza and Munoz is appropriate.

[redacted]

*See, e.g., Labatad v. Corr. Corp. of Am.,* 714 F.3d 1155, 1161 (9th Cir. 2013) (affirming summary judgment of no deliberate indifference in decision to house rival gang members together after one inmate had recently been in a fight with a member of his new cellmate's gang)*; Muniz v. Pfeiffer,* No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199, at *5 (E.D. Cal. Jan. 13, 2023) (recommendation adopted by order dated March 7, 2023) (granting summary judgment based on no deliberate indifference for Defendants who approved double cell status for an inmate who had "documented history of violence").

In addition, Plaintiff asserts that the "Determine Double Cell Compatibility" form required Loza to review "additional considerations" beyond what he did review. (Pl.'s Opp'n at 34.) Loza's review (confirming compatibility, [redacted], that both were double cell

clear, and that there were no security concerns) was appropriate under Department Operations Manual section 54046.7.1. (*See* Loza Decl. ¶¶ 12-13.) Plaintiff cites a document Bates numbered DEF 1044 to support the claim that "additional considerations" were required. (*See* PUF 560.) While it does not appear that Plaintiff has submitted that document in the record (*See* Darling Decl. Ex. 1-63), Defendants' counsel has reviewed it and the document states that the "Approving Authority" should undertake those considerations — that is, the Lieutenant. (*See* PUF 560.) Moreover, even if Plaintiff were correct and Loza did not follow CDCR policy, that failure to follow policy would not show that he knew of a substantial risk of serious harm to Romero.

[redacted] *See, e.g., Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1161 (9th Cir. 2013)*; Muniz v. Pfeiffer*, No. 1:19-cv-00233-JLT-CDB (PC), 2023 U.S. Dist. LEXIS 7199, at *5 (E.D. Cal. Jan. 13, 2023).

[redacted]

Last, Plaintiff attempts to fault Munoz for not conducting an "independent review" of Osuna and Romero's cell status. (Pl.'s Opp'n at 34.) Munoz did conduct an independent review, and determined that Romero and Osuna were compatible, and that neither had factors preventing double cell clearance. (Munoz Decl. ¶¶ 15-23.) Plaintiff's assertion otherwise is unsupported.

**D. Gallemore, Garcia, and Pena Were Not Deliberately Indifferent.**

Plaintiff argues that once the windows in cell 46 were covered, partially or completely, staff were subjectively aware of a substantial risk of harm to Romero. (Pltf.'s Opp at 35.) Aside from citing to this Court's ruling on a motion to dismiss in this case, Plaintiff cites to no authority for such a proposition. Nor does such an argument taken into account the circumstances under which

the officers operated the unit. Plaintiff also argues that Pena disregarded the window coverings "for his entire shift" and that a jury could infer awareness of a substantial risk from "a lack of supervision for hours at a time." *Id.* at 36. This argument is not supported by the evidence here.

**1. Pena Did Not Fail to Take Reasonable Measures to Address the Window Coverings in Cell 46.**

Plaintiff argues that Pena left Romero "unsupervised in his cell for the eight hours of his shift" and that there was a lack of supervision for "several hours at a time." (Pltf.'s Opp. at 35-36.) But the evidence in this case does not show that Romero, Osuna, or anyone else in the unit was left unsupervised for hours at a time.

[redacted]

**2. Gallemore and Garcia Appropriately Relied on Their Floor Officers to Properly Conduct Cell Checks and Had No Reason to Think They Were Not Doing So.**

Plaintiff similarly argues that Gallemore and Garcia "suspected that cell 46 might be obscured" and failed to take any action. Plaintiff argues that Gallemore and Garcia "refused to verify underlying facts that [they] strongly suspected to be true…" but that is not what the evidence shows. Neither Gallemore nor Garcia could see if the windows into Cell 46 were fully obstructed. (UF ¶¶ 81-84, 90, 94, 98.) Instead, they relied upon their floor officers to conduct safety checks and report back if any issues had arisen. (UF ¶¶ 81-86, 95-96.) Gallemore and Garcia did not "do nothing" as Plaintiff claims. Instead, they provided coverage and observed

their floor officers conduct their safety checks as normal, stopping at the cells and shining the flashlight into the windows. (UF ¶¶ 90-92, 95-99.) Gallemore and Garcia had no reason to think that Silva or Pena could not see into the cell or had not verified that both Romero or Osuna were alive and breathing. (UF ¶¶ 90-93, 95-100.)

Gallemore saw some sort of obstruction in cell 46, he could not tell if the window was blocked and it "looked like you could see in that cell from that far side, the shower side," and it appeared to Gallemore that Silva was conducting his checks from that angle. (Pltf.'s Opp. at 19.) Gallemore observed Silva conducting his checks, including shining his flashlight into the window of the cell, and Silva told Gallemore that everything was "all good" after he had conducted each round of cell checks. (Pltf.'s Opp at 19-20.) Gallemore testified consistently that he believed Silva was appropriately conducting his cell checks, that Gallemore himself did not see anything out of the ordinary, and that he had no reason to send Silva back over to Cell 46 or any other cell in the unit. (UF ¶¶ 81-86, 88-93.) There was nothing about cell 46 that drew Gallemore's attention during the first watch shift. (*Id.*)

Similarly, the undisputed evidence in this case shows that Garcia saw Pena conducting safety checks in the housing unit as normal, including on Cell 46. (UF ¶¶ 94-100; Pltf.'s Opp. at 23.) Garcia could not tell whether the windows into Cell 46 were covered, and so he relied on Pena to conduct the checks and notify him if there were any issues. (UF ¶¶ 84, 98.) It is undisputed that Pena did not alert Garcia to any such issues and Garcia was not subjectively aware, nor did he have any reason to be aware, that there were any issues with Pena being able to properly conduct the safety checks. (UF ¶¶ 95-100.) [redacted]

Plaintiff's opposition does not create a genuine dispute of fact as to whether Gallemore or Garcia was subjectively aware of a substantial risk of harm to Romero. The evidence shows that Gallemore and Garcia observed their floor officers conducting cell checks as normal and it did not appear that either floor officer had any issues with cell 46. Gallemore and Garcia are entitled to judgment as a matter of law.

## II. Plaintiff Cannot Establish That Romero's Murder Would Have Been Prevented by More Diligent Cell Checks and Cannot Establish Causation (First, Second, Fourth, and Fifth Claims For Relief).

Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986.) Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324.

"This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Plaintiff must present affirmative, "concrete evidence from which a reasonable jury could return a verdict in his favor." *Anderson,* 477 U.S. at 256-57. "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989.)

Plaintiff argues that there is a dispute over what time Romero died and that this dispute precludes summary judgment. However, this argument does not address the causation issue as, regardless of what time Romero was killed, it is pure, unsupported speculation that Pena or Silva would have encountered the attack in progress and been able to save Romero.

This is especially so where Plaintiff's own expert concedes that the mechanism of death was a cut to the carotid artery which caused Romero to die with in two to five minutes, far less time than the required thirty-minute cell checks. (Carpenter Dep. 31:17-25, 33:10-12, 35:11-17, 35:23-25, 37:2-4, 56:14-16.) Plaintiff's expert Dr. Carpenter opined that there was an initial attack to the base of the neck and then, after an unknown interval of time, a fatal cut to the carotid artery. (*Id.*) But, Carpenter has made clear he cannot offer any opinion about the length of that interval of time.

Plaintiff fails to offer admissible or affirmative, concrete evidence and even acknowledges that he cannot do so, instead arguing that a jury should simply speculate to fill in the missing

evidence. (Pltf.'s Opp. at 24.) [redacted] the time of Romero's death is not evidence that Pena or Silva would have conducted their checks at exactly the time that Osuna attacked Romero or within enough time to stop Osuna from inflicting the fatal wound on Romero. The attack could have happened at 11:00 p.m., 1:00 a.m., or 6:00 a.m., and Plaintiff's evidentiary problem would be the same: there is no evidence by which a jury could conclude that Pena or Silva would have encountered the attack and been able to stop it.

Plaintiff's expert opined that Osuna initially attacked Romero and then fatally cut Romero's carotid artery, which he acknowledged caused Romero to die within two to five minutes. (Carpenter Dep. 31:17-25, 33:10-12.) But Carpenter was very clear that he did not know and had no way to know the length of the purported interval between initial attack and fatal carotid injury: "So you have the attack and you have the unknown interval of time before the body was controlled, and the body lost consciousness, and then you have the estimate of the time of death between control and loss of consciousness." (Carpenter Dep. 27:13-17.)

Carpenter further testified:

> So that unknown area from the attack at the beginning to the time the body is controlled and bleeding to death probably the best hypothesis. Bleeding to death is not known. I have no way of knowing that. I have no way of knowing from my own perspective when the stab wound to the eye occurred or when that five-inch across the front of the upper abdomen occurred. I cannot figure that out. I have no way to contribute to our understanding of what happened.

Carpenter Dep. 46:9-17.)

With the clear lack of evidence to establish causation, Plaintiff instead argues that a jury should simply speculate and draw whatever conclusions it wanted without evidence to support such a conclusion. "A trier of fact can decide that the time between initial attack and time the carotid artery was cut was sufficient for Silva or Pena to intervene, including during a safety check. A trier of fact can also decide that the sounds Romero made during such an attack should have prompted intervention." (Pltf.s' Opp. at 26-27.) Plaintiff fails to cite to any evidence that

would permit a jury to draw such a conclusion. There is no evidence that there were sounds of a struggle or that Romero made any sounds that indicated there was a need for intervention. And, though Plaintiff claims that the wounds to the chest would have been "likely to be characterized by punching, kicking out, screaming, hollering, running away, activity," there is no evidence that any such activity occurred.

There is no evidence to support Plaintiff's claim that any interval of time between an initial attack and the fatal wound was sufficient for either Pena or Silva to intervene. There is simply no evidence at all from which a jury could determine the length of any such interval. Failing to fulfill her burden of identifying concrete, specific evidence to show that Pena or Silva could have saved Romero, Plaintiff instead requests that the jury be permitted to speculate about what occurred inside of Cell 46 the night before Romero's body was discovered.

Plaintiff fails to satisfy her burden of producing affirmative, concrete evidence from which a jury could conclude that the interval of time between the purported initial attack and the fatal wound was long enough for Silva or Pena to intervene. This is insufficient to survive summary judgment, and Plaintiff cannot prove the essential element of causation for her deliberate indifference and negligence claims (First, Second, Fourth, and Fifth Claims for Relief). Accordingly, Defendants are entitled to summary judgment on the claim that more diligent cell checks would have saved Romero's life.

## III. Defendants Are Entitled To Qualified Immunity.

### A. Plaintiff Incorrectly Analyzes Qualified Immunity and Incorrectly Defines the Right at Issue.

Plaintiff's argument against qualified immunity defines the rights to be analyzed in a vastly overbroad and general way, defining them at the level of the constitutional right itself, which could be applied to any case in which there are allegations that officers were aware of a risk of harm to an inmate at the hands of another inmate. (Pltf.'s Opp. at 39-40.) Citing to *Castro v. County of Los Angeles*, Plaintiff incorrectly defines the right at issue as "the right to be free form violence at the hands of other inmates." (Pltf.'s Opp. at 39.) Plaintiff argues that "Castro is binding and supplies the level of generality here." (*Id.*)

But a clearly established right to be free from violence at the hands of other inmates would not have put every reasonable officer on notice that Defendants' alleged conduct violated Romero's constitutional rights. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The Court must analyze "whether the violative nature of the particular conduct is clearly established." *Mullenix*, 577 U.S. at 12. "The proper inquiry focuses on whether 'it would be clear to a reasonable officer that [the defendant's] conduct was unlawful in the situation confronted' … or whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.'" *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). The Court must conduct "an individualized analysis to determine whether each moving defendant [is] entitled to qualified immunity based on his or her actions." *Cunningham v. Gates*, 229 F.3d 1271, 1282 (9th Cir. 2000). "A court must carefully examine the specific factual allegations against each individual defendant …." *Id.* at 1287. "[A] district court must decide whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." *Id.* at 1286-87 (emphasis in original).

Plaintiff also cites to *Hampton v. California*, a case involving transfers due to the COVID-19 pandemic, which found a clearly established right to be "free from exposure to serious disease." However, in *Hampton*, the court acknowledged that defining the right at the constitutional level is not sufficient and "to be clearly established, the relevant right must have been defined more narrowly." *Hampton v. California*, 83 F.4th 754, 769 (9th Cir. 2023).

In defining the right at issue as the right to be free from disease, the Court discussed the cases which showed the right was clearly established. *Id.* at 769-70. Precedent indicated that it was an Eighth Amendment violation to expose an inmate to levels of secondhand tobacco smoke that posed an unreasonable risk of harm, to force an inmate to drink demonstrably unsafe drinking water, to fail to provide adequate ventilation and air flow, or to expose an inmate to asbestos without providing sufficient protective gear. *Id.* at 770. In addition, the Ninth Circuit quoted from *Parsons v. Ryan*, which held that "a prison's failure to provide prisoners with protection from infections diseases was firmly established in our constitutional law. *Id.* (citing *Parsons v. Ryan*, 754 F.3d 657, 664, 676 (9th Cir. 2023).) Taken as a body of existing case law, the Ninth Circuit

found that "all reasonable prison officials would have been on notice in 2020 that they could be held liable for exposing inmates to a serious disease, including a serious communicable disease. Although COVID-19 may have been unprecedented, the legal theory that Plaintiff asserts is not." *Id.* The contours of the right, regardless of the serious disease at issue, had been established through case law such that an officer in the position of the *Hampton* defendants would have been aware that they were violating an inmate's constitutional rights. *Id*.

**B. Qualified Immunity Bars Plaintiff's Claims Against Burnes, Maytubby, Gamboa, Munoz, And Loza.**

The Ninth Circuit in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002) addressed whether Defendants accused of improperly double cell clearing an inmate, and improperly double celling two inmates together, were entitled to qualified immunity. The panel found that "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being a risk of some harm to a substantial risk of serious harm." *Id.* at 1051. Therefore Defendants were entitled to qualified immunity. *Id.* As pointed out in Defendants' moving papers, in the years since, it has not been clearly established when the risk of harm from double-celling changes from being a risk of some harm to a substantial risk of serious harm. (Defs.' Mem. of P. & A. at 22-23.) In short, *Estate of Ford* is on all fours, and remains good law. (*Id.* at 22-25.) Applying *Estate of Ford* here, Defendants Burnes, Maytubby, Gamboa, Munoz, and Loza are entitled to qualified immunity. (*Id.* at 24-25.)

In opposition, Plaintiff argues that the Court should apply *Castro* rather than *Estate of Ford*, and asserts that *Castro* is authoritative. (Pl.'s Opp'n at 39, 41.) First, *Castro* is a Fourteenth Amendment pretrial detainee case, and does not apply to this Eighth Amendment matter. *Castro*, 833 F.3d at 1067. As stated in *Castro*, pretrial detainees have a Fourteenth Amendment "due process right to be free from violence from other inmates." *Id. Castro* did not "clearly establish" any rights for convicted prisoners, only pretrial detainees. And *Castro* does not set a standard for evaluating qualified immunity in Eighth Amendment deliberate indifference claims. Instead, *Castro* established that for Fourteenth Amendment pretrial detainee § 1983 claims in the Ninth

Circuit, an objective-only test is used for deliberate indifference. *Id.* at 1071. The Ninth Circuit continues to use *Estate of Ford* to evaluate qualified immunity in cases where the subjective prong of the deliberate indifference test applies. *See, e.g., Horton by Horton v. City of Santa Maria,* 915 F.3d 592, 600 (9th Cir. 2019) ("[I]n *Estate of Ford v. Ramirez-Palmer*, we recognized that deliberate indifference claims 'depend in part on a subjective test that does not fit easily with the qualified immunity inquiry,' which is an objective inquiry.").

Second, Castro's "right to be free from violence from other inmates" is improper under Supreme Court precedent. In *City of Escondido v. Emmons*, 586 U.S. 38, 41 (2019) the Supreme Court rejected the Ninth Circuit's holding that: "[t]he right to be free of excessive force" was clearly established. *Id.* "As we have explained many times: [1] 'Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Escondido,* 586 U.S. at 42. "Under our cases, the clearly established right must be defined with specificity. This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* (internal quotation marks omitted). Such broad definitions of the right defeat the purpose of qualified immunity — to give officials "breathing room to make mistaken judgments." *Ziglar v. Abassi,* 582 U.S. 120, 150–51 (2015). Under a "right to be free from violence from other inmates" definition, the qualified immunity defense disappears entirely.

Instead of broad, outcome-focused definitions of a right, such as "the right to be free of excessive force" and the "right to be free from violence from other inmates," the Court must analyze "whether the violative nature of the particular conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (emphasis added). "The proper inquiry focuses on whether 'it would be clear to a reasonable officer that [the defendant's] conduct was unlawful in the situation confronted' … or whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.'" *Clement*, 298 F.3d at 906.

Plaintiff bears the burden of demonstrating that the constitutional right in question was clearly established at the time officials acted. *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997). Here, Plaintiff must show that, given the available case law at the time, a reasonable officer,

knowing what the defendant knew, would have understood that double-cell clearing Osuna, or allowing Osuna and Romero to cell together, presented such a substantial risk of harm to Romero that the conduct was unconstitutional.

Plaintiff asserts that *Hearns v. Terhune*, 413 F.3d 1036, 1040–42 (9th Cir. 2005), clearly established the right here. (Pl.'s Opp'n at 40.) In *Hearns,* Plaintiff alleged he was stabbed when members of a rival group of Muslims were allowed in the chapel with him, unsupervised. *Id.* at 1039. The Ninth Circuit reversed the district court's dismissal on a Rule 12(b)(6) motion, and allowed the case to proceed to discovery. *Id.* at 1043. *Hearns* did not address double celling or double cell clearing inmates, and is irrelevant to Defendants' conduct.

Plaintiff also identifies *Castro* as clearly establishing the right. (Pl.'s Opp'n at 40.) In *Castro,* two intoxicated pretrial detainees, were placed in a sobering cell together. One of them, Gonzalez, was listed as "combative." Staff could not see or hear what occurred inside the cell, and Gonzalez attacked Castro, causing injuries. *Castro*, 833 F.3d at 1065. Again, this case does little to guide prison officials considering double-cell clearing prison inmates. While presently "combative" intoxicated people should not be placed in an unmonitored cell with others, that is not a situation typically encountered in prison.

The cases Plaintiff cites leave open the question first identified in *Estate of Ford* — when does a risk of *some* harm from double celling two inmates, or double cell clearing an inmate, become a substantial risk of serious harm? *See Estate of Ford,* 301 F.3d at 1051. Because it had not been clearly established, in early 2019, that Defendants' conduct in double cell clearing Osuna, or approving Osuna and Romero to house together, was unconstitutional, Defendants are entitled to qualified immunity.

### C. There Is No Clearly Established Right To Regular Cell Checks Or For Cell Windows To Be Uncovered.

Plaintiff frames the right at issue in her cell search claims incorrectly, arguing that "since 2013 it has been clearly established that prison officials may not leave inmates in specialized housing unsupervised for hours." (Pltf.'s Opp. at 42.) Plaintiff cites *Lemire*, in which officers left a prison housing unit entirely for more than three hours and did not supervise the floor or

conduct any security checks. *Lemore v. California Department of Corrections and Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013.) Plaintiff argues that it is a dispute of fact whether Romero and Osuna were left unsupervised, arguing that there were cell obstructions "to different extents." (Pltf.'s Opp. at 43.) Plaintiff quickly walks back the argument, stating that the officers "*effectively* left Romero unsupervised." (*Id.*)

However, the evidence in this case does not establish that Gallemore, Garcia, or Pena left 4A1R unsupervised for hours. (UF ¶¶ 81-112.) Instead, it shows that Gallemore remained in his control booth the entire shift, provided visual coverage for Silva, and observed Silva conducting safety checks as normal. (UF ¶¶ 81, 84, 88-93.) Similarly, Garcia remained in the control booth and supervised the unit, including observing Pena conducting his duties and safety checks, until Romero's body was discovered. (UF ¶¶ 84, 94-100.) [redacted]

Plaintiff also cites *Clem*, another case that bears insufficient factual similarly, to put every reasonable prison official on notice that Gallemore's, Garcia's, or Pena's conduct was unlawful. *Clem v. Lomeli*, 566 F.3d 1177 (9th Cir. 2009). In *Clem*, the plaintiff-inmate entered his cell to find his cellmate drunk and the cellmate told the plaintiff that he would kill the plaintiff and threatened to beat him. *Id.* at 1180. While a housing unit officer was at the plaintiff's cell conducting count, the plaintiff asked his housing unit officer to move him from the cell because the cellmate was drunk and threatening to kill him. *Id.* In response, the officer told the plaintiff to "deal with it" and continued with his count. *Id.* Shortly after the officer left, the cellmate attacked and severely injured the plaintiff. *Id.*

The Court reiterated the deliberate indifference standard and found that the instructions given at trial improperly added an element to the claim, requiring a jury to find that the housing unit officer took an affirmative action that caused the plaintiff's injuries, as opposed to "failing to take reasonable measures to abate a risk." *Id.* at 1181-1182. The Court then noted that the failure to act instruction "had foundation in the evidence" noting the evidence that the officer had heard the plaintiff's request for help before the beating and took no steps to abate it. *Id.* The court did not discuss qualified immunity or whether any right was established. Instead, it simply found that there was an instructional error which added an element to Plaintiff's claim and that the error was not harmless. *Id.* at 1183.

*Clem* is thus clearly distinguishable from the conduct and circumstances in this case. In *Clem*, the plaintiff specifically alerted the officer to the threat he had received and was immediately attacked after the officer walked away. Here, there is no evidence that any threat or danger was communicated to Gallemore, Garcia, or Pena. Gallemore and Garcia observed the unit to function as normal and had no reason to think that Romero faced a substantial risk of harm from Osuna. (UF ¶¶ 81, 84, 88-100.) [redacted] UF ¶¶ 107-112.) Because entirely different conduct is involved, *Clem* does not put every reasonable official on notice that Gallemore's, Garcia's, or Pena's conduct was unlawful.

## IV. ROMERO'S DEATH WAS NOT CAUSED BY DEFENDANTS' BREACH OF A DUTY UNDER STATE LAW (FIFTH CLAIM FOR RELIEF).

### A. Defendants Burnes, Maytubby, Gamboa, Loza, And Munoz Are Not Liable For Wrongful Death.

Defendants' moving papers pointed out that the classification and double cell Defendants did not expose Romero to a foreseeable risk of harm. (Defs.' Mem. of P. & A. at 26-28.) Instead, they properly followed CDCR policy clearing Osuna for double-celling and in housing Osuna and Romero together. (*Id.* at 26.) Plaintiff's opposition does not address the lack of foreseeable risk of harm as to these Defendants. (Pl.'s Opp'n at 44.) Summary judgment for Defendants is appropriate because they did not expose Romero to a foreseeable risk of harm.

### B. Defendants Gallemore, Garcia, And Pena Are Not Liable For Wrongful Death.

As discussed in detail above, Plaintiff cannot establish that the acts or omissions of Gallemore, Garcia, or Pena were the proximate cause of Romero's death. Plaintiff argues that staff left "cell 46 unsupervised for hours at a time," but that is not what the evidence in this case shows. (DUF ¶¶ 81-112.) Plaintiff also argues that the time of Romero's death is a factual dispute but fails to create a genuine dispute that staff would have encountered the attack while it was in progress and be able to save Romero. (Pl.'s Opp'n at 24.) Plaintiff concedes that she cannot offer any evidence to establish the length of any interval between a purported initial attack and the fatal injury to Romero's carotid artery. (Pl.'s Opp'n at 26-27.) Rather than provide any admissible or affirmative, concrete evidence to support her argument, Plaintiff asks that a jury speculate about what might or might not have occurred. Plaintiff offers no evidence to establish that any interval of time between an initial attack and the fatal wound was sufficient for staff to intervene. Defendants Gallemore, Garcia, and Pena are entitled to summary judgment on this claim.

## V. Plaintiff Has Abandoned The Third And Sixth Causes Of Action.

Plaintiff "will dismiss" her third and sixth causes of action. (Pl.'s Opp'n at 45.)

## CONCLUSION

The evidence shows that Defendants Burnes, Maytubby, Gamboa, Loza, and Munoz did not know of, and disregard, a substantial risk of serious harm to Romero. Summary judgment is appropriate. And the same Defendants are entitled to qualified immunity. It was not clearly established, in early 2019, that their conduct in clearing Osuna for double-cell, and approving Osuna and Romero to cell together, was unconstitutional.

[redacted] Gallemore and Garcia were not subjectively aware of a substantial risk of harm to Romero, as they observed their floor officers conduct regular safety checks without any apparent issues and had no reason to think that Romero

was in substantial danger. Plaintiff similarly has failed to present evidence to establish that more diligent cell checks would have prevented Romero's murder, instead offering only conclusory statements and speculation. Finally, because Plaintiff has failed to show that case law would have put every reasonable official in Defendants' positions on notice that their conduct was unlawful, Defendants are entitled to qualified immunity.

Dated: August 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JAY GOLDMAN
Supervising Deputy Attorney General

***/s/ Jeremy Duggan***
JEREMY DUGGAN
Deputy Attorney General
*Attorneys for Defendants*
*Burnes, Pena, Garcia, Loza, Gamboa, Gallemore, Maytubby, and Munoz*

SA2019101902
45232684_2